# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| **EUPHORIC, LLC.,** | ) | |
| **a Missouri limited liability corporation,** | ) | |
| | ) | |
| **And** | ) | |
| | ) | |
| **UNIKC, LLC,** | ) | |
| **a Missouri limited liability corporation,** | ) | |
| | ) | |
|    **Plaintiffs;** | ) | |
| | ) | |
|    **v.** | ) | **Case No. 25-CV-00023-RK** |
| | ) | |
| **WESTPORT COMMUNITY** | ) | |
| **IMPROVEMENT DISTRICT,** | ) | |
| **a non-profit Missouri corporation,** | ) | |
| **4128 BROADWAY, LLC.** | ) | |
| **a Missouri limited liability corporation,** | ) | |
| **FRANKLIN D. KIMBROUGH,** | ) | |
| **as an individual and in his official** | ) | |
| **capacity as a member of the Westport** | ) | |
| **Community Improvement District,** | ) | |
| **PAMELA PTACEK,** | ) | |
| **in her official capacity as a member of** | ) | |
| **the Westport Community Improvement** | ) | |
| **District,** | ) | |
| **MAX WASSERSTROM,** | ) | |
| **in his official capacity as a member of** | ) | |
| **the Westport Community Improvement** | ) | |
| **District,** | ) | |
| **ZACH MARTEN,** | ) | |
| **in his official capacity as a member of** | ) | |
| **the Westport Community Improvement** | ) | |
| **District,** | ) | |

PAUL MESLER, )
in his official capacity as a member of )
the Westport Community Improvement )
District, )
KYLE KELLY, )
in his official capacity as a member of )
the Westport Community Improvement )
District, )
LARRY GOLDMAN, )
in his official capacity as a member of )
the Westport Community Improvement )
District, )
BRETT ALLRED, )
as an individual and in his official )
capacity as a member of the Westport )
Community Improvement District, )
MATTHEW VOS, )
as an individual and in his official )
capacity as a member of the Westport )
Community Improvement District, )
JEREMY HURT, )
as an individual and in his official )
capacity as a member of the Westport )
Community Improvement District, )
CHRISTIE MONTAGUE, )
in her official capacity as a member of )
the Westport Community Improvement )
District, )
BRANDI DEGENHARDT, )
in her official capacity as a member of )
the Westport Community Improvement )
District, )
HAROLD BRODY, )
in his official capacity as a member of )
the Westport Community Improvement )
District, and )

**DREW SHADER,** )
**In his individual capacity and as a** )
**member of the Westport Community** )
**Improvement District,** )
)
    **Defendants.** )

## PLAINTIFFS' FIRST AMENDED COMPLAINT AND REQUEST FOR IMMEDIATE INJUNCTIVE AND DECLARATORY RELIEF

COMES NOW Plaintiffs, Euphoric, LLC., and Unikc, LLC, and for their

complaint against Defendants, states as follows:

### JURY TRIAL DEMANDED

### I. Introductory Statement

1. This is a civil action seeking loss of revenue and profits, compensatory

damages, and punitive damages for racial discrimination against Defendants

premised upon race-based discrimination in Plaintiffs being denied their rights to

make and enforce contracts and denied their rights to lease real property in the

Westport community in violation of 42 U.S.C. §§ 1981, 1982, 1985(3), and 1986

because of the race of Plaintiffs' owners, Black/African American, and because of a

false assumption that Plaintiffs' patrons, customers, and consumers would be

Black/African American. This action also seeks declaratory relief, immediate

possession of a property in controversy, and damages for breach of a legally

binding lease agreement without just cause. The collective actions of the

Defendants have and/or will tortiously interfere with Plaintiff Euphoric, LLC's

3

business expectancy of $70 million in revenue over the life of a ten-year lease and did detrimentally interfere with Plaintiff, Unikc, LLC's ability to sustain and profit from its business.

## II. Parties to the Proceeding

2. Plaintiff, Euphoric, LLC. (hereinafter "Euphoric"), is a limited liability corporation that was formed and registered in the State of Missouri, with its business address registered at 522 Locust Lane, Kansas City, Missouri 64106.

3. At all times relevant hereto, the owners, operators, agents and/or managers of Euphoric were and are Christopher Lee (hereinafter "Lee"), and Damion Johnson (herein after Johnson"), both individuals and residents of Kansas City, Jackson County, Missouri, in the Western District of Missouri. Lee and Johnson had the authority to enter and execute any and all contracts and/or lease agreements on behalf on Euphoric. Lee and Johnson are Black/African American males.

4. Plaintiff, Unikc, LLC., (hereinafter "Unikc"), is a limited liability corporation that was formed and registered in the State of Missouri, with its registered business address at 1116 Grand Boulevard, Kansas City, Missouri 64106.

5. At all times relevant hereto, the owner, operator, agent and/or manager of Unikc was D'Mario Gray, an individual and resident of Kansas City, Jackson County, Missouri, in the Western District of Missouri. D'Mario Gray (herein after

4

"Gray") and Frederick Vickers (herein after "Vickers") have the authority to enter and execute any and all contracts and/or lease agreements on behalf of Unikc. Gray and Vickers are Black/African American males.

6. Defendant, Westport Community Improvement District (hereinafter "CID"), is a nonprofit Missouri corporation, founded on March 22, 2002, with its principal place of business located at 4050 Pennsylvania Avenue, Suite M-100, Kansas City, Missouri 64111, and its registered agent listed as D and A Agency Services, Inc., 3145 Broadway Boulevard, Kansas City, Missouri 64111-2405.

7. At all times relevant hereto, the CID is and was the governing body of the Westport community which creates policies and procedures for the operations of businesses in the Westport community, who are members of the CID. The CID is responsible for implementing and addressing neighborhood-level planning issues to support the identity and common goals of the community of Westport, including, but not limited to, the physical use of each property in the Westport community.

8. At all times relevant hereto, the CID board consisted of 12 members (collectively hereinafter "CID Defendants") who govern the CID pursuant to its bylaws and articles of incorporation.

9. Defendant, Franklin D. Kimbrough, (hereinafter "Kimbrough"), an individual and Missouri citizen, is a board member and Executive Director of the CID, with a listed address in Independence, Jackson County, Missouri. Upon

5

information and belief, Kimbrough is a White/Caucasian male. Kimbrough is sued in his official capacity as a board member and Executive Director of the CID.

10. Defendant, Pamela Ptacek (hereinafter "Ptacek"), an individual and Missouri citizen, is a board member and Chairperson of the CID, who resides in Kansas City, Platte County, Missouri. Upon information and belief, Ptacek is a White/Caucasian female. Ptacek is sued in her official capacity as a board member and Chairperson of the CID.

