# LEASE AGREEMENT

This **LEASE AGREEMENT** (the "**Lease**") is made and entered into as of this **October 1, 2021,** by and between **DB Icehouse LLC,** a Colorado limited liability company, having a mailing address: **524 S Tejon Street, Colorado Springs, CO 80903**, as the Landlord (the "**Landlord**"), and **UNIKC, LLC,** a Missouri limited liability company, as the Tenant (the "**Tenant**").

## W I T N E S S E T H:

**WHEREAS,** Landlord is the fee simple owner of that certain tract of real estate (the "**Land**") located at 4140-4144 Pennsylvania Avenue, Kansas City, Jackson County, Missouri 64111 more particularly described in **Exhibit A** annexed hereto and incorporated herein by this reference; and

**WHEREAS,** the Land is improved as a commercial office building, which shall be renovated and expanded as generally shown on Exhibit B; and

**WHEREAS,** Landlord desires to lease unto Tenant, and Tenant desires to lease from Landlord, certain leased premises which contains approximately 5,832 square feet to be known as 4140 Pennsylvania Avenue (the "**Premises**") in a building located at 4140-4144 Pennsylvania Avenue, 4141 Mill Street, and 426-428 West 42 Street, Kansas City, Missouri 64111(the "**Building**") which contains (or shall contain) approximately **13,903** square feet of area, and which Building & Premises is shown and identified on the **Exhibit B**.

**NOW, THEREFORE,** for and in consideration of the mutual covenants and agreements herein contained, Landlord and Tenant agree, covenant and provide, as follows:

**Section 1 -- Agreement to Lease Premises; Term; Annual Base Rent.**

(a) The Landlord, in consideration of the rents and agreements hereinafter reserved on the part of the Tenant to be paid and performed, does lease unto the Tenant for the "**Term**" hereinafter set forth, and the Tenant does hereby take for said Term, subject to the covenants and conditions hereinafter expressed (which the Tenant agrees to keep), the Premises;

TOGETHER WITH the privilege and license to the Tenant of using (in common with the other tenants and occupants of the Building, and subject to such rules and regulations as the Landlord may from time to time prescribe) the Common Facilities of the Building; AND TOGETHER with all equipment, and fixtures now or hereafter owned by the Landlord and located on the Premises and used exclusively for the operation and maintenance of the Premises (the "**Equipment**"); SUBJECT, however, to the matters of record listed on **Exhibit H**.

(b) The initial "**Term**" of the Lease shall be **five (5) years two (2) months**, the "**Commencement Date**" (as hereinafter defined in Section 3 hereof) and expiring on that day (the "**Expiration Date**") which is the day immediately preceding the sixty second (62) month of the Commencement Date (unless this Lease shall sooner terminate as hereinafter provided).

(c) For each year of the Term, Tenant agrees to and shall pay to Landlord an annual basic rental (hereinafter sometimes referred to as "**Annual Base Rent**") in accordance with the "**Annual Base Rent**

Schedule" annexed hereto as **Exhibit C** and incorporated herein by this reference, which Annual Base Rent is over and above the other and additional payments to be made by the Tenant as hereinafter provided.

(d) The Annual Base Rent shall be paid in equal monthly installments in accordance with the Annual Base Rent Schedule, in advance on the first day of each and every calendar month during the Term of this Lease. In the event any installment of Annual Base Rent is not paid by the tenth (l0th) of the calendar month, then: **(1)** the Tenant shall pay to Landlord a late charge of $750.00, which late charge Tenant agrees to pay to Landlord on demand as additional rent due hereunder, and **(2)** the unpaid rent amount shall bear interest at the per annum rate of ten percent (10%), from the due date thereof until paid, which interest charge Tenant agrees to pay to Landlord on demand as additional rent due hereunder. In addition, if any rent check of Tenant is returned for insufficient funds or otherwise not honored by any bank, then Tenant shall pay to Landlord a returned check fee of $50.00 per check, which returned check fee Tenant agrees to pay to Landlord on demand as additional rent due hereunder.

### Section 2 -- Landlord's Work.

(a) Landlord (at its cost and expense) shall substantially complete construction of the Building and the Common Facilities, to the extent of and all in accordance with the requirements and specifications of **Exhibit D** annexed hereto and incorporated herein by this reference (collectively, the **"Landlord's Work"**), **within 60 days of the execution of this lease**, subject to Force Majeure. Landlord shall give Tenant written notice (the Landlord's **"Completion and Availability Notice"**) of the Landlord's substantial completion of the Landlord's Work, and of the availability of the Leased Premises to Tenant for the performance by Tenant of its improvements to the Premises, which Completion and Availability Notice shall be deemed to be and shall constitute Landlord's delivery to Tenant of possession of the Premises. Tenant shall perform its improvements to the Leased Premises (the "Tenant Work") in accordance with the terms, conditions and requirements of Sections 17 & 18 of this Lease, and in accordance with the other applicable provisions of this Lease.

(b) If the Landlord shall be unable to substantially complete the Landlord's Work, and deliver possession of the Premises to Tenant, **within 60 days of the execution of this lease** (subject to Force Majeure), then the Tenant shall have the right, at any time prior to Landlord substantially completing Landlord's Work and giving the Tenant the Landlord's Completion and Availability Notice, to rescind and terminate this Lease, in which event Landlord shall refund to Tenant all rents and security deposits paid by Tenant to Landlord.

### Section 3 -- Rent Start Date; Commencement Date of Lease.

(a) The **"Rent Start Date"** is the dated that the lease is executed. The "Commencement Date" of the initial Term of the Lease is either: (1) the Rent Start Date, if the Rent Start Date is the first (1st) day of a calendar month, or (2) the first (1st) day of the month next immediately following the Rent Start Date, if the Rent Start Date is other than the first (1st) day of a calendar month. Upon the determination and establishment of the Commencement Date of the initial Term of this Lease, the parties shall execute a confirmatory memorandum and agreement which sets forth the Commencement Date and the Expiration Date of the initial Term of this Lease. For the purposes of this Lease, each **"Lease Year"** shall be the twelve (12) calendar month period commencing on the first (1st) day of the calendar month of the Commencement Date, and the first (1st) Lease Year hereunder shall be the twelve (12) calendar month period commencing on the Commencement Date.

**(b)** All Annual Base Rent and additional rent hereunder shall commence on, and shall be due and payable from and after, the Rent Start Date, prorated for any partial month. If the month of the Rent Start Date is a partial month, then the prorated monthly installment of Annual Base Rent payable for such month of the Rent Start Date shall be paid by Tenant to Landlord within five (5) days after the Rent Start Date, and the monthly rent installment paid by Tenant upon execution of this Lease shall be applied to the installment of Annual Base Rent for the first full calendar month during the Term.

**Section 4 -- Covenant to Pay Rent**. The Tenant covenants to pay, without notice or demand and without deduction or set-off for any reason whatsoever, the monthly installments of Annual Base Rent and all other rent, additional rent and other sums to be paid by Tenant as herein provided. The Tenant's obligations to pay the rent and additional rent amounts under this Lease shall survive the termination of this Lease. All rent and additional rent payments shall be paid to Landlord at its address stated above, or at such other address as Landlord may hereafter designate in writing.

**Section 5 -- Security Deposit.** Upon execution of this Lease, Tenant shall deposit with Landlord the Security Deposit in the amount of **$ 9,720.00** for the performance by Tenant of all terms, covenants and conditions of this Lease. It is expressly understood and agreed that such deposit is not an advance rental deposit or a measure of Landlord's damages in case of Tenant's default. If Tenant defaults with respect to any provision of this Lease, including, but not limited to, the provisions relating to the payment of rent or the obligation to repair and maintain the Premises or to perform any other term, covenant or condition contained herein, and such default continues beyond applicable notice and cure periods, Landlord may (but shall not be required to), without prejudice to any other remedy provided herein or provided by law and without notice to Tenant, use the Security Deposit, or any portion of it, to cure the default or to compensate Landlord for all damages sustained by Landlord resulting from Tenant's default. Tenant shall immediately on demand pay to Landlord a sum equivalent to the portion of the Security Deposit expended or applied by Landlord as provided in this Article 5 so as to maintain the Security Deposit in the sum initially deposited with Landlord. Although the Security Deposit shall be deemed the property of Landlord, if Tenant is not in default at the later of the expiration or termination of this Lease, Landlord shall return the Security Deposit to Tenant within sixty (60) days after the later of the termination or expiration of this Lease. Landlord shall not be required to keep the Security Deposit separate from its general funds and Tenant shall not be entitled to interest on any such deposit. Upon any sale or transfer of its interest in the Premises, Landlord may transfer the Security Deposit to its successor in interest and thereupon, Landlord shall be released from any liability or obligation with respect thereto.

**Section 6 -- Tenant's Use of Premises.** The Tenant agrees that it will use and occupy the Premises for the purpose of a **Bar** operation, and for incidental uses (the **"Permitted Use"**). Tenant agrees that it will not operate any other use whatsoever without the prior written consent of Landlord. In addition, the Tenant will not make or permit to be made any use of the Premises or any part thereof which would violate any of the covenants, agreements, terms, provisions and conditions of this Lease or which directly or indirectly is forbidden by public law, ordinance or governmental regulation or which may be dangerous to life, limb or property, or which may invalidate or increase the premium cost of any policy of insurance carried on the Buildings or covering its operation, or which will suffer or permit the Premises or any part thereof to be used in any manner or anything to be brought into or kept therein which, in the reasonable judgment of Landlord, shall in any way impair or tend to impair the character, reputation or appearance of the Buildings. Furthermore, Tenant shall be restricted for any of the following uses: (i) a Full-Service Breakfast Restaurant (as defined below) <u>excluding</u> (A) serving Weekend Brunch (as defined below) or (B) serving breakfast, lunch and dinner and that derive not more than thirty percent (30%) of gross revenue from its Full-Service Breakfast Restaurant operations (the **"Excluded Breakfast Service"**); or (ii) derive more than

thirty percent (30%) of gross revenue from the premises within the from the sale of pizza (collectively, **"Tenant's Restricted Use Right"**). In determining sales from a full-service breakfast restaurant operation, any sales from a weekend brunch will not be included.

