**FOR THE WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **EUPHORIC LLC, ET. AL.** | ) | |
| | ) | |
| | ) | **Case No. 4:25−cv−00023−RK** |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **WESTPORT COMMUNUITY** | ) | |
| **IMPROVEMENT DISTRICT, ET. AL.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFFS' SECOND AMENDED COMPLAINT AND REQUEST FOR IMMEDIATE INJUNCTIVE AND DECLARATORY RELIEF

COMES NOW Plaintiffs, Euphoric, LLC., Unikc, LLC, and The Sourze, LLC, for their complaint against Defendants, states as follows:

## I. Introductory Statement

1.  This is a civil action seeking loss of revenue and profits, compensatory damages, and punitive damages for racial discrimination against Defendants premised upon race-based discrimination in Plaintiffs being denied their rights to make and enforce contracts and denied their rights to lease real property in the Westport community in violation of 42 U.S.C. §§ 1981, 1982, 1985(3), and 1986 by way of civil conspiracy that violates 18 U.S.C. § 1962 et. seq. This action also seeks declaratory relief, immediate possession of a property in controversy, and damages for breach of a legally binding lease agreement without just cause. The collective actions of the

Defendants have and/or will tortiously interfere with Plaintiff Euphoric, LLC's business expectancy of $70 million in revenue over the life of a ten-year lease and did detrimentally interfere

with Plaintiff Unikc, LLC and Plaintiff The Sourze, LLC's ability to sustain and profit from its business.

## II. Parties to the Proceeding

2.      Plaintiff, Euphoric, LLC. (hereinafter "Euphoric"), is a limited liability corporation that was formed and registered in the State of Missouri, with its business address registered at 522 Locust Lane, Kansas City, Missouri 64106.

3.      At all times relevant hereto, the owners, operators, agents, and/or managers of Euphoric were and are Christopher Lee (hereinafter "Lee"), and Damion Johnson (herein after "Johnson"), both individuals and residents of Kansas City, Jackson County, Missouri, in the Western District of Missouri. Mr. Lee and Mr. Johnson had the authority to enter and execute any and all contracts and/or lease agreements on behalf on Plaintiff Euphoric, LLC. Mr. Lee and Mr. Johnson are Black/African American males.

4.      Plaintiff, Unikc, LLC., (hereinafter "Unikc"), is a limited liability corporation that was formed and registered in the State of Missouri, with its registered business address at 1116 Grand Boulevard, Kansas City, Missouri 64106.

5.      At all times relevant hereto, the owner, operator, agent, and/or manager of Plaintiff UniKC, LLC, was Mr. D'Mario Gray, an individual and resident of Kansas City, Jackson County, Missouri, in the Western District of Missouri. D'Mario Gray (herein after "Gray") and Mr. Frederick Vickers (herein after "Vickers") have the authority to enter and execute any and all contracts and/or lease agreements on behalf of Plaintiff UniKC, LLC. Mr. Gray and Mr. Vickers are Black/African American males.

6.      Plaintiff, The Sourze LLC, (hereinafter "The Sourze"), is a limited liability corporation that was formed and registered in the State of Missouri, with its registered business address at 1004 N. Washington, Raymore, Missouri 64083.

7.      At all times relevant hereto, the owner, operator, agent, and/or manager of The Sourze was Robert Thorpe, an individual and resident of Kansas City, Jackson County, Missouri, in the Western District of Missouri. Robert Thorpe had the authority to enter and execute any and all contracts and/or lease agreements on behalf of The Sourze. Robert Thorpe is a Black/African American male.

8.      Defendant, Westport Community Improvement District (hereinafter "CID"), is a nonprofit Missouri corporation, founded on March 22, 2002, with its principal place of business located at 4050 Pennsylvania Avenue, Suite M-100, Kansas City, Missouri 64111, and its registered agent listed as D and A Agency Services, Inc., 3145 Broadway Boulevard, Kansas City, Missouri 64111-2405.

9.      At all times relevant hereto, the CID is and was the governing body of the Westport community which creates policies and procedures for the operations of businesses in the Westport community, who are members of the CID. The CID is responsible for implementing and addressing neighborhood-level planning issues to support the identity and common goals of the community of Westport, including, but not limited to, the physical use of each property in the Westport community.

10.     At all times relevant hereto, the CID board consisted of 12 members (collectively hereinafter "CID Defendants") who govern the CID pursuant to its bylaws and articles of incorporation.

11.     Defendant Franklin D. Kimbrough, (hereinafter "Kimbrough"), an individual and Missouri citizen, is a board member and Executive Director of the CID, with a listed address in Independence, Jackson County, Missouri. Upon information and belief, Mr. Kimbrough is a White/Caucasian male. Mr. Kimbrough is sued in his official capacity as a board member and Executive Director of the CID.

12.     Defendant Pamela Ptacek (hereinafter "Ptacek"), an individual and Missouri citizen, is a board member and Chairperson of the CID, who resides in Kansas City, Platte County, Missouri. Upon information and belief, Ms. Ptacek is a White/Caucasian female. Ms. Ptacek is sued in her official capacity as a board member and Chairperson of the CID.

13.     Defendant Max Wasserstrom (hereinafter "Wasserstrom"), an individual and Kansas citizen, is a board member and Vice Chairperson of the CID, who resides in Leawood, Johnson County, Kansas. Upon information and belief, Mr. Wasserstrom is a White/Caucasian male. Mr. Wasserstrom is sued in his official capacity as a board member and Vice Chairperson of the CID.

14.     Defendant Zach Marten (hereinafter "Marten"), an individual and Missouri citizen, is a board member and Treasurer of the CID, who resides in Kansas City, Jackson County, Missouri. Upon information and belief, Marten is a White/Caucasian male. Mr. Marten is sued in his official capacity as a board member of the CID.

15.     Defendant Paul Mesler (hereinafter "Mesler"), an individual and Missouri citizen, is the Secretary of the CID, who resides in Kansas City, Jackson County, Missouri. Upon information and belief, Mesler is a White/Caucasian male. Mr. Mesler is sued in his official capacity as a board member of the CID.

16.     Defendant Kyle Kelly (hereinafter "Kelly"), an individual and Missouri citizen, is a board member of the CID, who resides in Kansas City, Jackson County, Missouri. Upon information and belief, Kelly is a White/Caucasian male. Mr. Kelly is sued in his official capacity as a board member of the CID.

17.     Defendant, Larry Goldman (hereinafter "Goldman"), an individual and Kansas citizen, is a board member of the CID, who resides in Leawood, Johnson County, Kansas. Upon information and belief, Goldman is a White/Caucasian male. Mr. Goldman is sued in his official capacity as a board member of the CID.

18.     Defendant Brett Allred (hereinafter "Allred"), an individual and  Missouri citizen, is a board member of the CID, who resides in Kansas City,  Jackson County, Missouri. Upon information and belief, Allred is a  White/Caucasian male. Mr. Allred is sued in his individual capacity, and in his official capacities as a board member of the CID.

19.     Defendant Matthew Vos (hereinafter "Vos"), an individual and Kansas  citizen, is a board member of the CID, who resides in Missouri. Upon information and belief, Mr. Vos is a White/Caucasian male. Vos is sued in his individual capacity, and in his official capacities as a board member of the CID.

20.     Defendant Jeremy Hurt (hereinafter "Hurt"), an individual and Kansas citizen, is a board member of the CID, who resides in Wichita, Sedgwick County, Kansas. Upon information and belief, Hurt is a White/Caucasian male. Mr. Hurt is sued in his individual capacity, and in his official capacities as a board member of the CID.

21.     Defendant Christie Montague (hereinafter "Montague"), an individual and Kansas citizen, is a board member of the CID, who resides in Overland Park, Johnson County, Kansas.

Upon information and belief, Montague is a White/Caucasian female. Ms. Montague is sued in her official capacity as a board member of the CID.

21. Defendant Brandi Degenhardt (hereinafter "Degenhardt"), an individual and Kansas citizen, is a board member of the CID, who resides in Overland Park, Johnson County, Kansas. Upon information and belief, Degenhardt is a White/Caucasian female. Ms. Degenhardt is sued in her official capacity as a board member of the CID.

22. Defendant 4128 Broadway, LLC., is and was at all times relevant hereto a limited liability corporation that was formed and registered in the State of Missouri, with its principal place of business located at the premises commonly known as 4128 Broadway Avenue, Kansas City, Missouri 64111, in the Western District of Missouri. The registered agent is listed as Halene Siegfried, 700 Fairways Circle, St. Louis, Missouri 63141-7525. 4128 Broadway, LLC, is a member of the CID.

23. Defendant, Harold Brody (hereinafter "Brody"), is an individual who resides in Danville, Contra Costa County, California. At all times relevant hereto, Mr. Brody was and is the managing member of 4128 Broadway, LLC. 4128 Broadway, LLC, is the owner of the property commonly known as 4128 Broadway Avenue, Kansas City, Missouri 64111, and Mr. Brody is the primary person with authority to enter into and execute contracts, including but not limited to lease agreements, on behalf of 4128 Broadway, LLC. Upon information and belief, Mr. Brody is a White/Caucasian male. Mr. Brody is sued in his individual capacity, and in his official capacity as the owner, operator and managing member of 4128 Broadway, LLC.

24. Defendant Murfin Inc., is and was at all times relevant hereto a limited liability corporation that was formed and registered in the State of Kansas, and it's Directors are Defendants

Jeremy Hurt and Matthew Vos. Defendant Murfin Inc. made Application for Certificate of Authority for a Foreign For-Profit in Missouri in the year 2009.

25.     Defendant Allred, Inc., is and was at all time relevant hereto a foreign general business for profit corporation registered in the state of Missouri, with its principal place of business located at 421 Westport Road, Kansas City, Missouri 64111-3004, and a personal address listed as P.O. Box 5810, Kansas City, Missouri 64111, Missouri 64105. Its President, Secretary and Director is Defendant Brett Allred.

26.     Defendant Allred Holdings, LLC, is and was at all times relevant hereto a limited liability corporation that was formed and registered in the State of Kansas, with its principal place of business located at 1519 Pierre St., Manhattan, Kansas, 66502. Defendant Allred Holdings LLC's sole Director is Brett Allred, and its registered agent is Brett Allred.

27.     Defendant Westport Development, LLC, is and was at all times relevant hereto a foreign limited liability corporation registered in the state of Missouri, with its principal place of business located at 250 N. Water, Suite 300, Wichita, Kansas, 67202, listing a registered agent as C T Corporation System, 5661 Telegraph Road, Suite 4B, St. Louis, Missouri 63129-4275.

28.     Defendant AC Westport, LLC, is and was at all times relevant hereto a foreign limited liability corporation registered in the state of Colorado, operating under the fictious name in the State of Missouri as The Denver Biscuit Company, owned by Mr. Drew Shader, Jason McGovern and Ashleigh Carter, with its principal place of business located at 250 N. Water, Suite 300, Wichita, Kansas, 67202, 1515 Adams St. Denver, Colorado 80206, listing a registered agent as Richard Bryant, 1111 Main St. Kansas City, Missouri, 64105.

