| | |
|---|---|
| EUPHORIC LLC, ET. AL. ) | |
| ) | |
| ) | Case No. 4:25−cv−00023−RK |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| WESTPORT COMMUNUITY ) | |
| IMPROVEMENT DISTRICT, ET. AL. ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFF EUPHORIC, LLC, UNIKC, LLC, AND THE SOURZE, LLC, RESPONSE AND SUGGESTIONS IN OPPOSITION TO DEFENDANT CID'S MOTION TO DISMISS COUNT XII OF THE SECOND AMENDED COMPLAINT**

COMES NOW Plaintiffs, Euphoric, LLC., Unikc, LLC, and The Sourze, LLC, for their Response To Defendant CID's Motion To Dismiss Count XII Of The Second Amended Complaint and state as follows:

**Introductory Statement**

Defendants' Motion to Dismiss should be denied at the threshold because it is procedurally improper and substantively unfounded. As a matter of procedure, Defendants filed their Answer and Motion to Dismiss simultaneously. Rule 12(b) requires that such a motion be filed before the answer; once the answer is filed, the pleadings are closed, and the proper mechanism is Rule 12(c). See *Westcott v. Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990); *Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003). By filing both documents together, Defendants waived their right to seek dismissal under Rule 12(b), rendering their motion moot. Even if the Court were to construe the motion as one under Rule 12(c), the same standard applies, and Plaintiffs' Second Amended Complaint easily survives. Substantively, Plaintiffs have alleged a valid civil RICO claim, including the existence of an enterprise, a pattern of racketeering activity, predicate acts of

1

extortion and fraud, causation, and concrete injury to business and property. Defendants' attempt to recast these allegations as mere "business disputes" ignores the coercive and fraudulent conduct pled in detail. For both procedural and substantive reasons, the motion must be denied.

## Statement of Facts

Plaintiffs Euphoric, LLC, UniKC, LLC, and The Sourze, LLC are minority-owned businesses that sought to operate in the Westport entertainment district of Kansas City, Missouri. Since 2013, Defendants—including members of the Westport Community Improvement District ("CID"), affiliated property owners, and business entities—have engaged in a coordinated scheme to exclude minority businesses from Westport through fraud, extortion, and discriminatory practices (Doc. 249, ¶ 367).

The Second Amended Complaint[1] alleges that Defendants conditioned lease approvals and liquor license consents on execution of one-sided "Good Neighbor Agreements." These agreements when enforced, stripped tenants of valuable contractual rights, imposed arbitrary restrictions on occupancy, and thereby transferred actual control of business operations to CID members (Doc. 249, ¶¶ 23, 53, 301, 368, 373). Defendants threatened that any business refusing to sign the Good Neighbor Agreement would be reported to Kansas City's Regulated Industries Division and Health Department, creating fear of regulatory retaliation. Recorded statements confirm that CID members openly admitted they would "turn in" non-compliant businesses to city regulators, thereby leveraging official authority to coerce concessions (Doc. 249, ¶¶ 367–370).

Plaintiffs further allege that Defendants made fraudulent misrepresentations to prospective tenants. For example, agents of Westport Development, LLC, falsely told The Sourze that its leased property was suitable only for a clothing store, despite zoning approval for restaurant use. After

---

[1] In Claim XII, Plaintiffs repeat, allege, and incorporate by reference, all facts set forth in paragraphs 1 through 359. (Doc. 249, ¶¶ 360).

2

The Sourze had already paid more than $22,000 in rent and nearly $25,000 in upgrades and improvements, Defendants reneged on the agreed concept for a Daiquiri Shop and demanded a new business model (Doc. 249, ¶¶ 145–150). Euphoric, LLC, similarly lost a $10,000 (ten-thousand dollar) deposit and a ten-year lease expectancy valued at approximately $70 million in projected revenue when Defendants arbitrarily withdrew support and refused to honor contractual commitments (Doc. 249, ¶¶ 155, 200–205, 259).

