**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **EUPHORIC LLC, ET. AL.**<br><br><br>**Plaintiffs,**<br><br>**v.**<br><br>**WESTPORT COMMUNUITY IMPROVEMENT DISTRICT, ET. AL.**<br><br>**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Case No. 4:25−cv−00023−RK** |

**PLAINTIFFS' JOINT SUGGESTIONS IN OPPOSITION TO DEFENDANT AC WESTPORT'S MOTION TO DISMISS COUNTS IV - XII OF PLAINTIFFS' SECOND AMENDED COMPLAINT FOR FAILURE TO STATE A CAUSE OF ACTION**

## TABLE OF CONTENTS

1. **Introduction** ........................................................................................................ 1
2. **Statement of Facts** ............................................................................................ 2
3. **Legal Standard for Motion to Dismiss** ............................................................ 6
4. **Argument** ........................................................................................................... 8
    - Count IV: Racial Discrimination in Violation of 42 U.S.C. § 1982 ....................... 8
    - Count V: Conspiracy to Commit Racial Discrimination (42 U.S.C. § 1985) ....... 15
    - Count VI: Racial Discrimination in Violation of 42 U.S.C. § 1981 ....................... 22
    - Count VII: Failure to Prevent Conspiracy (42 U.S.C. § 1986) ............................ 28
    - Count VIII: Tortious Interference with Contract (Missouri Law) ........................ 33
    - Count IX: Tortious Interference with Business Expectancy ................................. 39
    - Count X: Civil Conspiracy Under Missouri Law ................................................... 44
    - Count XI: Antitrust Conspiracy (Sherman Act & Mo. Rev. Stat. § 416.031) ....... 49
    - Count XII: RICO Violation (18 U.S.C. § 1962) .................................................... 54
5. **Conclusion** ........................................................................................................ 60

## TABLE OF AUTHORITIES

- *Ashcroft v. Iqbal* ................................................ 36
- *Bell Atl. Corp. v. Twombly* ................................. 36, 77
- *Daniels v. Dillard's, Inc.* .................................. 42
- *Jones v. Alfred H. Mayer Co.* ............................... 136
- *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.* .......... 48
- *Wharton v. Knefel* ............................................ 51, 55, 68
- *Smith v. Anchor Bldg. Corp.* ................................ 51, 55
- *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media* .......... 79
- *Rivers v. Roadway Express* .................................. 88
- *Domino's Pizza, Inc. v. McDonald* ........................... 88
- *Envirotech, Inc. v. Thomas* .................................. 132
- *All Star Awards & Ad Specialties, Inc. v. Halo Branded Sols., Inc.* .......... 106
- *Fabricor, Inc. v. E.I. Dupont Denemours & Co.* .............. 111
- *Cook v. MFA Livestock Ass'n* ................................. 114
- *Institutional Food v. Golden State Strawberries* ............. 115, 128

- *Envtl. Energy Partners, Inc. v. Siemens Bldg. Techs., Inc.* .......... 120
- *Creative Walking, Inc. v. American States Ins. Co.* .......... 134
- *John Knox Vill. v. Fortis Constr. Co.* .......................... 139
- *Haynes v. Hawkeye Sec. Ins. Co.* ................................ 141
- *United States v. Big D. Enters.* .................................. 137
- *Kansas City Star Co. v. United States* ............................ 152
- *International Salt Co. v. United States* .......................... 151
- *Sedima S.P.R.L. v. Imrex Co.* ...................................... 161
- *Wisdom v. First Midwest Bank* ..................................... 164
- *United States v. Lisinski* ........................................... 168
- *United States v. Rabbitt* ............................................ 168
- *Bader Farms, Inc. v. Monsanto Co.* ................................. 155


## TABLE OF STATUTES


- 42 U.S.C. § 1981 ................................................. 78, 79, 91
- 42 U.S.C. § 1982 ................................................. 41, 42, 56
- 42 U.S.C. § 1985 ................................................. 58, 59
- 42 U.S.C. § 1986 ................................................. 92, 94, 97, 100, 104
- 18 U.S.C. § 1961 ................................................. 163
- 18 U.S.C. § 1962 ................................................. 161, 169
- Mo. Rev. Stat. § 416.031 .......................................... 149

COMES NOW Plaintiffs Unikc LLC, Euphoric LLC, and The Sourze, LLC, respectfully submit this Joint Suggestions in Opposition to Defendant AC Westport's Motion to Dismiss Counts IV – XII of Plaintiffs' Second Amended Complaint for failure to state a cause of action.

## I. INTRODUCTION

Defendant seeks dismissal under Rule 12(b)(6), yet Plaintiffs' Second Amended Complaint not only meets but far exceeds the plausibility threshold established in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Plaintiffs UniKC, LLC, Euphoric, LLC, and The Sourze, LLC are minority-owned businesses systematically excluded from the Westport Entertainment District through a racially motivated scheme orchestrated by the Westport Community Improvement District ("CID") and its co-conspirators, including AC Westport, LLC.

This is not a case of conclusory allegations. Plaintiffs allege specific facts, supported by documents and recorded admissions, showing a decade-long pattern of discrimination, civil conspiracy, and racketeering, including:

- CID's use of the coercive "Good Neighbor Agreement" to control liquor licensing and exclude minority businesses;
- CID leaders admitting that businesses refusing to sign are "put out of business";
- AC Westport's interference with UniKC's lease and statements rejecting its "type of crowd"; and

- A broader pattern of coercion, extortion, and bribery to manipulate licensing and eliminate minority competition.

Plaintiffs assert claims under 42 U.S.C. §§ 1981, 1982, 1985(3), and 1986, Missouri common law, and federal statutes including the Sherman Act and RICO. Each claim is grounded in detailed factual allegations that, taken as true, state a plausible entitlement to relief. Defendant's motion mischaracterizes these facts and should be denied in its entirety.

## II. STATEMENT OF FACTS

Plaintiffs UniKC, LLC, Euphoric, LLC, and The Sourze, LLC are minority-owned businesses that sought to establish and operate venues in the Westport Entertainment District ("Westport") in Kansas City, Missouri one of the city's most prominent entertainment districts. (Doc. 249, pp. 3–7). Despite Westport having over 250 businesses, Black/African American ownership is virtually nonexistent. Since at least 2013, Defendants have engaged in a coordinated and unlawful scheme designed to exclude minority business owners from Westport. (Doc. 249, pp. 37–44).

The Westport Community Improvement District ("CID"), a statutorily created entity, is charged with neighborhood-level planning, and promoting the identity and common goals of Westport. Instead, the CID has acted outside its statutory authority by orchestrating and enforcing a racially discriminatory scheme to prevent minority-owned businesses from operating in Westport. (Doc. 249, pp. 42–43). CID board members used their positions to implement policies and practices that make it nearly impossible for Black/African American entrepreneurs to lease property or maintain liquor licenses in Westport. (Doc. 249, pp. 38–40).

