FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| **EUPHORIC, LLC, ET. AL.** | ) | |
| | ) | |
| | ) | **Case No. 4:25-cv-00023-RK** |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **WESTPORT COMMUNITY** | ) | |
| **IMPROVEMENT DISTRICT, ET. AL.** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFFS' SUGGESTIONS IN OPPOSITION TO DEFENDANT WESTPORT DEVELOPMENT, LLC'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

**COMES NOW** Plaintiffs Euphoric, LLC, UniKC, LLC, and The Sourze, LLC, and submit their Suggestions in Opposition to Defendant Westport Development, LLC's Motion to Dismiss The Second Amended Complaint hereinafter "SAC" and state as follows:

## FACTUAL BACKGROUND

The "SAC" alleges that Black-owned establishments are "nearly nonexistent" among more than 250 businesses in Westport (SAC ¶ 37). Plaintiffs allege that this disparity is the result of a deliberate plan by CID board members and affiliated property owners to exclude Black-owned and Black-oriented businesses from the district (SAC ¶¶ 42–52). Plaintiffs cite a text message from Defendant Allred admitting that property owners had "formulated a plan" to eliminate certain businesses and patrons (SAC ¶ 45). Recorded statements from CID agents describe a coercive licensing regime in which businesses that do not comply with CID demands are "put out of business" and targeted "with a vengeance" (SAC ¶ 48(d)). Against this backdrop, The Sourze negotiated a dual-use concept for 427 Westport Road beginning in October 2020 (SAC ¶¶ 57–59). The property included two levels and a basement (SAC ¶ 58). The Sourze proposed an art

gallery/event space upstairs and a restaurant/bar concept known as The Daiquiri Shop downstairs (SAC ¶¶ 59–63). Westport Development and Pulse Management approved this concept, reviewed architectural plans, and encouraged investment (SAC ¶¶ 60–63, 73–74). The first lease was signed on November 25, 2020. (SAC ¶ 64). Plaintiffs proffer that on or about December 6, 2020, after the lease was executed, Plaintiff recorded a meeting the company attended with Westport Development and CID executive Director, Franklin Kimbrough, Matthew Vos and Jeremy Hurts. (SAC 48 (a-e)). During the meeting, the CID Members made and ratified the following statements in response to liquor license inquiries:

> e. "Those are the requirements if you get into what we call a good neighbor agreement with us, but it's a contractual obligation and in exchange we would sign the consents and encourage our other property owners to sign the consents, and we've been fortunate since we started doing this in 2013, that 99 percent of the property owners down here won't sign a consent for a liquor license of any kind even beer and wine unless we have a good neighbor agreement in place."

(SAC 48 (e)).

The Sourze did not sign the good neighbor agreement and were told by Westport Development that the property was suitable only for a clothing store (SAC ¶ 69); despite knowing it was zoned for restaurant use (SAC ¶ 70). Westport Development then stated that the Daiquiri Shop would "cannibalize" other Westport bars (SAC ¶ 71) and that bars "patronized by the hip-hop crowds equated to violence" (SAC ¶ 72). Plaintiffs allege that these statements were racially coded and reflected the CID's discriminatory ideology (SAC ¶¶ 77–79). Plaintiffs further allege that white-owned businesses were permitted to change concepts and open new bars during the same period (SAC ¶ 74), while The Sourze was denied the same opportunity.

The Sourze had already paid more than $22,000 in rent and nearly $25,000 in improvements when Westport Development reversed its approval (SAC ¶ 73). Plaintiffs allege that Westport Development's conduct caused The Sourze to lose its investment, lose its business

expectancy, and ultimately fail (SAC ¶¶ 73–80). Plaintiff further alleges the motivating factors in changing the contract was race. (SAC ¶ 86).

## STANDARD OF REVIEW

A complaint survives a Rule 12(b)(6) motion if it alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible when the factual allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must accept all well-pleaded allegations as true and draw all reasonable inferences in Plaintiffs' favor. *Cole v. Homier Distrib. Co.*, 599 F.3d 856, 861 (8th Cir. 2010). The Court may not consider extrinsic evidence unless it is "necessarily embraced" by the complaint. *Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011).