11. Defendant, Max Wasserstrom (hereinafter "Wasserstrom"), an individual and Kansas citizen, is a board member and Vice Chairperson of the CID, who resides in Leawood, Johnson County, Kansas. Upon information and belief, Wasserstrom is a White/Caucasian male. Wasserstrom is sued in his official capacity as a board member and Vice Chairperson of the CID.

12. Defendant, Zach Marten (hereinafter "Marten"), an individual and Missouri citizen, is a board member and Treasurer of the CID, who resides in Kansas City, Jackson County, Missouri. Upon information and belief, Marten is a White/Caucasian male. Marten is sued in his official capacity as a board member of the CID.

13. Defendant, Paul Mesler (hereinafter "Mesler"), an individual and Missouri citizen, is the Secretary of the CID, who resides in Kansas City, Jackson

County, Missouri. Upon information and belief, Mesler is a White/Caucasian male. Mesler is sued in his official capacity as a board member of the CID.

14. Defendant, Kyle Kelly (hereinafter "Kelly"), an individual and Missouri citizen, is a board member of the CID, who resides in Kansas City, Jackson County, Missouri. Upon information and belief, Kelly is a White/Caucasian male. Kelly is sued in his official capacity as a board member of the CID.

15. Defendant, Larry Goldman (hereinafter "Goldman"), an individual and Kansas citizen, is a board member of the CID, who resides in Leawood, Johnson County, Kansas. Upon information and belief, Goldman is a White/Caucasian male. Goldman is sued in his official capacity as a board member of the CID.

16. Defendant, Brett Allred (hereinafter "Allred"), an individual and Missouri citizen, is a board member of the CID, who resides in Kansas City, Jackson County, Missouri. Upon information and belief, Allred is a White/Caucasian male. Allred is sued in his individual capacity, and in his official capacities as a board member of the CID.

17. Defendant, Matthew Vos (hereinafter "Vos"), an individual and Kansas citizen, is a board member of the CID, who resides in Missouri. Upon information and belief, Vos is a White/Caucasian male. Vos is sued in his individual capacity, and in his official capacities as a board member of the CID.

7

18. Defendant, Jeremy Hurt (hereinafter "Hurt"), an individual and Kansas citizen, is a board member of the CID, who resides in Wichita, Sedgwick County, Kansas. Upon information and belief, Hurt is a White/Caucasian male. Hurt is sued in his individual capacity, and in his official capacities as a board member of the CID.

19. Defendant, Christie Montague (hereinafter "Montague"), an individual and Kansas citizen, is a board member of the CID, who resides in Overland Park, Johnson County, Kansas. Upon information and belief, Montague is a White/Caucasian female. Montague is sued in her official capacity as a board member of the CID.

21. Defendant, Brandi Degenhardt (hereinafter "Degenhardt"), an individual and Kansas citizen, is a board member of the CID, who resides in Overland Park, Johnson County, Kansas. Upon information and belief, Degenhardt is a White/Caucasian female. Degenhardt is sued in her official capacity as a board member of the CID.

22. Defendant, 4128 Broadway, LLC., is and was at all times relevant hereto a limited liability corporation that was formed and registered in the State of Missouri, with its principal place of business located at the premises commonly known as 4128 Broadway Avenue, Kansas City, Missouri 64111, in the Western District of Missouri. The registered agent is listed as Halene Siegfried, 700

8

Fairways Circle, St. Louis, Missouri 63141-7525. 4128 Broadway, LLC, is a member of the CID.

23. Defendant, Harold Brody (hereinafter "Brody"), is an individual who resides in Danville, Contra Costa County, California. At all times relevant hereto, Brody was and is the managing member of 4128 Broadway, LLC. 4128 Broadway, LLC, is the owner of the property commonly known as 4128 Broadway Avenue, Kansas City, Missouri 64111, and Brody is the primary person with authority to enter and execute contracts, including but not limited to lease agreements, on behalf of 4128 Broadway, LLC. Upon information and belief, Brody is a White/Caucasian male. Brody is sued in his individual capacity, and in his official capacity as the owner, operator and managing member of 4128 Broadway, LLC.

### III. Jurisdiction and Venue

24. This action is brought pursuant to the Civil Rights Act of 1866, 42 U.S.C. §§ 1981, 1982, and 1985(3), and 1986, and the Civil Rights Act of 1968, 42 U.S.C. § 3604, as well as the Fifth and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1346, as this is a civil action arising under the Constitution, statutes, laws, or treaties of the United States, and the amount in controversy exceeds $75,000.00

25. This Court has supplemental jurisdiction over the state causes of action

9

pursuant to 28 U.S.C. § 1367 because the state claims are so related to the federal claims that they form the same case or controversy.

26. Venue is proper in the United States District Court for the Western District of Missouri, pursuant to 28 U.S.C. § 1391, because Plaintiffs are residents of Kansas City, Jackson County, Missouri, the property that is the subject of this Complaint is located at 4128 Broadway, Kansas City, Missouri, and the actions that occurred herein were all in the territorial jurisdiction of the Western District of Missouri.

27. Plaintiffs request a jury trial on all issues triable pursuant to Fed. R. Civ. P. 38(b).

## IV. Facts and Allegations Common to All Claims for Relief

### A. The CID's Responsibilities and Current Actions

28. The Westport community is a mixed-use district with more than 300 distinct business owners.

29. Of the 300 distinct business owners in the Westport community, Black/African American business owners are nearly nonexistent.

30. The Westport Community Improvement District (hereinafter "CID"), founded on March 22, 2002, is responsible for implementing and addressing neighborhood-level planning issues to support the identity and common goals of

10

the community of Westport, including, but not limited to, the physical use of each property in the Westport community.

31. At all times relevant hereto, the CID Board consisted of 12 members: Kimbrough, Ptacek, Wasserstrom, Marten, Mesler, Kelly, Goldman, Allred, Vos, Hurt, Montague, and Degenhardt.

32. Upon information and belief, all of the CID Defendants are White/ Caucasian individuals, and none of the CID Defendants are Black/African American individuals.

33. Many of the CID Defendants have also developed plans to open new bars and restaurants in the Westport community in the near future. With their own personal business development goals in mind, the CID Defendants are acting outside the scope of their responsibilities as CID board members by engaging in racial discrimination for their own economic gain.

34. Many of the CID Defendants have also developed plans to open new bars and restaurants in the Westport community in the near future.

35. At all times relevant hereto, each of the CID Defendants had authority to vote on the policies and procedures to be implemented in the Westport community, and each of the CID Defendants had the authority and/or ability to limit the availability of entrepreneurial opportunities for African American business owners

11

seeking to open new businesses in the Westport community by exercising the CID's duties in a discriminatory manner.