**"Affiliate of Landlord"** means: (a) any person that controls (as defined below) Landlord; and (b) any entity that is controlled, directly or indirectly, by a person that controls Landlord.

**"Full Service Breakfast Restaurant"** means: (a) a restaurant; (b) that operates between any of the hours commencing at 7:00 am through 11:00 am; and (c) where patrons primarily (i) order their meal from wait-staff or bartender once seated at a table or bar; (ii) consume their meal at a table or bar; and (iii) pay for their meal from their table or bar location upon completion of their meal.

**"Weekend Brunch"** means the service of breakfast by a restaurant on Saturday and Sunday that is incidental to such restaurant's primary dinner and lunch service and, if applicable, the Excluded Breakfast Service.

**Section 7 – Utility, Trash Removal and Janitorial**. Tenant shall be solely responsible for and promptly pay all charges for heat, water, sewer, gas, electricity, telephone, CATV and other utilities used or consumed on the Premises. Tenant shall pay their pro-rata share for the removal and hauling of trash from the Premises. Tenant shall be solely responsible for janitorial services to the Premises. Landlord shall not be liable to Tenant for interference in or interruption of any utility service nor shall any curtailment or interruption constitute a constructive eviction or grounds for rental abatement in whole or in part hereunder; provided any curtailment or interruption is not caused by the negligence or willful misconduct of Landlord. In the event that any utilities are not separately metered to Tenant, then Tenant will reimburse Landlord, upon demand, for the cost to Landlord of utilities used or consumed on the Premises.

**Section 8 – Insurance by Tenant.** The Tenant, at the Tenant's sole cost and expense, shall maintain general public liability insurance against claims for personal injury, death or property damage occurring upon, in or about the Premises or any elevators or escalators therein and on, in or about the adjoining streets and passageways, if any, such insurance to afford protection to the limits of not less than $1,000,000 in respect to injury or death to a single person, $1,000,000 in respect to any one occurrence, and $1,000,000 in respect to property damage. Tenant shall also maintain workmen's compensation in the satisfactory amounts. Tenant's general public liability insurance shall be in form and substance satisfactory to the Landlord, shall be written with companies reasonably satisfactory to the Landlord in amounts satisfactory to the Landlord, and shall provide that they shall not be cancelable on less than ten (10) days' notice to the Landlord or holder of any mortgage, and shall name Landlord as an additional insured. Certificates of insurance shall be furnished to the Landlord upon written request from Landlord.

**Section 9 – Square Footage of Premises and Building; Tenant's Proportionate Share of Certain expenses.**

**(a)** Upon completion of construction of the Building in which the Premises is located, the Landlord's architect or engineer shall determine and certify in writing the actual square footage of the Premises. The Annual Base Rent under Section 1 hereof (in accordance with the **Exhibit C Annual Base Rent Schedule** annexed hereto) shall be determined based upon said actual square footage as so determined and certified.

**(b)** Upon completion of construction of the Building, the Landlord's architect or engineer shall determine and certify in writing the actual square footage of the completed Building.

**(c)** For the purposes of determining the Tenant' share of real estate taxes, insurance maintained by Landlord, and other common expenses of the Building, the Tenant's **"Proportionate Share"** is a fraction, **(i)** the numerator of which is the actual square footage of the Premises, as determined and certified Landlord's architect or engineer, and **(ii)** the denominator of which is the actual square footage of the completed Building, as determined and certified Landlord's architect or engineer.

**(d)** As used herein, **"square footage"** means the square footage of the applicable **"Area"**, as measured, determined and certified in writing by the Landlord's architect or engineer. For the purposes of this Lease, the **"square footage"** of an applicable **"Area"** shall be measured and determined, as follows:

> **(1)** In the case of a single tenancy floor, the area within the outside surfaces of the exterior walls of the Building, or

> **(2)** in the case of a multiple occupancy floor, the area within the outside surfaces of the exterior walls, and the center line of any party walls or corridor walls, as the case may be; in both cases computed by measurement as hereinafter set forth. Subtenants of the Tenant hereunder shall be disregarded in the determination of the area of the Premises hereunder, and shall be disregarded in the determination of whether a floor is a single tenancy floor or multiple occupancy floors for purposes of ascertaining the area of the Premises. The Area shall be computed by measuring from or to:

> **(3)** The outside surfaces of the exterior wall(s) (except that if it consists in whole or in part of glass, then to the outside surface of the exterior wall(s) holding such glass);

> **(4)** The center line of any wall(s) common to the Premises and to the enclosing walls of any area(s) to be excluded as hereinafter provided; and

**Section 10 -- Insurance by Landlord.** Landlord shall be responsible for obtaining, securing and paying all premiums for the following insurance (the **"Landlord's Insurance"**) during the Term hereof, to-wit: **(a)** broad form fire and extended coverage casualty insurance for full replacement value of all of the Building, and **(b)** comprehensive public liability insurance for the Common Facilities with such reasonable limits as the Landlord shall from time-to-time determine, such insurance naming the Landlord (and any additional parties as Landlord determines) as insured(s); provided, however, that Tenant shall reimburse to Landlord, as additional rent due and owing under this Lease, the Tenant's Proportionate Share of the amount(s) of the premiums for such Insurance applicable to the policy periods occurring during the Term hereof (the "Insurance Premiums"), as hereinafter provided. The proceeds of any such Insurance shall be the sole property of Landlord. Landlord, shall invoice Tenant monthly for one-twelfth (1/12th) of the Tenant's Proportionate Share of any such annual Insurance Premiums. Tenant agrees to and shall pay Landlord such invoiced amounts, which shall be due and payable within thirty (30) days after invoice. In the event that the sum of the Tenant's installment payments in respect to Insurance Premiums paid to Landlord for any applicable policy period shall be less than the actual amount of the Tenant's Proportionate Share of the Insurance Premiums for such policy period, then in such event Tenant shall upon Landlord's demand thereof forthwith remit to Landlord the amount of such deficiency. In the event that the sum of Tenant's monthly installment payments in respect to Insurance Premiums paid to Landlord in any applicable policy period shall exceed the actual amount of the Tenant's Proportionate Share of the Insurance Premiums for such policy period, then in such event Landlord shall, at its option, either refund the excess to Tenant or credit the amount of the excess toward Tenant's rent or additional rent obligations next becoming due under this Lease, except in the event of an excess at the end of the term or earlier termination in which

case Landlord shall refund the excess to Tenant. Upon Tenant's request from time to time therefor, Landlord agrees to provide Tenant with a copy of the insurance certificate(s) evidencing the Insurance and the invoice(s) stating the amount of the annual Insurance Premiums therefor. Landlord's general public liability policies shall provide that they shall not be cancelable on less than ten (10) days' notice to the Tenant, and shall name Tenant as an additional insured. Certificates of insurance shall be furnished to the Tenant upon written request from Tenant.

**Section 11 -- Mutual Waiver of Subrogation.** Landlord and Tenant hereby waive the rights each may have against the other on account of any loss or damage occasioned to Landlord or Tenant, as the case may be, their respective property, the Premises or its contents arising from any risk insured against by Landlord or Tenant; and the parties each, on behalf of their respective insurance companies insuring the property of either Landlord or Tenant against any such loss, waive any right of subrogation that it may have against Landlord or Tenant, as the case may be, except to the extent such loss or damage is the result of the negligence or willful misconduct of Landlord or Tenant. The release set forth in this Section shall apply only to the extent that such loss or damage is covered by insurance and only so long as the applicable insurance policies contain a clause or otherwise provide that this release shall not affect the right of the insured to recover under such policies.

**Section 12 -- Real Estate Taxes.** Landlord shall be responsible for the payment of the real estate taxes, assessments and other impositions (collectively "**Taxes**") levied against the Land and the Building during the Term hereof; provided, however, that Tenant shall reimburse to Landlord, as additional rent due and owing under this Lease, the Tenant's Proportionate Share of the amount (such amount to be prorated for any partial calendar year during the Term) of such Taxes, as hereinafter provided. Landlord shall invoice Tenant monthly for one-twelfth (1/12th) of the Tenant's Proportionate Share of the annual Taxes for the Land and the Building. Tenant agrees to and shall pay Landlord such invoiced amounts, which shall be due and payable within thirty (30) days after invoice. Within sixty (60) days after the end of each calendar year, Landlord shall provide Tenant with a detailed statement of the actual Taxes for such applicable year, together with a statement or other reconciliation of the Tenant's installment payments in respect to Taxes paid to Landlord for such applicable year. In the event that the sum of the Tenant's installment payments in respect to Taxes paid to Landlord for any applicable calendar year shall be less than the actual amount of the Tenant's Proportionate Share of the Taxes for such calendar year, then in such event Tenant shall upon Landlord's demand thereof forthwith remit to Landlord the amount of such deficiency. In the event that the sum of Tenant's installment payments in respect to Taxes paid to Landlord in any applicable calendar year shall exceed the actual amount of the Tenant's Proportionate Share of the Taxes for such calendar year, then in such event Landlord shall, at its option, either refund the excess to Tenant or credit the amount of the excess toward Tenant's rent or additional rent obligations next becoming due under this Lease, except in the event of an excess at the end of the term or earlier termination in which case Landlord shall refund the excess to Tenant. Upon Tenant's request from time to time therefor, Landlord agrees to provide Tenant with a copy of the paid tax bill for the Premises.

**Section 13 -- Repairs and Maintenance by Landlord; Common Area Maintenance; Operating Expenses**.

(a) The Landlord covenants, at its cost and expense (without reimbursement by Tenant), to and shall perform and provide for the following "**Landlord Maintenance**": (**1**) the upkeep, repair, maintenance and replacement of the roof, structural components and foundational components of the Building in which the Premises is located; and (**2**) the replacement of the roof, structural components and foundational components. Landlord shall be responsible for repair of any damage to the interior of the Premises caused by Landlord's neglect or lack of proper maintenance.