29.     Defendant DB Icehouse, LLC, is and was at all times relevant hereto a foreign limited liability corporation registered in the state of Colorado, owned and managed by Joe Mark

7

Niebur and Gregory Bartold, with its with its principal place of business located at 1230 St., Tenderfoot Hill Rd., Suite 250, Colorado Springs, CO 80906, listing a registered agent as Steve Coats, 10540 Private Rd., 8945, West Plaines, MO 65775.

30. Defendant Gregory Bartold (hereinafter "Bartold"), is an individual who resides in the state of Colorado. At all times relevant hereto, Mr. Bartold was and is the managing member and agent of DB Icehouse, LLC, and during the time of the events in the lawsuit, owned the property at 4140 Pennsylvania, Kansas City, MO 64111. Upon information and belief, Mr. Bartold is a White/Caucasian male. Mr. Bartold is sued in his individual capacity, and in his official capacity as the owner, operator and managing member of DB Icehouse, LLC..

31. Defendant Joe Niebur (hereinafter "Niebur"), is an individual who resides in the state of Colorado. At all times relevant hereto, Mr. Niebur was and is the managing member and agent of DB Icehouse, LLC, and during the time of the events in the lawsuit, owned the property at 4140 Pennsylvania, Kansas City, MO 64111. Upon information and belief, Mr. Niebur is a White/Caucasian male. Mr. Niebur is sued in his individual capacity, and in his official capacity as the owner, operator and managing member of DB Icehouse, LLC.

### III. Jurisdiction and Venue

32. This action is brought pursuant to the Civil Rights Act of 1866, 42 U.S.C. §§ 1981, 1982, and 1985(3), and 1986, and the Civil Rights Act of 1968, 42 U.S.C. § 3604, as well as the Fifth and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1346, as this is a civil action arising under the Constitution, statutes, laws, or treaties of the United States, and the amount in controversy exceeds $75,000.00

33.     This Court has supplemental jurisdiction over the state causes of action pursuant to 28 U.S.C. § 1367 because the state claims are so related to the federal claims that they form the same case or controversy.

34.     Venue is proper in the United States District Court for the Western District of Missouri, pursuant to 28 U.S.C. § 1391, because Plaintiffs are residents of Kansas City, Jackson County, Missouri, the property that is the subject of this Complaint is located at 4128 Broadway, Kansas City, Missouri, and the actions that occurred herein were all in the territorial jurisdiction of the Western District of Missouri.

35.     Plaintiffs request a jury trial on all issues triable pursuant to Fed. R. Civ. P. 38(b).

### IV. Facts and Allegations Common to All Claims for Relief

#### A. The CID's Responsibilities and Current Actions

36.     The Westport community is a mixed-use district with more than 300 distinct business owners.

37.     Of the 251 distinct business owners in the Westport community, Black/African American business owners are nearly nonexistent.

38.     The Westport Community Improvement District (hereinafter "CID"), founded on March 22, 2002, is responsible for implementing and addressing neighborhood-level planning issues to support the identity and common goals of the community of Westport, including, but not limited to, the physical use of each property in the Westport community.

39.     At all times relevant hereto, the CID Board consisted of 12 members: Defendants Kimbrough, Ptacek, Wasserstrom, Marten, Mesler, Kelly, Goldman, Allred, Vos, Hurt, Montague, and Degenhardt.

40.     Upon information and belief, all of the CID Defendants are White/ Caucasian individuals, and none of the CID Defendants are Black/African American individuals.

41.     Many of the CID Defendants have also developed plans to open new bars and restaurants in the Westport community in the near future.

42.     The CID Defendants are acting outside the scope of their responsibilities as CID board members by engaging in racial discrimination for their own economic gain with their own personal business development goals in mind.

43.     At all times relevant hereto, each of the CID Defendants had authority to vote on the policies and procedures to be implemented in the Westport community, and each of the CID Defendants had the authority and/or ability to limit the availability of entrepreneurial opportunities for African American business owners seeking to open new businesses in the Westport community by exercising the CID's duties in a discriminatory manner.

44.     Written correspondence show that the CID Defendants are conspiring to make it nearly impossible for Black/African American business owners to exist in Westport, or to obtain and/or keep a liquor license as is required for operating such a business.

45.     On an unknown date, at 7:50 pm, Defendant Allred in his individual capacity, and as a the President of Allred Inc., Director of Allred Holdings, Inc., and as a member of the CID, composed a text message wherein he admitted that a group of property owners in the Westport community have formulated a plan to make several strategic moves to prevent "problematic" business owners/operators from existing in Westport, and for the purpose of eliminating "problematic" people from patronizing the Westport.

46.     Section 67.1451 provides that each board member of the CID shall be an owner of real property or of a business operating within the district.

47.     The group of property owners described in Defendant Allred's correspondence included all of the board members of the CID, in addition to property owners who are not board members of the CID.

48.     Agents of the CID members, CID Board members, and Westport community property and business owners in recorded audio stated the following:

a.  "Using caterers, they're not subject to our rules, which means we're going to be on you-- you make one step out of bounds we're going to be turning you in to regulated industries, health department, it can get really bad…"

b.  "…For establishments that are bars or restaurants that have a regular liquor license, and I will tell you in advance, if you have a caterer, and I don't know if it's a state statute or city ordinance, but they can only be in your establishment so many times before they have to be on premises licenses. So the on premises license is when our rules kick in, in addition to the city and our rules potentially are, I've got them here, ours is a written agreement, contractual agreement and basically you're agreeing that if you violate these you'll surrender your license and if you don't we'll go after you and seek damages and you pay us for all our cost and it's written pretty one-sided but it's the only way that our property owners are going to sign the consents so that's just the way it works."

c.  "Every new business that sells alcohol, restaurant or bars, that comes to Westport, and this has been the case since 2013, signs one of these (Good Neighbor Agreements)".

d. "We go after them with a vengeance because when we don't have a contractual agreement, we do everything we can to put them out of business"

e. "Those are the requirements if you get into what we call a good neighbor agreement with us, but it's a contractual obligation and in exchange we would sign the consents and encourage our other property owners to sign the consents, and we've been fortunate since we started doing this in 2013, that 99 percent of the property owners down here won't sign a consent for a liquor license of any kind even beer and wine unless we have a good neighbor agreement in place."

f. "…you're not going to have problems because most of them are scared, they know the rules, they know how close we come sometimes, and plus they don't want to fight, they're going to play by the rules."

49. One of the "strategic moves" made by Defendants Allred, WD and the CID Defendants has been to contact owners of property in the Westport community and make it nearly impossible for Black/African Americans to obtain and/or keep a lease for property in Westport.

50. Some of the "strategic moves" made by Defendants Allred and the CID Defendants has been to contact business owners in the Westport community and threaten to take steps to get liquor license revoked and/or terminated if they do business with Black/Arican American service providers.

51. One of the "strategic moves" made by the CID Defendants is to enforce a "Good Neighbor" agreement that is kept in the CID business office and not allowed in the personal possession of property and business owners.

52.     The actions of the CID Defendants have created a pattern of discrimination on the basis of race and ethnicity to the exclusion of Black/African Americans and other racial and ethnic minorities from leasing property and/or operating businesses and/or conducting business in the Westport community.

### B. Racial Discrimination against The Sourze, LLC

53.     The property and building located at 427 Westport Road, Kansas City, Missouri 64111 (hereinafter "427 Westport") was managed by Pulse Management, LLC, and is owned, controlled, and/or simultaneously managed by Westport Development, LLC.

54.     Defendant Westport Development, LLC, is the successor in interest to Pulse Management, LLC, and at all times during lease negotiations with Plaintiff The Sourze, LLC, engaged in the process.

55.     Defendants Voss and Hurt are the owners, agents, operators, stockholders, landlords and/or managers of Westport Development, LLC.

56.     At all times relevant hereto, Defendants Voss and Hurt had authority to act on behalf of Westport Development, LLC, and had authority to enter into and execute lease agreements, or to refuse lease agreements for 427 Westport.

57.     Around or about October 20, 2020, Robert Lee Thorp, on behalf of The Sourze, LLC, entered into discussions with Pulse Management, LLC, and agents of Westport Development, LLC, regarding plans for opening a new business at 427 Westport.

58.     427 Westport has two levels, an upstairs and a downstairs and a basement.

59.     In initial discussions between Plaintiff The Sourze, LLC, Pulse Management, LLC, and agents of Defendant Westport Development, LLC, the parties discussed the possibility of using

427 Westport for an art gallery/event space in one portion of the property, and as a restaurant in the other portion of the property.

60. Plaintiff The Sourze, LLC, developed plans to build a kitchenette in the downstairs portion of the front of the building and presented them to Pulse Management, LLC, and agents of Defendant Westport Development, LLC.

61. Plaintiff The Sourze, LLC, further planned for the art gallery/event space to operate under the name of The Sourze, LLC, and for the restaurant to operate as The Daiquiri Shop KC (hereinafter 'Daiquiri Shop").

62. The Daiquiri Shop was set to be an expansion and/or second location of the already existing Daiquiri Shop on 11th and Grand Avenue, Kansas City, Missouri.

63. Pulse Management, LLC, and agents of Defendant Westport Development, LLC, initially agreed to and approved of The Sourze's plans for 427 Westport, which included plans to open a restaurant and bar as Daiquiri Shop.

64. On November 25, 2020, The Sourze, LLC, entered into a lease agreement with Pulse Management, LLC.

65. The most relevant terms of the lease were as follows:

a. Leased Premises: Approximately 3,594 square feet of interior space located at 427 Westport.
b. Commencement Date: Shall be January 11, 2021 . . . Expiration Date: Three (3) years after the Commencement Date [January 11, 2023].

66. Initially, Plaintiff The Sourze, LLC, only opened the art gallery/event space portion of 427 Westport, and Pulse Management, LLC, and agents of Defendant Westport Development, LLC represented to The Sourze, LLC, that it would be able to use the additional portions of 427 Westport for Daiquiri Shop.

14

67.     The parties initially agreed to a lease payment of $5,000 per month in Year One, $5,148.33 per month in Year Two, and $5,300 for Year Three.

68.     On April 14, 2021, Plaintiff The Sourze, LLC, and Pulse Management, LLC, entered in to the Amended and Restated Triple Net Lease to the benefit of Defendant Westport, LLC.

69.     After the Amended and Restated Triple Net Lease agreement was in place, Pulse Management, LLC, and agents of Defendant Westport Development, LLC, falsely told the owner of The Sourze that the property was only fit to be a clothing store.

70.     Defendant Westport Development, LLC's made false representations regarding property use to Plaintiff The Sourze, LLC, because at the time that The Sourze moved into 427 Westport, the property was already zoned and deemed fit for a restaurant with a liquor license.

71.     In a meeting between agents of Defendant Westport Development, LLC, either Defendant Hurt or Voss stated to Plaintiff The Sourze, LLC, that the Daiquiri Shop would "cannibalize" the other Westport bars.

72.     In a meeting between agents of Defendant Westport Development, LLC, either Defendant Hurt or Voss stated to Plaintiff The Sourze, LLC, that they did not want any more bar and restaurant concepts in the Westport because bars, and especially those patronized by the hip-hop crowds, equated to violence.

73.     After Plaintiff The Sourze, LLC, had already paid over $22,000.00 in rents, and nearly $25,000.0 in expenses, agents of Defendant Westport Development, LLC, told Plaintiff The Sourze, LLC, that it would no longer agree to the concept for the Daiquiri Shop, and that The Sourze, LLC, needed to come up with a new concept.