The Complaint further alleges that Defendants' conduct was not isolated but part of a broader pattern of racketeering activity. The allegations state Defendants, conspired with Kansas City officials to use coercion, extortion, and bribery to restrict Black patronage in Westport. Through threats of liquor license revocation and improper influence over city officials, Defendants engaged in illegal racketeering to control which businesses could obtain or maintain licenses, thereby enforcing their own rules over property and business owners in the community. (Doc. 249, ¶¶ 363–365, 371, 376). The complaint alleges that since at least 2013, CID members and property owners have coordinated efforts to eliminate "problematic" businesses—primarily minority-owned establishments—from Westport. Text messages, recorded conversations, and discriminatory statements demonstrate a conspiracy to use fraud, extortion, and coercion to shape the district's commercial landscape (Doc. 249, ¶¶ 367–375).

As a result of Defendants' actions, Plaintiffs suffered concrete financial losses, including sunk costs, lost leasehold rights, and foregone profits. These injuries to business and property are directly traceable to Defendants' racketeering acts and form the basis of Plaintiffs' civil RICO claim (Doc. 249, ¶¶ 155, 245, 367–370).

**Standard of Review**

On a motion to dismiss under Rule 12(b)(6), the Court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009). A complaint need only contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Civil RICO claims are subject to this same standard, and the Eighth Circuit has emphasized that "RICO is to be liberally construed to effectuate its remedial purposes." *Handeen v. Lemaire*, 112 F.3d 1339, 1347 (8th Cir. 1997). At this stage, Plaintiffs need not prove racketeering activity; they must allege facts that, if true, establish the elements of a RICO claim.

## I. Procedural Impropriety of Defendants' Motion

As a threshold matter, Defendants' Motion to Dismiss is procedurally defective because they filed it simultaneously with their Answer. Federal Rule of Civil Procedure 12(b) expressly requires that "[a] motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed." Once an Answer is filed, the pleadings are closed, and the proper vehicle for testing the sufficiency of the complaint is a Rule 12(c) motion for judgment on the pleadings, not a Rule 12(b)(6) motion. The Eighth Circuit has consistently enforced this rule. In *Westcott v. Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990), the court emphasized that Rule 12(b)(6) motions must precede the filing of an answer. Similarly, in *Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003), the court explained that once the pleadings are closed, the proper mechanism is Rule 12(c). By filing both an Answer and a Motion to Dismiss, Defendants waived the right to seek dismissal under Rule 12(b). Their motion is therefore procedurally improper and moot. Even if the Court were to construe the motion as one under Rule 12(c), the same standard applies, and as shown below, Plaintiffs' Second Amended Complaint easily survives.

## II. Plaintiffs Sufficiently State A Claim Under Rule 12(B)(6) For Count XII-Violation Of 18 U.S.C. § 1962 Et. Seq. Racketeer Influenced And Corrupt Organizations Act

Plaintiffs' Second Amended Complaint alleges both a substantive RICO violation under 18 U.S.C. § 1962 and standing to pursue civil remedies under 18 U.S.C. § 1964(c). Under § 1962, Plaintiffs plead the existence of an enterprise, a pattern of racketeering activity, and predicate acts including extortion under the Hobbs Act and mail and wire fraud. Under § 1964(c), Plaintiffs allege concrete financial losses—leasehold interests, sunk costs, and foregone profits—directly traceable to Defendants' racketeering acts. Thus, the Complaint satisfies both the substantive elements of a RICO violation and the standing requirement for civil recovery.

### A. Enterprise

Plaintiffs allege that the Westport Community Improvement District (CID) board members, together with affiliated property owners and business entities, and agents of Kansas City formed an association-in-fact enterprise. An enterprise under 18 U.S.C. § 1961(4) includes "any union or group of individuals associated in fact although not a legal entity." The Eighth Circuit recognizes that such an enterprise may be proven by evidence of "a common purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *United States v. Lee*, 374 F.3d 637, 647 (8th Cir. 2004). Plaintiffs can establish RICO enterprise liability through three alternative theories that strengthen their claims beyond the association-in-fact enterprise already alleged. First, the Westport CID itself constitutes a legal entity enterprise under 18 U.S.C. § 1961(4), as it is a governmental entity with formal structure and powers. *Day v. Robinwood W. Cmty. Improvement Dist.*, 693 F. Supp. 2d 996 (E.D. Mo. 2010. Second, individual defendants operated through the CID as a vehicle for racketeering, satisfying the "enterprise as victim" theory where legitimate entities are used for illegal purposes. Third, the broader network of CID officials, property owners, and Kansas City personnel formed an association-in-fact enterprise with the requisite purpose, relationships, and longevity.