Central to this scheme is the "Good Neighbor Agreement," a one-sided contract that Defendants have used to coerce nearly every new alcohol-serving business to sign since 2013.

(Doc. 249, ¶48(c)). CID members admitted in recorded audio that "99 percent of property owners down here won't sign a consent for a liquor license of any kind, even beer and wine unless we have a Good Neighbor Agreement in place," and that businesses refusing to sign are "put out of business." (Doc. 249, ¶48(e)). This agreement gives CID members unfettered control over liquor licensing and business operations, stripping property owners of autonomy and consolidating power in CID members' hands. (Doc. 249, pp. 45, 364–65).

On April 6, 2021, UniKC entered into a valid lease agreement with DB Icehouse, LLC for the property at 4140 Pennsylvania Avenue in Westport. (Doc. 249, pp. 97–99). UniKC's owners, D'Mario Gray and Frederick Vickers, are African American. After UniKC received keys and began renovations, its representatives met with the owner of The Denver Biscuit to discuss plans for the neighboring property. (Doc. 249, pp. 104–113). When UniKC explained its plan to open a bar & lounge catering to a young R&B and Hip-Hop crowd, the Denver Biscuit owner responded with dismissive and agitated remarks. (Doc. 249, pp. 114–116). The very next day, AC Westport threatened DB Icehouse with a cease-and-desist letter demanding the termination of UniKC' s lease and warned that it would interfere with UniKC's liquor license application if DB Icehouse honored the lease. (Doc. 249, pp. 120, 125, 373). As a direct result, DB Icehouse locked UniKC out of the property and terminated their lease without cause despite UniKC's full compliance with all lease terms. (Doc. 249, pp. 126–130). UniKC suffered significant financial harm and was denied the opportunity to open its business solely because its owners are Black/African American. (Doc. 249, pp. 125–130, 377).

Plaintiffs allege these acts are not isolated incidents but part of a broader pattern of racketeering activity involving coercion, extortion, and bribery of Kansas City officials to control liquor licensing and exclude minority businesses. (Doc. 249, pp. 360–382). CID members admitted

in recorded audio that businesses refusing to comply with CID's "rules" are targeted aggressively: "We go after them with a vengeance… we do everything we can to put them out of business." (Doc. 249, ¶48(d), ¶379–381).

All of Plaintiffs' injuries, including lost revenue, reputational harm, and public humiliation are directly traceable to Defendants' civil conspiracy, racial discrimination conspiracy, and racketeering activities. Plaintiffs' claims are well-pleaded, supported by detailed factual allegations, documentary evidence, and recorded admissions. At a minimum, these claims easily satisfy the plausibility standard set by Twombly and Iqbal and should proceed to discovery.

## III. LEGAL STANDARD FOR MOTION TO DISMISS

Under Federal Rule of Civil Procedure 8(a)(2), a complaint need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief." This reflects a notice-pleading standard not a heightened fact-pleading requirement. The rule does not demand exhaustive detail, but it requires more than a bare accusation devoid of factual support. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "labels and conclusions" are insufficient, a complaint is not required to plead evidence or prove its case at this stage. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

When evaluating a motion under Rule 12(b)(6), the court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *Iqbal*, 556 U.S. at 678. Legal conclusions, however, are not entitled to the same presumption. *Id*. To survive dismissal, a complaint must allege facts that, taken as true, "state a claim to relief that is plausible on its face." Defendants also employed

Facial plausibility exists when the pleaded facts allow the court to reasonably infer that the defendant is liable for the misconduct alleged. *Id*. Importantly, the plausibility standard is not a probability standard; it simply requires enough factual content to raise a reasonable expectation that discovery will uncover evidence supporting the claim. *Twombly*, 550 U.S. at 545.

As the Supreme Court emphasized, a well-pleaded complaint should proceed even if "it strikes a savvy judge that actual proof of those facts is improbable and that a recovery is very remote and unlikely." *Id.* at 556. In short, Plaintiffs are not required to prove their case at the pleading stage, they need only allege sufficient facts to nudge their claims across the line from conceivable to plausible. Plaintiffs have done so here.

## IV. <u>ARGUMENT</u>

### A. Count IV: Racial Discrimination in Violation of 42 U.S.C. § 1982

Defendant AC Westport's claim that Plaintiffs fail to state a cause of action under 42 U.S.C. § 1982 is unfounded. The Second Amended Complaint alleges facts satisfying all required elements: (1) Plaintiffs are members of a racial minority; (2) Defendants acted with discriminatory intent; and (3) such discrimination interfered with Plaintiffs' rights to lease real property. See *Daniels v. Dillard's, Inc.*, 373 F.3d 885, 887 (8th Cir. 2004).

#### I. Defendants Intended to Discriminate Against Members of A Protected Class

Plaintiffs UniKC, Euphoric, and The Sourze are minority-owned businesses. Their owners—Christopher Lee, D'Mario Gray, Frederick Vickers, and Robert Thorpe—are all Black/African American. (Doc. 249, pp. 3–7). This fact is undisputed and satisfies the first element under § 1982.

AC Westport contends that Plaintiffs fail to allege discriminatory intent because UniKC "never names AC Westport." (Doc. 274, p. 8). This is incorrect. The Second Amended Complaint

expressly alleges that AC Westport operates as The Denver Biscuit Company and acted through its owners. (Doc. 249, p. 28). Plaintiffs allege that after UniKC signed a valid lease for 4140 Pennsylvania, AC Westport's owner met with UniKC's representatives, questioned whether the establishment would play "hip hop and R&B," and expressed concern about the "type of crowd" the business would attract. (Doc. 249, pp. 108–112). The next day, AC Westport contacted UniKC's landlord, delivered a cease-and-desist letter, threatened interference with liquor licensing, and stated it did not want that "type of crowd" in Westport. (Doc. 249, pp. 118, 120, 125). As a direct result, UniKC was locked out and its lease terminated without cause. (Doc. 249, pp. 121–122).

**The Meaning of "Type of Crowd" Demonstrates Discriminatory Intent**

The phrase "type of crowd" was not a neutral business concern. In context, it was a coded reference to race. AC Westport used this phrase immediately after learning UniKC's concept was a bar & lounge catering to a young R&B and Hip-Hop audience, genres historically associated with African American culture. (Doc. 249, pp. 108–114). Courts recognize that discriminatory intent can be inferred from such coded language and stereotypes. See *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 266 (1977). Here, "type of crowd" was shorthand for excluding Black patrons and businesses. This inference is reinforced by subsequent conduct by AC Westport who threatened UniKC's landlord and warned it would interfere with liquor licensing if UniKC remained. (Doc. 249, pp. 118, 120, 125).