## ARGUMENT

### A. Count I — Breach of Contract and Fraudulent Inducement

1. The SAC Alleges Westport Development Initially Approved the Restaurant Concept, Later Lied About Zoning, and Orally Modified the Lease

Westport Development overlooks critical allegations in the SAC. The Sourze alleges that Westport Development initially "agreed to and approved of The Sourze's plans for 427 Westport, which included plans to open a restaurant and bar as Daiquiri Shop." (SAC ¶ 63). After receiving pushback from the CID and surrounding business owners, Westport Development reversed course and falsely claimed the property was not properly zoned for a restaurant—conduct alleged to be part of a coordinated discriminatory scheme to exclude Black-owned businesses from Westport. (SAC ¶¶ 69–73). Defendant also misstates the operative lease history. While Westport Development asserts that the parties entered into a single lease on April 14, 2021, the SAC alleges that the parties executed an earlier lease on November 25, 2020, which contained no limitation on

permitted use. (SAC ¶ 64; Ex. A). Contrary to Defendant's assertion that the "denial" occurred before the lease, the SAC alleges ongoing negotiations well after both leases were executed, including a December 20, 2022 communication from an investor documenting discriminatory treatment. (SAC ¶ 76).

These allegations also support an alternative theory of breach: that Westport Development orally modified or waived any limitation on permitted use. Under Missouri law, an oral modification of a lease "may operate as a waiver" of a clause prohibiting modification. *Doss v. Epic Healthcare Mgmt. Co.*, 901 S.W.2d 216, 221 (Mo. App. S.D. 1995). Missouri courts recognize that such provisions "do not prevent the parties from effecting modifications by valid contractual formalities, even though there is no writing." *Id.* (citing § 400.2A-208). The SAC therefore plausibly alleges a breach of both the written lease and the orally modified agreement.

<u>2. The SAC Plausibly Alleges Breach Of The Implied Covenant Of Good Faith And Fair Dealing</u>

Missouri law implies a covenant of good faith and fair dealing in every contract. *Kieffer v. Icaza*, 376 S.W.3d 653, 657 (Mo. banc 2012). A party breaches this covenant when it "acts in a manner that evades the spirit of the transaction or denies the other party the expected benefit of the contract." *Arbors at Sugar Creek Homeowners Ass'n v. Jefferson Bank & Tr.*, 464 S.W.3d 177, 185 (Mo. banc 2015).

The SAC alleges that Westport Development approved The Sourze's dual-use concept during negotiations (SAC ¶¶ 59–63), reviewed and approved architectural plans (SAC ¶¶ 60–63), and accepted more than $47,000 in rent and improvements in reliance on those approvals (SAC ¶¶ 73–74). Only after the meeting with the CID Executive Director, Frankling Kimbrough were responses to Plaintiff's inquiries regarding the liquor licensing process and "Good Neighbor Agreement" revealed how consents were solicited and bargained for and learning that the

restaurant would attract a predominantly Black clientele did Westport Development reverse its approval (SAC ¶¶ 48, 71–72), falsely claiming the property was suitable only for a clothing store (SAC ¶ 69) despite knowing it was zoned for restaurant use (SAC ¶ 70). These allegations describe classic bad-faith conduct.

In *Affordable Communities of Mo. v. EF & A Capital Corp.*, No. 4:11-CV-00505-AGF, 2012 WL 1374126, at *4 (E.D. Mo. Apr. 19, 2012), the court held that Missouri law imposes an implied promise not to hinder or prevent performance. Plaintiffs allege that Westport Development did exactly that. Similarly, *Family Dollar Stores of Mo., LLC v. Tsai's Inv., Inc.*, No. 4:21-CV-01325-SEP, 2022 WL 16571059, at *6 (E.D. Mo. Oct. 31, 2022), explains that the implied covenant prevents opportunistic behavior where one party exploits changing conditions to the detriment of the other. Plaintiffs allege that Westport Development reversed its approval only after learning the business would attract a Black clientele—an opportunistic and discriminatory reversal.

<u>3. Integration Clauses Do Not Bar Fraudulent-Inducement Claims</u>

Missouri law is unequivocal: integration clauses do not bar claims for fraudulent inducement. In *Ward Hyundai, Inc. v. Zurich Am. Ins. Co.*, No. 4:13-CV-00855-AGF, 2014 WL 2808989, at *4 (E.D. Mo. June 20, 2014), the court held that the parol-evidence rule does not bar claims for negligent or fraudulent misrepresentation. Likewise, *Spring Lake Pork, LLC v. Great Plains Mgmt., L.L.C.*, No. 4:19-CV-00889-DGK, 2020 WL 7023960, at *4 (W.D. Mo. Nov. 30, 2020), confirms that allegations not included in a written agreement are not barred by an integration clause when the plaintiff alleges fraudulent inducement. The Eighth Circuit has held the same. *C.L. Maddox, Inc. v. Benham Grp.*, 88 F.3d 592, 599 (8th Cir. 1996).