36. Written correspondence show that the CID Defendants are conspiring to make it nearly impossible for Black/African American business owners to exist in Westport, or to obtain and/or keep a liquor license as is required for operating such a business.

37. On an unknown date, at 7:50 pm, Allred composed a text message wherein he admitted that a group of property owners in the Westport community have formulated a plan to make several strategic moves to prevent "problematic" business owners/operators from existing in Westport, and for the purpose of eliminating "problematic" people from patronizing the Westport.

38. Section 67.1451 provides that each board member of the CID shall be an owner of real property or of a business operating within the district.

39. The group of property owners described in Allred's correspondence included all of the board members of the CID, in addition to property owners who are not board members of the CID.

40. One of the "strategic moves" made by Allred and the CID Defendants has been to contact owners of property in the Westport community and make it nearly impossible for African Americans to obtain and/or keep a lease for property in Westport.

12

41. The "strategic moves" made by the CID Defendants have merely disguised an agenda that has worked solely to the exclusion of minority business owners, and specifically Black/African American business owners.

42. The actions of the CID Defendants have created a pattern of discrimination on the basis of race and ethnicity and the exclusion of Black/African Americans and other racial and ethnic minorities from leasing property and/or operating businesses in the Westport community.

### B. History of Racial Discrimination in Westport

43. In the 1900's, several developers used a "red lining" map to ensure that Black/African Americans could not obtain property in the Westport and Plaza areas.

44. In 2019, Defendant Allred was found to have made a secret "No Play List," which excluded very popular songs made by Black/African American entertainers.

45. Allred's response to public criticism about the discovered racism in Westport resulted in Allred opening a nightclub that predominantly played hip hop music.

46. The nightclub opened by Allred that played hip-hop music operated under the name of Bridger's.

47. Bridger's was only open for a few years and was eventually closed by Allred.

48. Allred, a White/Caucasian business owner was allowed to open a hip-hop establishment to cater to Black/African American patrons, customers, and/or consumers, but the CID Defendants have conspired and developed a plan that has worked to prevent Black/African American business owners from opening any businesses at all.

49. The "No Play List" included 11 Black/African American artists, some of which were music's most popular stars like Beyonce, Jay-Z, Drake, Cardi B, Kendrick Lamar, Migos, and Travis Scott.

50. Many of the songs on the "No Play List" were extremely popular Top 10 Billboard hits.

51. After the secret "No Play List" was exposed and posted on social media, Allred responded publicly stating that the list of banned artists, which included Beyonce, incited violence.

52. Allred's actions clearly amounted to illegal discrimination to the exclusion of Black/African Americans from the Westport community.

53. A survey conducted by the University of Missouri reviewed 400 top Billboard songs released between 2006 and 2016 and concluded that pop music contains just as many references to violence as rap music.

14

54. Allred's explanation for his blatant racial discrimination is completely unfounded, and was even debunked by the University of Missouri's survey.

55. At all times relevant hereto, Allred conspired with, acted on behalf of, and acted in conjunction with the other CID Defendants to implement policies and procedures that resulted in racial discrimination and the exclusion of Black/African American individuals from the Westport community.

*C. Racial discrimination against Unikc, LLC.*

56. On April 6, 2021, Unikc, LLC. (hereinafter "Unikc"), a Missouri limited liability corporation registered in Missouri, entered into a lease agreement with DB Icehouse, LLC. (hereinafter "DB Icehouse") for the purpose of leasing commercial property in the Westport community at 4140 Pennsylvania Avenue, Kansas City, Missouri 64111 (hereinafter "4140 Pennsylvania"). The said Lease Agreement is attached hereto as Exhibit "B" and incorporated as if fully set forth herein.

57. The lease was entered into and signed by Fredrick Vickers on behalf of Unikc.

58. The lease agreed to between Unikc and DB Icehouse contained a no-compete clause that prohibited Unikc from selling pizza or competing with The Denver Biscuit, a business owned by Defendant Shader.

59. 4140 Pennsylvania is on the same street as the CID.

15

60. The primary managing member of Unikc was D'Mario Gray, a Black/African American citizen of Kansas City.

61. DB Icehouse identified itself as having two primary members, Joe Neibur and Greg Bartold.

62. Upon information and belief, Neibur and Bartold are both White/Caucasian individuals.

63. Upon execution of the lease, DB Icehouse delivered possession of 4140 Pennsylvania to Unikc and provided keys for Unikc to access the property and begin renovations in preparation for its grand opening.

64. Sometime thereafter, the owner of a neighboring business called the Denver Biscuit greeted Gray and casually asked Gray what he planned to do with 4140 Pennsylvania. Gray explained that he was opening a nightclub at the property.

65 Upon information and belief, the owner of the Denver Biscuit was a White/Caucasian individual.

66. Upon information and belief, after his encounter with Gray, the owner of the Denver Biscuit contacted representatives of DB Icehouse to discuss his displeasure with his new neighbor.

67. At the time of his encounter with Gray, the owner of Denver Biscuit had absolutely no information about Gray other than the fact that he was Black/African American.

16

68. The displeasure with Gray was solely due to his race, Black/African American.

69. The very next day, on October 12, 2021, Neibur emailed Gray and explained that he received a cease-and-desist letter regarding the lease that DB Icehouse had entered into with Unikc.

70. After receiving the email, Gray attempted to access 4140 Pennsylvania, but the locks had been changed.

71. Gray was locked out of the property that he had a contractual right to possess for no other reason than the fact that he is Black/African American.

72. At the time of the email and the landlord's decision to change the locks, Unikc had not violated any terms or conditions under his lease.

73. After consulting with his attorney, Gray sent a return email explaining that he had entered into a legally binding lease agreement, and he fully expected to proceed under the terms of the lease.

74. In subsequent conversations with Neibur and Bartold, Gray was told that several neighboring business owners, including the owner of the Denver Biscuit, did not want Gray's "type of crowd" to come to the Westport community and cause problems.

75. Unikc never had a chance to open its doors to determine what "type of crowd" the business would bring, because DB Icehouse paid Unikc $100,000.00 to

17

terminate its lease, walk away from the deal, and indemnify itself from any legal action resulting from the unwarranted termination of lease. Unikc paid $10,000.00 as a deposit.

76. Gray is a positive contributor to the community.

77. Gray recently held an anti-violence event called "Guns Down Gloves Up," for which even Kansas City Mayor Quinton Lucas took notice of and commended.

78. Gray has also done charity events wherein he gave away 500 Thanksgiving turkeys to the Kansas City community.

79. Despite Gray's positive contributions to the community, upon information and belief, Unikc was not allowed to exist merely because its owner and/or operator was Black/African American, and because of an unfounded assumption that Unikc's targeted patrons, customers, and consumers, would also be Black/African American.