**(b)** The Landlord covenants, at its cost and expense (but subject to reimbursement by Tenant for Tenant's Proportionate Share of the cost thereof, as hereinafter provided), to and shall perform and provide for: **(1) "Building Maintenance"**, consisting of the upkeep, repair, and maintenance of the Building in which the Premises is located and Tenant's amortized share of capital improvements and replacements to the Building and/or the Premises as provided for in Section 13(c), except to the extent that any such Building Maintenance is the responsibility of Tenant under any of the provisions of this Lease, and other than any Landlord Maintenance which is governed by or covered the Landlord's obligation under Section 13(a) hereof; **(2) "Common Area Maintenance"** consisting of the upkeep, repair, and maintenance of Common Facilities of the Building, including (but not limited to): **(A)** lawn and shrubbery maintenance, **(B)** snow and ice removal from sidewalks, walkways, parking lots and driveways, **(C)** parking lot and driveway maintenance, **(D)** sidewalk and walkway maintenance, **(E)** common area lighting, including relamping and fixture maintenance, **(F)** trash removal for and cleaning of the Common Facilities, **(G)** installation, repair and replacement of directional and identification signage, **(H)** the cost of any security service obtained, or contracted for, or provided, by Landlord for the Building and **(I)** Tenant's amortized share of capital improvements and replacements to the Building Common Facilities as provided for in Section 13(c).

**(c)** The costs and expenses of Building Maintenance and Common Area Maintenance shall include, without limitation: reasonable wages and related employee benefits for employees; the cost of worker's compensation insurance for employee personnel; the cost of all labor, materials, services, supplies for the operation, maintenance and repair of the Building, and for the performance and provision by Landlord of the Building Maintenance and Common Area Maintenance. The costs and expenses of Building Maintenance and Common Area Maintenance (including, without limitation, all of the foregoing) are hereinafter referred to as the **"Operating Expenses"** of the Building. All Operating Expenses directly attributable to capital improvements and other items of a capital nature shall be amortized over the useful life of the applicable capital item in accordance with generally accepted accounting principles. Landlord may account for, calculate and determine the Operating Expenses for the Building based upon the Landlord's fiscal year, or based upon the calendar year, or based upon Lease Year(s), as Landlord shall determine. Notwithstanding anything herein to the contrary, Tenant shall have no responsibility for expenses for: (ii) any environmental remediation unless otherwise expressly set forth in this Lease; or (iii) repairs or replacements of items that are covered by the insurance required to be carried by Landlord under this Lease, or to the extent otherwise covered by insurance.

**(d)** The Common Facilities shall be under the exclusive control and management of Landlord, including such reasonable rules and regulations as Landlord may from time-to-time implement, including parking rules and regulations, which may, in reasonable Landlord's discretion, designate certain parking area(s) as exclusively reserved to certain specified tenant(s) of the Building. Landlord reserves to itself the right (at Landlord's sole cost and expense) to alter, add to, relocate, remove, and subtract from, the Common Facilities and/or the Building provided that the foregoing does not materially and adversely affect the use or visibility of the Premises.

**Section 14 -- Tenant's Proportionate Share of Operating Expenses**. Landlord shall be responsible for the payment of all Operating Expenses of the Building incurred during the Term hereof; provided, however, that Tenant shall reimburse to Landlord, as additional rent due and owing under this Lease, the Tenant's Proportionate Share of the amount of such Operating Expenses incurred during the Term hereof, as hereinafter provided. Landlord, shall estimate Operating Expenses in advance, and invoice Tenant monthly for one-twelfth (1/12th) of the Tenant's Proportionate Share of the annual Operating Expenses for the Building for the applicable fiscal year, calendar

year or Lease Year, as Landlord shall determine. Tenant agrees to and shall pay Landlord such invoiced amounts, which shall be due and payable within thirty (30) days after invoice. In the event that the sum of the Tenant's installment payments in respect to Operating Expenses paid to Landlord for any applicable year shall be less than the actual amount of the Tenant's Proportionate Share of the Operating Expenses for such year, then in such event Tenant shall within thirty (30) days of Landlord's demand thereof forthwith remit to Landlord the amount of such deficiency. In the event that the sum of Tenant's monthly installment payments in respect to Operating Expenses paid to Landlord for any applicable year shall exceed the actual amount of the Tenant's Proportionate Share of the Operating Expense for such year, then in such event Landlord shall, at its option, either refund the excess to Tenant or credit the amount of the excess toward Tenant's rent or additional rent obligations next becoming due under this Lease, except in the event of an excess at the end of the term or earlier termination in which case Landlord shall refund the excess to Tenant. Within sixty (60) days after the end of the applicable fiscal year, calendar year or Lease Year, whichever is applicable, the Landlord shall provide Tenant with a detailed statement of the actual Operating Expenses for such applicable year, together with a statement or other reconciliation of the Tenant's installment payments in respect to Operating Expenses paid to Landlord for such applicable year. On reasonable advance notice, Tenant may inspect the Landlord's books and records pertaining to Operating Expenses. Notwithstanding anything to the contrary herein, any increase in Tenant's Proportionate Share of Operating Expenses for any given Lease Year shall not exceed seven percent (7%) of the Tenant's Proportionate Share of Operating Expenses for the previous Lease Year excluding snow removal, taxes, and insurance.

**Section 15 -- Repairs and Maintenance by Tenant.**

(a) The Tenant covenants, at the Tenant's sole expense, to obtain and keep in place a standard service contract for all HVAC systems and equipment exclusively serving the Premises unless noted in Section 15(b), the plumbing and electrical systems exclusively serving and located within the Premises, and all other mechanical systems exclusively serving and located within the Premises, foreseen and unforeseen, routine or extraordinary, and also including repair, maintenance and replacement of all interior and exterior doors and glass, and to keep all of the same in good order and condition (collectively, **"Premises Maintenance"**). In addition, to the extent that any repairs, maintenance and replacements of the exterior, roof, structural components and foundational components of the Building in which the Premises is located are caused by or required as a result of any failure by Tenant to perform any of its Premises Maintenance obligations, then, to such extent, Tenant covenants, at the Tenant's sole expense, to promptly perform any such necessary and appropriate repairs, maintenance and replacements of the exterior, roof, structural components and foundational components of the Building in which the Premises is located. In addition, the Tenant, at its sole expense, covenants to keep the Premises in a clean and orderly condition and free of dirt and rubbish. In connection with the maintenance of any grease traps and/or grease interceptors installed pursuant to Section 16 hereof, Tenant shall, prior to the Commencement Date (and thereafter, upon Landlord's request or as otherwise required by any governmental agency having jurisdiction), provide Landlord with a copy of a maintenance agreement with a reputable grease rendering company which provides for the cleaning of all grease traps and/or grease inceptors on a Quarterly basis (or more often if required by any governmental agency having jurisdiction). Keep the sidewalk to the rear of their leased Premises free of debris and stains related to the operation of the restaurant, including without limitation,

liquid waste, grease and oil.  No cleaning products, dirty water, liquid waste, grease or oil shall be dumped on any area of the Building (including landscaped areas).

(b) Tenant shall be fully responsible for all HVAC maintenance and repairs.  Any replacement of the HVAC unit(s) during Tenants base term or extension options shall be the responsibility of the Landlord.

**Section 16 -- Compliance with Laws and Insurance Requirements.**

**(a)** Excepting and excluding any of the obligations of the Landlord under Section 13 hereof; the Tenant covenants that, during the Term hereof with respect to the Premises, the Tenant shall, at the Tenant's sole expense, promptly comply with all recommendations of any insurer, and with all laws, ordinances, requirements, rules regulations, and directives of all governmental agencies including, but not limited to, the Resource Conservation and Recovery Act, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (Superfund), the Americans with Disabilities Act (provided in no event, other than the Tenant Work, shall Tenant be required to make modifications to the Building or Property in connection with the foregoing, which shall be the sole responsibility of Landlord).  If the use of the Premises specified in Section 6 hereof contemplates the operation of a restaurant by Tenant in the Premises, or if otherwise required by Landlord or any governmental agency having jurisdiction, Tenant shall at its sole cost and expense install and continuously maintain grease traps and/or grease interceptors that Landlord reasonably deems necessary or desirable or that any governmental entity having jurisdiction shall deem necessary to handle liquid waste, including grease, oil or any material whatsoever which could damage, obstruct or overload any drainage, sewer or other systems.

**(b)** Notwithstanding anything to the contrary contained in this Section, Tenant shall have no responsibility, duty or obligation with respect to or by reason of any **"Hazardous Materials"** (as defined in Section 35 hereof) present or located at or on or upon or in Land, the Building or the Premises (or any part thereof) as of the date of this Lease or placed thereon by Landlord or third parties.

**Section 17 -- Changes and Alterations by Tenant.** The Tenant shall not make any changes or alterations, structural or otherwise, to the Premises without the Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Prior to commencing any changes or alterations to the Premises, Tenant shall submit to the Landlord detailed plans and specifications for such proposed changes or alterations, which plans shall be subject to the review and approval of Landlord, such approval not to be unreasonably withheld, conditioned or delayed.

**Section 18 -- Landlord's Conditions for Work Performed by Tenant.** All Tenant Work and/or work performed by or in behalf of Tenant for the making of repairs as required by Section 15 hereof, for complying with laws, ordinances, orders, regulations or requirements as required by Section 16 hereof, and for making changes or alterations permitted by Landlord pursuant to Section 17 hereof, shall in all cases be done and completed in accordance with the plans therefor approved by Landlord (which approval shall not be unreasonably withheld, conditioned or delayed), and in compliance with all applicable laws, rules, regulations, ordinances and building codes, and all applicable building permit and occupancy permit requirements, and in a first-class good and workmanlike manner, in accordance with sound and safe engineering and construction practices and standards, free from any mechanic's liens and construction defects, and shall be done and performed in all cases subject to such other reasonable conditions and requirements as the Landlord may impose (such as insurance and bonding requirements, escrow

disbursing requirements, and/or other security against mechanic's liens as may be reasonably required by Landlord).