74.    During this same time frame, Defendant Allred, and other White/Caucasian business owners were allowed to change their concepts and open new bars and restaurants in the Westport.

75.    Agents of Defendant Westport Development, LLC, refused to provide Plaintiff The Sourze, LLC, with an opportunity to utilize the additional portion of the building in a manner that would contribute to its success.

76.    On December 20, 2022, Untapped, LLC, an investor for Plaintiff The Sourze, LLC, sent Defendant Westport Development, LLC, a letter via email detailing the conversation and how it was discriminatory.

77.    The CID Defendants and/or Defendant Westport Development, LLC, had absolutely no basis or information to believe that the Daiquiri Shop would "cannibalize" other Westport bars or that a restaurant such as Daiquiri Shop would automatically equate to violence from "hip-hop crowds."

78.    The statements regarding cannibalizing other Westport bars, and the "hip-hop crowds" automatically equating to violence, are racist and stereotypical ideologies based on unfounded assumptions that all Black/African American people are violent.

79.    The CID's unfounded assumption about Black/African Americans deprived The Sourze, LLC, and a Black/African American business owner from the right to make and enforce contracts and the right to lease real property in the Westport community.

80.    Under the original and Amended and Restated Triple Net Lease, The Sourze, LLC, rented 3,594 square feet including a basement, main level, and upstairs portion of the building.

81. Initially, The Sourze, LLC, was allowed to have a customer occupancy of 200 people but after interference by Defendants CID and Westport Development, LLC, The Sourze LLC's maximum occupancy was arbitrarily decreased to 80 people.

82. Plaintiff The Sourze LLC, refused to sign the "Good Neighbor" agreement because it was "one sided" and gave Defendant CID and Westport Development too much control over business operations.

83. Without the ability to open the Daiquiri Shop and increase revenues by expanding its business, The Sourze, LLC was paying out more money in overhead than it was able to recover in revenue.

84. The Sourze LLC's inability to utilize the entire property caused its business to fail.

85. The CIDs refusal to approve plans for Daiquiri Shop, after Pulse Management, LLC, and agents of Defendant Westport Development, LLC, represented to The Sourze, LLC, that the plans were sufficient prior to entry of the lease, tortiously interfered with The Sourze, LLC's right to enforce the contract and lease agreement that it entered into with Westport Development.

86. A significant motivating factor in switching the original plan for Daiquiri Shop, and for refusing to lease the additional portion of 427 Westport to The Sourze, LLC, is simply because its owner, manager, and primary customer base were Black/African Americans. Even if race was not the exclusive motivating factor, the CID's policies, procedures, and actions in eliminating "problematic" owners has actually and predictably resulted in a practice or pattern of discrimination and has worked negatively to the exclusion of minority business owners from the Westport community.

87.     On February 8, 2023, Defendant Westport Development, LLC filed a Petition for Rents and Possession against Plaintiff The Sourze, LLC, pursuant to the Amended and Restated Triple Net Lease.

C.   <u>Racial Discrimination Toward Black/African American Patrons and Independent Contractors</u>
D.

88.     In 2019, Defendant Allred was found to have made a secret "No Play List," which excluded very popular songs made by Black/African American entertainers.

89.     Defendant Allred's response to public criticism about the discovered racism in Westport resulted in Allred opening a nightclub that predominantly played hip hop music.

90.     The "No Play List" included popular Top 10 Billboard hits by 11 Black/African American artists, some of which were music's most popular stars like Beyonce, Jay-Z, Drake, Cardi B, Kendrick Lamar, Migos, and Travis Scott.

91.     Defendant Allred, opened a hip-hop establishment to cater to Black/African American patrons, customers, and/or consumers, but abruptly closed the establishment in 2022.

92.     In a recorded meeting, Firefly Owner Todd Gambal along with Firefly Manager Kent Shultz and bar tender Jessica Teel informed Steven Davis that Todd Gambal had received a threatening email from Defendant Allred stating that if Gambal continued to hire Plaintiff Davis as a DJ at Firefly, Defendant Allred would take steps to get Firefly's liquor license revoked and/or terminated.

93.     Todd Gambal told Steven Davis that Defendant Allred instructed him not to hire Steven Davis in Westport because of the type of "crowd" Steven Davis attracts to Westport.

94.     Steven Davis has a large following in the Black/African American community in the Kansas City area.

95.     During the recorded meeting, Todd Gambal explained to Steven Davis that he wanted him to DJ at his business, but that Defendant Allred is trying to "whitewash" Westport, as means to exclude Black/African American people from Westport.

96.     Defendant Allred under the authority and ratification of Defendant CID by and through the "Good Neighbor" agreement used coercion, extortion, and bribery against business owner Todd Gambal to restrict and/or minimize the number of Black/African Americans patrons in Westport.

E.  Racial Discrimination against UniKC, LLC.

97.     On April 6, 2021, UniKC, LLC, (hereinafter "UniKC"), a Missouri limited liability corporation registered in Missouri, entered into a lease agreement with Defendant DB Icehouse, LLC. for the purpose of leasing commercial property in the Westport community at 4140 Pennsylvania Avenue, Kansas City, Missouri 64111 (hereinafter "4140 Pennsylvania").

98.     The lease was entered into and signed by Mr. Fredrick Vickers on behalf of Plaintiff UniKC, LLC.

99.     The lease agreed to between Plaintiff UniKC and DB Icehouse, LLC contained a noncompete clause that prohibited Plaintiff UniKC from selling pizza or competing with AC Westport, LLC, operating as The Denver Biscuit, and owned by Drew Shader, Jason McGovern, and Ashleigh Carter.

100.    The primary managing member of Plaintiff UniKC is D'Mario Gray, a Black/African American citizen of Kansas City.

101.    Defendant DB Icehouse, LLC, identified itself as having two primary members, Mr. Joe Neibur and Mr. Greg Bartold.

102. Upon information and belief, Mr. Neibur and Mr. Bartold are both White/Caucasian individuals.

103. Upon execution of the lease, DB Icehouse, LLC delivered possession of 4140 Pennsylvania to Plaintiff UniKC and provided keys to Plaintiff UniKC to access the property and begin renovations in preparation for its grand opening.

104. Sometime thereafter, the owner of a neighboring business met with Ms. Sheoni Givens, Mr. Frederick Vickers, and Mr. D'Mario Gray at the Denver Biscuit restaurant to talk about plans for 4140 Pennsylvania.

105. Upon going inside the Denver Biscuit, Ms. Sheoni Givens, Mr. Frederick Vickers, and Mr. D'Mario Gray were greeted by a doorman and Plaintiff D'Mario Gray informed the doormen of the meeting with the business owner.

106. Ms. Sheoni Givens, Mr. Frederick Vickers and Mr. D'Mario Gray were taken to a table and waited for the business owner.

107. The owner of the Denver Biscuit was a White/Caucasian individual.

108. The owner asked many questions of Plaintiff D'Mario Gray and Plaintiff Frederick Vickers.

109. The owner's first concern was about the placement of the door and where patrons would be entering.

110. The owner's next concern was about the type of music being played, specifically whether it would be R&B and Hip-hop.

111. The owner's third concern was about what type of crowd the club was drawing.

112. The owner also asked the age of the target market for the business.

113.     These questions caused Ms. Sheoni Givens, Mr. Frederick Vickers, and Mr. D'Mario Gray to pause with anxiety because the owner's tone and demeanor was offended, dismissive, annoyed, agitated, and upset at the answers provided.

114.     Mr. D'Mario Gray and Mr. Frederick Vickers' answers regarding the business described as a club catering to a young, R&B, Hip Hop, crowd.

115.     Mr. D'Mario Gray and Mr. Frederick Vickers assured the owner that they would be following security guidelines and employing the Kansas City Police Department.

116.     The expenses for following security guidelines and employing the Kansas City Police Department were also a part of their projected expenses created before entering the lease with DB Icehouse, LLC.

117.     Upon information and belief, after the owners encounter with Ms. Sheoni Givens, Mr. Frederick Vickers and Mr. D'Mario Gray, the owner of the Denver Biscuit contacted representatives of DB Icehouse, LLC to discuss his displeasure with his new neighbor.

118.     At the time of his encounter with Mr. Gray, the owner of Denver Biscuit had absolutely no information about Mr. Gray other than the fact that he was Black/African American and planned to open a space to cater to a young, R&B, Hip Hop, crowd.

119.     The displeasure with Mr. Gray was solely due to his race, Black/African American and the target market of his business.

120.     The very next day, on October 12, 2021, Mr. Neibur emailed Mr. Gray and explained that he received a cease-and-desist letter regarding the lease that DB Icehouse, LLC had entered into with UniKC, LLC.

121.     After receiving the email, Mr. Gray attempted to access 4140 Pennsylvania, but the locks had been changed.

122.   Mr. Gray was locked out of the property that he had a contractual right to possess for no other reason than the fact that he is Black/African American.

123.   At the time of the email and the landlord's decision to change the locks, Plaintiff UniKC had not violated any terms or conditions under his lease.

124.   After consulting with his attorney, Mr. Gray sent a return email explaining that he had entered into a legally binding lease agreement, and he fully expected to proceed under the terms of the lease.

125.   In subsequent conversations with Mr. Neibur and Mr. Bartold, Mr. Gray was told that several neighboring business owners, including the owner of the Denver Biscuit, did not want Mr. Gray's "type of crowd" to come to the Westport community and cause problems.

126.   Plaintiff UniKC never had a chance to open its doors to determine what "type of crowd" the business would bring, because DB Icehouse, LLC paid Unikc $100,000.00 to terminate its lease, walk away from the deal, and indemnify itself from any legal action resulting from the unwarranted termination of lease.

127.   Mr. Gray is a positive contributor to the community.

128.   Mr. Gray recently held an anti-violence event called "Guns Down Gloves Up," for which even Kansas City Mayor Quinton Lucas took notice of and commended.

129.   Mr. Gray has also done charity events wherein he gave away 500 Thanksgiving turkeys to the Kansas City community.

130.   Despite Mr. Gray's positive contributions to the community, upon information and belief, Plaintiff UniKC was not allowed to operate in the Westport community because its owner

and/or operator was Black/African American, and because of an assumption that Unikc's targeted patrons, customers, and consumers, would also be Black/African American.

F.   Racial Discrimination against Euphoric LLC

131.    For nearly a decade, one of the bar/restaurants in the Westport community operated under the name Ale House.

132.    Ale House was owned, operated, and/or managed by Defendant Zach Marten and Brett Springs.

133.    On April 9, 2024, Ale House closed its doors and ceased its business  operations.

134.    Sometime after the closure of Ale House, Christopher Lee, owner of Euphoric, LLC, became aware of a leasing vacancy of the property where Ale House had previously been located.

135.    The building and property that was opened and previously operating as Ale House is owned and/or leased by Defendant 4128 Broadway, LLC, and is a commercial building located at 4128 Broadway Avenue, Kansas City, Missouri, 64111 ("the Restaurant").

136.    The owner, manager, and/or landlord of the building and property for the Restaurant is Defendant Brody.

137.    Upon learning of the vacancy of the Restaurant, Lee contacted Brody about entering into a lease agreement for the Restaurant.