5

Under *Kruse v. Repp*, 611 F. Supp. 3d 666 (S.D. Iowa 2020, courts recognize that "evidence used to prove the pattern of racketeering activity and the evidence establishing a RICO enterprise may in particular cases coalesce," allowing the same facts to support both elements. The enterprise existed independently of the predicate acts through the formal CID structure and ongoing business relationships among participants, distinguishing it from enterprises that exist solely to commit crimes. Plaintiffs allege a common purpose—economic gain through exclusion of minority businesses—an ongoing structure in the CID board, and continuity of personnel and function. These allegations satisfy the enterprise element.

### B. Pattern of Racketeering Activity

Plaintiffs allege multiple predicate acts of racketeering, including mail and wire fraud through text messages and emails misrepresenting property use, extortion by threatening businesses with loss of liquor licenses unless they signed one-sided "Good Neighbor Agreements," and attempts to obtain the commercial lease with contracts by coordinated efforts to prevent Plaintiffs from enforcing valid lease agreements. The Eighth Circuit has held that predicate acts are related and continuous when they "share the same or similar purposes, results, participants, victims, or methods of commission." *Handeen*, 112 F.3d at 1347. Plaintiffs' allegations of coordinated discriminatory practices since at least 2013 establish both relatedness and continuity, satisfying the "pattern" requirement under *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229 (1989).

### C. Plaintiffs Have Plausibly Alleged Extortion Under the Hobbs Act

Defendants contend that Plaintiffs' RICO claim fails because the Second Amended Complaint does not allege "obtaining" property under the Hobbs Act, relying on *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393 (2003). Their reliance is misplaced. In *Scheidler*, the Supreme

6

Court held that anti-abortion protestors who disrupted clinic operations did not commit extortion because they interfered with the clinics' use of property but did not obtain property for themselves. The Court emphasized that mere interference, without acquisition, was insufficient. But unlike the protestors in *Scheidler*, the Westport CID Defendants did not simply interfere with Plaintiffs' businesses; they attempted to obtain the commercial lease and obtained valuable property rights and concessions through coercion and threats.

The Supreme Court further refined the obtaining property requirement in *Sekhar v. U.S.*, 570 U.S. 729 (2013), holding that "the property extorted must therefore be transferable—that is, capable of passing from one person to another." The Court explained that obtaining property requires that the victim "part with" his property and that the extortionist "gain possession" of it *Sekhar v. U.S.*, 570 U.S. 729 (2013). The Court rejected the government's attempt to characterize a recommendation as obtainable property, noting that such formulations "sound absurd" because recommendations cannot be exercised, transferred, or sold. *Sekhar v. U.S.*, 570 U.S. 729 (2013).

The Supreme Court's decision in *Sekhar* clarified that certain intangible property rights can constitute 'property' under the Hobbs Act when they have transferable value. This transferability requirement has become the controlling standard for evaluating whether alleged property satisfies the *Scheidler* framework.

The U.S. District Court for the Eastern District of Missouri applied the *Sekhar* transferability requirement comprehensively in *Raineri Const., LLC v. Taylor*, 63 F.Supp.3d 1017 (2014). The court rejected defendants' argument that their conduct did not constitute extortion because they did not actually obtain property, explaining that "the Hobbs Act includes attempts to obtain property, in addition to the actual obtainment of property" and that "the requirement for establishing liability under the Hobbs Act is that 'a defendant must pursue something of value

7

from the victim that can be exercised, transferred, or sold'—not that a defendant must actually obtain that property for its actions to constitute extortion" *Raineri Const., LLC v. Taylor*, 63 F.Supp.3d 1017 (2014).