Such language mirrors the discriminatory assumptions condemned in *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 342 (6th Cir. 2002), where decisions based on stereotypes violated civil rights protections. Here, Defendants acted on the stereotype that a "hip hop crowd" equates to violence or disorder, a racially charged assumption that disproportionately targets African Americans. . (Doc. 249, pp. 72, 200). This is direct evidence of discriminatory motive under §

1982, which "must encompass every racially motivated refusal to sell or rent." *Jones v. Mayer Co.*, 392 U.S. 409, 421–22 (1968).

**II. AC Westport's Actions Constitute Interference Under § 1982**

Defendant argues that "one conversation" cannot amount to interference. This misstates the law. Interference under § 1982 does not require physical obstruction or violence; it includes any conduct that prevents or frustrates the right to lease property on equal terms. See *Wharton v. Knefel*, 562 F.2d 550, 555 (8th Cir. 1977) (holding refusal to rent to a Black tenant sufficient to state a claim under § 1982). Similarly, *Smith v. Anchor Bldg. Corp.*, held that "where a Black rental applicant meets the objective requirements of a landlord, and the rental would have likely been consummated were he or she a white applicant, a prima facie inference of discrimination has been established." 536 F.2d 231, 233 (8th Cir. 1976).

Here, UniKC met all lease requirements and had already taken possession of the property. AC Westport's threats to the landlord warning that it would interfere with liquor licensing and expressing opposition to UniKC's "type of crowd" directly caused the landlord to terminate the lease. (Doc. 249, pp. 118–125). This is not speculative; the termination occurred immediately after AC Westport's interference. Euphoric faced similar interference when CID members, acting in concert with AC Westport, pressured its landlord to breach a valid lease after social media posts by Black promoters surfaced. (Doc. 249, pp. 157–182). These actions deprived Plaintiffs of their statutory right to lease and enjoy property on equal terms, satisfying § 1982.

**IV. Defendant Mischaracterizes *Varela v. Hill* and Overstates Plaintiffs' Burden**

AC Westport cites *Varela v. Hill*, 2024 WL 1328265 (E.D. Mo. Mar. 28, 2024), as if it supports dismissal. Varela undermines Defendant's argument. The court in *Varela* denied a motion to dismiss a § 1982 claim, holding that allegations of racially motivated interference with property

rights, like those here, were sufficient to survive Rule 12(b)(6). Defendant mischaracterizes *Varela* by suggesting it imposes a heightened pleading standard requiring "extreme" or "egregious" conduct, but this is incorrect. The court did not require racial slurs or overt hostility; rather, it required only plausible allegations of discriminatory intent and interference with property rights. Plaintiffs here allege far more: direct statements about the "type of crowd," threats to interfere with liquor licensing, and immediate termination of valid leases.

Defendant also overstates Plaintiffs' burden by implying that § 1982 demands proof of reprehensible conduct at the pleading stage. The Supreme Court has squarely rejected this notion. In *Jones v. Mayer Co.*, 392 U.S. 409, 421–22 (1968), the Court held that § 1982 "must encompass every racially motivated refusal to sell or rent." Likewise, the Eighth Circuit in *Wharton v. Knefel*, 562 F.2d 550, 555 (8th Cir. 1977), found a claim sufficient where the defendant simply refused to rent to a Black tenant without requiring inflammatory language or violence. Similarly, *Smith v. Anchor Bldg. Corp.*, 536 F.2d 231, 233 (8th Cir. 1976), held that when a Black applicant meets objective requirements and is denied housing that would have been granted to a white applicant, a prima facie inference of discrimination arises.

Plaintiffs are not required to prove their case now; they need only allege facts that make discrimination plausible. Plaintiffs have done so by alleging specific acts of interference, racially coded statements, and a pattern of exclusion that "bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266. Plaintiffs allege specific discriminatory statements, actions that caused lease termination, and a broader conspiracy to exclude minority-owned businesses from Westport. These allegations easily "nudge" Plaintiffs' claims across the line from conceivable to plausible. *Twombly*, 550 U.S. at 570. Plaintiffs have pleaded detailed facts showing that AC Westport intentionally discriminated against them on the basis of race and interfered with their

property rights in violation of 42 U.S.C. § 1982. Defendant's motion to dismiss Count IV should be denied.

### B. Count V: Conspiracy to Commit Racial Discrimination in Violation of 42 U.S.C. § 1985

Defendant AC Westport argues Plaintiffs fail to state a claim under 42 U.S.C. § 1985, but that argument is meritless. The Second Amended Complaint alleges facts satisfying all five elements of a § 1985(3) conspiracy: (1) a conspiracy of two or more persons; (2) motivated by class-based, invidiously discriminatory animus; (3) intended to deprive Plaintiffs of equal enjoyment of rights secured by law; (4) resulting in injury; and (5) involving an overt act in furtherance of the conspiracy. See *Sines v. Kessler*, 324 F. Supp. 3d 765, 780 (W.D. Va. 2018).

#### I. Plaintiffs Adequately Allege a Conspiracy of Two or More Persons and Show AC Westport Acted with Class-based, Invidiously Discriminatory Animus

AC Westport contends that Plaintiffs fail to allege facts showing it conspired with other Defendants. This is incorrect. Plaintiffs allege that AC Westport not only acted in concert with DB Icehouse to terminate UniKC's lease but also aligned itself with the CID's overarching discriminatory plan. The Second Amended Complaint details multiple facts demonstrating that AC Westport shared the same unlawful objective as other conspirators:

- **Participation in the CID's "strategic moves"**: Plaintiffs allege that the CID developed a list of "strategic moves" to make it nearly impossible for minority business owners to open in Westport, including contacting landlords and threatening interference with liquor licenses if tenants were Black/African American. (Doc. 249, pp. 49–50). AC Westport executed this strategy when it threatened DB Icehouse regarding

UniKC's liquor license, causing immediate lease termination. (Doc. 249, pp. 118, 120, 125).

- **Adherence to the Good Neighbor Agreement scheme**: Plaintiffs allege that all Defendants operated under the Good Neighbor Agreement as a tool to control who could enter Westport. Recorded statements confirm that "99 percent of property owners down here won't sign a consent for a liquor license of any kind even beer and wine unless we have a Good Neighbor Agreement in place." (Doc. 249, ¶48(e)). AC Westport's conduct of pressuring UniKC's landlord and objecting to the "hip hop crowd" reflects compliance with this discriminatory framework.

- **Shared discriminatory language and objectives**: AC Westport's owner used coded language ("type of crowd") and expressed concerns about hip hop music, mirroring the CID's documented efforts to exclude businesses associated with African American patrons. (Doc. 249, pp. 108–112). This language aligns with the CID's stated goal of eliminating "problematic" owners and patrons, which Plaintiffs allege was a euphemism for Black business owners and customers. (Doc. 249, pp. 44–45).