The SAC alleges that Westport Development represented that the property could be used for a restaurant (SAC ¶¶ 59–63, 69–70), approved the Daiquiri Shop concept (SAC ¶¶ 59–63), accepted substantial investment in reliance on those approvals (SAC ¶¶ 73–74), and then reversed its approval based on racially coded stereotypes (SAC ¶¶ 71–72). These allegations fall squarely within the fraud exception to the parol-evidence rule.

4. Plaintiffs Adequately Plead Damages

The Supreme Court in *McGuire v. Gerstley*, 204 U.S. 489, 496 (1907), held that damages need only be pleaded with enough specificity to show they are not "obscure, vague, or shadowy." Plaintiffs allege more than $22,000 in rent and nearly $25,000 in improvements (SAC ¶¶ 73–74), lost business expectancy (SAC ¶¶ 75–80), and the loss of the entire business due to Westport Development's reversal (SAC ¶¶ 73–80). These damages naturally flow from Westport Development's conduct and are more than sufficient at the pleading stage.

**B. The SAC More Than Plausibly Alleges That Westport Development (Counts 4–8)**

The SAC plausibly alleges a coordinated, racially motivated effort by Westport Development and its associates to block Black-owned businesses from using and benefiting from leased property in Westport, supporting each challenged claim.

**Section 1982.** Plaintiffs allege direct evidence of discriminatory intent, including statements equating "hip hop crowds" with violence and reversing approval only after learning the business would attract a "young, R&B, hip hop crowd" (SAC ¶¶ 71–72). The Eighth Circuit recognizes racially coded language as direct evidence of discrimination. *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 471–72 (8th Cir. 2009) (en banc). Plaintiffs also allege interference with their ability to use and expand their leased premises (SAC ¶¶ 69–80), which is actionable under § 1982. *Stroud v. Farr Rentals, LLC*, No. 4:19-CV-03050-AGF, 2020 WL 1322855, at *3 (E.D. Mo. Mar. 20,

2020). These allegations satisfy *City of Memphis v. Greene*, 451 U.S. 100, 120 (1981), and *Daniels v. Dillard's, Inc.*, 373 F.3d 885, 887 (8th Cir. 2004).

**Section 1985(3).** Plaintiffs allege a racially motivated agreement among CID members and property owners to exclude Black-oriented businesses. Conspiracies may be proven through circumstantial evidence. *Bonenberger v. St. Louis Metro. Police Dep't*, 810 F.3d 1103, 1109 (8th Cir. 2016). The SAC alleges that CID members "formulated a plan" to remove "problematic" businesses (SAC ¶ 45), threatened to "put out of business" non-compliant establishments (SAC ¶ 48(d)), used liquor-license consents as leverage (SAC ¶ 48(e)), and acted jointly with Westport Development (SAC ¶¶ 55–56, 71–72). These allegations exceed the conclusory pleadings rejected in *Mecey v. City of Farmington*, No. 4:19-CV-02584-SEP, 2020 WL 7023961, at *5 (E.D. Mo. Nov. 30, 2020), and mirror the coordinated conduct found sufficient in *Gibbs v. City of New Madrid*, No. 1:17-CV-00077-ACL, 2018 WL 4600301, at *6 (E.D. Mo. Sept. 25, 2018).

**Section 1981.** Plaintiffs allege that Westport Development approved The Sourze's concept, encouraged investment, and then reversed course based on racially coded stereotypes (SAC ¶¶ 59–63, 71–72), preventing Plaintiffs from entering contracts with vendors, employees, and customers (SAC ¶¶ 75–80). This is classic § 1981 interference. *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006). And where a Black applicant meets objective requirements but is denied opportunities afforded to white applicants, an inference of discrimination arises. *Smith v. Anchor Bldg. Corp.*, 536 F.2d 231, 233 (8th Cir. 1976).

**Section 1986.** Because Plaintiffs plausibly allege a § 1985 conspiracy, their § 1986 claim necessarily survives. *Snelling v. Westhoff*, 972 F.2d 199, 200 (8th Cir. 1992).