**E. Illegal Discrimination Against Euphoric**

80. For nearly a decade, one of the bar/restaurants in the Westport community operated under the name Ale House.

81. Ale House was owned, operated and/or managed by Defendant Zach Marten and Brett Springs.

82. On April 9, 2024, Ale House closed its doors and ceased its business

18

operations.

83. Sometime after the closure of Ale House, Christopher Lee, owner of Euphoric, LLC, became aware of a leasing vacancy of the property where Ale House had previously been located.

84. The building and property that was opened and previously operating as Ale House is owned and/or leased by Defendant 4128 Broadway, LLC, and is a commercial building located at 4128 Broadway Avenue, Kansas City, Missouri 64111 ("the Restaurant").

85. The owner, manager, and/or landlord of the building and property for the Restaurant is Defendant Brody.

86. Upon learning of the vacancy of the Restaurant, Lee contacted Brody about entering a lease agreement for the Restaurant.

87. During talks and negotiations, Brody told Lee that Ale House earned revenues of about $7 million annually.

88. Euphoric relied on the representations of Brody and created a plan to put its new restaurant and bar in position to earn at least the same annual revenues of $7 million as Ale House, or more.

89. Although Ale House operated as more of a nightclub, Euphoric's intended purpose for the lease agreement was to reopen the building and do business as a new restaurant and bar.

19

90. Lee spent several weeks and days discussing his plans with Brody, and even took a trip to California to meet Brody at Brody's California residence.

91. During discussions, Lee informed Brody that his plans for the business concept would be very similar to that of Elevation Bar and Lounge in Jacksonville, Florida. Lee provided Brody with a copy of Euphoric's plans for the building, and a menu for the food that it would serve.

92. After reviewing the plans, Brody told Lee that he (Brody) liked the concept and would be willing to do business with Euphoric.

93. The agreement between Euphoric and 4128 Broadway, LLC. was set to operate as a profit-sharing partnership wherein Euphoric agreed to pay a monthly leasing fee to 4128 Broadway, LLC., in addition to paying 4128 Broadway, LLC. a percentage of Euphoric's profits.

94. On October 21, 2024, Euphoric and 4128 Broadway, LLC. entered into a lease agreement. Lee and Brody signed and executed the lease on behalf of Euphoric and 4128 Broadway, LLC. (Exhibit "Ex." A)

95. The most relevant terms of the lease were as follows:

a. Term of lease is ten (10) years, and such term shall commence at 12:01a.m. on October 21, 2024 "Commencement Date" and shall expire at midnight on the 31st day of October, 2034. (Ex. A, pg. 4)

b. Landlord shall use due diligence to give possession of the Premises to Tenant as

20

nearly as possible on or before the Commencement Date of the Term.

(Ex. A, pg. 4)

c. Upon delivery by Landlord to Tenant of possession of the Premises or the Commencement Date of the Lease, whichever is earlier, Tenant shall deliver to Landlord the sum of $10,000.00 as security for the performance by Tenant of every covenant and condition of this Lease. (Ex. A, pg. 3)

d. Sole Use as Restaurant and Bar. Tenant shall operate a restaurant and bar on the Premise and shall use the Premise for no other purpose. (Ex. A, pg. 4)

e. Tenant shall have the exclusive right to the use and quiet enjoyment of the Premise and Property during the Term. (Ex. A, pg. 7)

f. Tenant shall be in default under this lease if: (A) Tenant fails to pay any item of Rent when due; (B) Tenant fails to comply, with any warranty, covenant, agreement, stipulation, term, condition, or provision of this Lease; (C) Tenant abandons or vacates the Premises; (D) a petition is filed by or against Tenant under any section or chapter of the Federal Bankruptcy Act, as amended, or under any similar law or statute of the United States or any state thereof; (E) Tenant becomes insolvent or makes a transfer in fraud of creditors; (F) Tenant makes an assignment for benefit of creditors; or (G) a receiver is appointed for Tenant or any of the assets of Tenant. (Ex. A, pg. 11)

g. In the event of a default, Landlord may terminate the Lease and/or sue for

21

damages as provided by law if Tenant does not initiate and pursue with diligence the curing of such default within thirty (30) days after Tenant's receipt of written notice from Landlord describing the particular default. (Ex. A, pg. 11)

h. So long as Tenant is not in default, Tenant shall be entitled to the peaceful, quiet enjoyment of the possession of the Premises during the Term and any extension or renewal of this Lease. (Ex. A, pg. 12)

96. Euphoric tendered performance of its obligations under the Lease by delivering $10,000.00 to 4128 Broadway, LLC. on October 23, 2024. (Ex. B)

97. Under the terms of the lease agreement, Euphoric was, and still is, entitled to the peaceful, quiet enjoyment of the possession of the Restaurant.

98. On October 23, 2024, Brody created a group text message wherein he introduced Lee to Defendants Allred and Kimbrough and told them that he (Brody) and Lee had entered into a lease agreement for the Restaurant.

99. Because Brody lives in California, he instructed Allred and Kimbrough to provide Lee with access to the Restaurant.

100. On October 23, 2024 and in anticipation of having access to the Restaurant as promised by Brody, Euphoric announced the reopening of the Restaurant on social media and announced that the Restaurant was "Now Hiring."

101. In the posts, Euphoric invited several potential employees to meet at the Restaurant to receive an opportunity for employment upon opening.

102. The aforementioned Gray, who is also a popular local promoter who promotes under the name Rio Entertainment, posted on his social media about the Restaurant's reopening. Gray is a Black/African American promoter.

103. Mark Mullmore, who promotes under the name of Marks My Barber, also posted news of the reopening. Mullmore is a popular Black/African American promoter.

104. The social media posts instantly gained significant community attention and interaction. Gray's post alone had 29,003 views, 761 shares, 531 likes, 55 comments and 49 saves.

105. The CID Defendants became aware of the posts, and immediately began interfering with Euphoric's plan to open its Restaurant.

106. Allred began looking into the matter, and texted Mullmore to ask Mullmore if he was the person that entered into the lease for "Ale House," to which Mullmore responded that he was not.

107. After the social media posts were discovered, Allred and the CID Defendants developed plans to stop Euphoric's opening.

108. On the date of the hiring event, Brody, Allred and Kimbrough refused to give Euphoric the keys to the Restaurant.

109. Euphoric was forced to host its hiring event outside of the Restaurant.

23

110. Several of Euphoric's potential prospective employees left the event due to the disorganization.

111. People on social media were publicly humiliating and discrediting Euphoric by claiming that Euphoric did not really have permission to open the Restaurant and claiming that Euphoric was a fraud.

112. Brody and the CID Defendants refused to provide Euphoric with access to the Restaurant after Euphoric entered a legally binding lease agreement for the Restaurant, was promised access to the Restaurant, and after Euphoric represented to the public that it was hiring in anticipation of opening the Restaurant.