**Section 19 -- Mechanic's Liens.** The Tenant shall not suffer or permit any mechanic's or other liens to be filed against the Land, the Building or the Premises, nor against the Tenant's leasehold interest in the Premises by reason of work, labor, services or materials supplied or claimed to have been supplied to the Tenant or anyone holding the Premises or any part thereof through or under the Tenant. The Landlord shall have the right at all reasonable times to post and keep posted on the Premises any notices which the Landlord may deem to be necessary or advisable for the protection of the Landlord and the Building or any part thereof from mechanics' liens. If any such mechanic's lien shall at any time be filed against the Premises, the Tenant shall cause the same to be discharged of record within twenty (20) days after the date of filing. If the Tenant shall fail to discharge such mechanic's lien within such period, then, in addition to any other right or remedy of the Landlord, the Landlord may, but shall not be obligated to, procure its discharge by paying the amount claimed to be due, or by deposit in court, or by bonding, and in any such event the Landlord shall be entitled, if the Landlord so elects, to compel the prosecution of an action for the foreclosure of such mechanic's lien by the lienor and to pay the amount of the judgment, if any, in favor of the lienor with interest, costs and allowances. Any amount paid by the Landlord for any of the aforesaid purposes, and all reasonable legal and other expenses of the Landlord, including reasonable counsel fees, with interest thereon at the rate of twelve percent (12%) per annum from the date of payment, shall be deemed additional rent hereunder and by payable by the Tenant to the Landlord on demand.

**Section 20 -- Signage.** Tenant shall not place on the outside of the Building any sign, advertisement, illumination or projection, unless Tenant shall first have obtained the written approval thereof by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed. All such signage installed by Tenant must be in compliance with Landlord's Building signage criteria, and all applicable requirements of all applicable governmental authorities having jurisdiction. If the Building has common sign(s) containing the names of the tenants in the Building, then Tenant shall have a license, in common with the other tenants of the Building, to install its signage upon the Building common sign(s), subject to such reasonable rules, regulations and sign criteria as the Landlord from time-to-time determines, and subject to the approval of Landlord as to the Tenant's signage, which approval shall not be unreasonably withheld, conditioned or delayed.

**Section 21 -- No Waste.** The Tenant covenants not to do or suffer any waste or damage, disfigurement or injury to the Premises or permits or suffers any overloading of the floors of the Premises or dispose of or allow the disposal of any liquid waste, including grease, oil or any material whatsoever which could damage, obstruct or overload any drainage, sewer or other systems.

**Section 22 -- Surrender of Premises; Holding Over.** The Tenant covenants that, upon termination of this Lease for any reason whatsoever, the Tenant will surrender to the Landlord the Premises, together with all improvements, alterations, replacements thereto, and the Equipment in good order, condition and repair, except for reasonable wear and tear, and except for casualty damage insured by the Landlord's Insurance; provided, however, that if Landlord requests Tenant to remove any improvements, additions or alterations installed by Tenant, then the Tenant shall remove same and restore the Premises to their condition prior to the installation thereof. Notwithstanding anything to the contrary contained in this Lease, (i) all personal property and trade fixtures installed by Tenant at the Premises shall remain the property of Tenant; and. (ii) Tenant shall retain title to and have the right to remove any improvements or fixtures, which are attached to the floor, walls or ceiling, bearing any trademark of Tenant prior to the

expiration or termination of this Lease, provided that Tenant covenants to repair any damage to the Premises caused by any such removal. Tenant covenants that it will vacate the Premises immediately upon the expiration or sooner termination of this Lease. If the Tenant retains possession of the Premises or any part thereof after the termination of the Term, the Tenant shall pay the Landlord rent at one hundred twenty five percent (125%) the then applicable monthly rental rate for the month in which the Term of this Lease terminates, for the time the Tenant thus remains in possession, however, the monthly rental shall remain the same if Landlord and Tenant have commenced negotiations to renew this Lease or enter into a new lease. If the Tenant remains in possession of the Premises, or any part thereof, after the termination of the Term, such holding over shall, at the election of the Landlord expressed in a written notice to the Tenant and not otherwise, constitute a renewal of this Lease on a month to month basis. The provisions of this Section do not exclude the Landlord's rights of re-entry or any other right hereunder, including without limitation, the right to refuse 125% of the monthly rent and instead to remove Tenant through summary proceedings for holding over beyond the expiration of the Term of this Lease.

**Section 23 -- Landlord's Right to Perform Tenant's Covenants.** The Tenant agrees and covenants that, if the Tenant shall at any time fail to make any payment or perform any other act on its part to be made or performed under this Lease, then the Landlord may upon ten (10) days prior notice to Tenant, but shall not be obligated to, and without waiving or releasing the Tenant from any obligation of the Tenant under this Lease, make such payment or perform such other act to the extent the Landlord may deem desirable, and in connection therewith to pay expenses and employ counsel. All sums so paid by the Landlord and all reasonable expenses directly incurred in connection therewith, together with interest thereon at the rate of twelve percent (12%) per annum from the date of such payment, shall be deemed additional rent hereunder and shall be payable by the Tenant to the Landlord on demand.

**Section 24 -- Landlord's Right to Enter Premises.** The Tenant agrees to permit the Landlord and any authorized representatives of the Landlord to enter the Premises upon at least twenty-four hours (24) prior notice to Tenant during Tenant's regular usual business hours or at any other time in case of emergency, to inspect the same (including, without limitation, the right to test for Hazardous Materials and liquid waste, including grease, oil or any material whatsoever which could damage, obstruct or overload any drainage, sewer or other systems) and if the Landlord shall desire, but without implying any obligation on the Landlord so to do, to make any repairs deemed necessary or desirable by the Landlord and to perform any work in the Premises deemed necessary by the Landlord to comply with any laws, ordinances, orders, regulations or requirements of any governmental authority or the recommendations of any insurer. During the progress of any such work, the Landlord may keep and store upon the Premises all necessary materials, tools and equipment to the extent doing so does not unreasonably interfere with Tenant's business. Tenant shall not be responsible for any loss or damage to Landlord's materials, tools and/or equipment kept or stored upon the Premises unless such loss or damages results from the negligence or willful misconduct of Tenant. The Landlord shall not in any event be liable for inconvenience, annoyance, disturbance, and loss of business or other damage to the Tenant.

**Section 25 -- Damage or Destruction.** The Tenant will promptly give written notice to Landlord of any damage to or destruction of the Premises by fire or other casualty. In the case of any damage to or destruction of the Premises or the Building in which the Premises is located by fire or other casualty, and if such damage or destruction cannot reasonably be repaired within one hundred twenty (120) days, then either Landlord or Tenant, shall have the right, by written notice to the other given within thirty (30) days after the date of such damage or destruction, to declare this Lease terminated effective as of the date of the casualty, and all rent shall be prorated to such date, and Landlord shall make a proportionate refund to Tenant of such rent as may have been paid in advance. If the Landlord and Tenant do not agree as to

the number of days required to repair the Premises, then the determination and certification of Landlord's independent architect shall be binding and conclusive on the parties. If the Lease is not so terminated, then the Landlord, at the Landlord's expense, shall, with due diligence and within one hundred twenty (120) days after the expiration of said thirty (30) day period (subject to Force Majeure), effect restoration of the Premises and the Building, and repair and rebuild the same, as nearly as possible to the condition the Premises were in immediately prior to such damage or destruction. Provided, however, that Landlord shall not be required to rebuild, repair or replace any part of the partitions, fixtures, additions and other improvements which may have been installed or placed in, on or about the Premises by Tenant. In the event of any damage or destruction, **(a)** all rent and additional rent amounts hereunder shall abate proportionately on such part of the Premises as may have been rendered wholly untenantable, from the date of casualty until such time as such part shall be fit for occupancy, and after which time the full amount of rent reserved in this Lease shall be payable as hereinbefore set forth, and **(b)** Landlord shall have no additional liability to Tenant, including but not limited to tenant improvements, lease value, loss of profits, etc. unless such damage or destruction results from Landlord's negligence or willful misconduct. Notwithstanding anything to the contrary herein, Tenant may terminate this Lease within thirty (30) days of any damage or destruction which renders twenty percent (20%) or more of the Premises unusable for Tenant's primary use if such damage or destruction occurs within the last Lease Year of the then current Lease Term. In such event, the Lease will be deemed terminated effective as of the date of such damage or destruction and Tenant shall have no further liability to Landlord.

**Section 26 -- Condemnation.** If the whole or any part of the Premises shall be taken under the power of the eminent domain, or shall be sold by the Landlord under threat of condemnation proceedings, then this Lease shall terminate as to the part so taken or sold on the day when Tenant is required to yield possession thereof, and, subject to the provision hereinafter set forth, Landlord shall make such repairs and alterations as may be necessary in order to restore the part not taken or sold to useful condition, and the rental hereinbefore specified shall be reduced proportionately as to the portion of tile Premises so taken or sold. If the amount of the Premises so taken or sold is such as to impair substantially the usefulness of the Premises for the purposes for which the same are hereby leased, then Tenant or Landlord shall have the option to terminate this Lease as of the date when Tenant is required to yield possession. Landlord shall notify Tenant of receipt of notice of condemnation. In any and all events, all compensation awarded or paid for any such taking or sale of the fee and the leasehold, or any part thereof, shall belong to and be the property of the Landlord, except for such part of such award as shall be made to Tenant for relocation of his business, or on account of the taking of fixtures installed by the Tenant, which shall not have become the property of the Landlord. Landlord shall have no further liability to Tenant, including but not limited to tenant improvements, lease value, loss of profits, etc.

**Section 27 -- Assignment and Subletting.**

**(a)** The Tenant agrees that the Tenant will not assign, transfer or mortgage this Lease or any right or interest therein or sublet the Premises or any part thereof, except in all such events upon the Landlord's written consent first obtained, which consent shall not be unreasonably withheld, conditioned or delayed. In addition, if Tenant is a corporation or other entity, then, for the purposes of this Lease, any transfer of stock or other ownership interests in Tenant which effects a change in control of Tenant shall constitute an assignment of this Lease, which Tenant covenants shall not occur without Landlord's prior written consent, which consent shall be unreasonably withheld, conditioned or delayed; provided that the foregoing shall be permitted without Landlord's consent in connection with the sale of Tenant's business provided that Guarantors (as defined in Exhibit G) shall remain liable under the Guaranty attached hereto as Exhibit D. Notwithstanding the foregoing or anything to the contrary herein, Tenant may, without

Landlord's approval, assign this lease to a parent, subsidiary, sister entity, or an Atomic Cowboy, Fat Sully's, or Denver Biscuit Company franchisee. No assignment or subletting made without the consent of Landlord shall relieve Tenant of its obligations hereunder, and Tenant shall continue to be liable as a principal, and not as a Guarantors or surety, to the same extent as though no assignment or sublease has been made. Consent by Landlord to an assignment or subletting in any one instance, shall not be deemed, construed or held to be consent to any additional assignment or subletting, but each successive act shall require similar consent of the Landlord.