138.    Defendant Brody required Euphoric LLC's owner, Christopher Lee, to take a personality test before allowing him to enter the lease agreement, unlike that of Caucasian business owners.

139.    During talks and negotiations, Defendant Brody told Mr. Lee that Ale House earned revenues of about $7 million annually.

140. Plaintiff Euphoric LLC, relied on the representations of Defendant Brody and created a plan to put its new restaurant and bar in position to earn at least the same annual revenues of $7 million as Ale House, or more.

141. Although Ale House operated as a nightclub, Plaintiff Euphoric's intended purpose for the lease agreement was to reopen the building and do business as a new restaurant and bar.

142. Mr. Lee spent several weeks and days discussing his plans with Defendant Brody and took a trip to California to meet Defendant Brody at his California residence.

143. During discussions, Mr. Lee informed Defendant Brody that the plan for the business concept would be very similar to that of Elevation Bar and Lounge in Jacksonville, Florida. Mr. Lee provided Defendant Brody with a copy of Plaintiff Euphoric's plan for the building, and a menu for the food that it would serve.

144. On or about September 02, 2024, Mr. Lee provided Defendant Brody with the Business Concept in person.

145. After reviewing the plans, Defendant Brody told Mr. Lee that he liked the concept and would be willing to do business with Plaintiff Euphoric LLC.

146. The agreement between Plaintiff Euphoric and Defendant 4128 Broadway, LLC. was set to operate as a profit-sharing partnership wherein Plaintiff Euphoric agreed to pay a monthly leasing fee to Defendant 4128 Broadway, LLC., in addition to paying Defendant 4128 Broadway, LLC. a percentage of Plaintiff Euphoric's profits.

147. Defendant Brody gave Defendant Zach Marten's contact information to Mr. Lee via text message.

148. Defendant Brody was leasing the property to Defendant Marten at the time Defendant 4128 was negotiating a lease agreement with Mr. Lee.

149.    Mr. Lee and Defendant Marten talked about the steps Plaintiff Euphoric needed to take regarding obtaining a liquor license.

150.    On September 24, 2024, Defendant Marten text Mr. Lee, "You get your lease signed?"

151.    On October 21, 2024, Plaintiff Euphoric and Defendant 4128 Broadway, LLC. entered into a lease agreement.

152.    Mr. Christopher Lee and Mr. Damion Johnson signed the lease on behalf of Plaintiff Euphoric, and Defendant Harold Brody signed the lease on behalf of Defendant 4128 Broadway, LLC.

153.    Mr. Christopher Lee and Mr. Damion Johnson signed the guarantor's agreement on behalf of Plaintiff Euphoric, and Defendant Harold Brody signed the same on behalf of Defendant 4128 Broadway.

154.    The most relevant terms of the lease were as follows:

a.    Term of lease is ten (10) years, and such term shall commence at 12:01a.m. on October 21, 2024 "Commencement Date" and shall expire at midnight on the 31st day of October, 2034.

b.    Landlord shall use due diligence to give possession of the Premises to Tenant as nearly as possible on or before the Commencement Date of the Term.

c.    Upon delivery by Landlord to Tenant of possession of the Premises or the

Commencement Date of the Lease, whichever is earlier, Tenant shall deliver to Landlord the sum of $10,000.00 as security for the performance by Tenant of every covenant and condition of this Lease.

d.    Sole Use as Restaurant and Bar. Tenant shall operate a restaurant and bar on the

Premise and shall use the Premise for no other purpose.

e.    Tenant shall have the exclusive right to the use and quiet enjoyment of the

Premise and Property during the Term.

f.    Tenant shall be in default under this lease if: (A) Tenant fails to pay any item of Rent when due; (B) Tenant fails to comply, with any warranty, covenant, agreement, stipulation, term, condition, or provision of this Lease; (C)

Tenant abandons or vacates the Premises; (D) a petition is filed by or against Tenant under any section or chapter of the Federal Bankruptcy Act, as amended, or under any similar law or statute of the United States or any state thereof; (E) Tenant becomes insolvent or makes a transfer in fraud of creditors; (F) Tenant makes an assignment for benefit of creditors; or (G) a receiver is appointed for Tenant or any of the assets of Tenant.

      g.     In the event of a default, Landlord may terminate the Lease and/or sue for damages as provided by law if Tenant does not initiate and pursue with diligence the curing of such default within thirty (30) days after Tenant's receipt of written notice from Landlord describing the particular default.

      h.     So long as Tenant is not in default, Tenant shall be entitled to the peaceful, quiet enjoyment of the possession of the Premises during the Term and any extension or renewal of this Lease.

155.    Plaintiff Euphoric tendered performance of its obligations under the Lease by delivering $10,000.00 to 4128 Broadway, LLC. on October 23, 2024.

156.    Under the terms of the lease agreement, Plaintiff Euphoric was, and still is, entitled to the peaceful, quiet enjoyment of the possession of the Restaurant.

157.    On October 23, 2024, Defendant Brody created a group text message wherein he introduced Mr. Lee to Defendants Allred and Kimbrough and told them that he (Brody) and Lee had entered into a lease agreement for the Restaurant.

158.    Defendant Brody created a group text message wherein he introduced Mr. Lee to a man named "Larry" and stated that he and Mr. Lee had entered into a lease agreement for the Restaurant and that Larry should give Mr. Lee access to the building.

159.    On October 23, 2024, Mr. Lee along with Mr. Damion Johnson and Mr. Maurice McKinney organized Ale House West, LLC as a Missouri LLC to provide "…Any and all other activities incidental or related to the operation of a restaurant, lounge, or hospitality business…" but specifically to provide payroll and human resources services to Plaintiff Euphoric LLC.

160.     On October 23, 2024, and in anticipation of having access to the Restaurant as promised by Defendant Brody, community members announced the reopening of the Restaurant on social media and announced that Ale House West, LLC was "Now Hiring"

161.     On October 23, 2024, Mr. Lee sent the flyer to Defendant Brody in a text message and asked Defendant Brody to give him a call.

162.     In the posts, community members invited several potential employees to meet at the Restaurant to receive an opportunity for employment upon opening.

163.     The aforementioned Mr. Gray, who is also a popular local promoter who promotes under the name Rio Entertainment, posted on his social media about the Restaurant's reopening. Mr. Gray is a Black/African American promoter.

164.     Mr. Mark Mullmore, who promotes under the name of Marks My Barber, also posted news of the reopening. Mr. Mullmore is a popular Black/African American promoter.

165.     The social media posts instantly gained significant community attention and interaction. Mr. Gray's post alone had 29,003 views, 761 shares, 531 likes, 55 comments and 49 saves.

166.     The CID Defendants became aware of the posts and immediately began interfering with Euphoric's plan to open its Restaurant.

167.     Defendant Allred began looking into the matter, and texted Mr. Mullmore to ask Mr. Mullmore if he was the person that entered into the lease for "Ale House," to which Mr. Mullmore responded that he was not.

168.     After the social media posts were discovered, Defendant Allred and the CID Defendants interfered with Plaintiff Euphoric's business opportunity and business expectation by instructing Defendant Brody to terminate the agreement.

169.    On or about October 24, 2024, in response to Defendant Allred and the CID Defendants instruction Defendant Brody called Mr. Lee concerning the flyer.

170.    Defendant Brody instructed Mr. Lee along with Mr. Damion Johnson and Mr. Maurice McKinney to change the name from Ale House West, LLC.

171.    Mr. Lee changed the name of Ale House West, LLC to House of Broadway, LLC.

172.    On October 28, 2024, Defendants Brody, Allred, and Kimbrough refused to give Plaintiff Euphoric the keys to the Restaurant.

173.    Plaintiff Euphoric was forced to host its hiring event outside of the Restaurant because in violation of the lease agreement, Euphoric was not granted access to the property.

174.    Several of Ale House West, LLC and House of Broadway, LLC's potential prospective employees to be hired in Euphoric Bar and Lounge left the event due to the disorganization.

175.    People on social media were publicly humiliating and discrediting Euphoric by claiming that Euphoric did not really have permission to open the Restaurant and claiming that Plaintiff Euphoric was a fraud.

176.    Defendants Brody and the CID Defendants refused to provide Plaintiff Euphoric with access to the Restaurant after Plaintiff Euphoric entered a legally binding lease agreement for the Restaurant, was promised access to the Restaurant, and after Plaintiff Euphoric represented to the public that it was hiring in anticipation of opening the Restaurant.

177.    The actions of Defendants Brody, 4128 Broadway and the CID Defendants caused Plaintiff Euphoric to experience severe public humiliation.

178.     Plaintiff Euphoric later learned that when the social media posts announcing the Restaurant's reopening and hiring efforts were posted, the CID Defendants began conspiring to pressure Defendant Brody into stopping the Restaurant's reopening.

179.     Sometime thereafter, Mr. Lee contacted Defendant Brody, and Defendant Brody informed Lee that he had Defendant Allred on the other line of his phone.

180.     Mr. Lee asked Defendant Brody to merge Defendant Allred into the call, and Defendant Brody initially informed Mr. Lee that Defendant Allred said he (Allred) did not want to talk to Mr. Lee.

181.     Defendant Brody informed Mr. Lee that Defendant Allred said: "I don't need to talk to him (Lee). I already know what he (Lee) is all about."

182.     At that time, the only thing Defendant Allred knew about Mr. Lee was: (1) his name, (2) that he entered into a lease for the Restaurant, (3) that Mr. Lee was a Black/African American male, and (4) some of the social media posts advertising the hiring came from very popular Black/African American Kansas City promoters.

183.     After some further conversations, Mr. Lee convinced Defendant Brody to merge Defendant Allred into a call with Mr. Lee.

184.     Defendant Allred revealed to Mr. Lee that Defendant Allred and other Westport business owners did not want Euphoric's "type of crowd" in the Westport community.

185.     Defendant Allred stated concerns about security and business operations, but Defendant Allred's security concerns failed to consider Plaintiff Euphoric's plans for managing such concerns.

186. The CID Defendants assumed Plaintiff Euphoric's target audience was Black/African American patrons, customers, and/or consumers because of the posts by the two most popular Black/African American promoters in Kansas City.

187. During the conversation, Defendant Allred never truly provided Mr. Lee with a fair chance to explain that he had plans for pursuing a diverse crowd of patrons, customers, and consumers.

188. Upon entry of the lease, Plaintiff Euphoric had plans to implement sufficient security measures, but Plaintiff Euphoric was never given a chance to show that their security measures would have been sufficient to sustain a successful, peaceful, and profitable business.

189. In historically familiar fashion, the CID Defendants deprived Plaintiff Euphoric of its right to make and execute contracts and its right to lease real property.

190. The CID Defendants committed these discriminatory acts before Plaintiff Euphoric even had a chance to open its doors, and with no evidence of any wrongdoing by Plaintiff Euphoric.

191. Sometime after the conversation with Defendant Allred, Mr. Lee asked Defendant Brody again to provide him (Lee) with the keys to the Restaurant.

192. Defendant Brody told Mr. Lee he was not giving Plaintiff Euphoric access to the Restaurant.

193. Defendant Brody admitted that Plaintiff Euphoric did not breach the contract in a recorded conversation, stating, "I'm not suggesting that there's necessarily a breach at all, it's just it didn't…. pan out..."