Applying this standard, the *Raineri* court found that the plaintiff's allegation that "defendants sought to obtain health benefits pursuant to a collective bargaining agreement" sufficiently stated obtainable property to support an extortion claim. The court cited authority that "a contract or contractual rights can be assigned, and therefore constitute something of value that can be exercised, transferred, or sold." *Raineri Const., LLC v. Taylor*, 63 F.Supp.3d 1017 (2014).

In *U.S. v. Howe.*, 353 F.Supp. 419 (W.D. MO 1973), the court held that space in a tavern for coin-operated machines constitutes property under the Hobbs Act. The court rejected the argument that space is not property within the meaning of the statute. Here, the Westport CID Defendants' alleged control over commercial space and who could operate businesses in that space constitutes obtaining property under the Hobbs Act, even though it involves control rather than physical possession.

### (i). Commercial Leases as Obtainable Property

Commercial leases clearly satisfy the *Sekhar* transferability standard as contractual rights that can be assigned, transferred, or sold. Commercial lease assignments and transfers are routine business transactions, distinguishing them fundamentally from the non-transferable personal recommendation right rejected in *Sekhar v. U.S.,* 570 U.S. 729 (2013).

### (ii). Liquor Licenses as Obtainable Property

The Eighth Circuit addressed liquor licenses as property in *In re O'Neill's Shannon Village,* 750 F.2d 679 (1984), holding that "the only decisions in which a UCC security interest in a liquor license has been ruled invalid have been in states in which the liquor control statute expressly

requires that result." *Id*. The court noted that many liquor control statutes do not state that liquor licenses are not property, nor do they contain express prohibitions against encumbrance. *Id*.

The practical reality that liquor licenses have significant economic value and are routinely transferred in business transactions supports their classification as obtainable property under the Hobbs Act. As confirmed by Practical Law resources, "transferring the existing liquor licenses or obtaining new liquor licenses is crucial to the continued operation of the hotel because liquor sales (and other spending on food and beverage) are usually a significant stream of revenue" and many jurisdictions allow license transfers subject to regulatory approval.

### *(iii). Plaintiffs Have Pled That Defendants Obtained Or Attempted To Obtain Transferable Property Rather Than Merely Interfere With Business Operations.*

*Scheidler* emphasized that "eliminating the requirement that property must be obtained to constitute extortion would not only conflict with the express requirement of the Hobbs Act, it would also eliminate the recognized distinction between extortion and the separate crime of coercion" *Scheidler v. National Organization for Women, Inc.*, 537 U.S. 393 (2003). *Wilkie v. Robbins*, 551 U.S. 537 (2007) addressed similar regulatory pressure claims. The Court found that regulatory pressure by government employees to obtain property for the government rather than private parties did not constitute traditional extortion. The Court held that the conduct alleged did not fit the traditional definition of extortion *Wilkie v. Robbins*, 551 U.S. 537 (2007).

Here, the key distinction is that Plaintiffs allege that defendants actually obtained or attempted to obtain the commercial lease and liquor license for themselves, versus merely interfering with regulatory processes and thus the claim survives under *Scheidler*. The complaint specifically alleges that defendants pursued commercial leases and liquor license for their own benefit. The Second Amended Complaint alleges that Defendants conditioned lease approvals and liquor license consents on execution of one-sided "Good Neighbor Agreements" (Doc. 249 ¶¶ 23,

9

53, 301). It further alleges that "All Defendants herein combined together to create strategies and covenants by and through the "Good Neighbor" agreement and other means that allow them to own majority of the property in the Westport community, and to ensure that their group of property owners also own and operate the majority of businesses in the Westport community." (Doc. 249 ¶ 353). The CID Defendants are acting outside the scope of their responsibilities as CID board members by engaging in racial discrimination for their own economic gain with their own personal business development goals in mind. (Doc. 249 ¶ 42). Defendants threatened that any business refusing to sign would be reported to Kansas City's Regulated Industries Division and Health Department, creating fear of regulatory retaliation (Doc. 249 ¶¶ 367–370). In recorded statements, CID members openly admitted: *"Using caterers, they're not subject to our rules, which means we're going to be on you—you make one step out of bounds we're going to be turning you in to regulated industries, health department, it can get really bad."* (Doc. 249 ¶ 368). CID members further stated that since 2013, property owners would not sign liquor license consents unless businesses agreed to these one-sided agreements (Doc. 249 ¶ 369). These admissions confirm that Defendants used fear of regulatory retaliation to obtain concessions and control under color of official right.