- **Common modus operandi**: Plaintiffs allege that all Defendants, including AC Westport, engaged in the same pattern: contacting landlords, leveraging liquor license threats, and enforcing arbitrary agreements to block minority businesses. (Doc. 249, pp. 280–284, 325–332). AC Westport's overt act against UniKC fits squarely within this pattern.

Courts have held that a single conspiracy exists when defendants share a common overall goal, even if they do not participate in every act or know every conspirator. *United States v. Pullman*, 187 F.3d 816, 821 (8th Cir. 1999). Here, AC Westport's actions underscore its

commitment to the shared goal of excluding Black-owned businesses from Westport. Further, these overt acts were not isolated; it was part of the CID's broader plan to keep Westport "whitewashed" and free from what they describe as the "hip hop crowd." AC Westport's conduct demonstrates racial animus and a deliberate effort to exclude Black-owned businesses. Courts have held that discriminatory effect alone can establish animus, noting that "clever men may easily conceal their motivations." *Wharton v. Knefel*, 562 F.2d 550, 555 (8th Cir. 1977). Here, AC Westport's actions were overt and intentional, leaving no doubt about its discriminatory purpose.

**II. AC Westport's Interference Deprived Plaintiffs of Rights Secured by Law**

AC Westport's threats directly caused UniKC's landlord to breach a valid lease, locking UniKC out of the property and terminating its contract without cause. (Doc. 249, pp. 121–122). This deprived UniKC of its right under § 1981 to make and enforce contracts and under § 1982 to lease property on equal terms. AC Westport's interference was not speculative; it was confirmed when UniKC's landlord admitted that "several neighboring business owners, including the owner of the Denver Biscuit, did not want Mr. Gray's 'type of crowd' to come to Westport and cause problems." (Doc. 249, p.125). Euphoric faced similar interference when CID members, acting in concert with AC Westport, pressured its landlord to breach its lease after social media posts by Black promoters surfaced. (Doc. 249, pp. 168–182). These acts show AC Westport's active participation in depriving Plaintiffs of federally protected rights.

**III. AC Westport's Actions Cause Injury and Advanced a Coordinated Conspiracy**

AC Westport's conduct inflicted significant and foreseeable harm on Plaintiffs. UniKC was prevented from opening an establishment in one of Kansas City's most lucrative entertainment districts, resulting in lost revenue and wasted investment. Euphoric was unlawfully denied possession of its leased premises despite full compliance with its lease obligations. Similarly, The

Sourze's business collapsed following discriminatory interference. These actions caused not only substantial financial losses but also reputational damage and emotional distress. AC Westport's threats and discriminatory objections were a proximate cause of these injuries, directly triggering lease terminations and perpetuating the exclusion of minority-owned businesses from Westport.

Plaintiffs further allege multiple overt acts taken in furtherance of this conspiracy, including:

- AC Westport's threats to DB Icehouse regarding UniKC's liquor license, which led to termination of UniKC's lease (Doc. 249, pp. 117–125).
- CID Defendants' pressure on Euphoric's landlord to breach its lease after social media posts by Black promoters (Doc. 249, pp. 168–182).

These acts were not isolated incidents but deliberate steps in a coordinated plan to exclude minority-owned businesses from the district.

Plaintiffs have met their burden of alleging sufficient factual matter to raise a reasonable expectation that discovery will reveal evidence supporting their claims by alleging that AC Westport joined a conspiracy motivated by racial animus, acted in concert with other Defendants, and committed overt acts that deprived Plaintiffs of rights guaranteed under federal law. Accordingly, Defendant's motion to dismiss Count V should be denied.

### C. Count IV: Racial Discrimination in Violation of 42 U.S.C. § 1981

Defendant AC Westport argues Plaintiffs fail to state a claim under 42 U.S.C. § 1981, but that argument is meritless. The Second Amended Complaint alleges facts satisfying all required elements: (1) Plaintiffs are members of a protected class; (2) AC Westport intentionally discriminated on the basis of race; (3) Plaintiffs engaged in protected activity—the making and

enforcement of contracts; and (4) AC Westport interfered with those contractual rights. See *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020).

**I. AC Westport Intentionally Discriminated Against Members of Protected Class Based on Race**

Plaintiffs UniKC, Euphoric, and The Sourze are minority-owned businesses. Their owners, Christopher Lee, D'Mario Gray, Frederick Vickers, and Robert Thorpe are all Black/African American. (Doc. 249, pp. 2–7). This fact is undisputed and satisfies the first element under § 1981.

AC Westport's discriminatory intent is evident from its conduct and statements. After UniKC signed a valid lease for 4140 Pennsylvania, AC Westport's owner met with UniKC representatives and questioned whether the club would play "hip hop and R&B" and what "type of crowd" it would attract, coded language signaling the exclusion of African American patrons. (Doc. 249, pp. 108–112). The very next day, AC Westport contacted UniKC's landlord and threatened interference with liquor licensing if UniKC remained. (Doc. 249, pp. 118, 120, 125). DB Icehouse confirmed that "business owners in Westport including AC Westport didn't want [UniKC's] type of group there." (Doc. 249, p.125). A "hip hop crowd" predominantly consists of Black/African American individuals. (Doc. 249, p.200). These facts demonstrate that AC Westport acted with racial animus.

Similarly, Euphoric faced interference after its landlord was pressured by CID members and others, including AC Westport, following social media posts by Black promoters. Defendant Allred refused to speak with Euphoric's owner, stating he already knew what Lee "was all about"—the only thing Allred knew was that Lee was African American and associated with Black promoters. (Doc. 249, pp. 181–182). These allegations demonstrate intentional discrimination.

Courts recognize that discriminatory intent can be inferred from coded language and adverse actions. See *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 469 (8th Cir. 2009).

**II. Plaintiffs Engaged in Protected Activity Under § 1981**

Section 1981 protects the right to "make and enforce contracts," encompassing the making, performance, modification, and termination of contracts. Plaintiffs UniKC and Euphoric entered valid lease agreements for properties in Westport. (Doc. 249, pp. 85, 122, 215–216). Under Missouri law, this functions as both a conveyance and a contract, and a party harmed by breach may pursue standard contract remedies. *Arnold Crossroads, LLC v. Gander Mt. Co.*, 471 S.W.3d 721, 723 (Mo. App. E.D. 2015).

**IV. AC Westport's Interference with Plaintiffs' Contractual Rights**

AC Westport argues Plaintiffs fail to show a direct contract with AC Westport, but this misstates the law. The Supreme Court has held that § 1981 applies to "all phases and incidents of the contractual relationship, including discriminatory contract terminations." *Rivers v. Roadway Express*, 511 U.S. 298, 302 (1994). It also protects prospective contractors and applies to discrimination that "blocks the creation of a contractual relationship." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006).