**C. Count 8 — Tortious Interference With Contract**

To state a claim, Plaintiffs must allege a valid contract, knowledge of the contract, intentional interference, improper means, and damages. *Eagle Fuels, LLC v. Perrin*, 10 F. Supp. 3d 1028, 1034 (W.D. Mo. 2014). The SAC alleges that The Sourze had contracts with vendors, contractors, and service providers (SAC ¶¶ 73–80). Westport Development knew of these contracts because it approved the restaurant concept and reviewed architectural plans (SAC ¶¶ 59–63). Westport Development intentionally interfered by reversing its approval based on racially coded stereotypes (SAC ¶¶ 71–72). Improper means include discrimination, fraud, and coercion (SAC ¶¶ 48(a)–(f), 71–72). Plaintiffs allege damages exceeding $47,000 (SAC ¶¶ 73–74). These allegations state a claim.

Furthermore, Plaintiffs sufficiently alleged that Westport Development joined the civil conspiracy occurring in the Westport community. Plaintiffs also alleged that Westport Development's coconspirators intentionally interfered with Euphoric, LLC's and Unikc, LLC's lease agreements. "[U]nder civil conspiracy theory, the conspiracy gives rise to mutual agency of each conspirator to act for the others, which makes all conspirators liable for the tortious acts of any one of them." *Bader Farms, Inc. v. Monsanto Co.,* 100 F.4th 944, 948 (8th Cir. 2024)(quoting Restatement (Second) of Torts, Sec. 876(a), cmt. a). Westport Development is therefore liable for the tortious interference caused by its coconspirators.

**D. Count 9 — Tortious Interference With Business Expectancy**

To state a claim, Plaintiffs must allege a valid business expectancy, knowledge, intentional interference, improper means, and damages. *Rail Switching Servs., Inc. v. Marquis-Missouri Terminal, LLC*, 533 S.W.3d 245, 265 (Mo. Ct. App. 2017). The SAC alleges that The Sourze had a valid expectancy in opening The Daiquiri Shop (SAC ¶¶ 59–63, 73–80). Westport Development knew of this expectancy because it approved the concept (SAC ¶¶ 59–63). Westport Development

intentionally interfered by reversing its approval based on racially coded stereotypes (SAC ¶¶ 71–72). Improper means include discrimination and fraud (SAC ¶¶ 48(a)–(f), 71–72). Plaintiffs allege damages exceeding $47,000 (SAC ¶¶ 73–74). These allegations state a claim.

**E. Count 10 — Civil Conspiracy (State Law)**

Missouri law requires an agreement, unlawful objective, and damages. *Creative Compounds, LLC v. ThermoLife Int'l, LLC*, 669 S.W.3d 330, 341 (Mo. Ct. App. 2023). The SAC alleges that CID members and property owners "formulated a plan" to exclude Black-owned businesses (SAC ¶ 45), that CID agents threatened to "put out of business" non-compliant establishments (SAC ¶ 48(d)), and that Vos and Hurt acted on behalf of Westport Development (SAC ¶¶ 55–56). Plaintiffs allege damages exceeding $47,000 (SAC ¶¶ 73–74). These allegations plainly state a claim.When the allegations in the SAC are taken as true and viewed in the light required by Rule 12(b)(6), Plaintiffs have plausibly alleged that Westport Development knowingly participated in a coordinated, racially discriminatory conspiracy to exclude Black-owned and Black-oriented businesses from the Westport district. Westport Development's motion improperly isolates its conduct from the broader factual context pled in the complaint and ignores well-established conspiracy principles that foreclose dismissal at this stage.

The SAC alleges that Westport Development was not a passive landlord but an active participant in a multi-entity scheme orchestrated through the Westport Community Improvement District ("CID") and allied property owners. Plaintiffs allege that this scheme used liquor-license leverage, "Good Neighbor" agreements, coordinated pressure campaigns, and targeted interference with leases to prevent Black-owned businesses from operating in Westport. Westport Development's own conduct fits squarely within this pattern. Plaintiffs allege that Westport Development refused to allow The Sourze to use the additional portion of the premises for its

business, not because of any contractual restriction, but because of coordinated pressure from other Westport stakeholders who sought to prevent a Black-owned business from expanding its operations. Plaintiffs further allege that Westport had a meeting of the minds with other property owners and CID members to block, delay, or undermine Plaintiffs' business operations, including through coordinated communications, shared objectives, and actions that would be unlikely absent a common plan.