113. The actions of Brody and the CID Defendants caused Euphoric to experience severe public humiliation.

114. Euphoric later learned that when the social media posts announcing the Restaurant's reopening and hiring efforts were posted, the CID Defendants began conspiring to pressure Brody into stopping the Restaurant's reopening.

115. Sometime thereafter, Lee contacted Brody, and Brody informed Lee that he (Brody) had Allred on the other line of his phone.

116. Lee asked Brody to merge Allred into the call, and Brody initially informed Lee that Allred said he (Allred) did not want to talk Lee.

117. Brody informed Lee that Allred said: "I don't need to talk to him (Lee). I already know what he (Lee) is all about."

24

118. At that time, the only thing Allred knew about Lee was: (1) his name, (2) that he entered into a lease for the Restaurant, (3) that Lee was a Black/African American male, and (4) some of the social media posts advertising the hiring came from very popular Black/African American Kansas City promoters.

119. After some further conversations, Lee convinced Brody to merge Allred into a call with Lee.

120. Allred revealed to Lee that Allred and other Westport business owners did not want Euphoric's "type of crowd" on the Westport.

121. Allred stated concerns about security and business operations, but Allred's security concerns failed to consider Euphoric's plans for handling such concerns.

122. The CID Defendants assumed Euphoric's target audience was Black/African American patrons, customers, and/or consumers because of the posts by the two most popular Black/African American promoters in Kansas City.

123. During the conversation, Allred never truly provided Lee a fair chance to explain that he had plans for pursuing a diverse crowd of patrons, customers, and/or consumers that were not only Black/African American.

124. Upon entry of the lease, Euphoric had plans to implement sufficient security measures, but Euphoric was never given a chance to show that their

25

security measures would have been sufficient to sustain a successful, peaceful, and profitable business.

125. In historically familiar fashion, the CID Defendants deprived Euphoric of its right to make and execute contracts and its right to lease real property.

126. The CID Defendants committed these discriminatory acts before Euphoric even had a chance to open its doors, and with no evidence of any wrongdoing by Euphoric.

127. Sometime after the conversation with Allred, Lee asked Brody again to provide him (Lee) with the keys to the Restaurant.

128. Brody told Lee he was not giving Euphoric access to the Restaurant.

129. Brody told Lee that he needed to change the concept he had for the Restaurant, and that he needed to target "an older crowd" and "not that young hip hop crowd."

130. A typical "hip hop crowd" predominantly consists of Black/African American individuals.

131. To Plaintiff's knowledge, information, and belief, based on internet research and business dealings of the parties, all Defendants are White/Caucasian individuals and/or are owned and/or controlled by White/Caucasian individuals.

132. On November 15, 2024, Euphoric sent a Demand Letter, via certified mail, to Brody, 4128 Broadway, LLC., and their attorney.

26

133. Euphoric informed Brody and 4128 Broadway, LLC. that the parties had entered into a legally binding contract, that 4128 Broadway, LLC. was currently in breach of that contract, and that Euphoric demanded immediate possession of the Restaurant as agreed upon in the lease agreement. (Exhibit C)

134. As of the date of this complaint, Brody and/or 4128 Broadway, LLC. has never responded to Euphoric's Demand Letter.

135. At any time relevant hereto, Euphoric did not engage in any conduct described in the seven listed causes of default in the lease agreement.

136. As of the date of this Complaint, Euphoric has not received any notice of an alleged default from 4128 Broadway, LLC., or instructions to cure any such alleged default.

137. As of the date of this Complaint, 4128 Broadway, LLC. has refused to deliver possession of the Restaurant to Euphoric.

138. During the relevant time hereto that Euphoric was told to change its concept, White/Caucasian business owners are being allowed to own and operate the exact type of business that Euphoric seeks to operate.

139. Defendant Allred announced plans to open several new bars and restaurants in the Westport in 2024 and 2025.

140. Upon information and belief, a substantial motivating factor in Defendants' conspiracy to refuse and withhold the delivery of possession of the

27

Restaurant is/was that (1) Lee, Euphoric's owner, stock holder, operator, agent, and/or managing member, is a Black/African American individual, (2) the viral social media posts were made by popular Black/African American individuals, and (3) because of the CID's false assumption that Euphoric's targeted patrons, consumers, and/or customers would very likely be predominantly Black/African American individuals. Even if race was not the exclusive motivating factor, the CID's policies, procedures and actions in eliminating "problematic" owners has actually and predictable resulted in a practice or pattern of discrimination and has worked negatively to the exclusion of minority business owners from the Westport community.

141. The CID's discriminatory acts were also done as a tactic to receive a financial benefit for the companies for which the CID Defendants were and/or are owners, operators, stockholders, and/or managing members by decreasing competition and increasing their own revenues.

142. The Defendants herein acted with malicious intent, evil motive, and a reckless indifference to the statutory and constitutional rights of the Plaintiffs.

*E. Claims Against Defendants*

**CLAIM ONE – CIVIL CONSPIRACY (All Plaintiffs against All Defendants)**

143. Plaintiffs herein repeat, allege, and incorporate by reference, all facts set forth in paragraphs 1 through 142 as set forth here in full.

28

144. The CID was originated in 2002.

145. The CID Defendants met regularly to discuss several matters, including opportunities for new business in the Westport community.

146. The CID Defendants meet regularly to discuss improvements and the vision for Westport, and other property owners join those meetings on occasion.

147. Through CID meetings and other forms of communications, each of the Defendants had a meeting of the minds to discuss plans for excluding certain new business owners from existing in Westport and for making it difficult for existing businesses to keep their liquor licenses.

148. All Defendants herein entered an agreement to engage in a civil conspiracy for the purpose of eliminating the threat of strong competitors and Defendants acted to achieve the objective of maximizing profits for their own businesses in the Westport community.

149. All Defendants herein also entered an agreement to engage in a civil conspiracy for the purpose of stopping Black/African American business owner from opening new businesses in the Westport community to achieve the objective of ensuring that the Westport community is predominantly patronized by White/Caucasian patrons, customers, and/or consumers.

150. The Defendants entered an illegal conspiracy and took affirmative steps in furtherance of such conspiracy by contacting owners of property in the Westport

29

community and illegally and tortiously interfering with the contract rights of other potential, prospective business owners.

151. The actions of the Defendants has caused the Plaintiffs public humiliation, emotional distress, and financial damages which include loss of revenue and profits.

152. During CID meetings and through other forms of correspondence, Defendants Kimbrough, Ptacek, Wasserstrom, Marten, Mesler, Kelly, Goldman, Vos, Hurt, Montague, Degenhardt, Brody, and Shader, acting with others known and unknown to the Plaintiffs, joined the civil conspiracy by agreeing to the "strategic moves" described in the Allred's email, which included maneuvers and actions that were illegal under the law.