**Section 28 -- Events of Default.** The following events shall be deemed to be events of default by Tenant under this Lease:

**(a)** Tenant shall fail to pay any installments of Annual Base Rent or additional rent when due, or any other payment or reimbursement to Landlord required herein when due, and such failure shall continue for a period of ten (10) days from the date such payment was due (such payment default beyond the grace period being hereinafter referred to as a "Payment Default"), and Tenant thereafter fails to cure such Payment Default within five (5) days after receipt of written default notice from Landlord to Tenant.

**(b)** Tenant shall: **(1)** apply for consent to the appointment of a receiver, trustee or liquidator of the Tenant or of all or a substantial part of its assets, **(2)** become insolvent or admit in writing its inability to pay its debts as they come due, **(3)** make a general assignment for the benefit of creditors, **(4)** file a petition or an answer seeking reorganization or arrangement with creditors or to take advantage of any insolvency law, other than the Federal Bankruptcy Code, **(5)** file an answer admitting the material allegations of a petition filed against the Tenant in any reorganization or insolvency proceedings, other than a proceeding commenced pursuant to the Federal Bankruptcy Code, or if any order, judgement or decree shall be entered by any court of competent jurisdiction, except for a bankruptcy court or a federal court sitting as a bankruptcy court, adjudicating the Tenant insolvent or approving a petition seeking reorganization of the Tenant or appointing a receiver, trustee or liquidator of the Tenant or of all or a substantial part of its assets, or **(6)** make a transfer in fraud of creditors.

**(c)** Tenant shall abandon or vacate any substantial portion of the Premises for a period of thirty (30) or more days;

**(d)** Tenant shall fail to discharge any lien placed upon the Premises in violation of Section 19 hereof within twenty (20) days after any such lien or encumbrance is filed against the Premises and such failure continues for five (5) business days after receipt of written notice.

**(e)** Tenant shall fail to comply with any term, provision or covenant of this Lease (other than an event of default covered by the foregoing provisions of this Section) and shall not cure such failure within thirty (30) days (or such longer period if the remedy cannot be completed within said period provided Tenant has commenced to cure the default within the period and diligently pursues same to completion) after written notice thereof by Landlord to Tenant.

**Section 29 -- Landlord's Remedies on Default.** Upon the occurrence of any of such events of default described in Section 28 hereof, Landlord shall have the option to pursue either or both of the following remedies, or any other rights or remedies of Landlord at law or in equity, as Landlord shall elect, to-wit:

**(a)** Terminate this Lease by giving to the Tenant a notice of intention to end the Term of this Lease specifying a day not earlier than ten (10) days thereafter, and upon the giving of such notice the Term of

this Lease and all right, title and interest of the Tenant hereunder shall expire as fully and completely on the day so specified as if that day were the date herein specifically fixed for the expiration of the Term, whereupon, Tenant shall immediately surrender the Premises to Landlord, and, if Tenant fails so to do, Landlord may, without prejudice to any other remedy which it may have for possession or arrearages in rent, additional rent, or other charges, enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying such Premises or any part thereof, by force if necessary, without being liable for prosecution or any claim of damages therefor, except to the extent such damage results from the negligence or willful misconduct of Landlord; and Tenant agrees to pay to Landlord on demand the amount of all loss and damage which Landlord may suffer by reason of such termination, whether through inability to relet the Premises on satisfactory terms or otherwise.

**(b)** Enter upon and take possession of the Premises without terminating this Lease and expel or remove Tenant and any other person who may be occupying such Premises or any part thereof, by force if necessary, without being liable for prosecution or any claim for damages therefor, and without terminating this Lease or releasing Tenant from its obligations hereunder for the full Term hereof, endeavor to relet the Premises for the account of Tenant for such time and upon such terms as the Landlord shall determine, and receive the rent therefor. In any case of reletting hereunder, the Landlord may make repairs, alterations and additions in or to the Premises, and redecorate the same to the extent deemed by Landlord necessary or desirable, and the Tenant shall, upon demand, pay the cost thereof, together with the Landlord's expenses of the reletting. If the consideration collected by the Landlord upon any such reletting for Tenant's account is not sufficient to pay monthly the full amount of the rent, additional rent and other charges reserved in this Lease, together with the cost of repairs, alterations, additions, redecorating and the Landlord's expenses, the Tenant shall pay to the Landlord the amount of each monthly deficiency upon demand. In the event Landlord is successful in reletting the Premises at a rental in excess of that agreed to be paid by Tenant pursuant to the terms of this Lease, Landlord and Tenant each mutually agree that Tenant shall not be entitled, under any circumstances, to such excess rental, and Tenant does hereby specifically waive any claim to such excess rental.

**Section 30 -- Tenant Waivers; Additional Provisions Regarding Tenant's Default and Landlord's Remedies.** The Tenant hereby expressly waives the service of notice of intention to re-enter provided for in any statute, or to institute legal proceedings to that end, and also waives any and all right or redemption in case the Tenant shall be disposed by a judgement or by warrant of any court or judge. The Landlord and Tenant hereby waive trial by jury in any action, proceeding or counterclaim brought by either party against the other on any matters arising out of or in connection with this Lease, the relationship of Landlord and Tenant hereunder, the Premises or the Tenant's use or occupancy thereof. The terms "enter", "entry", or "re-entry" as used in this Lease are not restricted to their technical legal meaning. In the event of the employment of an attorney by Landlord because of violation by Tenant for default or enforcement of any provisions under this Lease, including failure to pay rent hereunder, when and as due, the prevailing party shall pay the reasonable attorney's fees of the other party, together with all other reasonable cost and expenses incurred in connection therewith.

**Section 31 -- Landlord's Remedies Cumulative; No Waiver by Landlord.** The specified remedies to which the Landlord may resort under the terms of this Lease are cumulative and are not intended to be exclusive of any other remedies or means of redress to which the Landlord may be entitled, either by law or in equity, in case of any breach or threatened breach by the Tenant of any covenant, agreement or condition of this Lease. The failure of the Landlord to insist in any one or more cases upon the strict performance or observance of any of the covenants, agreements or conditions of this Lease or to exercise any option herein contained shall not be construed as a waiver for the future of such covenant, agreement, condition

or option. A receipt by the Landlord of rent with knowledge of the breach of any covenant, agreement or condition hereof shall not be deemed a waiver of such breach, and no waiver by the Landlord of any covenant, agreement or condition of this Lease shall be deemed to have been made unless expressed in writing and signed by the Landlord. In addition to the other remedies in this Lease provided, the Landlord shall be entitled to the restraint by injunction of the violation, or attempted or threatened violation, of any of the covenants, agreements or conditions of this Lease. No receipt of moneys by Landlord from Tenant after the termination or cancellation hereof in any lawful manner shall reinstate, continue or extend the Term hereof, or affect any notice theretofore given to Tenant, or operate as a waiver of the right of Landlord to enforce the payment of rent or additional rent or other charges then due or thereafter falling due, or operate as a waiver of the right of Landlord to recover possession of the Premises by proper suit, action proceedings or remedy; it being agreed that, after the service of notice to terminate or cancel this Lease, and the expiration of the time therein specified, if the default has not been cured in the meantime, or after the commencement of suit, action or summary proceedings or of any other remedy, or after a final order, warrant or judgment for the possession of the Premises, Landlord may demand, receive and collect any moneys then due, or thereafter becoming due, without in any manner affecting such notice, proceeding, suit, action, order, warrant or judgment and any and all such moneys so collected shall be deemed to be payment on account for the use and occupation of the Premises, or at the election of Landlord, on account of Tenant's liability hereunder. Acceptance of the keys to the Premises, or any similar act, by Landlord, or any agent or employee of Landlord during the Term hereof, shall not be deemed to be an acceptance of a surrender of the Premises unless Landlord shall consent thereto in writing.

**Section 32 -- Notice to and Rights of Landlord and of Mortgagees.** In the event of any act or omission by the Landlord which would give the Tenant the right to terminate this Lease, the Tenant shall not exercise any such right: (a) until it shall have given written notice, by certified mail, of such act or omission to Landlord and to the holder(s) of any deed(s) of trust or mortgage(s) encumbering the Premises whose name and address shall have been furnished to the Tenant in writing, at the last address so furnished, and (b) until a period of thirty (30) days for remedying such act or omission shall have elapsed following the giving of such notice, provided that following the giving of such notice, the Landlord or said holder(s) shall, with reasonable diligence, have commenced and continued to remedy such act or omission or to cause the same to be remedied within such thirty (30) days period.

**Section 33 -- Lease Subordinate; Tenant Attornment.** This Lease is and shall be subordinate to any deed(s) of trust or mortgage(s) now or hereafter encumbering the Land, the Building and/or the Premises; provided that, in the event any proceedings are brought for the foreclosure of, or in the event of exercise of the power of sale under, any mortgage or deed of trust now or hereafter encumbering the Premises, or any part thereof, Tenant shall agree to and shall attorn to the purchaser upon such foreclosure or sale or upon any grant of a deed in lieu of foreclosure, and recognize such purchaser as the Landlord under this Lease if so requested by such purchaser; provided further, however, that the foregoing shall be conditioned upon the holder thereof executing and delivering to Tenant a commercially reasonable subordination, non-disturbance, and attornment agreement in a form approved by Tenant. In addition, at the request of the holder of any deed(s) of trust or mortgage(s) now or hereafter encumbering the Land, the Building and/or the Premises, the Tenant agrees to and shall execute and join in a commercially reasonable instrument by which Tenant confirms the subordination of this Lease to such deed of trust or mortgage, and confirms Tenant's attornment agreement as aforesaid provided that such agreement is executed by such holder and includes an agreement by such party not to disturb Tenant's possession of the Premises pursuant to this Lease if Tenant is not then in default hereunder beyond applicable notice and cure periods.