194. During this recorded conversation, Mr. Lee asked Defendant Brody why it did not "pan out" Defendant Brody responded, "Because of the way it got presented to the community immediately."

195.    During this recorded conversation, Defendant Brody admitted that Defendant Allred and the other CID members had influence over him and his decision to breach the lease agreement.

196.    During this recorded conversation, Defendant Brody asked Mr. Lee to "convince them, please."

197.    During this recorded conversation, Mr. Lee asked Defendant Brody, if "It's a culture thing, that they (the community) doesn't want a certain culture down there?"

198.    Defendant Brody responded, "Well, they're afraid that it will bring violence."

199.    Defendant Brody told Mr. Lee that he needed to change the concept he had for the Restaurant, and that he needed to target "an older crowd" and "not that young hip hop crowd."

200.    A typical "hip hop crowd" predominantly consists of Black/African American individuals.

201.    On November 15, 2024, Plaintiff Euphoric sent a Demand Letter, via certified mail, to Defendants Brody and 4128 Broadway, LLC., and their attorney.

202.    Plaintiff Euphoric informed Defendants Brody and 4128 Broadway, LLC, that the parties had entered into a legally binding contract, and that 4128 Broadway, LLC, was currently in breach of that contract, and that Euphoric demanded immediate possession of the Restaurant as agreed upon in the lease agreement.

203.    As of the date of this complaint, Defendants Brody and/or 4128 Broadway, LLC, have never responded to Plaintiff Euphoric's Demand Letter.

204.    At any time relevant hereto, Plaintiff Euphoric did not engage in any conduct described in the seven listed causes of default in the lease agreement.

205.    As of the date of this Complaint, Plaintiff Euphoric has not received any notice of an alleged default from 4128 Broadway, LLC, or instructions to cure any such alleged default.

206.    As of the date of this Complaint, Defendant 4128 Broadway, LLC, has refused to deliver possession of the Restaurant to Plaintiff Euphoric.

207.    On March 15, 2025, Defendant Brody and Mr. Lee met for lunch and discussed the current case.

208.    On March 15, 2025, Defendant Brody once again offered to lease the property to Mr. Lee upon getting him business concept.

209.    On March 15, 2025, Defendant Brody that he wants a "clean sports bar".

210.    On March 15, 2025, Defendant Brody and Mr. Lee talked about the fact that Mr. Lee had already presented a concept to Defendant Brody and that Defendant Brody had reviewed it in a binder and that Defendant Brody forgot to take the binder with him.

211.    Sometime after April 24, 2025, but before July 26, 2025, Holy Brunch Kc Brunch Bar LLC, entered into an agreement with Defendant Harold Brody and 4128 Broadway, LLC to operate a restaurant and bar, with its principal business located at 4128 Broadway Kansas City, MO 64111-2617.

212.    The lease agreement between Holy Brunch KC Brunch Bar LLC, and Defendant Harold Brody and 4128 Broadway, LLC, violates Euphoric LLC's lease agreement made on October 21, 2024 with Defendant Harold Brody and 4128 Broadway, LLC.

213.    The owner of Holy Brunch KC Brunch Bar LLC stated in recorded audio that the parties and night-club like events, use "bottle service" and "bottle girls" and serve "the cheapest liquor" in Kansas City in order "to get patrons to buy more liquor."

214. Defendant Allred announced plans to open several new bars and restaurants in the Westport in 2024 and 2025.

215. Upon information and belief, a substantial motivating factor in Defendants' conspiracy to refuse and withhold the delivery of possession of the Restaurant is/was that (1) Mr. Lee, Euphoric's owner, stock holder, operator, agent, and/or managing member, is a Black/African American individual, (2) the viral social media posts were made by popular Black/African American individuals, and (3) because of the CID's false assumption that Plaintiff Euphoric's targeted patrons, consumers, and/or customers would very likely be predominantly Black/African American individuals.

216. Even if race was not the exclusive motivating factor, the CID's policies, procedures, and actions in eliminating "problematic" owners has actually and predictable resulted in a practice or pattern of discrimination and has worked negatively to the exclusion of minority business owners from the Westport community.

217. The CID's discriminatory acts were also done as a tactic to receive a financial benefit for the companies for which the CID Defendants were and/or are owners, operators, stockholders, and/or managing members by decreasing competition and increasing their own revenues.

218. The Defendants herein acted with malicious intent, evil motive, and a reckless indifference to the statutory and constitutional rights of the Plaintiffs.

## CLAIM I.

## BREACH OF CONTRACT
### (Plaintiff THE SOURZE, LLC Against Defendants
### Westport Development, LLC, Murfin, Inc.,

**Defendant Hurt and Defendant Vos)**

219.     Plaintiffs herein repeat, allege, and incorporate by reference, all facts set forth in paragraphs 1 through 218 as set forth here in full.

220.     On November 25, 2020, The Sourze, LLC, entered into a lease agreement with Pulse Management, LLC, and agents of Defendant Westport Development.

221.      The most relevant terms of the lease were as follows:

    i.    Leased Premises: Approximately 3,594 square feet of interior space located at 427 Westport.
    ii.   Commencement Date: Shall be January 11, 2020 . . . Expiration Date: Three (3) years after the Commencement Date [January 11, 2023].

222.     Initially, The Sourze, LLC only opened the art gallery/event space portion of 427 Westport, and Pulse Management, LLC, and agents of Westport Development represented to The Sourze that it would be  able to use the additional portion of 427 Westport for Daiquiri Shop.

223.     The parties initially agreed to a lease payment of $5,000 per month in Year  One, $5,148.33 per month in Year Two, and $5,300 for Year Three.

224.     On April 14, 2021, Plaintiff The Sourze, LLC, and Pulse Management, LLC, entered in to the Amended and Restated Triple Net Lease.

225.     After the Amended and Restated Triple Net Lease agreement was in place, Pulse Management, LLC,  and agents of Defendant Westport Development, LLC, falsely told the owner of The Sourze that the property was only fit to be a clothing store.

226.     Defendant Westport Development, LLC's representations to Plaintiff The Sourze, LLC, were false because at the time that The Sourze moved into 427 Westport, the property was already zoned and deemed fit for a restaurant.

227.     In a meeting between agents of Defendant Westport Development, LLC, either Defendant Hurt or Voss stated to Plaintiff The Sourze, LLC, that the Daiquiri Shop would "cannibalize" the other Westport bars.

228.     In a meeting between agents of Defendant Westport Development, LLC, either Defendant Hurt or Voss stated to Plaintiff The Sourze, LLC, that they did not want any more bar and restaurant concepts in the Westport because bars, and especially those patronized by the hip-hop crowds, equated to violence.

229.     After Plaintiff The Sourze, LLC, had already paid over $50,000.00 in rents, agents of Defendant Westport Development, LLC told Plaintiff The Sourze, LLC that it would no longer agree to the concept for the Daiquiri Shop, and that The Sourze, LLC, needed to produce a new concept.

230.     During this same time frame, Defendant Allred and other White/Caucasian business owners were allowed to change their concepts and open new bars and restaurants in the Westport.

231.     Agents of Defendant Westport Development, LLC, refused to provide Plaintiff The Sourze, LLC, with an opportunity to utilize the additional portion of the building in a manner that would contribute to its success.

232.     Such refusal was a breach of contract and caused the demise and failure of The Sourze, LLC's business.

233.    The CID Defendants and/or Westport Development, LLC had absolutely no legal basis to change the terms of the Amended and Restated Triple Net Lease.

234.    The CID's unfounded assumption about Black/African Americans deprived The Sourze, LLC, and a Black/African American business owner from the right to make and enforce contracts and the right to lease real property in the Westport community.

235.    Without the ability to utilize the entire property and open the Daiquiri Shop to increase revenues, The Sourze, LLC, was paying out more money in overhead than it was able to recover in revenue.

236.    Defendants refusal to approve plans for Daiquiri Shop, under Defendant CID's "Good Neighbor" agreement caused direct harm to Plaintiff The Sourze, LLC business profitability.

237.    Defendant Westport Development, LLC, represented to The Sourze, LLC, that the plans were sufficient prior to entry of the lease, and tortiously interfered with The Sourze, LLC's right to enforce the contract and lease agreement that it entered into with Westport Development.

238.    A significant motivating factor in switching the original plan for Daiquiri Shop, and for refusing to lease the additional portion of 427 Westport to The Sourze, LLC, is simply because its owner, manager, and primary customer base were Black/African Americans.

239.    Even if race was not the exclusive motivating factor, the CID's policies, procedures, and actions in eliminating "problematic" owners has actually and predictably resulted in a practice or pattern of discrimination and has worked negatively to the exclusion of minority business owners from the Westport community.

240.    As a direct and proximate cause of the actions and conduct set forth herein, Plaintiffs have suffered and will continue to suffer damages including expenses.

241.    Plaintiffs have been (and continues to be) damaged as a direct and proximate result of Defendants' actions causing Plaintiffs severe and continuing injuries, including, but not limited to:

a.    emotional pain and suffering;
b.    insult;
c.    mental distress;
d.    embarrassment;
e.    humiliation;
f.    anxiety; and
g.    inconvenience.

**WHEREFORE**, Plaintiff The Sourze, LLC, requests that this Court, after a trial by jury of their claims, enter Judgment against Defendants Westport Development, LLC, and granting such relief as may be appropriate, including: a finding that he has been subjected to breach of contract; such actual and punitive damages as are fair and reasonable; Plaintiff's reasonable attorneys' fees, expert witness fees and expenses, the costs of this action; and for such further relief as the Court considers just and proper.

## CLAIM II.

### DECLARATORY RELIEF ESTABLISHING PLAINTIFF'S RIGHT TO IMMEDIATE POSSESSION OF THE RESTAURANT AND DAMAGES FOR LOST REVENUE AND PROFITS
### (Plaintiff Euphoric Against Defendants 4128 Broadway, LLC. and Brody)

242.    Plaintiff herein repeats, alleges, and incorporates by reference, all facts set forth in paragraphs 1 through 241 as set forth here in full.

243.    Mo. Rev. Stat. § 527.020 provides: "Any person interested under a deed, will, written contract or other writings constituting a contract, or whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined

any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status or other legal relations thereunder."

244. On October 21, 2024, Plaintiff Euphoric entered into a lease agreement with 4128 Broadway, LLC for the purpose of leasing a Restaurant.

245. Mr. Christopher Lee entered and signed the lease on behalf of Euphoric, and Harold Brody entered and signed the lease on behalf of 4128 Broadway, LLC. 208. Upon signing the lease, Euphoric tendered performance of its obligations under the lease by delivering $10,000.00 to 4128 Broadway, LLC on the same day. 165. Under the terms of the lease, Defendant 4128 Broadway, LLC was/is required to use due diligence to give possession of the Restaurant to Euphoric as nearly as possible on or before the Commencement Date of the lease.

246. The lease also provided Plaintiff Euphoric with the exclusive right to the use and quiet enjoyment of the Restaurant during the term of the lease.

247. Since the commencement date of the lease, Plaintiff Euphoric has never received any notice of default from 4128 Broadway, LLC.

248. Plaintiff Euphoric is therefore entitled to immediate possession of the Restaurant under the terms of the lease agreement.