Such conduct fits squarely within the Hobbs Act's prohibition on extortion and, when conducted systematically, constitutes a pattern of racketeering activity under RICO. See *id.* (recognizing repeated demands for payment tied to official influence as actionable extortion).

### D. Plaintiffs Have Alleged Fraudulent Misrepresentations as Predicate Acts

In addition to extortion, Plaintiffs allege predicate acts of mail and wire fraud. Defendants used text messages, emails, and recorded communications to misrepresent material facts about property use and lease and licensing requirements. These misrepresentations were transmitted

electronically and relied upon by Plaintiffs, satisfying the elements of mail and wire fraud under 18 U.S.C. §§ 1341 and 1343. Fraudulent misrepresentations designed to induce reliance, and secure economic concessions are well-recognized RICO predicates.

Agents of Westport Development, LLC, falsely told The Sourze that its leased property was suitable only for a clothing store, despite zoning approval for restaurant use (Doc. 249 ¶¶ 145–150). After The Sourze had already paid more than $22,000 in rent and nearly $25,000 in upgrades and improvements, Defendants reneged on the agreed concept for a Daiquiri Shop and demanded a new business model. Euphoric, LLC, similarly lost a $10,000, (ten-thousand dollar) deposit and a ten-year lease expectancy valued at approximately $70 million in projected revenue when Defendants arbitrarily withdrew support and refused to honor contractual commitments (Doc. 249 ¶¶ 145, 200–205, 245). These allegations demonstrate attempts to obtain the commercial lease and acquisition of property interests, rents, upgrades, contractual concessions, and control over business operations were wrongfully obtained through coercion. (Doc. 249 ¶¶ 42, 367-369).

The Eighth Circuit has recognized that extortion under the Hobbs Act encompasses intangible property interests, including contractual rights and business expectancies. *Handeen v. Lemaire*, 112 F.3d 1339, 1347 (8th Cir. 1997). Other circuits agree. The Second Circuit has held that intangible rights such as business goodwill and contractual control are "property" under the Hobbs Act. *United States v. Tropiano*, 418 F.2d 1069, 1075 (2d Cir. 1969). The Seventh Circuit has similarly recognized that extortion includes obtaining intangible rights and economic advantages. *United States v. Lisinski*, 728 F.2d 887, 890 (7th Cir. 1984). These authorities confirm that Plaintiffs' allegations of coerced contractual concessions, lost leasehold rights, and foregone profits fall squarely within the scope of Hobbs Act extortion.

E.  **Plaintiffs Have Alleged Injury to Business or Property**

Defendants mischaracterize the allegations in the Second Amended Complaint by suggesting that Plaintiffs have pled only "intangible property interests" or "hypothetical lost revenues." Plaintiffs have alleged concrete financial losses sufficient for RICO standing. The Eighth Circuit in *Regions Bank v. J.R. Oil Co., LLC*, 387 F.3d 721, 730–31 (8th Cir. 2004), recognized that out-of-pocket expenses constitute concrete financial losses. Here, Plaintiffs specifically allege expenditures made in reliance on their ability to operate businesses in Westport, including lease deposits, lease payments, renovation costs, and business investments. These are not speculative future profits but actual financial outlays directly caused by Defendants' alleged scheme to exclude African American-owned businesses. Courts have consistently held that such expenditures constitute concrete financial injury sufficient for RICO standing at the pleading stage.

(i). Euphoric, LLC.