Here, AC Westport's threats directly caused UniKC's landlord to breach its lease, locking UniKC out and terminating the contract without cause. (Doc. 249, pp. 121–122). Euphoric faced similar interference when CID members, acting in concert with AC Westport, pressured its landlord to breach its lease after social media posts by Black promoters surfaced. (Doc. 249, pp. 168–182). These acts deprived Plaintiffs of their contractual rights and business opportunities.

Further, AC Westport was an intended third-party beneficiary to UniKC's lease, which contained a noncompete clause prohibiting UniKC from selling pizza or competing with AC

Westport. (Doc. 249, p.99). The Eighth Circuit has suggested that third-party intended beneficiaries of a contract have § 1981 rights. *Parker v. Kearney Sch. Dist.*, 130 F.4th 649 (8th Cir. 2025). This underscores AC Westport's direct involvement and liability under § 1981.

AC Westport overstates Plaintiffs' burden by implying that egregious conduct or racial slurs are required. They are not. Plaintiffs' allegations easily satisfy *Twombly* and *Iqbal*. Plaintiffs allege detailed facts showing that AC Westport intentionally discriminated against them on the basis of race and interfered with their contractual rights in violation of 42 U.S.C. § 1981. Therefore, Defendant's motion to dismiss Count VI should be denied.

**D. Count VII: Failure to Prevent Racial Discrimination Conspiracy in Violation of 42 U.S.C. § 1986**

Defendant AC Westport argues that Plaintiffs fail to state a claim under 42 U.S.C. § 1986, but this argument fails because Plaintiffs have sufficiently alleged facts showing that AC Westport knew of the racially discriminatory conspiracy described in Count V, had the power to prevent it, and failed to do so.

**I. Legal Standard**

Section 1986 provides, in relevant part:

"Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in the preceding section [§ 1985], are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act shall be committed, shall be liable to the party injured…" (42 U.S.C. § 1986).

Although § 1986 claims are derivative of § 1985 violations, the statute does not require that the defendant participated in the conspiracy or shared discriminatory animus. Courts have consistently held that liability under § 1986 arises when a defendant knew of a § 1985 conspiracy and failed to act despite having the power to prevent it. *Park v. City of Atlanta*, 120 F.3d 1157, 1159–60 (11th

Cir. 1997) (Section 1986 "requires only that [Defendants] knew of a § 1985 conspiracy and, having the power to prevent or aid in preventing the implementation of the conspiracy, neglected to do so"). Similarly, the Third Circuit explained: "Although discriminatory intent is essential in proving a § 1985(3) conspiracy, it does not follow that a defendant charged under section 1986 with neglecting to intervene… must personally share the class-based animus." *Clark v. Clabaugh*, 20 F.3d 1290, 1298 (3d Cir. 1994).

**II. AC Westport's Knowledge of and Ability to Prevent the Conspiracy**

Plaintiffs allege that AC Westport was not only aware of the CID's discriminatory scheme but actively participated in it. AC Westport's owner met with UniKC representatives and questioned whether the club would play "hip hop and R&B," expressing concern about the "type of crowd" it would attract—coded language for excluding African American patrons. (Doc. 249, pp. 108–112). The following day, AC Westport contacted UniKC's landlord and threatened interference with liquor licensing if UniKC remained. (Doc. 249, pp. 118, 120, 125). These actions demonstrate that AC Westport understood and embraced the conspiracy's objective: preventing Black-owned businesses from operating in Westport. Even if AC Westport denies knowledge of the CID's broader plan, Plaintiffs allege and will show that AC Westport devised its own discriminatory strategy to exclude UniKC. (Doc. 249, pp. 117, 125). This satisfies the knowledge requirement under 42 U.S.C. § 1986.

Moreover, AC Westport had the power to prevent the conspiracy. As a prominent Westport business owner and participant in the CID's network, AC Westport wielded influence over property owners and business decisions in the district. Rather than using that influence to stop discriminatory practices, AC Westport reinforced them by threatening UniKC's landlord and endorsing the CID's "Good Neighbor Agreement" scheme. (Doc. 249, pp. 44–52, 280–283,

373). AC Westport's failure to act and its affirmative acts of interference underscore its liability under § 1986.

**III. AC Westport's Failure Resulted in Harm**

Plaintiffs UniKC and Euphoric were deprived of their contractual rights and business opportunities because AC Westport not only failed to prevent the conspiracy but actively advanced it. UniKC was locked out of its leased property and lost substantial investment. Euphoric was denied possession of its premises despite full compliance with its lease. These injuries flow directly from AC Westport's failure to prevent the conspiracy and its affirmative acts in furtherance of it.

Plaintiffs have alleged specific acts showing AC Westport's knowledge, ability to prevent the conspiracy, and failure to act, facts that easily satisfy the plausibility standard. Plaintiffs have alleged sufficient facts to state a claim under 42 U.S.C. § 1986. AC Westport knew of the racially discriminatory conspiracy, had the power to prevent it, and failed to do so. Accordingly, Defendant's motion to dismiss Count VII should be denied.

**E. Count VIII: Tortious Interference with Plaintiffs' Contracts**

Defendant AC Westport contends that Plaintiffs have not stated a claim for tortious interference with contract under Missouri law. That argument fails. The Second Amended Complaint alleges detailed facts satisfying each required element: (1) the existence of valid contracts; (2) AC Westport's knowledge of those contracts; (3) intentional interference that induced breaches; (4) absence of any legitimate justification; and (5) resulting damages. See *All Star Awards & Ad Specialties, Inc. v. Halo Branded Sols., Inc.*, 642 S.W.3d 281, 293 n.15 (Mo. banc 2022).

**I. AC Westport's Knowledge of Plaintiffs' Valid Contracts**

Plaintiffs allege valid lease agreements for their respective properties: UniKC leased 4140 Pennsylvania Avenue from DB Icehouse on April 6, 2021; Euphoric leased 4128 Broadway from 4128 Broadway, LLC on October 21, 2024; and The Sourze leased property from Pulse Management, LLC and Westport Development, LLC on October 20, 2020. (Doc. 249, pp. 57, 97, 151). Under Missouri law, leases are treated as both conveyances and contracts, entitling parties to standard contract remedies for breach. *Arnold Crossroads, LLC v. Gander Mt. Co.*, 471 S.W.3d 721, 723 (Mo. App. E.D. 2015).

AC Westport's claim of ignorance regarding these contracts is contradicted by the pleadings. Plaintiffs allege that AC Westport learned of UniKC's lease during a meeting at The Denver Biscuit, where UniKC's plans for the property were discussed. (Doc. 249, pp. 104–117). AC Westport confirmed this knowledge when it contacted DB Icehouse, its own landlord and UniKC's landlord and threatened interference with UniKC's liquor license. (Doc. 249, pp. 117, 125, 373). Likewise, AC Westport was aware of Euphoric's lease through CID communications and a group text message in which Harold Brody introduced Lee to CID members and stated he had entered into a lease for 4128 Broadway. (Doc. 249, p. 157). Lastly, AC Westport was generally aware of the Sourze's agreement because of general communication with the CID and CID members. (Doc. 249, p. 308). These facts establish that AC Westport knew of Plaintiffs' valid contracts and nonetheless engaged in conduct designed to interfere with them.