Under well-established conspiracy law, Plaintiffs need not allege that Westport Development communicated with every other conspirator or participated in every act, and the SAC makes clear that this is unnecessary because the CID conspiracy involved a coordinated group of property owners and CID board members acting pursuant to a shared plan to exclude Black-owned businesses from Westport (SAC ¶¶ 63–70). Plaintiffs need only allege facts supporting a plausible inference that Westport Development shared this discriminatory objective and took actions in furtherance of it, and the SAC does exactly that. The complaint alleges that Westport Development acted in alignment with the CID's exclusionary practices by reversing its approval of The Sourze's restaurant concept after CID-aligned actors expressed opposition to businesses attracting a "hip-hop crowd," and by asserting false restrictions on use despite knowing the property was zoned for a restaurant with a liquor license (SAC ¶¶ 133–145).

The SAC further alleges that Westport Development benefitted from the CID's coordinated efforts to control the racial composition of Westport businesses, including the CID's admitted practice of withholding liquor-license consents unless businesses signed the one-sided Good Neighbor Agreement and its stated intention to "go after" noncompliant businesses "with a vengeance" and "put them out of business" (SAC ¶¶ 71–78). The complaint also alleges that Westport Development's refusal to allow The Sourze to expand its operations was consistent with

the CID's stated goal of preventing Black-oriented establishments from operating in the district, as reflected in Westport Development's own statements that bars "patronized by the hip-hop crowds equated to violence" and that The Sourze's concept would "cannibalize" other Westport bars (SAC ¶¶ 141–145, 146–150). These allegations, taken together, plausibly support the inference that Westport Development knowingly joined the conspiracy.

Plaintiffs further allege that Westport Development's refusal to allow Plaintiffs to expand their business was motivated by the same concerns expressed by other conspirators. When a landlord acts to accommodate the racial preferences of third parties, that conduct itself constitutes discriminatory intent. Plaintiffs have therefore plausibly alleged discriminatory motive under §§ 1981, 1982, and 1985.

Westport Development's argument that it cannot be liable for acts directed at other Plaintiffs is foreclosed by conspiracy doctrine. The SAC alleges that the same coordinated scheme targeted Euphoric and Unikc through liquor-license interference, threats, and coordinated pressure from property owners, including CID members (SAC ¶¶ 176–210). Once a conspiracy is plausibly alleged, each conspirator is liable for the acts of any other conspirator taken in furtherance of the common plan. Plaintiffs further allege that other conspirators interfered with the leases and business expectancies of Euphoric and Unikc, and that these acts were part of the same coordinated effort. Under settled law, Westport Development may be held liable for these acts even if it did not personally commit them.

Finally, Westport Development's reliance on "obvious alternative explanations" is misplaced. The SAC alleges coordinated timing, shared motives, race-coded objections, and actions against unilateral business interest, including Westport Development's refusal to allow a permitted use and its reversal after The Sourze had already invested substantial funds (SAC ¶¶

118–150). At the pleading stage, competing inferences do not warrant dismissal. The allegations make the conspiratorial and discriminatory inference at least as plausible as any benign explanation. For these reasons, Plaintiffs have plausibly alleged that Westport Development participated in a racially discriminatory conspiracy, and the conspiracy-based claims should proceed to discovery. Westport Development's Motion to Dismiss should therefore be denied.

**F. Count 11 — Sherman Act and Missouri Antitrust Claims**

Plaintiffs allege that Westport Development participated in a horizontal group boycott orchestrated by CID board members and affiliated property owners to exclude Black-owned and Black-oriented businesses from Westport (SAC ¶¶ 42–52). Group boycotts of this nature are per se unlawful under § 1 of the Sherman Act. *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959). The SAC alleges that CID members and property owners coordinated to deny liquor-license consents, manipulate regulatory enforcement, and pressure landlords to remove disfavored businesses (SAC ¶¶ 45, 48(a)–(f), 49–52). Plaintiffs allege that Vos and Hurt, acting on behalf of Westport Development, participated in this coordinated scheme (SAC ¶¶ 55–56, 342).

Westport Development argues that Plaintiffs have not alleged a relevant market, antitrust injury, or concerted action. But Plaintiffs allege a clearly defined geographic market — the Westport entertainment district — and a specific product market — nightlife, bar, and restaurant services (SAC ¶¶ 37, 42–52). Plaintiffs allege that Black-owned businesses were systematically excluded from this market through coordinated conduct (SAC ¶¶ 42–52). Plaintiffs allege antitrust injury in the form of exclusion from the market, loss of business expectancy, and coerced shutdown (SAC ¶¶ 73–80). These allegations satisfy the requirement that Plaintiffs plead injury "of the type the antitrust laws were intended to prevent." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

The SAC also alleges concerted action. CID members and property owners "formulated a plan" to eliminate certain businesses (SAC ¶ 45). CID agents admitted that non-compliant businesses would be "put out of business" (SAC ¶ 48(d)). CID members used liquor-license consents as leverage (SAC ¶ 48(e)). Vos and Hurt acted on behalf of Westport Development in furtherance of this plan (SAC ¶¶ 55–56). These allegations plausibly allege concerted action under *Twombly*, which requires only enough facts to "nudge" the claim "across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Missouri antitrust law is interpreted consistently with federal law. *State ex rel. Ashcroft v. Kansas City Firefighters Local No. 42*, 672 S.W.2d 99, 110 (Mo. App. 1984). Plaintiffs therefore state claims under both federal and Missouri antitrust statutes.