153. Defendants Allred and Kimbrough, acting with others known and unknown to the Plaintiffs, took affirmative steps in furtherance of the civil conspiracy by contacting property owners and encouraging them to terminate or refuse contracts or leases with the Plaintiffs herein by threatening to illegally interfere with Plaintiffs' rights to obtain and keep a liquor license.

154. Defendants Vos and Hurt, acting with others known and unknown to the Plaintiffs, took affirmative steps in furtherance of the civil conspiracy by denying the Plaintiffs an opportunity to exercise its right to make and enforce contracts and

its right to lease real property for illegal reasons, and for misrepresenting to the Plaintiffs the true reasons for denying the Plaintiffs a business opportunity.

155. Defendant Brody, acting with others known and unknown to the Plaintiffs, joined the civil conspiracy and took affirmative actions in furtherance of the conspiracy by contacting Euphoric, after entering a legally binding lease agreement, and attempting to terminate the lease for illegal reasons and without just cause.

156. Defendant Brody, acting with others known and unknown to the Plaintiffs, also joined the conspiracy and acted on behalf of and for the benefit of 4128 Broadway, LLC.

157. Defendant Shader, acting with others known and unknown to the Plaintiffs, joined the civil conspiracy by contacting DB Icehouse to encourage them to terminate the lease entered into by Unikc for illegal reasons and without just cause.

158. Defendant Shader, also joined the conspiracy and acted on behalf of and for the benefit of The Denver Biscuit.

159. Defendant Allred, also joined the conspiracy and acted on behalf of and for the benefit of Allred, Inc.

160. Defendants Vos and Hurt also joined the conspiracy and acted on behalf of and for the benefit of Westport Development.

31

**CLAIM TWO - DECLARATORY RELIEF ESTABLISHING PLAINTIFF'S RIGHT TO IMMEDIATE POSSESSION OF THE RESTAURANT AND DAMAGES FOR LOST REVENUE AND PROFITS (Plaintiff Euphoric Against Defendants 4128**

**Broadway, LLC. and Brody)**

161. Plaintiff herein repeats, alleges, and incorporates by reference, all facts set forth in paragraphs 1 through 160 as set forth here in full.

162. Mo. Rev. Stat. § 527.020 provides: "Any person interested under a deed, will, written contract or other writings constituting a contract, or whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status or other legal relations thereunder."

163. On October 21, 2024, Euphoric entered into a lease agreement with 4128 Broadway, LLC for the purpose of leasing a Restaurant.

164. Christopher Lee entered and signed the lease on behalf of Euphoric, and Harold Brody entered and signed the lease on behalf of 4128 Broadway, LLC. 208. Upon signing the lease, Euphoric tendered performance of its obligations under the lease by delivering $10,000.00 to 4128 Broadway, LLC on the same day.

32

165. Under the terms of the lease, 4128 Broadway, LLC was/is required to use due diligence to give possession of the Restaurant to Euphoric as nearly as possible on or before the Commencement Date of the lease. (Ex. A, pg. 1)

166. The lease also provided Euphoric with the exclusive right to the use and quiet enjoyment of the Restaurant during the term of the lease.

167. Since the commencement date of the lease, Euphoric has never received any notice of default from 4128 Broadway, LLC.

168. Euphoric is therefore entitled to immediate possession of the Restaurant under the terms of the lease agreement.

169. Euphoric anticipates revenues of $7 million annually (equivalent to $583,333.33 per month).

170. Defendant's refusal to deliver possession of the Restaurant has caused Euphoric to suffer significant monetary damages by the loss of revenue ~~and profits~~ in the amount of $583,333.33 per month.

171. Defendants' actions have also caused mental anguish and public humiliation.

172. Plaintiff herein seeks a declaration of its rights to immediate possession of the Restaurant, and a declaration of it rights to operate a restaurant and bar in the Westport community.

173. Plaintiff further seeks compensatory damages of $583,333.33 per month for lost revenue and profits, in addition to damages for humiliation, mental anguish, and punitive damages for racial discrimination.

**CLAIM TWO - BREACH OF CONTRACT (Plaintiff Euphoric Against Defendants 4128 Broadway, LLC. and Brody)**

174. Plaintiff herein repeats, alleges, and incorporates by reference, all facts set forth in paragraphs 1 through 173 as set forth here in full.

175. On October 21, 2024, Lee entered a Lease agreement with 4128 Broadway, LLC on behalf of Euphoric.

176. The Lease required Euphoric to deliver to 4128 Broadway, LLC the sum of $10,000.00 as security for the performance by Euphoric of every covenant and condition of the Lease.

177. Euphoric tendered performance of its obligations under the Lease by delivering to 4128 Broadway, LLC $10,000.00 at the time of the signing of the Lease.

178. Under the terms of the Lease, 4128 Broadway, LLC was required to use due diligence to give possession of the Restaurant to Euphoric as nearly as possible on or before the Commencement Date of the Lease.

179. As of the date of this complaint, 4128 Broadway, LLC has not performed its obligations under the lease, and has not delivered

34

possession of the Restaurant to Euphoric.

180. 4128 Broadway, LLC's failure to perform its obligation under the lease and deliver possession of the Restaurant to Euphoric places 4128 Broadway, LLC in violation and breach of the Lease agreement.

181. Under the terms of the Lease agreement, Euphoric anticipated annual revenues of $7 million.

182. The parties agreed that the Term of lease is ten (10) years, and such term shall commence at 12:01a.m. on October 21, 2024 "Commencement Date" and shall terminate at midnight on the 31st day of October 2034.

183. Euphoric therefore anticipated total revenues of $70 million over the life of the entire ten-year Lease.

184. Defendant's breach of contract has and will cause Euphoric to suffer damages as a result of lost revenue and profits.

185. Defendant's actions have also caused mental anguish and public humiliation.

**CLAIM THREE - ILLEGAL RACIAL DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1982 (All Plaintiffs Against All Defendants)**

186. Plaintiffs herein repeat, allege, and incorporate by reference all facts set forth in paragraphs 1 through 185 as set forth here in full.

187. Defendants engaged in illegal racial discrimination by interfering with and/or refusing to deliver possession of the Restaurant to Euphoric as agreed in the lease because of Defendants' desire to keep Black/African American business owners, patrons, customers, and/or consumers out of the Westport community.

188. Defendants engaged in illegal racial discrimination when they caused the Plaintiffs' business to fail through their refusal to allow the Plaintiffs to utilize the entire property they leased and refused to approve plans because of Defendants' desire to keep Black/African American business owners, patrons, customers, and/or consumers out of the Westport community.