**Section 34 -- Tenant Indemnification of Landlord; Landlord Indemnification of Tenant.** Except to the extent that any of the following claims or damages are caused by the negligence or willful misconduct of Landlord (or any of its agents and employees); the Tenant agrees to indemnify and save harmless the Landlord against and from any and all claims by or on behalf of any persons, firms or corporations, arising from the conduct or management of, or from any work or thing whatsoever done in or about, the Premises during the Term of this Lease or arising from any breach or default on the part of the Tenant in the performance of any covenant or agreement on the part of the Tenant to be performed pursuant to the terms of this Lease, or arising from any act or negligence of the Tenant, or any of its agents, contractors, servants, employees or licensees, or arising from any accident, injury or damage whatsoever caused to any person, firm or corporation occurring during the Term of this Lease, in or about the Premises, and from and against all costs, reasonable counsel fees, expenses and liabilities incurred in connection with any such claim or action or proceeding brought thereon; and in case any action or proceeding be brought against the Landlord by reason of any such claim, the Tenant upon prompt notice from the Landlord covenants to resist or defend such action or proceeding by counsel satisfactory to the Landlord.    Except to the extent that any of the following claims or damages are caused by the negligence or willful misconduct of Tenant (or any of its agents and employees); the Landlord agrees to indemnify and save harmless the Tenant against and from any and all claims by or on behalf of any persons, firms or corporations, arising from the conduct or management of, or from any work or thing whatsoever done in or about, the Property (other than the Premises) during the Term of this Lease or arising from any breach or default on the part of the Landlord in the performance of any covenant or agreement on the part of the Landlord to be performed pursuant to the terms of this Lease, or arising from any act or negligence of the Landlord, or any of its agents, contractors, servants, employees or licensees, or arising from any accident, injury or damage whatsoever caused to any person, firm or corporation occurring during the Term of this Lease, in or about the Property (other than the Premises), and from and against all costs, reasonable counsel fees, expenses and liabilities incurred in connection with any such claim or action or proceeding brought thereon; and in case any action or proceeding be brought against the Tenant by reason of any such claim, the Landlord upon prompt notice from the Tenant covenants to resist or defend such action or proceeding by counsel satisfactory to the Tenant.

**Section 35 -- Tenant's Environmental Covenants.**

(a) Tenant (for itself and its employees, agents, successors and assigns) covenants, promises and agrees that it will not use, manufacture, store, treat, transport, refine, handle, produce or dispose of any Hazardous Materials in, at, on, under, upon or from the Premises except to the extent consistent with Tenant's normal business practices and in compliance with applicable laws.

(b) Tenant (for itself and its employees, agents, successors and assigns) further covenants, promises and agrees that it will not discharge, deposit, inject, dump, leak, spill, place or allow escape of any Hazardous Materials or other liquid waste (including grease, oil or any material whatsoever which could damage, obstruct or overload any drainage, sewer or other systems) in, at, on, under, upon or from the Premises, or into the sewer system serving the Premises except to the extent consistent with Tenant's normal business practices of the Permitted Use and in compliance with applicable laws.

(c) Tenant agrees to and shall indemnify, defend and hold Landlord harmless from and against any and all claims, demands, liabilities, damages, suits, actions, judgments, fines, penalties, losses, removal and/or remedial costs and/or charges, costs and expenses (including reasonable attorney's fees) arising or

resulting from, or suffered, sustained or incurred by Landlord as a result of, any breach by Tenant of any of its covenants in this Paragraph.

**(d)** Landlord represents and warrants that the Building and Property is free of Hazardous Materials. Landlord agrees to and shall indemnify, defend and hold Tenant harmless from and against any and all claims, demands, liabilities, damages, suits, actions, judgments, fines, penalties, losses, removal and/or remedial costs and/or charges, costs and expenses (including reasonable attorney's fees) arising or resulting from, or suffered, sustained or incurred by Tenant as a result of any generation, storage or disposal of Hazardous Materials at the Property or the Building in violation of applicable laws except to the extent caused by Tenant's violation of its covenants in this Paragraph.

As used herein, the term **"Hazardous Materials"** shall mean any asbestos, flammable substances, explosives, radioactive materials, PCB-laden oil, hazardous materials, hazardous waste, pollutants, contaminates, toxic substances, under any federal, state or local laws, ordinances, rules, regulations or policies governing use, storage, treatment, transportation, manufacture, refinement, handling, production or disposal of such materials, including without limitation, Section 9601 of Title 42 of the United States Code.

**Section 36 -- Attorney's Fees.** Landlord and Tenant covenant and agree to pay, and to indemnify the prevailing party against, all reasonable legal costs and charges, including counsel fees, lawfully and reasonably incurred in enforcing any covenant or agreement of the herein contained, or in the defense of any suit arising out of the occupancy or operation of the Premises by the Tenant.

**Section 37 -- Estoppel Certificate.** At any time and from time to time upon not less than ten (10) days prior request by the Landlord, the Tenant agrees to execute, acknowledge and deliver to the Landlord a statement in writing certifying: (a) that this Lease is unmodified and in full force and effect or if there have been modifications, that the same is in full force and effect as modified and identifying the modifications, (b) the dates in which the basic rent, additional rent and other charges have been paid, and (c), that, so far as the person making the certificate knows, the Landlord is not in default under any provisions of this Lease. It is intended that any such statement may be relied upon by any person proposing to acquire the Landlord's interest in this Lease or any prospective mortgagee of, or assignee of any mortgage upon, such interest.

**Section 38 -- Entry for Sale Purposes; Landlord's "For Sale" and "For Rent" Signs.** The Tenant agrees to permit the Landlord and any authorized representatives of the Landlord to enter the Premises upon at least twenty-four (24) hours prior notice to Tenant during Tenant's usual business hours to exhibit the same for the purpose of sale or mortgage, and, during the final three month of the Term of this Lease, for purposes of lease or sale, during which period the Landlord may display on the Premises, reasonable "For Sale" or "For Rent" signs.

**Section 39 -- Quiet Enjoyment.** The Landlord covenants and agrees that the Tenant upon paying the Annual Base Rent, additional rent and all other charges herein provided for and performing and fulfilling the covenants, agreements and conditions of this Lease on the Tenant's part to be performed and fulfilled, shall lawfully and quietly hold, occupy and enjoy the Premises during the Term of this Lease without hindrance or molestation by the Landlord or any person or persons claiming under the Landlord, subject, however, to the matters herein set forth.

**Section 40 -- Limitation on Landlord's Liability.** The term "Landlord" as used in this Lease shall be limited to mean and include only the owner or owners of the Landlord's interest in this Lease at the time in question, and in the event of any transfer or transfers of such interest, the Landlord herein named (and in case of any subsequent transfer, the then transferor) shall be automatically freed and relieved from and after the date of such transfer of all personal liability as respects the performance of any covenants or agreements on the part of the Landlord contained in this Lease thereafter to be performed (other than with respect to Tenant's Exclusive Use Right which shall continue to bind Landlord following any such transfer), provided that any funds in the hands of such Landlord (or the then transferor at the time of such transfer) in which the Tenant has an interest shall be turned over to the transferee and provided further that upon any such transfer, the transferee shall be deemed to have assumed, subject to the limitations of this Section, all of the covenants, agreements and conditions in this Lease contained to be performed on the part of the Landlord, it being intended hereby that the covenants and agreements contained in this Lease on the part of the Landlord to be performed, shall, subject as aforesaid, be binding on the Landlord, its successors and assigns, only during and in respect of their respective periods of ownership. Also, the obligations of the Landlord hereunder are not personally binding upon, nor shall resort be had to the private property of any of the constituent partners, shareholders, employees, or agents of the Landlord, but the Landlord's interest in the property only shall be bound.

**Section 41 -- Force Majeure.** Landlord or Tenant, whichever as is applicable, shall not be deemed to have failed or delayed in making any required repairs or replacements or performing any work or other obligation under this Lease if Landlord or Tenant is unable to make or is delayed in making any repairs or performing work or such other obligation called for herein by reason of any of the foregoing (collectively, "Force Majeure"): (a) by reason of strikes or labor troubles, (b) by reason of governmental preemption in connection with a national emergency, (c) by reason of fire, casualty or other acts of God or, (d) by other similar reasons beyond Landlord's or Tenant's reasonable control. Landlord or Tenant shall in each instance exercise reasonable diligence to effect performance when such delaying condition is no longer present.

**Section 42 -- Brokers.** The Tenant is represented by Christian Roustic from Newmark Zimmer. The Landlord is represented by Hank Simpson from AREA Real Estate Advisors. Brokers shall split evenly a commission to be paid by the Landlord equal to six (6%) percent of the total base rentals for the initial term. Landlord shall pay half within 30 days of lease execution and half within 30 days of Tenant taking occupancy.

**Section 43 -- Notices.** All notices, demands and requests which may or are required to be given by either party to the other shall be in writing and shall be given by personal delivery, or by nationally recognized overnight delivery service, or by United States certified mail, return receipt requested, postage prepaid, (a) if for the Tenant, addressed to the Tenant, at the Premises (or at such other place as the Tenant may from time to time designate by written notice to the Landlord), or (b) if for the Landlord, addressed to the Landlord at the address first above stated (or at such other or additional places as the Landlord may from time to time designate by written notice to the Tenant). Notices given by personal delivery or by overnight delivery service shall be deemed given on the date of delivery or refusal of delivery. Notices given by U.S. Certified Mail shall be deemed given two (2) business days after deposit in the U.S. Mails, Postage Prepaid.

**Section 44 -- Invalidity of Particular Provisions.** If any covenant, agreement or condition of this Lease or the application thereof to any person, firm or corporation or to any circumstance shall to any extent be invalid or unenforceable, the remainder of this Lease, or the application of such covenant, agreement or

condition to persons, firms or corporations or to circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby. Each covenant, agreement or condition of this Lease shall be valid and enforceable to the fullest extent permitted by law.