249. Euphoric anticipates revenues of $7 million annually (equivalent to $583,333.33 per month).

250. Defendant's refusal to deliver possession of the Restaurant has caused Euphoric to suffer significant monetary damages by the loss of revenue and profits in the amount of $583,333.33 per month.

251. Defendants' actions have also caused mental anguish and public humiliation.

38

252.     Plaintiff herein seeks a declaration of its rights to immediate possession of the Restaurant, and a declaration of it rights to operate a restaurant and bar in the Westport community.

253.     Plaintiff further seeks compensatory damages of $583,333.33 per month for lost revenue and profits, in addition to damages for humiliation, mental anguish, and punitive damages for racial discrimination.

254.     As a direct and proximate cause of the actions and conduct set forth herein, Plaintiffs have suffered and will continue to suffer damages including expenses.

255.     Plaintiffs have been (and continues to be) damaged as a direct and proximate result of Defendants' actions causing Plaintiffs severe and continuing injuries, including, but not limited to:

a.     emotional pain and suffering;
b.     insult;
c.     mental distress;
d.     embarrassment;
e.     humiliation;
f.     anxiety; and
g.     inconvenience.


**WHEREFORE**, Plaintiffs requests that this Court, after a trial by jury of their claims, enter Judgment against Defendants 4128 Broadway and Brody and  granting such relief as may be appropriate, including: a  finding declaratory relief; such actual and punitive damages as are fair and reasonable; Plaintiff's reasonable attorneys' fees, expert witness fees and expenses,  the costs of this action; and for such further relief as the Court considers just and proper.

## CLAIM III.

## BREACH OF CONTRACT
### (Plaintiff Euphoric Against Defendants 4128 Broadway, LLC, and Brody)

256.    Plaintiff herein repeats, alleges, and incorporates by reference, all facts set forth in paragraphs 1 through 255 as set forth here in full.

257.    On October 21, 2024, Plaintiff Euphoric entered a Lease agreement with Defendant 4128 Broadway, LLC.

258.    The Lease required Plaintiff Euphoric to deliver to Defendant 4128 Broadway, LLC the sum of $10,000.00 as security for the performance by Plaintiff Euphoric of every covenant and condition of the Lease.

259.    Plaintiff Euphoric tendered performance of its obligations under the Lease by delivering to Defendant 4128 Broadway, LLC $10,000.00 at the time of the signing of the Lease.

260.    Under the terms of the Lease, Defendant 4128 Broadway, LLC was required to use due diligence to give possession of the Restaurant to Plaintiff Euphoric as nearly as possible on or before the Commencement Date of the Lease.

261.    As of the date of this complaint, Defendant 4128 Broadway, LLC, has not performed its obligations under the lease and has not delivered  possession of the Restaurant to Euphoric.

262.    Defendant 4128 Broadway, LLC's failure to perform its obligation under the lease and deliver possession of the Restaurant to Plaintiff Euphoric places Defendant 4128 Broadway, LLC in violation and breach of the Lease agreement.

263.    Under the terms of the Lease agreement, Plaintiff Euphoric anticipated annual revenues of $7 million.

264.    The parties agreed that the Term of lease is ten (10) years, and such term shall commence at 12:01a.m. on October 21, 2024 "Commencement Date" and shall terminate at midnight on the 31st day of October 2034.

265.    Plaintiff Euphoric therefore anticipated total revenues of $70 million over the life of the entire ten-year Lease.

266.    Defendant's breach of contract has and will cause Plaintiff Euphoric to suffer damages as a result of lost revenue and profits.

267.    Defendant's actions have also caused mental anguish and public humiliation.

268.    As a direct and proximate cause of the actions and conduct set forth herein, Plaintiffs have suffered and will continue to suffer damages including expenses.

269.    Plaintiffs have been (and continues to be) damaged as a direct and proximate result of Defendants' actions causing Plaintiffs severe and continuing injuries, including, but not limited to:

        a.    emotional pain and suffering;
        b.    insult;
        c.    mental distress;
        d.    embarrassment;
        e.    humiliation;
        f.    anxiety; and
        g.    inconvenience.


**WHEREFORE**, Plaintiffs requests that this Court, after a trial by jury of their claims, enter Judgment against Defendants 4128 Broadway, LLC, and Brody and granting such relief as may be appropriate, including: a finding that Plaintiff has been subjected to a breach of contract; such actual and punitive damages as are fair and reasonable; Plaintiff's reasonable attorneys' fees,

expert witness fees and expenses, the costs of this action; and for such further relief as the Court considers just and proper.

## CLAIM IV.

### ILLEGAL RACIAL DISCRIMINATION IN VIOLATION
### OF 42 U.S.C. § 1982
### (All Plaintiffs Against All Defendants)

270.    Plaintiffs herein repeat, allege, and incorporate by reference all facts set forth in paragraphs 1 through 269 as set forth here in full.

271.    Defendants engaged in illegal racial discrimination by interfering with and/or refusing to deliver possession of the Restaurant to Euphoric as agreed in the lease because of Defendants' desire to keep Black/African American business owners, patrons, customers, and/or consumers out of the Westport community.

272.    Defendants engaged in illegal racial discrimination when they caused the Plaintiff The Sourze, LLC's business to fail through their refusal to allow the Plaintiffs to utilize the entire property they leased and refused to approve plans because of Defendants' desire to keep Black/African American business owners, patrons, customers, and/or consumers out of the Westport community.

273.    Plaintiff UniKc, LLC were denied the opportunity to lease properties in the Westport, which is a predominantly White community, because Plaintiffs' owners are Black/African American citizens and not White/Caucasian, and because of an assumption that their potential patrons, customers, and consumers could possibly be Black/African American.

274.    42 U.S.C. § 1982 provides: "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherent, purchase, lease, sell, hold, and convey real and personal property."

275.    Defendant's actions have tortiously interfered with Plaintiffs' rights to lease real property under section 1982.

276.    Defendants' illegal racial discrimination has and will cause Euphoric to suffer damages as a result of lost revenue and profits.

277.    As a direct and proximate cause of the actions and conduct set forth herein, Plaintiffs have suffered and will continue to suffer damages including expenses.

278.    Plaintiffs have been (and continues to be) damaged as a direct and proximate result of Defendants' actions causing Plaintiffs severe and continuing injuries, including, but not limited to:

    a.   emotional pain and suffering;
    b.   insult;
    c.   mental distress;
    d.   embarrassment;
    e.   humiliation;
    f.   anxiety; and
    g.   inconvenience.

**WHEREFORE**, Plaintiffs requests that this Court, after a trial by jury of their claims, enter Judgment against all Defendants and granting such relief as may be appropriate, including: a finding that Plaintiff has been subjected to a violation of 42 U.S.C. § 1982; such actual and punitive damages as are fair and reasonable; Plaintiff's reasonable attorneys' fees, expert witness fees and expenses, the costs of this action; and for such further relief as the Court considers just and proper.

# CLAIM V

## CONSPIRACY TO COMMIT ILLEGAL RACIAL
## DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1985
### (All Plaintiffs Against All Defendants)

279.    Plaintiffs herein repeat, allege, and incorporate by reference all facts set forth in paragraphs 1 through 278 as set forth here in full.

280.    Since 2013 and during the time frames relevant hereto, all Defendants acting in conspiracy with  Defendant CID developed an illegal plan and agreement by and through the "Good Neighbor" agreement and other means, to prevent Black/African American entrepreneurs from opening and maintaining businesses in the Westport community. In furtherance of its plan, Defendant CID and individually name CID Defendants used their power in the Westport Community Improvement District maliciously by actively contacting property owners on the Westport and pressuring them either to or not to consent to liquor licenses for prospective tenants resulting in termination of or breaching lease agreements to prospective tenants/tenants who are Black/African American individuals.

281.    The purpose of the Defendant CID and individually named CID Defendants conspiracy is to deprive Black/African American business owners from the equal enjoyment of leasing property in the Westport community as a measure to decrease the amount of Black/African American patrons, customers, and/or consumers in the Westport community, and to ensure that the Westport Community Improvement District is predominantly patronized by White/Caucasian patrons, customers, and/or consumers.

282.    Since 2013 and during the time frames relevant hereto, all Defendants acting in conspiracy with  Defendant CID developed an illegal plan and agreement by and through the

"Good Neighbor" agreement and other means to prevent Black/African American entrepreneurs from opening and maintaining businesses in the Westport community.

283.    Since 2013 and during the time frames relevant hereto, all Defendants acting in conspiracy with  Defendant CID meet regularly and discuss plans for new businesses opening in Westport. In these meetings, all Defendants agreed to a plan by and through the "Good Neighbor" agreement and other means that served to limit the existence of Black/African American business owners in the Westport community, and to make success extremely difficult for those that already existed.

284.    Since 2013 and during all times mentioned herein, "99 percent" of the 251 CID members and all Defendants took affirmative actions by and through the "Good Neighbor" agreement and other means and are liable for entering an illegal conspiracy to implement the racially discriminatory practices that have existed in Westport, and  directly, detrimentally, and tortiously affected the Plaintiffs herein.

285.    42 U.S.C. § 1981(a) provides, in relevant part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . ." 243. 42 U.S.C. § 1982 provides: "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherent, purchase, lease, sell, hold, and convey real and personal property."

286.    The actions of the Defendants acting in conspiracy with Defendant CID caused Plaintiffs to be deprived of their lawful rights to lease property in violation of sections 1981 and 1982.

287.    42 U.S.C. § 1985(3) provides, in relevant part: "If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or

45

class of persons of the dual protection of the laws, or of equal privileges and immunities under the laws . . . the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

288.  Defendants acting in conspiracy with Defendant CID deprived Plaintiffs of the equal protection of the laws and privileges under federal law have and continue to cause Plaintiffs to suffer significant monetary damages by the loss of revenue and profits and did cause the Plaintiffs' businesses to fail.

289.  Defendants acting in conspiracy with Defendant CID deprived Plaintiffs of the equal protection of the laws and privileges under federal law has also caused mental anguish, public humiliation, and damage to the reputation of each Plaintiffs' businesses. Plaintiffs are also entitled to their attorney's fees and costs incurred in prosecuting this action.

290.  As a direct and proximate cause of the actions and conduct set forth herein, Plaintiffs have suffered and will continue to suffer damages including expenses.

291.  Plaintiffs have been (and continues to be) damaged as a direct and proximate result of Defendants acting in conspiracy with Defendant CID actions causing Plaintiffs severe and continuing injuries, including, but not limited to:

    a.    emotional pain and suffering;
    b.    insult;
    c.    mental distress;
    d.    embarrassment;
    e.    humiliation;
    f.    anxiety; and
    g.    inconvenience.

**WHEREFORE**, Plaintiffs requests that this Court, after a trial by jury of their claims, enter Judgment against all Defendants acting in conspiracy with Defendant CID and granting

such relief as may be appropriate, including: a finding that Plaintiff has been subjected to a violation of 42 U.S.C. § 1985; such actual and punitive damages as are fair and reasonable; Plaintiff's reasonable attorneys' fees, expert witness fees and expenses, the costs of this action; and for such further relief as the Court considers just and proper.

## CLAIM VI

### RACIAL DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981
(All Plaintiffs Against All Defendants)

292.     Plaintiffs herein repeats, alleges, and incorporates by reference, all facts set forth in paragraphs 1 through 291 as set forth here in full.