Defendants argue that Euphoric's damages are speculative because its business never opened. But the Complaint alleges that Euphoric lost a $10,000 (ten-thousand-dollar) deposit and a ten-year lease expectancy valued at approximately $70 million in projected revenue (Doc. 249 ¶¶ 155, 200–205, 245, 259, 372). Plaintiffs can recover substantial damages for lost lease expectancies and business opportunities under established Eighth Circuit precedent, provided they present sufficient evidence to move beyond speculation. In *Cargill, Inc. v. Taylor Towing Serv., Inc.*, 642 F.2d 239 (8th Cir. 1981), the court held that while "expected profits of a commercial business are too remote, speculative and uncertain to permit recovery," damages are recoverable when plaintiffs "present proof sufficient to bring the issue outside the realm of conjecture, speculation or opinion unfounded on definite facts." Here, Euphoric's $70 million lease expectancy is based on a binding ten-year lease agreement with specific terms, not mere speculation. This expectancy was not based on mere "intangible interests." Leasehold rights and lost profits tied to contractual expectancies are recognized as "business or property" under RICO. *See Terry v.*

12

*Standard Oil Co. (Indiana)*, 799 F.2d 1523, 1525 (8th Cir. 1986). Plaintiff Euphoric has adequately pleaded damages with both specificity and legal sufficiency.[2]

Accordingly, Euphoric has sufficiently pleaded both economic and non-economic damages, establishing a legally cognizable basis for recovery under settled precedent.

(ii). <u>The Sourze, LLC.</u>

Defendants contend that The Sourze has not alleged "concrete financial loss" because it only identified rent and operating costs. But the Complaint specifically alleges that The Sourze paid over $22,000 in rent and nearly $25,000 in upgrades and improvements before Defendants reneged on the agreed business concept and arbitrarily reduced occupancy limits, forcing the business into failure (Doc. 249 ¶¶ 73, 145–150, 360–382). These sunk costs are not intangible; they are actual expenditures traceable to Defendants' extortionate conduct. Courts have consistently recognized that out-of-pocket losses and foregone investments constitute injury to business or property under § 1964(c). Accordingly, The Sourze has sufficiently pleaded both economic and non-economic damages, establishing a legally cognizable basis for recovery under settled precedent

(iii). <u>UniKC, LLC.</u>

Defendants argue that UniKC "never had a chance to open its doors" and therefore cannot show concrete loss. But the Complaint alleges that UniKC was denied equal access to lease opportunities, pressured into signing restrictive agreements, and forced to abandon its business

---

[2] In addition to lost profits, Euphoric may recover compensatory damages for humiliation and emotional distress. Courts have consistently held that such damages may be awarded based on testimony or inferred from the circumstances, even absent evidence of economic loss or physical symptoms. *Johnson v. Hale*, 13 F.3d 1351, 1352 (9th Cir. 1994) (citing *Phiffer v. Proud Parrot Motor Hotel*, 648 F.2d 548, 552–53 (9th Cir. 1980); *Seaton v. Sky Realty Co.*, 491 F.2d 634, 636 (7th Cir. 1974)).

13

plans due to Defendants' coercive tactics (Doc. 249 ¶¶ 126, 367–377). UniKC specifically pleads damages including expenses incurred in preparation for opening, which were rendered worthless by Defendants' discriminatory and extortionate conduct. These are actual financial injuries, not abstract harms, and they fall squarely within the definition of injury to business or property under RICO.

Defendants' reliance on *Gomez v. Wells Fargo Bank*, N.A., 676 F.3d 655, 660 (8th Cir. 2012) is misplaced. In that cases, plaintiffs alleged only intangible harms—such as a second security interest or contractual rights to repayment—without concrete financial loss. Here, by contrast, Plaintiffs allege actual monetary expenditures, lost leasehold rights, and foregone profits tied to specific contractual expectancies. These allegations are sufficient to establish standing under § 1964(c).

### F. Plaintiffs Have Alleged a RICO Conspiracy Under § 1962(d)

Defendants argue that Plaintiffs' bribery allegations fail because they do not identify public officials who were allegedly bribed within the meaning of 18 U.S.C. § 201. However, Plaintiffs directly allege that CID board members, affiliated property owners and Kansas City officials agreed to pursue a common plan to exclude minority businesses, as evidenced by recorded statements, text messages, and coordinated enforcement of "Good Neighbor Agreements" (Doc. 249 ¶¶ 367–375). The Eighth Circuit has held that a § 1962(d) conspiracy claim requires only an agreement to commit predicate acts, not the completion of those acts. *United States v. Darden*, 70 F.3d 1507, 1543 (8th Cir. 1995). Plaintiffs' allegations satisfy this requirement.