**II. AC Westport Intentionally Interfered and Induced Breach**

Missouri law requires proof that the defendant actively and affirmatively took steps to induce a breach and that the contract would have performed absent interference. *Fabricor, Inc. v. E.I. Dupont Denemours & Co.*, 24 S.W.3d 82, 93–94 (Mo. App. W.D. 2000). Plaintiffs meet this standard:

- **UniKC**: After meeting with UniKC, AC Westport contacted DB Icehouse and voiced disapproval of UniKC's plans, threatening interference with liquor licensing. (Doc. 249, pp.117, 125). The immediate result was that DB Icehouse changed the locks and terminated UniKC's lease. AC Westport's phone call "set in motion the chain of circumstances" leading to UniKC's damages. *Envirotech, Inc.*, 259 S.W.3d at 588.
- **Euphoric**: CID members and coconspirators, including AC Westport, pressured Brody to breach Euphoric's lease after social media posts by African Americans promoting Euphoric's hiring event surfaced. (Doc. 249, pp.166–168, 178, 195). Absent this interference, Brody had no reason to terminate the lease.

Missouri courts have found a single phone call sufficient to state a claim for tortious interference where it causes a third party to cancel an agreement. *Cook v. MFA Livestock Ass'n*, 700 S.W.2d 526 (Mo. App. W.D. 1985). AC Westport's conduct meets this standard.

AC Westport had no legitimate justification for interfering with UniKC's lease; its actions were driven by racial animus and stereotypes, not business necessity. AC Westport opposed UniKC's opening solely because it feared attracting a "hip hop crowd", a coded reference to African American patrons. (Doc. 249, p.125). Similarly, Euphoric's lease was sabotaged because Defendants assumed its owner and clientele would be predominantly Black. (Doc. 249, pp.184, 200). Missouri law does not permit interference based on discriminatory motives. *Institutional Food v. Golden State Strawberries*, 587 F. Supp. 1105, 1111 (W.D. Mo. 1984), aff'd, 747 F.2d 448 (8th Cir. 1984).

Plaintiffs were prevented from opening their businesses in Westport, causing significant financial loss, mental anguish, and public humiliation. (Doc. 249, p.313). These injuries were the

foreseeable and proximate result of AC Westport's interference. *Alcorn v. Union Pac. R.R. Co.*, 50 S.W.3d 226, 239 (Mo. 2001).

**VI. Conspiratorial Liability Under Missouri Law**

Under Missouri law, conspirators are jointly liable for tortious acts committed in furtherance of the conspiracy. *Bader Farms, Inc.*, 100 F.4th at 948 (quoting Restatement (Second) of Torts § 876(a)). AC Westport's participation in the CID's discriminatory scheme makes it liable for interference with Euphoric's and the Sourze's lease as well. Plaintiffs have alleged sufficient facts to state a claim for tortious interference with contract under Missouri law. AC Westport knew of Plaintiffs' leases, intentionally induced breaches without justification, and caused substantial damages. Accordingly, Defendant's motion to dismiss Count VIII should be denied.

**F. Count IX: Tortious Interference with Plaintiffs' Business Expectancy Under Missouri Law**

Defendant AC Westport asserts that Plaintiffs fail to state a claim for tortious interference with business expectancy under Missouri law. This argument is without merit. The Second Amended Complaint alleges facts satisfying each required element: (1) a valid business expectancy; (2) AC Westport's knowledge of that expectancy; (3) intentional interference resulting in its breach or termination; (4) absence of justification; and (5) resulting damages. See *Envtl. Energy Partners, Inc. v. Siemens Bldg. Techs., Inc.*, 178 S.W.3d 691, 697 (Mo. App. S.D. 2005).

**I. AC Westport Knew of Plaintiffs' Business Expectancies**

Plaintiffs UniKC and Euphoric had reasonable expectations of operating profitable businesses in Westport, supported by valid lease agreements and substantial investments in renovations and marketing. UniKC entered a lease for 4140 Pennsylvania and began preparations for its grand opening. Euphoric executed a 10-year lease for 4128 Broadway and launched hiring

campaigns. (Doc. 249, pp. 85, 97, 122, 215–216). These facts establish valid business expectations in one of Kansas City's most lucrative entertainment districts.

AC Westport's claim that it lacked knowledge is contradicted by the pleadings. Plaintiffs allege that AC Westport had direct knowledge of UniKC's plans after Gray personally informed AC Westport's owner that UniKC intended to open a nightclub at the neighboring property. (Doc. 249, p.114). AC Westport confirmed this knowledge when it contacted DB Icehouse to encourage termination of UniKC's lease. (Doc. 249, pp.117, 125).

Similarly, AC Westport was aware of Euphoric's business expectancy through CID communications and a group text message where Harold Brody informed Allred and Kimbrough that he had entered into a lease with Euphoric. (Doc. 249, p.157). Plaintiffs also allege that all CID Defendants including AC Westport as a coconspirator knew about Euphoric's hiring event and conspired to pressure Brody into stopping the restaurant's reopening. (Doc. 249, pp.166–168). These facts support a reasonable inference that AC Westport knew of Plaintiffs' business expectancies.

**II. AC Westport Intentionally Interfered Without Justification**

AC Westport's interference was deliberate and racially motivated. After learning of UniKC's plans, AC Westport contacted DB Icehouse and objected to attracting a "hip hop crowd"—a coded reference to African American patrons (Doc. 249, pp.117, 125). AC Westport's threats caused DB Icehouse to lock UniKC out and terminate its lease. Similarly, Euphoric's business expectancy was destroyed when CID members and co-conspirators, including AC Westport, pressured Brody to breach Euphoric's lease after social media posts by African Americans promoting Euphoric's hiring event surfaced (Doc. 249, pp.166–168, 178, 195).

Missouri law deems interference unlawful when it is “legally improper” or based on independently wrongful acts. *Envtl. Energy Ptnrs., Inc. v. Siemens Bldg. Techs., Inc.*, 178 S.W.3d 691, 703 (Mo. App. S.D. 2005). Racial discrimination qualifies as an independently wrongful act. See *Broome v. Biondi*, 17 F. Supp. 2d 211, 221 (S.D.N.Y. 1997) (racially motivated interference with housing rights actionable).