**G. Count 12 — RICO (18 U.S.C. § 1962)**

To state a RICO claim, Plaintiffs must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). Plaintiffs allege each element in detail.

<u>1. Westport Development Participated In The Enterprise</u>

An association-in-fact enterprise requires only a common purpose, relationships among associates, and longevity. *Boyle v. United States*, 556 U.S. 938, 946 (2009). The SAC alleges a coordinated enterprise consisting of CID board members, property owners, and affiliated business entities (SAC ¶¶ 42–52, 360–382). Plaintiffs allege that Vos and Hurt, acting on behalf of Westport Development, were CID board members (SAC ¶¶ 55–56) and participated in the CID's coercive licensing and enforcement regime (SAC ¶¶ 48(a)–(f), 49–52). Plaintiffs allege that Westport Development benefitted from the enterprise by maintaining control over the racial composition of Westport's business environment (SAC ¶¶ 37, 42–52).

Westport Development argues that it is not part of the enterprise because it is not formally a CID board member. But *Boyle* rejects any requirement of formal structure. The enterprise may consist of "a group of persons associated together for a common purpose of engaging in a course of conduct." *Id.* at 944. Plaintiffs allege precisely that.

2. Plaintiffs Allege A Pattern Of Racketeering Activity and Plaintiffs Allege RICO Injury

A pattern requires at least two predicate acts that are related and amount to or pose a threat of continued criminal activity. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). The SAC alleges extortion through threats to withhold liquor-license consents (SAC ¶¶ 48(a)–(f)), coercion of landlords (SAC ¶¶ 49–52), bribery of city officials (SAC ¶¶ 363–365), and mail and wire fraud through misrepresentations to Plaintiffs (SAC ¶¶ 66–70). These predicate acts span more than a decade (SAC ¶¶ 42–52, 360–382), satisfying the continuity requirement.

In *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 353–54 (8th Cir. 2011), the Eighth Circuit held that similar allegations satisfied the enterprise and pattern requirements. Plaintiffs allege even more detailed predicate acts here. Plaintiffs allege concrete financial losses, including more than $47,000 in rent and improvements (SAC ¶¶ 73–74), lost business expectancy (SAC ¶¶ 75–80), and the loss of the entire business (SAC ¶¶ 73–80). These are precisely the type of injuries recognized under RICO. *Regions Bank v. J.R. Oil Co.*, 387 F.3d 721, 730–31 (8th Cir. 2004).

## CONCLUSION

When the SAC is read as Rule 12(b)(6) requires, Plaintiffs have more than plausibly stated claims for breach of contract, fraudulent inducement, violations of 42 U.S.C. §§ 1981, 1982, 1985(3), and 1986, tortious interference, civil conspiracy, antitrust violations, and RICO. Westport Development's motion to dismiss should be denied in its entirety.

Respectfully submitted,

**Cecilia Brown**
**Cecilia Nuby & Associates, LLC**
Missouri Bar Number: 67646
Kansas Bar Number: 78602
Illinois Bar Number: 6346825
220 E. Illinois, ste. 3704
Chicago, IL 60611
Phone: (913)-200-7900
Fax: (913) 273-0996
E-mail: Cecilia@NubyLaw.com
**ATTORNEY FOR PLAINTIFF EUPHORIC, LLC**

**THE LAW OFFICE OF STEPHEN R. WILLIAMS, LLC**

/s/ *Stephen Williams*
Stephen R. Williams
MO # 59416
4520 Main Street, Suite 700
Kansas City, MO 64111
Office: 816.285.6047
Fax:816.756.1999
stephen@srwilliamslaw.com
**ATTORNEY FOR PLAINTIFF UniKC, LLC**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of February 2026, the above and was served by electronic filing with the Court Administrator through the CM/ECF system and by e-mail to the e-mail addresses provided by counsel of record for the parties in this case.

Respectfully submitted,