189. Plaintiffs were denied the opportunity to lease properties in the Westport, which is a predominantly White community, because Plaintiffs' owners are Black/African American citizens and not White/Caucasian, and because of an assumption that their potential patrons, customers, and consumers could possibly be Black/African American.

190. 42 U.S.C. § 1982 provides: "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherent, purchase, lease, sell, hold, and convey real and personal property."

191. Defendant's actions have tortiously interfered with Plaintiffs' rights to lease real property under section 1982.

36

192. Defendants' illegal racial discrimination has and will cause Euphoric to suffer damages as a result of lost revenue and profits.

## CLAIM FOUR - CONSPIRACY TO COMMIT ILLEGAL RACIAL DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1985 (All Plaintiffs Against All Defendants)

193. Plaintiffs herein repeat, allege, and incorporate by reference all facts set forth in paragraphs 1 through 192 as set forth here in full.

194. During the time frames relevant hereto, the CID Defendants developed an illegal plan and agreement to prevent Black/African American entrepreneurs from opening and maintaining businesses in the Westport community. In furtherance of its plan, CID Defendants used their power in the Westport maliciously by actively contacting property owners on the Westport and pressuring them into terminating or refusing lease agreements to prospective tenants who are Black/African American individuals. The purpose of the CID's conspiracy is to deprive Black/African American business owners from the equal enjoyment of leasing property in the Westport community as a measure to decrease the amount of Black/African American patrons, customers, and/or consumers in the Westport community, and to ensure that the Westport community is predominantly patronized by White/Caucasian patrons, customers, and/or consumers.

37

195. During the time frames relevant hereto, the CID Defendants developed an illegal plan and agreement to prevent Black/African American entrepreneurs from opening and maintaining businesses in the Westport community.

196. The CID meets regularly and discusses plans for new businesses opening in Westport. In these CID meetings, all CID Defendants agreed to a plan that served to limit the existence of Black/African American business owners in the Westport community, and to make success extremely difficult for those that already existed.

197. Although some defendants took more noticeable actions than others, the CID itself, and every CID Defendant is liable for entering an illegal conspiracy to implement the racially discriminatory practices that have existed in Westport, and directly, detrimentally, and tortiously affected the Plaintiffs herein.

198. 42 U.S.C. § 1981(a) provides, in relevant part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . ." 243. 42 U.S.C. § 1982 provides: "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherent, purchase, lease, sell, hold, and convey real and personal property."

199. The actions of the Defendants caused Plaintiffs to be deprived of their lawful rights to lease property in violation of sections 1981 and 1982.

38

200. 42 U.S.C. § 1985(3) provides, in relevant part: "If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the dual protection of the laws, or of equal privileges and immunities under the laws . . . the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

201. Defendants' conspiracy to deprive Plaintiffs of the equal protection of the laws and privileges under federal law has caused and will cause Euphoric to suffer significant monetary damages by the loss of revenue and profits, and did cause the Plaintiffs' businesses to fail.

202. Defendants' conspiracy to deprive Plaintiffs of the equal protection of the laws and privileges under federal law has also caused mental anguish, public humiliation, and damage to the reputation of each Plaintiff's business.  Plaintiffs are also entitled to their attorney's fees and costs incurred in prosecuting this action.

## CLAIM FIVE - RACIAL DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981 (All Plaintiffs Against All Defendants)

203. Plaintiff herein repeats, alleges, and incorporates by reference, all facts set forth in paragraphs 1 through 202 as set forth here in full.

39

204. 42 U.S.C. § 1981(a) provides, in relevant part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . ."

205. The actions of the Defendants set forth above caused Plaintiffs to be deprived of their lawful rights to make and enforce contracts in violation of section 1981.

206. Defendants' conspiracy to deprive Plaintiffs of the equal protection of the laws and privileges under federal law and their rights to make and enforce contracts has also caused mental anguish, public humiliation, and damage to each of the Plaintiffs' reputations.

207. Defendants' conspiracy to deprive Plaintiffs of the equal protection of the laws and privileges under federal law and their rights to make and enforce contracts has caused and will cause Plaintiffs to suffer significant monetary damages by the loss of revenue and profits. Plaintiffs are also entitled to their attorney fees and costs incurred in prosecuting this claim.

## CLAIM SIX - FAILURE TO PREVENT RACIAL DISCRIMINATION CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1986 (All Plaintiffs Against All Defendants)

208. Plaintiffs herein repeat, allege, and incorporate by reference all facts set forth in paragraphs 1 through 207 as set forth here in full.

40

209. 42 U.S.C. § 1986 provides, in relevant part: "Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in the preceding section [42 USCS § 1985], are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act shall be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case;. . ."

210. Defendants' failure to stop the conspiracy to deprive Plaintiffs of the equal protection of the laws and privileges under federal law and their rights to make and enforce contracts has caused loss of revenue and profits, mental anguish, public humiliation, and damage to each of the Plaintiffs' reputations.

211. Defendants' failure to stop the illegal racial discrimination conspiracy deprived Plaintiffs of the equal protection of the laws and privileges under federal law and their rights to make and enforce contracts and to lease real property, which has caused and will cause Euphoric to suffer significant monetary damages by the loss of revenue and profits. Plaintiffs are also entitled to their attorney fees and costs incurred in prosecuting this claim.

# CLAIM SEVEN - TORTIOUS INTERFERENCE WITH PLAINTIFFS'

## CONTRACTS (All Plaintiffs Against All Defendants)

212. Plaintiffs herein repeat, allege, and incorporate by reference, all facts set forth in paragraphs 1 through 211 as set forth here in full.

213. Tortious interference is a common law tort which provides a claim for damages wherein an individual interferes with another's right to the entrance or enjoyment of a contract.

214. Each of the Plaintiffs had a valid lease contract for their respective properties.

215. The Defendants were aware of the contracts entered into between the Plaintiffs and their respective landlords.

216. Defendants intentionally interfered with the Plaintiffs contract by contacting the landlords and persuading them not to enter into any agreements with individuals who they thought would bring the "hip hop" crowd and African Americans to Westport.

217. As Plaintiffs had not violated the terms of their respective leases or disturbed any neighboring businesses, Defendants had no equitable or legal justification for interfering with any of the Plaintiffs' contracts.

218. Defendants' tortious interference with the Plaintiffs' contracts has deprived each of the Plaintiffs the equal privileges under the law to enter and

42

execute contracts, and has caused public humiliation, emotional distress, and financial damages which include loss of revenue and profits.

## CLAIM EIGHT - TORTIOUS INTERFERENCE WITH PLAINTIFFS' BUSINESS EXPECTANCY (All Plaintiffs Against All Defendants)

219. Plaintiffs herein repeat, allege, and incorporate by reference, all facts set forth in paragraphs 1 through 218 as set forth here in full.