**Section 45 -- Entire Agreement; Modification.** This Lease, including the exhibits attached hereto and any addenda thereto, sets forth the entire agreement between the parties. All prior conversations or writings between the parties hereto, or their agents or representatives are merged herein and extinguished. This Lease cannot be modified or changed orally, but only by agreement in writing signed by the party against whom enforcement of the change is sought. The submission by Landlord of this Lease for execution by Tenant and the actual execution and delivery thereof by Tenant to Landlord shall have no binding force and effect, unless and until Landlord shall have executed this Lease and a duplicate original thereof shall have been delivered to Tenant.

**Section 46 -- Option(s) to Renew.** None

**Section 47 -- Personal Guaranty.** See attached Exhibit G

**Section 48 -- Governing Law.** This Lease shall be construed and enforced in accordance with the laws of the State of Missouri, the state in which the Land is situated, and as having been jointly drafted by the parties.

**Section 49 -- Binding Effect.** The parties hereto agree that the covenants and agreements herein contained shall be binding upon and shall inure to the benefit of the Landlord, its heirs, successors and assigns, and the Tenant, its heirs, successors and permitted assigns.

IN WITNESS WHEREOF, the Landlord and the Tenant have executed this Agreement as of the day and year first above written.

LANDLORD:                                          TENANT:

**DB Icehouse, LLC,**                              **UNIKC, LLC,**
a Colorado limited liability company               a Missouri limited liability company

By: _____                        By: _____
                                                        Frederick Vickers (Oct 4, 2021 09:41 CDT)
Name:   Joseph M. Niebur                            Name:   Frederick Vickers
Title:    Manager                                   Title:   Managing Partner

**Exhibits**

Exhibit A -- Legal Description of Land Constituting
The Land

Exhibit B -- Plan of the Building,
Showing Buildings and Common Facilities, and
Identifying the Premises

Exhibit C -- Annual Base Rent Schedule

Exhibit D -- Landlord's Work

Exhibit E -- Option to Renew

Exhibit F -- Signage Guidelines

Exhibit G – Lease Guaranty

**Exhibit A**
**Legal Description**

The land referred to in this Commitment is situated in the State of Missouri, County of Jackson and is described as follows:

LOTS 97 AND 100, AS SAID LOTS ARE MARKED AND DESIGNATED ON THE PLAT RECORDED IN RECORD D AT PAGE 1, IN THE OFFICE OF THE RECORDER OF DEEDS OF JACKSON COUNTY, MISSOURI, AT INDEPENDENCE, WHICH PLAT IS COMMONLY CALLED JOHN CAMPBELL'S ADDITION TO THE TOWN OF WESTPORT OR JOHN CAMPBELL'S PART OF WESTPORT, AND FREQUENTLY CALLED CAMPBELL'S ADDITION, A SUBDIVISION IN KANSAS CITY, JACKSON COUNTY, MISSOURI, ACCORDING TO THE RECORDED PLAT THEREOF, TOGETHER WITH THE EASTERLY 1/2 OF THE VACATED ALLEY LYING WESTERLY OF AND ADJACENT TO SAID LOTS.

Commonly known as: 4140-4144 Pennsylvania Avenue, 4141 Mill Street, and 426-428 West 42nd Street, Kansas City, Jackson County, Missouri 64111



**Exhibit B**
**Site Plan of the Building**

## Exhibit C
## Annual Base Rent Schedule

| | TOTAL RENTABLE SF | | 5,832 |
|---|---|---|---|
| **MONTHS** | **ANNUAL RENT PER SF** | **MONTHLY RENT** | **ANNUALIZED RENT** |
| 1-2 | $ - | $ - | Build Out |
| 3-14 | $ 20.00 | $ 9,720.00 | $ 116,640.00 |
| 15-26 | $ 21.00 | $ 10,206.00 | $ 122,472.00 |
| 27-39 | $ 22.00 | $ 10,692.00 | $ 128,304.00 |
| 40-51 | $ 23.00 | $ 11,178.00 | $ 134,136.00 |
| 51-62 | $ 24.00 | $ 11,664.00 | $ 139,968.00 |

**Exhibit D**
**Landlord's Work**

1.      *Landlord's Work*.  The term **"Landlord's Work"** means the construction of the Project pursuant to the Tenant approved Final Construction Drawings.

**DIVISION 1:  GENERAL**

1.1     All work shall conform to the Uniform Building Code, current Local Building Code and all applicable National, State and Local Codes and Ordinances, including, without limitation, the Americans with Disability Act.

1.2     Provide one-year warranty on all workmanship and materials on all new Building Improvements unless noted otherwise for specific materials.  One year warranty shall begin on the completion of the improvements.

**DIVISION 2: SITE WORK**

Not Applicable

**DIVISION 3: CONCRETE**

3.1   Creation of concrete stairs/entryway connecting both sides of the leased space.

**DIVISION 4: MASONRY**

4.1   Exterior:  None

4.2   Interior: clean and restore brick & mortar on all exposed interior walls.

**DIVISION 5: METALS**

Not Applicable

**DIVISION 6: CARPENTRY**

Not Applicable

**DIVISION 7: THERMAL PROTECTION**

7.1   All necessary repairs of roof to Existing Building.

**DIVISION 8: DOORS, FRAMES & HARDWARE**

8.1   New windows and entry door per mutually approved plan.

**DIVISION 9: FINISHES**

Not Applicable

**DIVISION 10: SPECIALTIES**

Not Applicable

**DIVISION 11: EQUIPMENT**

None required.

**DIVISION 12: FURNISHINGS**

Not Applicable

**DIVISION 13: SPECIAL CONSTRUCTION**

13.1    Fire sprinkler systems as required by applicable codes with heads turned up. Distribution to be Tenant Improvement.

**DIVISION 14: CONVEYING SYSTEMS**

Not Applicable

**DIVISION 15: MECHANICAL**

15.1    Provide adequate amount of Roof Top Units to provide 1 ton per 300 square feet throughout Premises. Duct distribution shall be part of Tenant Improvements.   Existing RTU's to be used and incorporated into Final Construction Drawings.

15.2    Provide 1" Water Supply and 4" Sewer Service to Premises.

15.3    All water and waste distribution, new rest rooms, kitchens, etc. part of Tenant Improvements.

15.4    Grease trap per approved mechanical plans and service line to Premises.

15.5    Provide _____ Gas Service to Premises

**DIVISION 16:  ELECTRICAL**

16.1    Install 600 amp 120/208 three phase electrical distribution panel within Premises.  All electrical distribution shall be part of Tenant Improvements.

16.2    Phone/Data: Metal conduit from phone room to termination location near electrical distribution panel.

**Exhibit E**

Option to Renew – None

**Exhibit F**
**BUILDING SIGNAGE GUIDELINES**

- Tenant/Sign Contractor shall obtain from the co-ordinate with Owner/Agent, actual extent of signage. Sign shall comply with all governing state, municipal and local codes and ordinances. All signs shall meet NEC requirements. All components shall be UL listed. Tenant/Sign Contractor shall be responsible for obtaining all permits.
- Sign Contractor will submit no less than (3) copies of shop drawings for signage including elevations, sections and equipment specifications of suppliers and tear sheets from individual manufacturer for Owner/Agents review and approval prior to construction. Drawings shall also include scale measurements of the existing space where the sign is to be installed. Detailing the sign in its intended position and proximity to other signs or building elements.
- Owner/Agent reserves the right to approve or not approve any or all signage submittals. No signage may be installed without Owner/Agent approval.
- All signage shall be Individual Channel Letters attached to an Extruded Aluminum Raceway painted to match the color of the building; or an Internally Illuminated Cabinet type sign.-The type of sign to be used will vary from property to property. Owner/Agent will determine the type of sign to be allowed.
- Sign must have a disconnect switch.
- Sign will be hung with a bucket truck. Sign Contractor is not allowed on the roof. Sign Contractor will be responsible to leave the property in the same condition as it was prior to installation.
- Tenant/Sign Contractor must give Owner/Agent at least 48 hours' notice of date of installation.
- Any signs not in compliance with the above Guidelines, in the opinion of the Owner/Agent, shall be removed immediately at the Tenant's expense. Tenant/Sign Contractor will then be responsible for any damage related to the installation and subsequent removal of the sign, and for the entire expense of the signs removal.
- These Guidelines may be modified, added to, or altered by Owner/Agent at any time. Owner/Agent shall submit written notice to Tenant of any changes.

**Exhibit G**
**LEASE GUARANTY**

This Lease Guaranty (hereinafter "Guaranty") is made by the undersigned individuals, **Frederick Vickers, D'Mario Gray and Greg Burns**(referred to hereafter as the "Guarantors"), **to DB Icehouse, LLC,** a Colorado limited liability company , its successors and assigns (hereinafter "Landlord"), having its principal office at 524 S Tejon Street, Colorado Springs, Colorado 80903, as an inducement to Landlord to enter into the Lease dated as of October 1, 2021 (the "Lease") between Landlord and ("Tenant"). It is the intent of the parties that this Guaranty extend to all obligations arising from the Lease and any existing or future Exhibits, amendments, or Addenda, all which shall hereafter be referred to as the "Lease" between Landlord and Tenant.

For good and valuable consideration, receipt of which is hereby acknowledged, Guarantors, as compensated Guarantors, agree as follows:

1. **Guaranty**. Guarantors absolutely and unconditionally guarantees to Landlord that Tenant shall promptly pay all rent owed to Landlord under the Lease, including any modifications thereof, whether direct or indirect, joint or several, absolute or contingent, secured or unsecured, matured or unmatured, regardless of amount arising from the Lease, and any and all modifications thereof (all of which individually and collectively referred to as "Indebtedness").

2. **Guaranty of Payment**. This Guaranty is an absolute and unconditional guarantee of payment and not of collectability.