293.     42 U.S.C. § 1981(a) provides, in relevant part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . ."

294.     The actions of the Defendants set forth above caused Plaintiffs to be deprived of their lawful rights to make and enforce contracts in violation of section 1981.

295.     Defendants' conspiracy to deprive Plaintiffs of the equal protection of the laws and privileges under federal law and their rights to make and enforce contracts has also caused mental anguish, public humiliation, and damage to each of the Plaintiffs' reputations.

296.     Defendants' conspiracy to deprive Plaintiffs of the equal protection of the laws and privileges under federal law and their rights to make and enforce contracts has caused and will cause Plaintiffs to suffer significant monetary damages by the loss of revenue and profits.

297.     As a direct and proximate cause of the actions and conduct set forth herein, Plaintiffs have suffered and will continue to suffer damages including expenses.

298.     Plaintiffs have been (and continues to be) damaged as a direct and proximate result of Defendants' actions causing Plaintiffs severe and continuing injuries, including, but not limited to:

   a.   emotional pain and suffering;
   b.       insult;
   c.       mental distress;
   d.       embarrassment;
   e.       humiliation;
   f.       anxiety; and
   g.       inconvenience.

**WHEREFORE**, Plaintiffs requests that this Court, after a trial by jury of their claims, enter Judgment against all Defendants and  granting such relief as may be appropriate, including: a finding that Plaintiff has been subjected to a violation of 42 U.S.C. § 1981; such actual and punitive damages as are fair and reasonable; Plaintiff's reasonable attorneys' fees, expert witness fees and expenses,  the costs of this action; and for such further relief as the Court considers just and proper.

## CLAIM VII

### FAILURE TO PREVENT RACIAL DISCRIMINATION CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1986
### (All Plaintiffs Against All Defendants)

299.     Plaintiffs herein repeat, allege, and incorporate by reference all facts set forth in paragraphs 1 through 298 as set forth here in full.

300.     42 U.S.C. § 1986 provides, in relevant part: "Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in the preceding section [42 USCS § 1985], are about to be committed, and having power to prevent or aid in preventing the commission

of the same, neglects or refuses so to do, if such wrongful act shall be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case;. . ."

301.   Defendants' failure to stop the conspiracy to deprive Plaintiffs of the equal protection of the laws and privileges under federal law and their rights to make and enforce contracts has caused loss of revenue and profits, mental anguish, public humiliation, and damage to each of the Plaintiffs' reputations.

302.   Defendants' failure to stop the illegal racial discrimination conspiracy deprived Plaintiffs of the equal protection of the laws and privileges under federal law and their rights to make and enforce contracts and to lease real property, which has caused and will cause Euphoric to suffer significant monetary damages by the loss of revenue and profits. Plaintiffs are also entitled to their attorney fees and costs incurred in prosecuting this claim.

303.   As a direct and proximate cause of the actions and conduct set forth herein, Plaintiffs have suffered and will continue to suffer damages including expenses.

304.   Plaintiffs have been (and continues to be) damaged as a direct and proximate result of Defendants' actions causing Plaintiffs severe and continuing injuries, including, but not limited to:

    a.      emotional pain and suffering;
    b.      insult;
    c.      mental distress;
    d.      embarrassment;
    e.      humiliation;
    f.      anxiety; and
    g.      inconvenience.

**WHEREFORE**, Plaintiffs requests that this Court, after a trial by jury of their claims, enter Judgment against all Defendants and granting such relief as may be appropriate, including: a finding that Plaintiff has been subjected to a violation of **42 U.S.C. § 1986**; such actual and punitive damages as are fair and reasonable; Plaintiff's reasonable attorneys' fees, expert witness fees and expenses, the costs of this action; and for such further relief as the Court considers just and proper.

## CLAIM VIII

### TORTIOUS INTERFERENCE WITH PLAINTIFFS' CONTRACTS
### (All Plaintiffs Against All Defendants)

305.    Plaintiffs herein repeat, allege, and incorporate by reference, all facts set forth in paragraphs 1 through 304 as set forth here in full.

306.    Tortious interference is a common law tort which provides a claim for damages wherein an individual interferes with another's right to the entrance or enjoyment of a contract.

307.    Each of the Plaintiffs had a valid lease contract for their respective properties.

308.    The Defendants were aware of the contracts entered into between the Plaintiffs and their respective landlords.

309.    Defendants intentionally interfered with the Plaintiffs contract by contacting the landlords and persuading them not to enter into any agreements with individuals who they thought would bring the "hip-hop" crowd and African Americans to Westport.

310.    As Plaintiffs had not violated the terms of their respective leases or disturbed any neighboring businesses, Defendants had no equitable or legal justification for interfering with any of the Plaintiffs' contracts.

311. Defendants' tortious interference with the Plaintiffs' contracts has deprived each of the Plaintiffs the equal privileges under the law to enter and execute contracts, and has caused public humiliation, emotional distress, and financial damages which include loss of revenue and profits.

312. As a direct and proximate cause of the actions and conduct set forth herein, Plaintiffs have suffered and will continue to suffer damages including expenses.

313. Plaintiffs have been (and continues to be) damaged as a direct and proximate result of Defendants' actions causing Plaintiffs severe and continuing injuries, including, but not limited to:

   a.   emotional pain and suffering;
   b.   insult;
   c.   mental distress;
   d.   embarrassment;
   e.   humiliation;
   f.   anxiety; and
   g.   inconvenience.


**WHEREFORE**, Plaintiffs requests that this Court, after a trial by jury of their claims, enter Judgment against all Defendants and granting such relief as may be appropriate, including: a finding that Plaintiff has been subjected to Tortious Interference with Contracts; such actual and punitive damages as are fair and reasonable; Plaintiff's reasonable attorneys' fees, expert witness fees and expenses, the costs of this action; and for such further relief as the Court considers just and proper.

## CLAIM IX

### TORTIOUS INTERFERENCE WITH PLAINTIFFS' BUSINESS EXPECTANCY
### (All Plaintiffs Against All Defendants)

314. Plaintiffs herein repeat, allege, and incorporate by reference, all facts set forth in paragraphs 1 through 313 as set forth here in full.

315. Tortious interference is a common law tort which provides a claim for damages wherein an individual interferes with another's right to a business expectancy.

316. Each of the Plaintiff had valid lease agreements for their respective properties and therefore had a reasonable expectation that the businesses within those properties would produce a profit.

317. The Defendants are mostly or all business owners with property on in the Westport Community Improvement District themselves, and each Defendant therefore has a direct knowledge about the amount of money that can be expected to be earned in the Westport community, which is one of the most popular entertainment districts in the Kansas City Metropolitan Area.

318. Defendants intentionally interfered with the Plaintiffs business expectancy by and through the "Good Neighbor" agreement and other means and contacted the landlords and persuading them not to enter into any agreements with individuals who they thought would bring the "hip hop" crowd to Westport.

319. As Plaintiffs had not violated the terms of their respective leases or disturbed any neighboring businesses, Defendants had no equitable or legal justification for interfering with any of the Plaintiffs' business expectancy.

320. Defendants' tortious interference with the Plaintiffs' business expectancy has deprived each of the Plaintiffs the equal privileges under the law to enter and execute contracts, and has caused public humiliation, emotional distress, and financial damages which include loss of revenue and profits.

321.    As a direct and proximate cause of the actions and conduct set forth herein, Plaintiffs have suffered and will continue to suffer damages including expenses.

322.    Plaintiffs have been (and continues to be) damaged as a direct and proximate result of Defendants' actions causing Plaintiffs severe and continuing injuries, including, but not limited to:

a.    emotional pain and suffering;
b.    insult;
c.    mental distress;
d.    embarrassment;
e.    humiliation;
f.    anxiety; and
g.    inconvenience.

**WHEREFORE**, Plaintiffs requests that this Court, after a trial by jury of their claims, enter Judgment against all Defendants and  granting such relief as may be appropriate, including: a finding that Plaintiff has been subjected to Tortious Interference with Business Expectancy; such actual and punitive damages as are fair and reasonable; Plaintiff's reasonable attorneys' fees, expert witness fees and expenses,  the costs of this action; and for such further relief as the Court considers just and proper.

## CLAIM X

### CIVIL CONSPIRACY
### (All Plaintiffs against All Defendants)

323.    Plaintiffs herein repeat, allege, and incorporate by reference, all facts set forth in paragraphs 1 through 322 as set forth here in full.

324.     Defendant CID started enforcing a "Good Neighbor" agreement on all business and property owners in 2013.

325.     The Defendants met regularly to discuss several matters, including opportunities for new business in the Westport community.

326.     The Defendants meet regularly to discuss improvements and the vision for Westport, and other property owners join those meetings on occasion.

327.     Through the "Good Neighbor" agreement and other means including meetings and other forms of communications, each of the Defendants had a meeting of the minds to execute plans for excluding certain new business owners from existing in Westport and for making it difficult for existing businesses to keep their liquor licenses.

328.     All Defendants herein entered an agreement to engage in a civil conspiracy for the purpose of eliminating the threat of strong competitors and Defendants acted to achieve the objective of maximizing profits for their own businesses in the Westport community.

329.     All Defendants herein also entered an agreement to engage in a civil conspiracy for the purpose of stopping Black/African American business owner from opening new businesses in the Westport community to achieve the objective of ensuring that Caucasian patrons, customers, and/or consumers predominantly patronize the Westport community.

330.     The Defendants entered an illegal conspiracy and took affirmative steps in furtherance of such conspiracy by contacting owners of property in the Westport community and illegally and tortiously interfering with the contract rights of other potential, prospective business owners and service providers.

331.     The actions of the Defendants have caused the Plaintiffs public humiliation, emotional distress, and financial damages which include loss of revenue and profits.

332. During CID meetings and through other forms of correspondence, Defendants Kimbrough, Ptacek, Wasserstrom, Marten, Mesler, Kelly, Goldman, Vos, Hurt, Montague, Degenhardt, Brody, and Shader, acting with others known and unknown to the Plaintiffs, joined the civil conspiracy by agreeing to the "strategic moves" described in the Defendant Allred's email, which included maneuvers and actions that were illegal under the law.

333. One of the "strategic moves" made by Defendants has been to contact owners of property in the Westport community and make it nearly impossible for Black/African Americans to obtain and/or keep a lease for property in Westport.

334. One of the "strategic moves" made by Defendants has been to contact business owners in the Westport community and threaten to take steps to get liquor license revoked and/or terminated if they do business with Black/Arican American service providers.

335. The "strategic moves" made by Defendants have merely disguised an agenda that has worked solely to the exclusion of minority business owners, and specifically Black/African American business owners.

336. Defendants Allred and Kimbrough, acting with others known and unknown to the Plaintiffs, took affirmative steps in furtherance of the civil conspiracy by contacting Defendant Brody and encouraging him to terminate or refuse contracts or leases with the Plaintiffs herein by threatening to illegally interfere with Plaintiffs' rights to obtain and keep a liquor license.

337. Defendants Vos and Hurt, acting with others known and unknown to the Plaintiffs, took affirmative steps in furtherance of the civil conspiracy by denying the Plaintiff The Sourze, LLC, an opportunity to exercise its right to make and enforce contracts and its right to lease real property for illegal reasons, and for misrepresenting to the Plaintiffs the true reasons for denying the Plaintiffs a business opportunity.