In *Bieter Co. v. Blomquist*., 987 F.2d 1319 (8th Cir. 1993), the court held that a commercial developer had standing to bring RICO claims based on allegations of bribery of city officials that were charged with sufficient factual specificity. The court rejected an excessively narrow view of

14

causation and injury, noting that limiting RICO's application would undermine its effectiveness in rooting out public corruption. *Id*. The court emphasized that RICO serves as a means to address corruption of democratic processes, supporting the principle that bribery schemes can constitute valid predicate acts for RICO claims when properly alleged. *Id*.

*Floyd v. Quick Cash.*, Not Reported in F.Supp.2d (E.D. MO 2009), establishes that while the RICO Act makes it unlawful to conduct enterprise affairs through a pattern of racketeering activity, the definition of racketeering activity in 18 U.S.C. § 1961(1) includes not only bribery but also various activities prohibited by state and federal law. *Id*. State law bribery violations can serve as predicate acts for RICO claims if properly alleged with factual specificity.

The Second Amended Complaint contains sufficient factual allegations to support bribery claims under alternative statutory provisions. While 18 U.S.C. § 201 applies specifically to federal public officials, RICO's predicate acts also include state law bribery violations. Missouri law prohibits commercial bribery and bribery of public servants under Mo. Rev. Stat. § 570.150 and § 576.010, which would encompass the alleged conduct between Westport CID Defendants and private businesses through the Good Neighbor Agreement scheme. The complaint specifically identifies the Good Neighbor Agreement as the mechanism for the alleged bribery scheme, providing sufficient factual basis to state a plausible claim at this pleading stage.

**Conclusion**

Defendants' Motion to Dismiss is procedurally barred because it was filed simultaneously with their Answer, contrary to Rule 12(b). Even if construed under Rule 12(c), Plaintiffs' Second Amended Complaint sufficiently alleges a civil RICO claim, including an enterprise, a pattern of racketeering activity, predicate acts of extortion and fraud, and concrete injury to business and property. Accordingly, the Motion to Dismiss Count XII should be denied.

Respectfully submitted,

*[signature]*

**Cecilia Nuby & Associates, LLC**
Missouri Bar Number: 67646
Kansas Bar Number: 78602
Illinois Bar Number: 6346825
220 E. Illinois St., ste. 3704
Chicago, IL, 60611
Phone: (913)-200-7900
Fax: (913) 273-0996
E-mail: Cecilia@NubyLaw.com
**ATTORNEY FOR PLAINTIFF
EUPHORIC, LLC,**

Respectfully submitted,

*[signature]*

**Cecilia Nuby & Associates, LLC**
Missouri Bar Number: 67646
Kansas Bar Number: 78602
Illinois Bar Number: 6346825
220 E. Illinois St., ste. 3704
Chicago, IL, 60611
Phone: (913)-200-7900
Fax: (913) 273-0996
E-mail: Cecilia@NubyLaw.com
**ATTORNEY FOR PLAINTIFF
The Sourze, LLC**


**THE LAW OFFICE OF
STEPHEN R. WILLIAMS, LLC**

**/s/ Stephen R. Williams**
Stephen R. Williams MO # 59416
4520 Main Street, Suite 700
Kansas City, MO 64111
Office: 816.285.6047
Fax: 816.756.1999

stephen@srwilliamslaw.com
**ATTORNEY FOR UNIKC, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of November 2025, the above and foregoing **RESPONSE TO DEFENDANT CID MOTION TO DISMISS COUNT XII OF THE SECOND AMENDED COMPLAINT** was served by electronic filing with the Court Administrator through the CM/ECF system and by e-mail to the e-mail addresses provided by counsel of record for the parties in this case.

Respectfully submitted,