AC Westport lacked any legitimate justification for its conduct. Its actions were driven by racial animus and stereotypes, not business necessity. UniKC was opposed solely because AC Westport feared attracting a “hip hop crowd.” Euphoric’s lease was sabotaged based on assumptions that its owner and clientele would be predominantly Black. Missouri law does not permit interference based on discriminatory motives. *Institutional Food v. Golden State Strawberries*, 587 F. Supp. 1105, 1111 (W.D. Mo. 1984), aff’d, 747 F.2d 448 (8th Cir. 1984).

**III. Conspiratorial Liability**

Under Missouri law, conspirators are jointly liable for tortious acts committed in furtherance of the conspiracy. *Bader Farms, Inc.*, 100 F.4th at 948. AC Westport’s participation in the CID’s discriminatory scheme renders it jointly liable for interference with Euphoric’s business expectancy. Plaintiffs have alleged sufficient facts to state a claim for tortious interference with business expectancy under Missouri law. AC Westport knew of Plaintiffs’ business plans, intentionally interfered without justification, and caused substantial damages. Defendant’s motion to dismiss Count IX should be denied.

## G. Count X: Civil Conspiracy Under Missouri Law

AC Westport argues that Plaintiffs fail to state a claim for civil conspiracy under Missouri law. This argument fails because Plaintiffs allege detailed facts satisfying each required element: (1) two or more persons; (2) pursuing an unlawful objective; (3) after a meeting of the minds; (4)

committing at least one act in furtherance of the conspiracy; and (5) resulting damages. *Envirotech, Inc. v. Thomas*, 259 S.W.3d 577, 586–87 (Mo. App. E.D. 2008).

**I. Two or More Persons Acting Together**

Plaintiffs allege that AC Westport conspired with DB Icehouse (Joe Niebur and Greg Bartold) and CID members to exclude Black-owned businesses from Westport. (Doc. 249, pp.332, 340). Even if AC Westport disputes joining the larger CID conspiracy, Plaintiffs allege a separate conspiracy between AC Westport and DB Icehouse to terminate UniKC's lease. Missouri law requires only two or more persons acting together, which Plaintiffs have pled. *Creative Walking, Inc. v. American States Ins. Co.*, 25 S.W.3d 682, 688 (Mo. App. E.D. 2000).

**II. Unlawful Objective**

The conspiracy's objective was unlawful: to prevent African Americans from exercising their rights to make and enforce contracts and lease property on equal terms, in violation of 42 U.S.C. §§ 1981 and 1982. Plaintiffs allege that Defendants acted unlawfully in both the ends sought and the means used to exclude African Americans from owning or operating businesses in Westport and interfering with valid leases. (Doc. 249, pp.329–334). Racial discrimination in property transactions is prohibited by federal law. *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 421–22 (1968). Missouri law also recognizes conspiracy to breach a contract as actionable. *Envirotech*, 259 S.W.3d at 587.

Defendants' "Good Neighbor Agreement" and coordinated threats regarding liquor licenses were tools to achieve this unlawful objective. CID members admitted that "99 percent of property owners down here won't sign a consent for a liquor license of any kind even beer and wine unless we have a Good Neighbor Agreement in place." (Doc. 249, ¶48(e)). This policy

mirrors discriminatory practices condemned in *United States v. Big D. Enters.*, 184 F.3d 924, 928 (8th Cir. 1999) (policy forbidding rentals to Black applicants violates federal law).

**III. Meeting of the Minds**

AC Westport contends Plaintiffs allege no meeting of the minds. This is incorrect. Plaintiffs allege that CID Defendants and Westport business owners including AC Westport met regularly to discuss strategies for excluding Black-owned businesses, including implementing the "Good Neighbor Agreement" and making "strategic moves" to prevent "problematic" owners. (Doc. 249, pp.49–51, 332). AC Westport demonstrated agreement and unity of purpose when it contacted DB Icehouse and encouraged termination of UniKC's lease because it did not want the "hip hop crowd" as a neighbor. (Doc. 249, p.125). Missouri courts recognize that circumstantial evidence of "unity of purpose" and "common design" establishes a meeting of the minds. *John Knox Vill. v. Fortis Constr. Co.*, 449 S.W.3d 68, 80 (Mo. App. W.D. 2014).

**IV. Overt Acts in Furtherance of the Conspiracy**

The gist of the action is not the conspiracy itself but the wrongful acts committed in furtherance of it. *Haynes v. Hawkeye Sec. Ins. Co.*, 579 S.W.2d 693, 705 (Mo. App. W.D. 1979). Plaintiffs allege multiple overt acts, including:

- AC Westport contacted DB Icehouse and pressured termination of UniKC's lease, which caused its termination (Doc. 249, p.340).
- CID Defendants and coconspirators pressured Brody to breach Euphoric's lease after social media posts by African Americans promoting Euphoric's hiring event surfaced. (Doc. 249, pp.166–168, 178, 195).

These acts were deliberate steps to achieve the conspiracy's unlawful objective.

Plaintiffs have alleged sufficient facts to state a claim for civil conspiracy under Missouri law. AC Westport joined an agreement with other Defendants to achieve an unlawful objective, committed overt acts in furtherance of the conspiracy, and caused substantial damages. Defendant's motion to dismiss Count X should be denied.

## H. Count XI: Conspiracy to violate Sherman Act, Antitrust, or Trade Law

AC Westport argues that Plaintiffs fail to state a claim under federal and Missouri antitrust laws. This argument fails because Plaintiffs allege detailed facts satisfying each element of a claim under the Sherman Act, 15 U.S.C. § 1, and Mo. Rev. Stat. § 416.031: (1) a contract, combination, or conspiracy; (2) that unreasonably restrains trade; (3) affecting commerce; and (4) resulting in antitrust injury. *Sitzer v. Nat'l Ass'n of Realtors*, 420 F. Supp. 3d 903, 911 (W.D. Mo. 2019).

**I. Existence of a Conspiracy**

Plaintiffs allege that AC Westport joined an agreement with CID members and other Westport business owners to exclude minority-owned businesses from the district. This conspiracy was implemented through the "Good Neighbor Agreement" and coordinated threats regarding liquor licenses. (Doc. 249, pp.44–52, 280–283). AC Westport's overt act, contacting DB Icehouse and pressuring termination of UniKC's lease demonstrates its participation in the conspiracy. (Doc. 249, pp.117, 125, 373). Missouri law mirrors the Sherman Act and prohibits "every contract, combination or conspiracy in restraint of trade or commerce in this state." Mo. Rev. Stat. § 416.031.1.

**II. Unreasonable Restraint of Trade**

The conspiracy's objective was to restrict competition in Westport by preventing African American entrepreneurs from opening businesses. Plaintiffs allege that Defendants' actions limited market entry and reduced consumer choice, creating a racially exclusive business environment. (Doc. 249, pp.329–334). Such conduct constitutes a per se violation of the Sherman Act because

it reflects a horizontal agreement among competitors to exclude rivals. *International Salt Co. v. United States*, 332 U.S. 392, 396 (1947) ("It is unreasonable, per se, to foreclose competitors from any substantial market").