220. Tortious interference is a common law tort which provides a claim for damages wherein an individual interferes with another's right to a business expectancy.

221. Each of the Plaintiffs had valid contract for their respective properties, and therefore had a reasonable expectation that the properties who h the leased would produce a profit.

222. The Defendants are mostly or all business owners with property on the Westport themselves, and each Defendant therefore has a direct knowledge about the amount of money that can be expected to be earned in the Westport community which is one of the most popular entertainment district in the Kansas City metropolitan area.

223. Defendants intentionally interfered with the Plaintiffs business expectancy by contacting the landlords and persuading them not to enter into any

43

agreements with individuals who they thought would bring the "hip hop" crowd to Westport.

224. As Plaintiffs had not violated the terms of their respective leases or disturbed any neighboring businesses, Defendants had no equitable or legal justification for interfering with any of the Plaintiffs' business expectancy.

225. Defendants' tortious interference with the Plaintiffs' business expectancy has deprived each the Plaintiffs the equal privileges under the law to enter and execute contracts, and has caused public humiliation, emotional distress, and financial damages which include loss of revenue and profits.

**CLAIM NINE - CONSPIRACY TO BREACH THE DUTY OF LOYALTY**

226. Plaintiffs herein repeat, allege, and incorporate by reference, all facts set forth in paragraphs 1 through 225 as set forth here in full.

227. The CID was originated in 2002.

228. The CID Defendants met regularly to discuss several matters, including opportunities for new business in the Westport community.

229. The Defendants entered an illegal conspiracy and took affirmative steps in furtherance of such conspiracy by contacting owners of property in the Westport community and make it nearly impossible for Black/African American business owners to obtain and/or keep a lease for property in the Westport.

44

230. The actions of the Defendants has caused the Plaintiffs public humiliation, emotional distress, and financial damages which include loss of revenue and profits.

**CLAIM TEN - CIVIL CONSPIRACY - (All Plaintiffs against All Defendants)**

231. Plaintiffs herein repeat, allege, and incorporate by reference, all facts set forth in paragraphs 1 through 230 as set forth here in full.

232. The CID Defendants meet regularly to discuss improvements and the vision for Westport, and other property owners join those meetings on occasion.

233. Through CID meetings and other forms of communications, each of the Defendants had a meeting of the minds to discuss plans for excluding certain new business owners who are Black/African American from existing in Westport and for making it difficult for existing businesses to keep their liquor licenses.

234. All Defendants herein entered an agreement to engage in a civil conspiracy for the purpose of eliminating the threat of strong African American competitors and Defendants acted to achieve the objective of maximizing profits for their own businesses in the Westport community.

235. All Defendants herein also entered an agreement to engage in a civil conspiracy for the purpose of stopping Black/African American business owners from opening new businesses in the Westport community to achieve the objective

of ensuring that the Westport community is predominantly patronized by White/Caucasian patrons, customers, and/or consumers.

236. Defendants contacted Plaintiffs' landlords and pressured the landlords to back out of leases with Plaintiffs by threatening to making it difficult for Plaintiffs to get and/or keep their liquor licenses.

237. Plaintiffs were damaged by the civil conspiracy herein and suffered public humiliation, mental anguish, and loss of revenue and profits.

## CLAIM ELEVEN - CONSPIRACY TO VIOLATE SHERMAN ACT, ANTITRUST, AND/OR TRADE LAW (All Plaintiffs against All Defendants)

238. Plaintiffs herein repeat, allege, and incorporate by reference, all facts set forth in paragraphs 1 through 237 as set forth here in full.

239. Mo. Rev. Stat. § 416.031.1 provides: "Every contract, combination or conspiracy in restraint of trade or commerce in this state is unlawful."

240. Mo. Rev. Stat § 416.031.2 provides: "It is unlawful to monopolize, attempt to monopolize, or conspire to monopolize trade or commerce in this state."

241. 15 U.S.C. § 1 provides: "Every contract, combination in the form of trust or otherwise, or conspiracy in the restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal."

242. All Defendants herein combined together to create strategies that allow them to own majority of the property in the Westport community, and to ensure

46

that their group of property owners also own and operate the majority of businesses in the Westport community.

243. The Defendants agreements amongst themselves have served to limit the number of competitors that are able to open businesses in the Westport community.

244. The Defendants object of limiting business competition and the Defendants actions of contacting and threatening landlords to breach Plaintiffs' lease agreements is illegal.

245. If Plaintiffs had been allowed to become owners of businesses in the Westport community, Plaintiffs would have been direct competitors to the Defendants.

246. Plaintiffs were damaged by the civil conspiracy herein and suffered public humiliation, mental anguish, and loss of revenue and profits.

## CLAIM TWELVE - ILLEGAL CONVERSION OF PROPERTY - (Plaintiff Euphoric against Defendants Brody and 4128 Broadway, LLC.)

247. Plaintiffs herein repeat, allege, and incorporate by reference, all facts set forth in paragraphs 1 through 246 as set forth here in full. On October 21, 2024, Euphoric entered into a legally binding lease agreement for the Restaurant with Defendant 4128 Broadway, LLC.

248. Under the terms of the lease, Euphoric was entitled to take immediate possession of the Restaurant after paying a deposit of $10,000.00

249. After signing the lease, Defendant refused to give Euphoric the keys to the Restaurant and further refused to deliver possession of the Restaurant.

250. Euphoric sent a demand letter to Defendant to request immediate possession, but Defendant continued in his refusal to deliver possession as agreed upon under the terms of the lease.

251. Defendant's refusal to deliver possession has caused Euphoric to suffer public humiliation, mental anguish, and loss of revenue and profits.

WHEREFORE, Plaintiffs Demand judgment against Defendants as follows:

A. Directing Defendants to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and prevent similar occurrences in the future; and add racial diversity to the CID by adding a minority or person of a different ethnic background other than White/Caucasian, to become a board member of the CID;

B. Award compensatory damages in an amount to be determined by the jury that would fully compensate Plaintiffs for their loss of revenue and profits, mental anguish, and public humiliation that has been caused by Defendants' racial discrimination;

C. Award punitive damages in an amount to be determined by the jury that would punish Defendants for their willful, wanton, reckless and discriminatory conduct described herein;

D. Award reasonable attorney's fees, litigation fees and costs associated with this lawsuit;

E. Order other such relief as the Court deems just and equitable.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial on all claims so triable.

Respectfully submitted,

LAW OFFICES OF DAVID S. RAUZI

/s/ David S. Rauzi
David S. Rauzi         MBA # 35702
204 West Linwood Boulevard
Kansas City, Missouri 64111
816-474-9969
816-470-9977 Fax
drauzi@att.net

ATTORNEY FOR PLAINTIFFS