3. **Guaranty Unconditional**. The liability of Guarantors is not conditional or contingent upon the genuineness, validity, sufficiency or enforceability of the Indebtedness or any instruments or agreements related thereto (hereinafter collectively referred to as "Agreements") or any security or collateral therefor (hereinafter collectively referred to as "Collateral"), or any equipment or personal property secured by the Lease (hereinafter collectively referred to as the "Equipment"). Landlord shall not be required to (i) proceed against the Tenant by suit or otherwise, (ii) foreclose, proceed against, liquidate, release or exhaust any of the Agreements, Collateral or Equipment, or (iii) exercise, pursue or enforce any right or remedy Landlord may have against the Collateral, the Equipment, any other Guarantors (whether hereunder or under a separate instrument), any other party, or otherwise, prior to proceeding against Guarantors.

4. **Agreement to Pay Attorneys' Fees**. If the Tenant fails to pay any Indebtedness promptly as the same becomes due, or otherwise fails to perform any obligation under the Lease, Guarantors agrees to pay on demand the entire Indebtedness together with interest thereon as provided in the Lease or any agreements evidencing the Indebtedness, and all losses, costs, attorneys' fees and expenses which may be suffered by Landlord by reason of the Tenant's default or the default of Guarantors hereunder, specifically including, but without limitation, all attorneys' fees and costs incurred by Landlord in pursuing collection of the Indebtedness from Tenant, and all attorneys' fees and costs incurred by Landlord in enforcing this Guaranty. Additionally, Guarantors agree to pay all expenses, including attorneys' fees and legal expenses, incurred by Landlord in any bankruptcy proceedings of any type involving such Guarantors, Tenant, the Indebtedness, or any Equipment subject to the Lease, including, without limitation, expenses incurred in modifying or lifting the automatic stay, determining adequate protection, use of cash collateral, use of or obtaining possession of the Equipment, or relating to any plan of reorganization.

5. **Waiver by Guarantors**.  Guarantors expressly and absolutely, without affecting the liability of Guarantors hereunder:

    (a)    Waives notice of acceptance by Landlord of this Guaranty, the offer of guarantee contemplated by this Guaranty, or any other notice which may be required relative to the acceptance of this Guaranty;

    (b)    Waives demand, protest, notice of dishonor or nonpayment or presentment for payment of any Lease, agreement, or other evidence of the Indebtedness;

    (c)    Waives notice of the failure of any party to pay the Landlord any indebtedness held by Landlord as collateral for any Indebtedness;

    (d)    Waives notice of any kind in bringing and prosecuting any action on any Lease, the Agreements, or other evidence of the Indebtedness, diligence in connection with the collection on any Lease, or the Agreements, or other evidence of Indebtedness and the handling or re-leasing of any Equipment existing, or to exist, in connection therewith;

    (e)    Waives all offsets and counterclaims which Guarantors may at any time have to any claim of Landlord against the Tenant;

    (f)    Waives notice of transactions which have occurred under or relating to or affecting this Guaranty;

    (g)    Waives notice of any adverse change in the Tenant's condition, financial or otherwise, or of any other fact which might materially increase Guarantors' risk, whether or not Landlord has knowledge of the same; and

    (h)    Waives any right to require Landlord to exhaust any Collateral for the Indebtedness, re-lease or sell any Equipment or to first proceed against any other person or property, including, without limitation, any such rights arising pursuant to Colorado law or statute.

6. **Consent to Landlord's Acts**.  Guarantors hereby authorizes and consents to Landlord at any time and from time to time, without notice or further consent of Guarantors, doing the following and Guarantors agrees that the liability of Guarantors shall not be released, diminished, impaired, reduced, exonerated, or affected by:

    (a)    The taking or accepting, or the failure by Landlord to take or accept, any other collateral or guarantee for the Indebtedness;

    (b)    The modification, extension, renewal or consolidation of any Lease agreement, or other evidence of the Indebtedness, to the granting of any other credit, execution of any other Lease and to the acceleration of maturity of the Indebtedness;

    (c)    Any complete or partial release, withdrawal, waiver, surrender, exchange, substitution, subordination, impairment, loss, compromise, or other modification of the Equipment or the Collateral or any collateral which may be taken by Landlord in the future, or any other guarantee at any time existing in connection with the Indebtedness;

    (d)    The complete or partial release or substitution of Tenant, Guarantors or any other Guarantors on the Indebtedness;

    (e)    Any renewal, extension, modification, acceleration, consolidation, adjustment, indulgence, forbearance, waiver or compromise of the payment of any part or all

of the Indebtedness, or any liability of Guarantors or any other party or any other guarantee therefor, or the performance of any covenant contained in any agreement had or to be had in connection with the Indebtedness, the Agreements, the Collateral or the Equipment, either with or without notice to or consent of Guarantors;

(f)     Any neglect, delay, omission, failure, or refusal of Landlord to take or prosecute any action for the collection of the Indebtedness or any party thereof, or for the enforcement of any provisions of the Lease or other Agreements, or to re-lease, sell or exhaust, or take or prosecute any action in connection with any Collateral or Equipment existing or created in the future, or any guarantee of the Indebtedness;

(g)     Taking possession of, modifying, repairing or re-leasing any Collateral or Equipment;

(h)     Acceptance of any partial payments on the Indebtedness and the application of such partial payments to part of the Indebtedness; or

(i)     Landlord's exercising any and all rights and remedies available to Landlord by law, at equity or agreement, even if the exercise thereof may affect, modify, or eliminate Guarantors' right of subrogation against the Tenant or any other party.

7.     **Landlord's Remedies**.  In the event Landlord obtains another guarantee for the Indebtedness or there is more than one Guarantors under this Guaranty, Guarantors agree that Landlord, in its sole discretion, may (1) bring suit against Guarantors and/or the Guarantors under any other guarantee, or any of the Guarantors individually, for the Indebtedness, (2) compromise or settle with any one or more of Guarantors and/or the Guarantors under any other guarantee for such consideration as Landlord my deem proper, and (3) release one or more of Guarantors and/or the Guarantors under the other guarantee from liability.  Guarantors further agree that such action shall not impair or affect the rights of Landlord to collect the entire indebtedness from Guarantors pursuant to this Guaranty.

8.     **Application of Payments**.  Without affecting any obligation created hereby or hereunder, Guarantors grants to Landlord full power and authority, in its discretion and at any time and in such manner and on such terms as it deems fit, with or without notice to Guarantors, to apply any one or more payments by, or recoveries from the Tenant or any Guarantors or any sums realized from the Collateral or Equipment in such manner and in such order of priority as Landlord deems fit, whether or not such obligation is due at the time of such application.

9.     **Term of Guaranty**.  This Guarantee shall expire, terminate, and be of no further force and effect upon the earlier of the expiration of the initial 10 year term of the Lease.

10.     **Subrogation**.  Guarantors will not exercise any right of subrogation it may acquire, by any payment hereunder or otherwise, unless and until all Indebtedness has been paid in full.  If any amount is paid to Guarantors on account of such right of subrogation while any Indebtedness remains unpaid, such amount will be paid forthwith to Landlord to be credited against the Indebtedness, whether matured or unmatured.

11.     **Cumulative Rights**.  The rights and remedies herein conferred are cumulative and not exclusive of any other rights or remedies and shall be in addition to every other right, power and remedy

herein or hereafter existing at law, in equity or by statute which Landlord might otherwise have and may be exercised from time to time and as often and in such order as may be deemed expedient by Landlord. No delay or omission by Landlord in the exercise of any such right, power or remedy or in the pursuance of any remedy shall impair any such right, power, or remedy or be construed to be a waiver of any default or to be an acquiescence therein.

12. **Governing Law**.  This Guaranty shall be governed by, and construed in accordance with, the laws of the State of Missouri.

13. **Binding Effect**.  This Guaranty may be executed and delivered to Landlord prior to the consummation of the Lease or Agreements constituting the Indebtedness.  This Guaranty shall nonetheless be considered a binding, enforceable Guaranty upon its execution and delivery to Landlord.

14. **Entire Agreement**.  This Guaranty constitutes the entire agreement between Landlord and Guarantors, constitutes all representations, express or implied, between Landlord and Guarantors and may not be altered, amended or modified except in writing signed by Landlord and Guarantors.  All prior and contemporaneous agreements and representations, express or implied, are merged herein.

15. **Severability and Interpretation**.  Each provision of this Guaranty is intended to be severable. Any provision of this Guaranty, which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction only, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  All references in this Guaranty to the singular shall be deemed to include the plural when the context so requires, and vice versa.  References in the collective or conjunctive shall also include the disjunctive unless the context otherwise clearly requires a different interpretation.  All references shall include the masculine, feminine and neuter when the context so requires.

16. **Continuing Guaranty**.  All agreements, representations, warranties, and covenants made herein by Guarantors shall survive the execution and delivery of this Guaranty and shall continue in effect so long as the Indebtedness or any portion thereof is outstanding and unpaid, notwithstanding any termination of the Guaranty subject to Section 9 above.  All agreements, representations, warranties, and covenants made herein by Guarantors shall survive any bankruptcy proceedings. This Guaranty shall bind the party making the same, and its successors, assigns, heirs, executors, and personal representatives. The death, insolvency, bankruptcy, disability, or lack of corporate power of Tenant, Guarantors, or any party at any time which is liable for the payment of any part, or all of the Indebtedness will not affect this Guaranty.

17. **Joint and Several Liability**.  The liability of each of the undersigned parties shall be joint and several.  All of the agreements, obligations, representations, and warranties contained herein shall apply to each Guarantors.

18. **Jurisdiction of Colorado Courts**.  Guarantors acknowledges that by execution and delivery of this Guaranty, Guarantors have transacted business in the State of Colorado and Guarantors hereby voluntarily submits himself to the jurisdiction of the courts located in the State of Colorado as to all matters relating to or arising from the Guaranty.  Venue shall be exclusive to state courts in the County of Denver, State of Colorado.

19. **Captions.** The captions or headings in this Guaranty are for convenience only and in no way define, limit or describe the scope or intent of any provisions or sections of this Guaranty.

DATED: Oct, 1 , 2021.

GUARANTORS:

Frederick Vickers

Address:

*Frederick Vickers*

3627 NE 85th St

K.C. MO 64156

D'Mario Gray

Address:

1804 Kensington Ave

K.C.M.O 64127

Greg Burns

Address:

320 W. 103rd

STE 1B KCmo. 64114