338. Defendant Brody, acting with others known and unknown to the Plaintiffs, joined the civil conspiracy and took affirmative actions in furtherance of the conspiracy by breaching the valid lease made with Plaintiff Euphoric, LLC.

339. Defendant 4128 Broadway, LLC, acting with others known and unknown to the Plaintiffs, joined the civil conspiracy and took affirmative actions in furtherance of the conspiracy by breaching the valid lease made with Plaintiff Euphoric, LLC.

340. Defendant AC Westport, LLC's agents acting with others known and unknown to the Plaintiffs, joined the civil conspiracy by contacting DB Icehouse, LLC, to encourage them to terminate the lease entered into by Plaintiff UniKC for illegal reasons and without just cause. Defendant AC Westport, LLC acted on behalf of and for the benefit of The Denver Biscuit.

341. Defendant Allred, also joined the conspiracy and acted on behalf of and for the benefit of Allred, Inc.

342. Defendants Vos and Hurt also joined the conspiracy and acted on behalf of and for the benefit of Defendants Murfin Inc., and Westport Development, LLC.

343. Through the "Good Neighbor" agreement and other means including meetings and other forms of communications, each of the Defendants had a meeting of the minds to execute plans for excluding certain new business owners who are Black/African American from existing in Westport and for making it difficult for existing businesses to keep their liquor licenses.

344. All Defendants herein entered an agreement to engage in a civil conspiracy for the purpose of eliminating the threat of strong African American competitors and Defendants acted to achieve the objective of maximizing profits for their own businesses in the Westport community.

345. All Defendants herein also entered an agreement to engage in a civil conspiracy for the purpose of stopping Black/African American business owners from opening new businesses in

the Westport Community Improvement District to achieve the objective of ensuring that Caucasian patrons, customers, and/or consumers predominantly patronize the Westport community.

346.     Through the "Good Neighbor" agreement and other means Defendants contacted Plaintiffs' landlords and pressured the landlords to breach the valid leases with Plaintiffs by threatening to making it difficult for Plaintiffs to get and/or keep their liquor licenses.

347.     As a direct and proximate cause of the actions and conduct set forth herein, Plaintiffs have suffered and will continue to suffer damages including expenses.

348.     Plaintiffs have been (and continues to be) damaged as a direct and proximate result of Defendants' actions causing Plaintiffs severe and continuing injuries, including, but not limited to:

a.     emotional pain and suffering;
b.     insult;
c.     mental distress;
d.     embarrassment;
e.     humiliation;
f.     anxiety; and
g.     inconvenience.

**WHEREFORE**, Plaintiffs requests that this Court, after a trial by jury of their claims, enter Judgment against all Defendants and  granting such relief as may be appropriate, including: a finding that Plaintiff has been subjected to Civil Conspiracy; such actual and punitive damages as are fair and reasonable; Plaintiff's reasonable attorneys' fees, expert witness fees and expenses, the costs of this action; and for such further relief as the Court considers just and proper.

## CLAIM XI

## CONSPIRACY TO VIOLATE SHERMAN ACT, ANTITRUST, AND/OR TRADE LAW
### (All Plaintiffs against All Defendants)

349.    Plaintiffs herein repeat, allege, and incorporate by reference, all facts set forth in paragraphs 1 through 348 as set forth here in full.

350.    Mo. Rev. Stat. § 416.031.1 provides: "Every contract, combination or conspiracy in restraint of trade or commerce in this state is unlawful."

351.    Mo. Rev. Stat § 416.031.2 provides: "It is unlawful to monopolize, attempt to monopolize, or conspire to monopolize trade or commerce in this state."

352.    15 U.S.C. § 1 provides: "Every contract, combination in the form of trust or otherwise, or conspiracy in the restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal."

353.    All Defendants herein combined together to create strategies and covenants by and through the "Good Neighbor" agreement and other means that allow them to own majority of the property in the Westport community, and to ensure that their group of property owners also own and operate the majority of businesses in the Westport community.

354.    The Defendants agreements amongst themselves have served to limit the number of competitors that are able to open businesses in the Westport community.

355.    The Defendants object of limiting business competition and the Defendants actions of contacting and threatening landlords to breach Plaintiffs' lease agreements is illegal.

356.    If Plaintiffs had been allowed to become owners of businesses in the Westport community, Plaintiffs would have been direct competitors to the Defendants.

357. Plaintiffs were damaged by the civil conspiracy herein and suffered public humiliation, mental anguish, and loss of revenue and profits.

358. As a direct and proximate cause of the actions and conduct set forth herein, Plaintiffs have suffered and will continue to suffer damages including expenses.

359. Plaintiffs have been (and continues to be) damaged as a direct and proximate result of Defendants' actions causing Plaintiffs severe and continuing injuries, including, but not limited to:

    a.   emotional pain and suffering;
    b.   insult;
    c.   mental distress;
    d.   embarrassment;
    e.   humiliation;
    f.   anxiety; and
    g.   inconvenience.

**WHEREFORE**, Plaintiffs requests that this Court, after a trial by jury of their claims, enter Judgment against all Defendants and granting such relief as may be appropriate, including: a finding that Plaintiff has been subjected to a violation of SHERMAN ACT, ANTITRUST, AND/OR TRADE LAW; such actual and punitive damages as are fair and reasonable; Plaintiff's reasonable attorneys' fees, expert witness fees and expenses, the costs of this action; and for such further relief as the Court considers just and proper.

## CLAIM XII

### VIOLATION OF 18 U.S.C. § 1962 et. seq.
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)

### (All Plaintiffs against All Defendants)

360.    Plaintiffs herein repeat, allege, and incorporate by reference, all facts set forth in paragraphs 1 through 359 as set forth here in full.

361.    This claim is brought pursuant to 18 U.S.C. § 1962 et. seq.

362.    All Defendants, operating under the authority and ratification of Defendants CID used coercion and extortion by and through the "Good Neighbor" Agreement in partnership with Westport Community business and property owners along with Kansas City officials and agents against "problematic" property and business owners in the Westport Community to restrict and/or minimize contracts for services with Black/African Americans business owners in Westport.

363.    Defendant Hurt operating under the authority and ratification of Defendant Murfin, Inc., used coercion and extortion in partnership with Kansas City officials against property and business owners in the Westport Community to restrict and/or minimize the number of Black/African Americans patrons in Westport.

364.    Defendant Allred, Defendant Hurt, Defendant Murfin Inc., Defendant AC Westport LLC, and Defendant CID as well as all individually named Defendants are actively engaging in illegal racketeering through Agreement and the use of its relationship with Kansas City officials through threats to other Westport business and property owners that Defendants will have the liquor licenses of those Westport business owners revoked if those business owners do not follow the "rules" of the Defendants, whether legal  or illegal.

365.    Defendants are further actively engaging in illegal racketeering through use of influence and bribery of Kansas City officials/agents and employees to control who receives and/or maintains a liquor license for prospective and/or established businesses in the Westport community.

366.     All individually named Defendants and Defendant CID actions are being conducted on behalf of several enterprises, including, but not limited to, the Westport Community Improvement District, Allred, Inc., Westport Development, LLC, and Murfin, Inc,. as well as several bars, nightclubs, and restaurants owned by Defendants.

367.     Since 2013 all Defendants have engaged in a pattern of racketeering and have committed at least two acts involving bribery and/or extortion in violation of 18 U.S.C. §§ 1951, 1962, and 1964.

368.     In October 2025, Defendant Allred contacted the landlord for the property located at 4128 Broadway Boulevard, Kansas City, Missouri 64111, and threatened to interfere with a prospective Black/African American tenant's application for a liquor license if the landlord leased the property to said Black/African American tenant.

369.     Defendants had/have awareness of the coercive nature of actions.

370.     Defendants Brody and 4128 Broadway's consent lacked voluntary agreement to terminate Plaintiff Euphoric's lease.

371.     Defendant Allred, under the authority and ratification of Defendant CID, through coercion and extortion caused Defendants Brody and 4128 Broadway's to breach its lease agreement with Plaintiff Euphoric's resulting in injury to Plaintiff Euphoric's business.

372.     Plaintiff Euphoric LLC, suffered a concrete financial loss of profit as promised in the lease agreement with Defendants Brody and 4128 Broadway.

373.     Defendant AC Westport, LLC, agents contacted the landlord for the property located at 4140 Pennsylvania Avenue, Kansas City, Missouri 64111, with a cease and desists letter and further threatened to interfere with a prospective Black/African American tenant's application for a liquor license if the landlord leased the property to said Black/African American tenant.

374. Defendants had/have awareness of the coercive nature of actions.

375. Defendant DB Icehouse, LLC, consent lacked voluntary agreement to terminate Plaintiff UniKC's lease.

376. Defendant AC Westport, LLC, under the authority and ratification of Defendant CID, through coercion and extortion caused DB Icehouse, LLC, to breach its lease agreement with Plaintiff UniKC resulting in injury to Plaintiff's business.

377. As a direct and proximate cause of the actions and conduct set forth herein, Plaintiff has suffered and will continue to suffer damages including expenses.

378. In recorded audio CID Members, CID Board members and business and property owners admitted to using the "Good Neighbor" agreements against 99 percent of the 251 owners in the Westport community in order to extort and or bribe companies to follow their "rules" if they wanted to gain consent from the 251 owners in order to get liquor license.

379. In recorded audio CID Members, CID Board members and business and property owners admitted to using the "Good Neighbor" agreements against 99 percent of the 251 owners in the Westport community in order to extort and or bribe companies to follow the "rules" or else Defendants "come after them with a vengeance."

380. In recorded audio CID Members, CID Board members and business and property owners admitted that using the "Good Neighbor" agreements against 99 percent of the 251 owners in the Westport community in order to keeps them "scared".

381. In recorded audio CID Members, CID Board members and business and property owners admitted that if businesses do not sign the "Good Neighbor" agreements that Defendants "do everything we can to put them out of business."

382.     Plaintiffs have been (and continues to be) damaged as a direct and proximate result of Defendants actions causing Plaintiffs severe and continuing injuries, including, but not limited to:

a.      emotional pain and suffering;
b.      insult;
c.      mental distress;
d.      embarrassment;
e.      humiliation;
f.      anxiety; and
g.      inconvenience.

**WHEREFORE**, Plaintiffs requests that this Court, after a trial by jury of their claims, enter Judgment against Defendants and granting such relief as may be appropriate under 18 U.S.C. § 1962 et. seq including: a  finding that Plaintiffs have been subjected to unlawful conduct; such actual and punitive damages as are fair and reasonable; Plaintiffs reasonable attorneys' fees, expert witness fees and expenses,  the costs of this action; and for such further relief as the Court considers just and proper.

## **DEMAND FOR JURY TRIAL**

383.     Plaintiffs demand a jury trial on all claims so triable.

Respectfully submitted,

**Cecilia Brown**
**Cecilia Nuby & Associates, LLC**

Missouri Bar Number:   67646
Kansas Bar Number:  78602
Illinois Bar Number: 6346825
117 E. 29TH STREET
Kansas City, Missouri 64108
Phone: (913)-200-7900
Fax: (913) 273-0996
E-mail: Cecilia@NubyLaw.com
**ATTORNEY FOR PLAINTIFF**
**EUPHORIC, LLC**