The Eighth Circuit has long held that "the antitrust laws are as much violated by the prevention of competition as by its destruction." *Kansas City Star Co. v. United States*, 240 F.2d 643, 664 (8th Cir. 1957). Plaintiffs allege that Defendants combined to create strategies and covenants through the Good Neighbor Agreement to control the majority of property and businesses in Westport, thereby foreclosing competitors from entering the market. (Doc. 249, pp.353–354).

**III. AC Westport's Role**

AC Westport was not a passive participant; it actively implemented and enforced the conspiracy's exclusionary policies. After learning of UniKC's plans, AC Westport contacted DB Icehouse and threatened interference with liquor licensing if UniKC remained. (Doc. 249, pp.117, 125). This conduct directly advanced the conspiracy's goal of eliminating minority-owned businesses from Westport and maintaining control over the market.

Even if AC Westport did not independently violate the Sherman Act, it is liable under civil conspiracy principles. "Under the civil conspiracy theory, the conspiracy gives rise to a mutual agency of each conspirator to act for the others, which makes all conspirators liable for the tortious act of any one of them." *Bader Farms, Inc. v. Monsanto Co.*, 100 F.4th 944, 948 (8th Cir. 2024).

**IV. Antitrust Injury**

Plaintiffs suffered direct injury as a result of Defendants' anticompetitive conduct. UniKC and Euphoric were prevented from entering the market despite meeting all objective requirements for leasing property. (Doc. 249, pp.85, 122, 215–216). The conspiracy deprived Plaintiffs of the

opportunity to compete, resulting in lost revenue and reputational harm. These injuries flow directly from the reduction of competition and exclusionary practices condemned by antitrust law.

Plaintiffs have alleged sufficient facts to state a claim under the Sherman Act and Missouri antitrust law. AC Westport joined a conspiracy to restrain trade, committed overt acts to exclude minority-owned businesses, and caused substantial damages. Accordingly, Defendant's motion to dismiss Count XI should be denied.

## I. Count XII: Violation of 18 U.S.C.A §1962 (RICO)

Defendant AC Westport moves to dismiss Plaintiffs' RICO claim under 18 U.S.C. § 1962(c), asserting that Plaintiffs fail to plead facts showing an enterprise or a pattern of racketeering activity, but this argument ignores both the breadth of the RICO statute and the detailed allegations in the Complaint. Plaintiffs have sufficiently alleged each element of a RICO violation: (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity. *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).

### I. Plaintiffs Adequately Plead An Enterprise Under RICO

Defendant contends Plaintiffs fail to allege AC Westport's participation in an enterprise. This is incorrect. The RICO statute broadly defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Plaintiffs allege that AC Westport, CID Board members, and other property owners acted together through "Good Neighbor" agreements to extort landlords and coerce compliance with unlawful restrictions . (Doc. 249, pp. 364, 379). These allegations describe an association-in-fact enterprise, satisfying § 1961(4).

### II. Plaintiffs Allege a Pattern of Racketeering Activity

Defendant argues Plaintiffs fail to plead a "pattern." A pattern exists where two or more related

acts of racketeering amount to or pose a threat of continued criminal activity. *Wisdom v. First Midwest Bank*, 167 F.3d 402, 406 (8th Cir. 1999). Plaintiffs allege multiple acts of extortion and coercion, including:

- AC Westport threatening UniKC's landlord with interference in liquor licensing if the property was leased to UniKC. (Doc. 249, p. 373).

- Defendant Allred engaged in similar conduct toward Euphoric. (Doc. 249, p. 368).

These repeated acts targeting different victims demonstrate continuity and relatedness, satisfying the pattern requirement.

**III. Plaintiffs Allege Racketeering Activity and Extortion Under Federal Law**

Extortion by wrongful use of economic fear constitutes racketeering activity under federal law. *United States v. Lisinski*, 728 F.2d 887, 890 (7th Cir. 1984); *United States v. Rabbitt*, 583 F.2d 1014, 1027 (8th Cir. 1978). In *Lisinski*, the defendant exploited a restaurant owner's fear of losing a liquor license to demand payment. Similarly, Defendants here threatened landlords and minority-owned businesses with loss or interference in liquor licenses, exploiting economic vulnerability. These allegations fit squarely within established precedent.

**IV. Plaintiffs' Allegations Show Discriminatory Motive and Economic Coercion**

Defendants' threats disproportionately targeted Black/African American entrepreneurs, evidencing intent and unlawful purpose. Such conduct underscores the enterprise's coordinated scheme to exclude minority-owned businesses from Westport, reinforcing the plausibility of Plaintiffs' RICO claim. Therefore, Plaintiffs have alleged facts sufficient to state a claim under 18 U.S.C. § 1962(c). The Motion to Dismiss Count XII should be denied.

WHEREFORE, for the reasons stated above, Plaintiffs respectfully request this Court deny Defendant AC Westport's Motion to Dismiss Counts IV – XII of Plaintiffs' Second Amended Complaint

Respectfully Submitted,

**THE LAW OFFICE OF STEPHEN R. WILLIAMS, LLC**

/s/ Stephen R. Williams
Stephen R. Williams MO # 59416
4520 Main Street, Suite 700
Kansas City, MO 64111
Office: 816.285.6047
Fax: 816.756.1999
stephen@srwilliamslaw.com
**ATTORNEY FOR PLAINTIFF UniKC, LLC**

Respectfully submitted,

**Cecilia Brown**
**Cecilia Nuby & Associates, LLC**
Missouri Bar Number: 67646
Kansas Bar Number: 78602
Illinois Bar Number: 6346825
117 E. 29TH STREET
Kansas City, Missouri 64108
Phone: (913)-200-7900
Fax: (913) 273-0996
E-mail: Cecilia@NubyLaw.com
**ATTORNEY FOR PLAINTIFFS EUPHORIC LLC**

Respectfully submitted,

**Cecilia Brown**
**Cecilia Nuby & Associates, LLC**
Missouri Bar Number: 67646
Kansas Bar Number: 78602
Illinois Bar Number: 6346825
117 E. 29TH STREET
Kansas City, Missouri 64108
Phone: (913)-200-7900
Fax: (913) 273-0996
E-mail: Cecilia@NubyLaw.com
**ATTORNEY FOR PLAINTIFF THE SOURZE, LLC**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of December 2025, the above and foregoing **Suggestions in Opposition to Defendant AC Westport's Motion to Dismiss** was served by electron filing with the Court Administrator through the CM/ECF system and by e-mail to the e-mail addresses provided by counsel of record for the parties in this case.

/s/ Stephen R. Williams

**Attorney for Plaintiff UniKC, LLC**