# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI WESTERN DIVISION

EUPHORIC, LLC; THE SOURZE, LLC; UNIKC, LLC,

Plaintiffs,

v.

WESTPORT COMMUNITY IMPROVEMENT DISTRICT, A NON-PROFIT MISSOURI CORPORATION; et al.,

Defendants.

Case No. 4:25-cv-00023-RK

## ORDER

Plaintiffs—three business entities who sought to lease certain commercial property in the Westport entertainment district in Midtown, Kansas City, Missouri—brought this sprawling conspiracy lawsuit asserting various claims for breach of contract, tortious interference, illegal racial discrimination, and violation of the federal Racketeering Influenced and Corrupt Organizations (RICO) statute and state and federal antitrust laws, among other claims. Before the Court are three sets of motions, all of which are fully briefed: (1) six motions to dismiss the Second Amended Complaint under Rule 12(b)(6) for failure to state a claim filed collectively by eighteen of the twenty-three named defendants, (Docs. 260, 271, 273, 316, 355, 399); (2) Plaintiffs' second motion to join party defendants, (Doc. 402), together with Plaintiffs' third motion to amend the complaint, (Doc. 403); and (3) Plaintiffs' motion to reconsider the Court's prior Order granting Defendant Drew Shader's unopposed motion to dismiss as to the First Amended Complaint, (Doc. 430).[1]

As explained below, in light of the procedural posture and in the interests of justice, judicial economy, and fairness, the Court considers together the various motions to dismiss and Plaintiffs'

---

[1] Plaintiffs did not respond to Defendant Murfin, Inc.'s motion to dismiss, and the time for doing so has passed. Several defendants filed opposition briefs to Plaintiffs' third motion to amend; no defendant filed an opposition brief to Plaintiffs' second motion to join directly, although the second motion to join is expressly incorporated into Plaintiffs' third motion to amend. The relevant briefing consists of Docs. 261, 266, 269, 272, 274, 287, 293, 296, 312, 317, 354, 356, 375, 377, 392, 400, 404, 410, 411, 412, 413, 419, 420, 421, 423, 424, 431, 442, 450.

third motion to amend (which is intended, at least in part, to address some of the pleading deficiencies challenged by the various motions to dismiss).  After careful consideration and review, and for the reasons set out below, the Court **ORDERS** that:

First, as to the interrelated claims of Defendants' motions to dismiss and Plaintiffs' third motion to amend:  Defendants' motions to dismiss are **GRANTED in part** as to the Second Amended Complaint, and Plaintiffs' third motion to amend is **DENIED in relevant part** to file the proposed third amended complaint, as set out specifically in the following chart.  Additionally, Plaintiffs' third motion to amend is **DENIED in part** as to proposed Count 14 asserting a claim for fraudulent misrepresentation against DB Icehouse, LLC.  Subject to the foregoing, Plaintiffs' third motion to amend is otherwise **GRANTED**, and Defendants' motions to dismiss are **DENIED as moot in relevant part**.

Second, as to the remaining motions, (1) Plaintiffs' second motion to join is **GRANTED** pursuant to Rule 20 of the Federal Rules of Civil Procedure, and (2) Plaintiffs' motion to reconsider the dismissal of Defendant Shader is **DENIED**.

[remainder of page intentionally left blank]

2

*Claims for which Defendants' motions to dismiss are granted in part and Plaintiffs' third motion to amend is denied in relevant part*:

| Count | Claim | Defendants dismissed from the Second Amended Complaint or as to whom leave to amend through the proposed third amended complaint is denied |
|---|---|---|
| 1 | Breach of Contract | Westport Development, LLC; Murfin, Inc.; Jeremy Hurt; Matthew Vos |
| 4 | 42 U.S.C. § 1982 | Westport Development, LLC; Murfin, Inc. |
| 5 | 42 U.S.C. § 1985 | AC Westport, LLC; DB Icehouse, LLC;Gregory Bartold; Joe Niebur |
| 6 | 42 U.S.C. § 1981 | Murfin, Inc. |
| 7 | 42 U.S.C. § 1986 | AC Westport, LLC; DB Icehouse, LLC; Gregory Bartold; Joe Niebur |
| 8 | Tortious Interference (Contract) | Westport Development, LLC; DB Icehouse, LLC; Gregory Bartold; Joe Niebur |
| 9 | Tortious Interference (Business Expectancy) | Westport Development, LLC; DB Icehouse, LLC; Gregory Bartold; Joe Niebur |
| 10 | Civil Conspiracy | AC Westport, LLC; DB Icehouse, LLC; Gregory Bartold; and Joe Niebur |
| 11 | Antitrust Conspiracy | AC Westport, LLC; DB Icehouse, LLC; Gregory Bartold; Joe Niebur |
| 12 | RICO (premised on predicate acts of mail/wire fraud and bribery under Missouri state law) | All Defendants |

3

**Procedural Posture**[2]

Plaintiffs The Sourze, LLC and Euphoric, LLC instituted this action (improperly acting pro se) on January 14, 2025. (Doc. 1.) A First Amended Complaint was filed by counsel on behalf of Plaintiffs Euphoric and Unikc, LLC[3] on February 7, 2025. The First Amended Complaint named as defendants: the Westport Community Improvement District (the "Westport CID"), which is the governing body of the Westport entertainment district, and its individual board members, among others. (*See generally* Doc. 16.) Only one of the defendants named in the First Amended Complaint, Drew Shader—named in that pleading as a defendant both in his individual capacity and as a member of Westport CID board of directors—filed a motion to dismiss; the rest of the defendants named in the First Amended Complaint each filed an answer. Discovery then began in earnest. On July 22, 2025, after Plaintiffs failed to file a response to Shader's motion to dismiss, the Court granted the motion as unopposed and dismissed Shader as a defendant in this action. (Doc. 99.)

In August 2025, with new counsel having appeared earlier on Plaintiffs' behalf, Plaintiffs filed several substantive motions. Specifically, new counsel filed a first motion to join several party defendants, (Doc. 136), a second motion to amend, (Doc. 143), and a corresponding motion to join The Sourze, LLC once again as a plaintiff in this litigation, (Doc. 145). On October 7, 2025, the Court granted all three motions over the objection of several defendants. (Doc. 213.) As the Court noted in that Order, the defendants opposed a second amended complaint on the basis that it would "vastly expand[] the scope of the litigation . . . [and] it will result in undue delay and prejudice" but they did not raise a futility argument challenging the sufficiency of the proposed amended pleading. (Doc. 213 at 5; *see* Docs. 171, 173, 174, 175.)

Plaintiffs thereafter filed the Second Amended Complaint on October 31, 2025. (Doc. 249.) Over the course of the next five months, various defendants filed, and the parties briefed, several motions to dismiss under Rule 12(b)(6) for failure to state a claim. On March 10, 2026,

---

[2] The Court does not endeavor to set out the full procedural posture of this case but only points to certain litigation landmarks that are particularly relevant to resolve the various motions identified above.

[3] Plaintiffs refer to Unikc as both "Unikc" and "UniKC." For ease of reference, the Court will refer to Plaintiff as "Unikc." (*See* Doc. 249 at ¶ 4.) The Sourze was not named as a plaintiff in the First Amended Complaint filed by counsel.

4

after nearly all the motions to dismiss had been fully briefed, Plaintiffs filed their second motion to join several new defendants and their third motion to amend.[4]

The goal of Plaintiffs' second motion to join and third motion to amend, together, is twofold. Plaintiffs seek to join several new defendants as to whom Plaintiffs assert discovery has demonstrated "were not peripheral observers but [were] central participants in the same conspiracy already pleaded against the existing defendants." (Doc. 402 at 2.) In addition, the proposed third amended complaint is intended by Plaintiffs to "clarif[y] the roles of existing defendants," (Doc. 404 at 2), and to address or shore up the various pleading deficiencies as challenged in the numerous motions to dismiss, (*see, e.g.*, Doc. 419 at 9 (asserting that "[t]he [proposed third amended complaint] contains materially expanded allegations that cure any deficiencies previously alleged"); Doc. 424 at 10-11 ("Far from introducing new theories, the proposed [third amended complaint] adds factual specificity that directly responds to the asserted deficiencies DB Icehouse highlighted in its motion to dismiss.")).

### Interrelated Claims Addressed Together

As a general rule, the proposed third amended complaint, to the extent it is allowed to be filed, will supersede and "render[] . . . without legal effect" the Second Amended Complaint. *Cartier v. Wells Fargo Bank, N.A.*, 547 F. App'x 800, 803 (8th Cir. 2013) (quoting *In re Atlas Van Lines, Inc.*, 209 F.3d 1064, 1067 (8th Cir. 2000)). The Court has broad discretion to allow or deny leave to amend a complaint. *Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1065 (8th Cir. 2005) ("We review the district court's decision to deny leave to amend a complaint for abuse of discretion."). Rule 15(a) directs that Court "should freely give leave [to amend] when justice so requires." There is, however, "no absolute or automatic right to amend one's complaint." *Deutsche Fin. Servs. Corp. v. BCS Ins. Co.*, 299 F.3d 692, 700 (8th Cir. 2002). "A district court may appropriately deny leave to amend where there are compelling reasons such as undue delay, bad faith, or dilatory motive, . . . undue prejudice to the non-moving party, or futility of the amendment."[5] *Moses.com Sec., Inc.*, 406 F.3d at 1065 (internal quotation marks

---

[4] To be clear, Plaintiffs defended the Second Amended Complaint fully on the merits and briefed all but one of the various motions to dismiss. By the time Plaintiffs filed their motions to join/amend, all motions to dismiss had been fully briefed except for one. Defendant Murfin, Inc.'s motion to dismiss was filed one day before Plaintiffs' motions to join/amend. Plaintiffs never responded to that motion to dismiss.

[5] The Court notes that Plaintiffs' second motion to join and third motion to amend were timely filed under the Court's Scheduling Order, as amended, which set a deadline of April 15, 2026, to join parties and

5

omitted). The "futility" analysis for a motion to amend a complaint asks whether the proposed amended complaint could or would withstand a motion to dismiss under Rule 12(b)(6) and thus applies the same standard of review as a motion to dismiss. *See Zutz v. Nelson*, 601 F.3d 842, 850-51 (8th Cir. 2010).

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is facially plausible where the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Wilson v. Ark. Dep't of Hum. Servs.*, 850 F.3d 368, 371 (8th Cir. 2017) (internal quotation marks omitted). While a complaint does not need to include detailed factual allegations, the complaint must allege more than a sheer possibility that a defendant acted unlawfully to survive a motion to dismiss. *Id.*

Under these circumstances and because certain aspects of the proposed third amended complaint are intertwined with (and intended to address specifically) the challenged pleading deficiencies as to the Second Amended Complaint raised in the various motions to dismiss, all of which (save Murfin, Inc.'s motion to dismiss) were fully briefed by the parties, the Court will consider Defendants' motions to dismiss and Plaintiffs' third motion to amend together, as set out below.[6]

---

amend pleadings. (*See* Doc. 382.) Plaintiffs' motions were filed on March 10, 2026.

[6] Contrary to Plaintiffs' suggestion in their briefing regarding the third motion to amend, the Court has not "already found the [Second Amended Complaint] claims facially plausible and legally sufficient to proceed." (Doc. 419 at 9 n.4.) As indicated above, Plaintiffs' second motion to amend was opposed only on grounds that it would "vastly expand[] the scope of the litigation . . . [and] will result in undue delay and prejudice." (Doc. 213 at 5.) In other words, no defendant argued—and the Court did not otherwise address—whether the then-proposed second amended complaint was futile in any respect, which would require a substantively equivalent analysis as a Rule 12(b)(6) motion to dismiss. In other words, the Court did not, as Plaintiffs suggest, "necessarily reject[] Defendants' futility arguments" in granting Plaintiffs' second motion to amend. The language Plaintiffs cite—that the Court "concluded that 'no good reason, such as undue delay, prejudice, or futility, exists for denial," (Doc. 419 at 9 n.4 (quoting Doc. 213 at 5-6))— was merely reciting Plaintiffs' arguments in support of their second motion to amend. It is inaccurate to quote that language as the prior ruling of the Court. Accordingly, the Court can—and does—properly and fully address the sufficiency of the Second Amended Complaint as challenged by defendants as well as the futility of the proposed third amended complaint, which is intended, at least in part, to address some of the challenged pleading deficiencies.

**I.    The Second Amended Complaint**

Plaintiffs Euphoric, Unikc, and The Sourze are each owned and operated by Black/African American entrepreneurs.[7]  (Doc. 249 at ¶¶ 3, 5, 7.)  Collectively, Plaintiffs assert twelve claims against twenty-three defendants in the Second Amended Complaint.  The twenty-three defendants are:

(1) Westport Community Improvement District ("Westport CID") and its twelve board members in their official capacities—Franklin Kimbrough, Pamela Ptacek, Max Wasserstrom, Zach Marten, Paul Mesler, Kyle Kelly, Larry Goldman, Brett Allred, Matthew Vos, Jeremy Hurt, Christie Montague, and Brandi Degenhardt (collectively, "CID Board Members"), with three CID board members, Allred, Vos, and Hurt, named in their individual capacities as well;

(2) 4128 Broadway, LLC and its managing member, Harold Brody (named in his official and individual capacities);

(3) Murfin, Inc.;

(4) Allred, Inc. and Allred Holdings, LLC;

(5) Westport Development, LLC;

(6) AC Westport, LLC d/b/a The Denver Biscuit Company (hereinafter, "AC Westport (Denver Biscuit)"; and

(7) DB Icehouse, LLC and its "managing member[s] and agent[s]," Gregory Bartold and Joe Niebur (named in their official and individual capacities).  (Doc. 249 at ¶¶ 8, 11-31.)

The chart below shows the various relationships between the entities and the certain individual defendants:

[*see chart below*]

---

[7] For ease of reference, the Court will largely refer to the Plaintiffs-business entities as the actors in the relevant facts below, rather than the actual individuals themselves.  The Court intends no disrespect or de-personalization of Plaintiff's owners and operators in doing so.

7

| Defendant Entity | Related Individual Defendant | Individual Defendant's Role |
|---|---|---|
| 4128 Broadway | Brody | Managing Member (*id.* at ¶ 23) |
| Murfin, Inc. | Hurt and Vos | Directors (*id.* at ¶ 24) |
| Allred, Inc. and Allred Holdings | Allred | President, Secretary, and/or Director (*id.* at ¶¶ 25, 26) |
| Westport Development | Hurt and Vos | Owners, Operators, Stockholders, Landlords and/or Managers (*id.* at ¶ 55) |
| AC Westport (Denver Biscuit) | Shader[8] | Co-Owner (*id.* at ¶ 28) |
| DB Icehouse | Bartold and Niebur | Owners/Managers (*id.* at ¶ 29) |

Westport CID is the governing body of the Westport entertainment district located in the Midtown neighborhood of Kansas City. (*Id.* at ¶ 9.) The entertainment district is a mixed-use district with more than 250 business owners, few of whom are Black/African American. (*Id.* at ¶ 37.) Westport CID, founded in 2002, implements and addresses neighborhood-level planning issues, including "the physical use of each property in the Westport community." (*Id.* at ¶ 38.) Westport CID is a creature of both state law and city ordinance. Members of the CID board of directors are required under state law to either (1) own real property or a business within the district, or (2) be a registered voter residing within the district. Mo. Rev. Stat. § 67.1451.2(2)(b).

Plaintiffs allege that Westport CID and CID Board Members "are conspiring to make it nearly impossible for Black/African American business owners to exist in Westport, or to obtain and/or keep a liquor license as is required for operating such a business." (*Id.* at ¶ 44.) Plaintiffs allege that "[o]n an unknown date, at 7:50 pm," CID board member Brett Allred "composed a text message" in which he "admitted that a group of property owners in the Westport community have formulated a plan to make several strategic moves to prevent 'problematic' business owners/operators from existing in Westport, and for the purpose of eliminating 'problematic' people from patronizing Westport."[9] (*Id.* at ¶ 45.) Plaintiffs allege that the "group of property

---

[8] Although Shader is not named as a defendant in the Second Amended Complaint, he is still included in the Second Amended Complaint as an actor in the underlying claims for which liability is sought against AC Westport (Denver Biscuit).

[9] Other than the apparent use of the word "problematic" in Allred's alleged text message, Plaintiffs

owners" referred to in paragraph 45 of the Second Amended Complaint referencing Allred's text message includes the CID Board Members and other unspecified property owners in the district. (*Id.* at ¶ 47.) Plaintiffs allege that Allred, Westport Development, and the CID Board Members (1) have "contact[ed] owners of property in the Westport Community and make it nearly impossible for Black/African Americans to obtain and/or keep a lease for property in Westport," (2) have "threaten[ed] to take steps to get liquor license revoked and/or terminated if they do business with Black/African American service providers," and (3) have enforced a so-called "Good Neighbor Agreement" that every new business that sells alcohol (whether a restaurant or a bar) has to sign.[10] (*Id.* at ¶¶ 48-51.)

### A. Plaintiff The Sourze – 427 Westport Road (Lease with Defendant Westport Development and Non-Party Pulse Management)

On or around October 20, 2020, The Sourze started discussions with the manager and owner of 427 Westport Road, Kansas City, Missouri 64111—non-party Pulse Management, LLC[11] and Defendant Westport Development, LLC—to open a new business at this commercial property. (*Id.* at ¶¶ 53, 54, 57.) The Sourze alleges that the parties' "initial discussions" included "the possibility" of using the property as both (1) an art gallery/event space, which would operate under the name "The Sourze, LLC," and (2) a restaurant, which would operate under the name "The Daiquiri Shop KC."[12] (*Id.* at ¶¶ 59, 61.) The Sourze alleges that its plan to build a kitchenette in

---

include in the Second Amended Complaint only this summary or representation of the alleged text message and do not otherwise provide the particular text or text string of this alleged text message itself. Nonetheless, at this stage, the Court accepts the allegation set out in paragraph 45 as true.

[10] While the Good Neighbor Agreement plays a prominent or even central role in this lawsuit, the Second Amended Complaint does not describe what exactly the Good Neighbor Agreement requires or entails. Plaintiffs suggest that it is a "one sided" agreement that gives, somehow, the CID and landlords "too much control over business operations." (Doc. 249 at ¶ 82.) In addition, Plaintiffs suggest that the Good Neighbor Agreement is somehow related or connected to Kansas City ordinances governing liquor license applications. In particular, it appears that under Kansas City ordinances governing liquor license applications, neighboring property owners (and potentially other entities like Westport CID) are provided the opportunity to consent to (or oppose) a particular application for a liquor license before the Kansas City Regulated Industries Division. *See also* Kansas City Ord. § 10-214. As set out below, the proposed third amended complaint provides substantially more clarity and detail as to the contours, effects, and terms of the Good Neighbor Agreement in this regard.

[11] Plaintiffs do not assert any claim against Pulse Management and do not allege that Pulse Management is owned or managed by any of the individual defendants in this case.

[12] The property at 427 Westport has an upstairs and a downstairs, as well as a basement. (Doc. 249 at ¶ 58.)

the downstairs portion of the building was presented to Pulse Management and Westport Development, both of which "initially agreed to and approved" The Sourze's plan "to open a restaurant and bar as Daiquiri Shop." (*Id.* at ¶¶ 60, 63.)  The parties signed a lease agreement on November 25, 2020.  (*Id.* at ¶ 64.)

While The Sourze initially opened only the art gallery/event space, it alleges that "agents" of Westport Development (i.e., Hurt and Vos) "represented . . . that it would be able to use the additional portions of 427 Westport" for The Daiquiri Shop KC.  (*Id.* at ¶ 66.)  The Sourze and Pulse Management entered an Amended and Restated Triple Net Lease on April 14, 2021.  (*Id.* at ¶ 68.)[13]  The Sourze alleges that this amended and restated lease was entered into "to the benefit of" Westport Development.  (*Id.*)

The Sourze alleges that following this amended lease, Pulse Management and Westport Development "falsely told" The Sourze "that the property was only fit to be a clothing store."  (*Id.* at ¶ 69.)  The Sourze alleges that this assertion was false because at the time it moved into the 427 Westport property, the property had been "already zoned and deemed fit for a restaurant with a liquor license."  (*Id.* at ¶ 70.)  The Sourze further alleges that in a meeting at an unspecified time, "agents of" Westport Development (i.e., Hurt and Vos) stated that "the Daiquiri Shop [KC] would 'cannibalize' the other Westport bars" and that "they did not want any more bar and restaurant concepts in the Westport [community] because bars, and especially those patronized by the hip-hop crowds, equated to violence."  (*Id.* at ¶¶ 71, 72.)  Ultimately, The Sourze alleges that Westport Development "told [The Sourze] that [Westport Development] would no longer agree to the concept for the Daiquiri Shop [KC], and that [The Sourze] needed to come up with a new concept."  (*Id.* at ¶ 73.)  At this point, The Sourze had paid more than $22,000 in rent and $25,000 in expenses.[14]  (*Id.*)

---

[13] The Second Amended Complaint is not clear and provides little to no context for the circumstances that led to the parties' amended lease agreement.  Plaintiffs' proposed third amended complaint provides more context, as set out below.

[14] The Second Amended Complaint is not clear whether the $25,000 in expenses paid by The Sourze at this point were expenses related to the art gallery/event space it had already opened or whether they were related to The Daiquiri Shop KC.  As indicated above, the Second Amended Complaint does not provide any further context for when the referenced meetings and statements occurred other than that they occurred following the April 14, 2021 Amended and Restated Triple Net Lease.  Additionally, elsewhere in the Second Amended Complaint, The Sourze alleges that Westport Development (i.e. Hurt and Vos) told it that they "would no longer agree to the concept for the Daiquiri Shop" after The Sourze had "paid over $50,000.00 in rents."  (Doc. 249 at ¶ 229.)

10

The Sourze alleges that because it was unable to utilize the entire property, it was unable to successfully maintain its business and tenancy at 427 Westport Road. (*Id.* at ¶ 84.) On February 8, 2023, Westport Development filed a Petition for Rents and Possession against The Sourze in the Circuit Court of Jackson County, Missouri, pursuant to the Amended and Restated Triple Net Lease. (*Id.* at ¶ 87.)[15]

### B. Plaintiff Unikc, LLC – 4140 Pennsylvania Avenue (Lease with Defendant DB Icehouse, LLC)

On April 6, 2021, Plaintiff Unikc, LLC entered into a lease agreement with Defendant DB Icehouse, LLC to lease its commercial property at 4140 Pennsylvania Avenue, Kansas City, Missouri 64111. (*Id.* at ¶ 97.) The lease agreement included a "noncompete clause" that prohibited Unikc from "selling pizza or competing with" AC Westport (Denver Biscuit) (co-owned by Shader). (*Id.* at ¶ 99.) Unikc obtained possession upon execution of the lease and began renovations to prepare for its opening of "a club catering to a young, R&B, Hip Hop, crowd." (*Id.* at ¶¶ 103, 114.)

Unikc alleges that "[s]hortly thereafter" it had a meeting with "[t]he owner" of a neighboring restaurant, The Denver Biscuit Company—i.e., Shader[16]—"to talk about" Unikc's plans for the property. (*Id.* at ¶¶ 104, 108.) Unikc alleges that Shader expressed concerns about the customer entrance to the property at 4140 Pennsylvania, the type of music being played (i.e., whether it would be R&B or Hip Hop), the "type of crowd the club was drawing," and "the age of

---

[15] The Circuit Court of Jackson County, Missouri, entered a default judgment for restitution of the premises at 427 Westport and $55,947 in damages against The Sourze on March 9, 2023. *See Westport Development, LLC v. Sourze LLC*, Case No. 2316-CV03698 (Cir. Ct. of Jackson Cty.).

[16] Plaintiffs allege that The Denver Biscuit Company restaurant is owned by two other people in addition to Shader—Jason McGovern and Ashleigh Carter. Neither McGovern or Carter are named as individual defendants in the Second Amended Complaint. Unikc does not allege in the Second Amended Complaint which of these three individuals it had this meeting with or who "[t]he owner" referred to in this portion of the pleading is. The other allegations in the complaint, however, suggest that the unidentified owner was either Shader or McGovern, the two male co-owners. (*See* Doc. 249 at ¶ 117 (using the pronoun "his" referring to the referenced owner of The Denver Biscuit Company).)

Plaintiffs clarify in the proposed third amended complaint that although the Denver Biscuit Company meeting was with all two or three of the co-owners (it still is not clear who), the particular statements and conduct is otherwise attributable to Shader. *See* Facts, § II.C.2, below. Moreover, the First Amended Complaint also at least implicitly attributes these statements to Shader, as well, to the extent it identifies "The Denver Biscuit" as "a business owned by Defendant Shader." (Doc. 16 at ¶ 58.) Accordingly, for ease of reference, the Court will refer to Shader wherever "the owner" of The Denver Biscuit Company is referenced in the Second Amended Complaint.

the target market." (*Id.* at ¶¶ 109-12.) Unikc alleges that Shader's "tone and demeanor was offended, dismissive, annoyed, agitated, and upset" at the answers that were provided. (*Id.* at ¶ 113.) Unikc told Shader that it would follow security guidelines and would employ the Kansas City Police Department; in fact, these expenses were part of Unikc's projected expenses before entering the lease agreement. (*Id.* at ¶¶ 115, 116.) Unikc alleges that after this meeting, Shader "contacted representatives of DB Icehouse [i.e., Bartold and Niebur] . . . to discuss his displeasure with his new neighbor." (*Id.* at ¶ 117.) Unikc alleges that Shader's "displeasure"—as attributed to Defendant AC Westport (Denver Biscuit)—was "solely due" to the race of Unikc's owner who is Black/African American "and the target market of [its] business." (*Id.* at ¶ 119.)

On October 12, 2021, the day after the Denver Biscuit Company meeting, Niebur (one of the two owners/managers of DB Icehouse) e-mailed Unikc, explaining that he had received a cease-and-desist letter regarding the lease between DB Icehouse and Unikc; Unikc then discovered that the locks to the property had been changed. (*Id.* at ¶¶ 120, 121.) Unikc alleges that AC Westport (Denver Biscuit) sent the referenced cease-and-desist letter to DB Icehouse. (*Id.* at ¶ 373.) Unikc alleges that it had not violated any term or condition of the lease when it was locked out of the property. (*Id.* at ¶ 123.) In subsequent conversations, Unikc alleges that it was told by Niebur and Bartold (the co-owners or managers of DB Icehouse) "that several neighboring business owners, including the owner of the Denver Biscuit [i.e., Shader], did not want . . . [the] 'type of crowd'" the business would bring "to come to the Westport community and cause problems." (*Id.* at ¶ 125.) DB Icehouse ultimately paid Unikc $100,000 to withdraw or terminate the lease in a settlement between the parties. (*Id.* at ¶ 126.)

### C. Plaintiff Euphoric, LLC – 4128 Broadway Avenue (Lease with 4128 Broadway, LLC)

For the ten years prior to April 9, 2024, the commercial property at 4128 Broadway Avenue, Kansas City, Missouri, 64111, had operated as a bar/restaurant called Ale House. (*Id.* at ¶¶ 131, 133.) After the property had become vacant with the closure of Ale House, Plaintiff Euphoric contacted the landlord, Harold Brody, as managing member of 4128 Broadway, LLC, to potentially lease the property. (*Id.* at ¶ 137.) Euphoric learned during their communications that Ale House had earned $7 million in annual revenues. (*Id.* at ¶ 139.) It intended to operate its own restaurant and bar to earn the same annual revenues, or more. (*Id.* at ¶ 140.) After initially approving Euphoric's plans for the property, including its restaurant and bar concept, and agreeing to a profit-

sharing lease agreement structure, Brody put Euphoric in touch with CID board member Marten,[17] who was leasing the property during Euphoric's lease negotiations with Brody. (*Id.* at ¶¶ 146-48.) Euphoric and Marten talked about steps needed to obtain a liquor license. (*Id.* at ¶ 149.)

Euphoric and 4128 Broadway, LLC entered a lease agreement on October 21, 2024.[18] (*Id.* at ¶ 151.) Two days later, Brody introduced Euphoric to CID board members Allred and Franklin Kimbrough via text message, telling them that they (Brody and Euphoric) had entered into a lease agreement for the property. (*Id.* at ¶ 157.) Christopher Lee, the managing member of Euphoric, organized an entity, Ale House West, LLC, on the same day to provide payroll and human resources services to Euphoric. (*Id.* at ¶ 159.) Also on the same day, "community members announced the reopening" of the property on social media and "announced that Ale House West, LLC was 'Now Hiring.'" (*Id.* at ¶ 160.) The social media posters included several local Black/African American promoters, including D'Mario Gray (the managing member of Unikc, who also promotes under the name "Rio Entertainment") and Mark Mullmore (also known as "Marks my Barber"). (*Id.* at ¶¶ 163, 164.) The social media posts about the reopening of the 4128 Broadway property "gained significant community attention and interaction." (*Id.* at ¶ 165.) Lee also sent Brody a flyer about the hiring event.[19] (*Id.* at ¶ 161.)

Plaintiffs allege that as the social media posts about the reopening of the 4128 Broadway property gained attention, the CID Board Members "became aware of the posts and immediately began interfering with Euphoric's plan" to open its restaurant and bar at the former Ale House. (*Id.* at ¶¶ 165, 166.) Specifically, Euphoric alleges that Allred texted Mullmore ("Marks my Barber") asking if he was the one that "entered into the lease for 'Ale House.'" (*Id.* at ¶ 167.) Plaintiffs allege that "Allred and the [CID Board Members] . . . instruct[ed] Defendant Brody to terminate" the lease agreement with Euphoric. (*Id.* at ¶ 168.) Plaintiffs allege that on October 24, 2024, "in response to Defendant Allred and the [CID Board Members'] instruction[,] Defendant

---

[17] Marten had previously co-owned, operated, or managed Ale House.

[18] A year later, on October 22, 2025, the Court denied Euphoric's motion for preliminary injunction against Brody and 4128 Broadway, LLC under the October 21, 2024 lease agreement, finding that Euphoric was not likely to succeed on its breach of contract claim because the agreement did not satisfy the Missouri Statute of Frauds. (*See generally* Doc. 229.) Euphoric's interlocutory appeal of the Court's preliminary injunction order remains pending.

[19] The Second Amended Complaint does not include any details about the flyer Lee sent to Brody. It appears, however, that the flyer at least in some respect referred to the property or the anticipated business using the name "Ale House West, LLC." (*See* Doc. 249 at ¶¶ 169, 170.)

Brody called Mr. Lee" and instructed that the name in reference to the property be changed from "Ale House West, LLC." (*Id.* at ¶¶ 169, 170.) Lee changed the name from Ale House West, LLC to "House of Broadway, LLC." (*Id.* at ¶ 171.)

On October 28, 2024, the day of the hiring event, Euphoric had not been given access to the property by Brody/4128 Broadway, LLC, and was "forced to host its hiring event outside." (*Id.* at ¶ 173.) Several potential employees "left the event due to the disorganization" and various individuals on social media discredited Euphoric, posting that "Euphoric did not really have permission to open" its restaurant at 4128 Broadway "and claiming that Plaintiff Euphoric was a fraud." (*Id.* at ¶¶ 174, 175.)

"Sometime thereafter," Lee called Brody, during which Brody told Lee that Allred was on Brody's other line. After Lee asked Brody to merge Allred into their call, Brody told Lee that Allred has said he "do[es]n't need to talk to [Lee]" and that he "already know[s] what [Lee] is all about." (*Id.* at ¶¶ 179-81.) After further conversation, Brody merged Allred into the phone call with Lee, and Allred told Lee that he (Allred) "and other Westport business owners did not want Euphoric's 'type of crowd' in the Westport community," and that he had "concerns about security and business operations." (*Id.* at ¶¶ 183-85.) Euphoric alleges that Lee (its managing member) was not given a "fair chance to explain [to Allred] that [Euphoric] had plans for pursuing a diverse crowd of patrons, customers, and consumers" or "to show that [Euphoric's] security measures would have been sufficient to sustain a successful, peaceful, and profitable business." (*Id.* at ¶¶ 187, 188.)

Brody refused to give Euphoric access to the property, saying that their relationship "didn't . . . pan out" because of how "it got presented to the community immediately." (*Id.* at ¶¶ 193, 194.) Euphoric alleges that Brody also suggested that "they're afraid that [Euphoric's concept] will bring violence" and that Euphoric "needed to target 'an older crowd' and 'not that young hip hop crowd.'" (*Id.* at ¶¶ 198, 199.) On November 14, 2024, Euphoric sent both Brody and 4128 Broadway, LLC a demand letter seeking to enforce the lease agreement. (*Id.* at ¶ 201.) Neither defendant responded to the letter. (*Id.* at ¶ 203.) Four months later, however, on March 15, 2025, Brody offered to lease the property to Euphoric after reviewing a new concept for the property. (*Id.* at ¶¶ 207-08.) Brody indicated at that meeting that he wanted a "clean sports bar." (*Id.* at ¶ 209.) Ultimately, however, that plan did not move forward.[20] Instead, sometime between April

---

[20] The Second Amended Complaint does not include any facts or other context why the parties did

14

24, 2025, and July 26, 2025, 4128 Broadway, LLC leased the property to a third party, Holy Brunch KC Brunch Bar LLC.  (*Id.* at ¶¶ 211, 212.)

**D.     Plaintiffs' Claims Asserted in the Second Amended Complaint**

Plaintiffs assert the following 12 claims in the Second Amended Complaint:

| Count | Claim | Plaintiff(s) | Defendant(s) |
|---|---|---|---|
| 1 | Breach of Contract | The Sourze | Westport Development; Murfin, Inc. |
| 2 | Declaratory Relief (4128 Broadway Lease Agreement) | Euphoric | 4128 Broadway, LLC; Brody |
| 3 | Breach of Contract | Euphoric | 4128 Broadway, LLC; Brody |
| 4 | Race Discrimination (42 U.S.C. § 1982) | All Plaintiffs | All Defendants |
| 5 | Conspiracy, Race Discrimination (42 U.S.C. § 1985) | All Plaintiffs | All Defendants |
| 6 | Race Discrimination (42 U.S.C. § 1981) | All Plaintiffs | All Defendants |
| 7 | Failure to Prevent Race Discrimination (42 U.S.C. § 1986) | All Plaintiffs | All Defendants |
| 8 | Tortious Interference with Contract | All Plaintiffs | All Defendants |
| 9 | Tortious Interference with Business Expectancy | All Plaintiffs | All Defendants |
| 10 | Civil Conspiracy | All Plaintiffs | All Defendants |
| 11 | Antitrust Conspiracy | All Plaintiffs | All Defendants |
| 12 | Violation of RICO (18 U.S.C. § 1962 *et seq.*) | All Plaintiffs | All Defendants |

---

not move forward following the March 15, 2025 meeting.  This case had been filed two months earlier in January 2025.

## II. Proposed Third Amended Complaint

### A. New/Additional Defendants

In addition to the same defendants named in the Second Amended Complaint, Plaintiffs seek to join the following defendants as to the proposed third amended complaint: (1) Jim Ready, Manager of the Kansas City Regulated Industries Division; (2) City of Kansas City by and through the Regulated Industries Division[21]; (3) Chelsey Brown International, Inc., and a supervisory security official, Tony Uredi; (4) the Westport Regional Business League; and (5) AC Westport (Denver Biscuit)'s co-owner, Jason McGovern.[22]

Generally, Plaintiffs allege that Ready and the Regulated Industries Division, along with Uredi and Chelsey Brown International, "jointly exercised operational control over security, licensing and enforcement functions in the Westport district." (Doc. 403-1 at ¶ 66.) Plaintiffs allege that they all undertook "coordinated actions" including:

(1) that Uredi and Chelsey Brown International "directed or implemented security practices that selectively monitored, interfered with, or discouraged patrons and operations of targeted establishments"; and

(2) that Ready and the Regulated Industries Division "threatened adverse licensing action, imposed heightened scrutiny, or communicated regulatory pressure aligned with the objectives of private Westport actors."

(*Id.* at ¶¶ 70, 71.)

Plaintiffs allege the Westport Regional Business League, a non-profit organization, "operates as the administrative and policy-setting hub for the Westport commercial district" and "coordinat[es] the actions of the two Westport Community Improvement Districts, major property owners, business committees, and contracted security providers." (*Id.* at ¶ 45.) In short, Plaintiffs allege that the Westport Regional Business League "exercises centralized control over business access, licensing conditions, and commercial operations within Westport." (*Id.* at ¶ 47.)

More specifically, as relevant here, Plaintiffs additionally allege that in January 2019, CID board member Kimbrough (who is also the Executive Director of the Westport Regional Business

---

[21] For ease of reference, the Court will refer to the "Regulated Industries Division."

[22] Although not referenced in the second motion to join, Plaintiffs also include AC Westport (Denver Biscuit)'s third co-owner, Ashleigh Carter, as a defendant in the proposed third amended complaint. (*See* Doc. 403-1 at ¶ 35.)

League, (*id.* at ¶ 15)), was informed that the Regulated Industries Division would no longer "be accepting or approving any conditional licenses," (*id.* at ¶ 88). In a subsequent e-mail communication between Ready and Kimbrough, Ready noted that "prior to Regulated Industries Division entering into conditional license agreements the neighborhoods used to enter into 'Good Neighbor Agreements' . . . . Basically this is just like a conditional license but it is between the neighborhoods and the business . . . not the City." (*Id.* at ¶ 90.)[23] Plaintiffs allege (largely without additional factual content) that the Westport Regional Business League and Westport CID "insisted [the Regulated Industries Division] to deny or delay licenses unless businesses signed Good Neighbor Agreements or accepted operational restrictions," (*id.* at ¶ 112), and that Ready "treated the presence or absence of these agreements as relevant to licensing decisions," (*id.* at ¶ 138).

### B. The Good Neighbor Agreement

Plaintiffs also provide some clarification as to the Good Neighbor Agreement. Plaintiffs allege that under the agreement, Westport CID "agrees to vote 'yes' to the Liquor License expansion[24] and changes; provided, however, [that] Owner shall conduct its operations . . . and shall comply with the following conditions," (*id.* at ¶ 77), including:

> 78. . . . mandatory participation in the Westport Camera Program, installation of interior and exterior surveillance cameras with 14-day storage, providing video footage "immediately" to KCPD or Westport Public Safety, mandatory notification to Westport Public Safety before ejecting patrons, filing Tavern Disturbance Reports, enforcing "no loitering," "no weapons," and "no trespass" policies, and complying with CID-controlled nuisance standards . . . ;

> 79. . . . pay[ment] for off-duty Kansas City police officers, to allow CID-installed door alarms, and to restrict ingress and egress to a single entrance during CID-implemented screening periods.

(*Id.* at 16-17.)

---

[23] Plaintiffs assert that "Kansas City abolished conditional consents in 2019." (Doc. 403-1 at ¶ 135.) Plaintiffs also allege, however, that Westport CID has been using the Good Neighbor Agreement since 2013. (*See, e.g.*, *id.* at ¶ 519.) Other than what is included above, the proposed third amended complaint is not clear as to what a "conditional consent" or "conditional license" actually entailed or how the Good Neighbor Agreement changed (if at all) after conditional liquor licenses or conditional consents were "abolished."

[24] The Court presumes that the "Liquor License expansion" referred to in the Good Neighbor Agreement is a reference to a business's application with the Regulated Industries Division to obtain a liquor license needed to operate a restaurant or bar, although it is not entirely clear what that phrase means.

17

### C. Amended/Clarified Allegations as to Plaintiffs' Leases

#### 1. Plaintiff The Sourze – 427 Westport Road (Lease with Defendant Westport Development and Non-Party Pulse Management)

As to The Sourze's lease for the property at 427 Westport Road, Plaintiffs clarify in the proposed third amended complaint:

First, that the initial November 23, 2020 lease included as a "relevant term": "No limitation on permitted use." (*Id.* at ¶ 153).

Second, in early December 2020, after Pulse Management raised a concern with The Sourze potentially seeking "to make the space a night club," (*id.* at ¶ 156), The Sourze met with Hurt and Vos, along with Kimbrough. (*Id.* at ¶ 157.) During this meeting, Kimbrough referenced the Good Neighbor Agreement and the liquor license consents and indicated that a Good Neighbor Agreement was required for The Sourze to do business and to seek a liquor license. (*Id.* at ¶ 160.) The Sourze refused to sign a Good Neighbor Agreement. (*Id.* at ¶ 161.)

Then, on December 14, 2020, Westport Development presented The Sourze with "a new version of the existing lease" that included "several revisions in order [to] align the lease with [The Sourze's] intended use and to make sure that all the rules are spelled-out regarding any events to be held at the space." [25] (*Id.* at ¶ 163.) Westport Development indicated that "[o]nce we agree on the language for this new lease, we will terminate the existing lease and execute this new lease (thus making the new lease the effective/controlling document)." (*Id.*) The Sourze did not sign the proposed amended lease. (*Id.* at ¶ 164.)

In late December 2020 and early January 2021, The Sourze received two termination-of-lease notices. (*Id.* at ¶¶ 165, 166.) While the proposed third amended complaint does not include any details about the content of the two termination notices The Sourze received, The Sourze does allege that as of "February 12, 2021[,] the termination notices were no longer an issue as all defects had been cured." (*Id.* at ¶ 167.)

Third, and finally, The Sourze further clarifies that after the parties entered the April 14, 2021 Amended and Restated Triple Net Lease—which The Sourze alleges it signed "under duress . . . because of the previous threats to terminate the lease," (*id.* at ¶ 186)—The Sourze was falsely told that "the property was only fit to be a clothing store," (*id.* at ¶ 171).

---

[25] The specific terms or revisions contained in the proposed December 14, 2020 revised lease are not set out in the proposed third amended complaint or otherwise provided in any detail.

## 2. Plaintiff Unikc – 4140 Pennsylvania Avenue (Lease with Defendant DB Icehouse)

As to Unikc's lease for the property at 4140 Pennsylvania Avenue, Unikc clarifies in the proposed third amended complaint that after discovering that the locks had been changed, on October 12, 2021, it received an email from Niebur "stating that he received a cease-[and-]desist letter *from his partners at DB Icehouse* [i.e., Bartold] indicating that he [Niebur] did not have sole authority to enter into the lease with Unikc, LLC." (*Id.* at ¶ 227 (emphasis added).) In other words, the cease-and-desist letter DB Icehouse received was sent from Bartold to Niebur indicating that Niebur did not have sole authority to enter DB Icehouse into the lease with Unikc. Unikc also alleges that two days later, Bartold similarly told Unikc that "Niebur didn't have authority to enter in the lease agreement." (*Id.* at ¶ 229.) (Thus, the cease-and-desist letter referenced in Plaintiffs' pleadings related to DB Icehouse's lease with Unikc had not been sent by AC Westport (Denver Biscuit) as originally alleged in the Second Amended Complaint, but instead arose from an intra-corporate dispute between DB Icehouse's two co-owners/managers, Bartold and Niebur.)

Unikc also clarifies that the Denver Biscuit Company meeting occurred after Niebur told Fredrick Vickers (General Manager of Unikc) that Shader "did not want them to lease the space," and "suggested that [Unikc] meet with [Shader] in person in attempt to change his mind." (*Id.* at ¶ 231.) In addition, Plaintiffs add that on November 17, 2021, Unikc was granted a temporary restraining order and preliminary injunction *pendente lite* by the Circuit Court of Jackson County, Missouri, regarding its right to access the property under the lease agreement. (*Id.* at ¶ 245.) Unikc alleges, however, that "DB Icehouse violated the court order and changed the locks . . . again" in December 2021. (*Id.* at ¶ 248). Unikc clarifies that after this occurred and "[i]n subsequent conversations with Mr. [Niebur] and Mr. Bartold," they told Unikc that neighboring business owners, including AC Westport (Denver Biscuit), "did not want their 'type of crowd' to come to the Westport community and cause problems . . . ." (*Id.* at ¶ 251.)

## 3. Plaintiff Euphoric – 4128 Broadway Avenue (Lease with 4128 Broadway, LLC

As to Euphoric's lease for the property at 4128 Broadway Avenue, the proposed third amended complaint includes additional allegations that Brody explained to Euphoric that the deal to lease the 4128 Broadway property did not work because "they're afraid that it will bring violence." (*Id.* at ¶ 320.) In addition, Plaintiffs allege that a third party, Jah Kenya Seals, stated in "a recorded witness interview" with Euphoric's former counsel that "Brody solicited Seals' help

19

to 'stop Mr. Lee' and counter Plaintiffs' race discrimination claims." (*Id.* at ¶¶ 332, 333.) The proposed third amended complaint alleges that Seals told Euphoric's prior counsel that "Brody was 'willing to do business' with Seals if Seals would assist him," by "us[ing] [Seals'] political connections to 'block' Mr. Lee and to 'clean his image up'" by "create[ing] a public appearance that Brody was willing to do business with a Black tenant, thereby undermining Plaintiffs' claims." (*Id.* at ¶¶ 334, 336, 337.)

### D. Plaintiffs' Proposed Amended Claims as set out in the Proposed Third Amended Complaint

Plaintiffs assert the following seventeen claims against the thirty named defendants in the proposed third amended complaint as follows: (additions included within the proposed third amended complaint are indicated by **[text]**)

| Count | Claim | Plaintiff(s) | Defendant(s) |
|---|---|---|---|
| 1 | Breach of Contract | The Sourze | Westport Development, Murfin, Inc., **[Hurt, Vos]** |
| 2 | Declaratory Relief (4128 Broadway Lease Agreement) | Euphoric | 4128 Broadway, LLC, Brody |
| 3 | Breach of Contract | Euphoric | 4128 Broadway, LLC, Brody |
| 4 | Race Discrimination (42 U.S.C. § 1982) | All Plaintiffs | **[All Defendants]**[26] |
| 5 | Conspiracy, Race Discrimination (42 U.S.C. § 1985) | All Plaintiffs | **[All Defendants]** |
| 6 | Race Discrimination (42 U.S.C. § 1981) | All Plaintiffs | **[All Defendants]** |
| 7 | Failure to Prevent Race Discrimination (42 U.S.C. § 1986) | All Plaintiffs | **[All Defendants]** |
| 8 | Tortious Interference with Contract | All Plaintiffs | **[All Defendants]** |

---

[26] As set out in the chart on page 15 as to the claims asserted under the Second Amended Complaint, Plaintiffs assert Counts 4-12 against "All Defendants." Plaintiffs reassert Counts 4-12 in the proposed third amended complaint against "All Defendants" including, with the exception of Count 11 discussed in note 27, below, each of the new additional defendants.

| 9 | Tortious Interference with Business Expectancy | All Plaintiffs | **[All Defendants]** |
|---|---|---|---|
| 10 | Civil Conspiracy | All Plaintiffs | **[All Defendants]** |
| 11 | Antitrust Conspiracy | All Plaintiffs | **[All Defendants except Ready and Uredi]**[27] |
| 12 | Violation of RICO (18 U.S.C. § 1962 *et seq.*) | All Plaintiffs | **[All Defendants]** |
| **[13]** | **[Civil Conspiracy]** | **[Euphoric]** | **[Brody, Allred, 4128 Broadway, LLC]** |
| **[14]** | **[Fraudulent Misrepresentation]** | **[All Plaintiffs]** | **[Brody, 4128 Broadway, LLC, Westport Development, DB Icehouse]** |
| **[15]** | **[42 U.S.C. § 1983 – *Monell* Liability]** | **[All Plaintiffs]** | **[Kansas City Regulated Industries Division, Ready (official capacity)]** |
| **[16]** | **[42 U.S.C. § 1983 – Equal Protection]** | **[All Plaintiffs]** | **[Ready (individual capacity)]** |
| **[17]** | **[42 U.S.C. § 1983 – *Monell* Liability, Failure to Train/Supervise]** | **[All Plaintiffs]** | **[Regulated Industries Division]** |

**Discussion**

**I.    Defendants' Motions to Dismiss and Plaintiffs' Third Motion to Amend**

Before the Court are the following six motions to dismiss under Rule 12(b)(6) for failure to state a claim as to the Second Amended Complaint:

(1) Westport CID and CID Board Members (except Marten and Degenhardt) – Count 12, (Doc. 260);

(2) CID Board Members Marten and Degenhardt – Count 12, (Doc. 271);

---

[27] Plaintiffs state that Count 11 of the proposed third amended complaint is asserted against Defendants Westport Regional Business League, Chesley Business International, Kansas City Regulated Industries Division, CID Board Members, Allred Inc., Allred Holdings, Westport Development, Murfin Inc., AC Westport (Denver Biscuit), DB Icehouse, 4128 Broadway, LLC, and "all property-owner defendants and all business-entity defendants engaged in a horizontal group boycott[.]"  (Doc. 403-1 at ¶ 496.)  Ready and Uredi are neither "property-owner defendants" nor "business-entity defendants."

21

(3) AC Westport (Denver Biscuit) – Counts 4-12, (Doc. 273);

(4) DB Icehouse, Bartold, and Niebur – Counts 4-12, (Doc. 316);

(5) Westport Development – Counts 1, 4-12, (Doc. 355);

(6) Murfin, Inc. – Counts 1, 4-12, (Doc. 399).

As to Plaintiffs' third motion to amend, several defendants—Westport CID and CID Board Members; DB Icehouse, Bartold, and Niebur; Westport Development; and Murfin, Inc.—filed briefs in opposition asserting various grounds including futility of the proposed amendments.

### A.      Murfin, Inc.

To start, the Court notes (as Murfin, Inc. points out) that Plaintiffs wholly failed to respond to Murfin, Inc.'s motion to dismiss.  Even after Murfin, Inc. filed a "reply" pointing out the failure to respond, (Doc. 423), Plaintiffs did not seek leave to file a response out of time or any other relief as to Murfin, Inc.'s motion to dismiss.  By failing to respond to Murfin Inc.'s motion to dismiss, Plaintiffs waived any arguments opposing it.  *See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009); *Daniel v. Honeywell Int'l, Inc.*, No. 22-cv-3184 (ECT/DLM), 2023 WL 6392404, at *2 (D. Minn. Oct. 2, 2023), *affirmed* No. 23-3476, 2024 WL 3634227 (8th Cir. Aug. 2, 2024).  At the same time, however, the parties briefed substantively similar arguments in the context of Plaintiffs' third motion to amend (Plaintiffs did file a reply to address Murfin, Inc.'s brief opposing Plaintiffs' third motion to amend).  The Court will therefore consider the sufficiency of the pleadings as to Murfin, Inc. on the merits as discussed below.

### B.      Count 1 – Breach of Contract
### [As to Westport Development, Murfin, Inc., and Hurt and Vos]

In Count 1 of the Second Amended Complaint, The Sourze asserts a claim for breach of contract against Westport Development and Murfin, Inc.  In the proposed third amended complaint, The Sourze adds Hurt and Vos as defendants (who are also the principals[28] of both Westport Development and Murfin, Inc.) and otherwise reasserts the same claim.  The Sourze's breach of contract claim primarily rests on Defendants' alleged refusal to allow it to open and operate The Daiquiri Shop KC in the downstairs portion of the leased property at 427 Westport Road after initially approving the concept or plan.

---

[28] Unless made clear by context, the Court uses the term "principal" throughout this Order in a more descriptive sense rather than in a legal sense as to the law of agency (i.e., a principal-agent relationship). Plaintiffs' claims against the various entities and individuals appear to rely heavily on the law of agency and principal-agent liability.  The Court discusses the law of agency, as applicable here, below.

### 1. Westport Development

Westport Development argues that The Sourze fails to state a claim for breach of contract because The Sourze does not identify any provision of the Amended and Restated Triple Net Lease that it breached by not allowing The Sourze to operate The Daiquiri Shop KC. *See Glanzer v. Bank of Am., N.A.*, No. 14-0298-CV-W-REL, 2014 WL 6604788, at *13 (W.D. Mo. Nov. 20, 2014) ("A plaintiff fails to state a claim for breach of contract if he does not set out his rights or the defendant's obligations under the contract.").

In response, The Sourze primarily appears to rely on the alleged prior approval of its plans for The Daiquiri Shop KC as supporting its claim for breach of contract. (Doc. 377 at 4; *see* Doc. 249 at ¶ 63.) It also points out that the initial lease agreement did not include a similar limitation on permitted use as in the parties' subsequent Amended and Restated Triple Net Lease. (Doc. 377 at 4; *see* Doc. 403-1 at ¶ 153(c) (including a specific allegation in the proposed third amended complaint to this effect).)

As best as the Court can discern, The Sourze asserts claims for ordinary breach of contract and breach of the duty of good faith and fair dealing under the Amended and Restated Triple Net Lease, presenting multiple theories of liability.[29] As noted above, the Amended and Restated Triple

---

[29] Both the Second Amended Compliant and the proposed third amended complaint (and The Sourze's motion-to-dismiss and motion-to-amend briefing) make clear that the alleged denial or refusal by Westport Development to allow or to approve The Sourze to move forward with The Daiquiri Shop KC plan occurred *after* the parties signed the amended lease. For instance, The Sourze alleges that after it had already paid either $22,000 or $50,000 in rents, Hurt and/or Vos informed The Sourze that Westport Development would no longer agree to the concept for The Daiquiri Shop KC. (Doc. 294 at ¶¶ 73, 229; Doc. 403-1 at ¶¶ 175, 363.) In either case, The Sourze's rent under the initial lease agreement was $5,000 per month in the first year, starting January 11, 2020. (Doc. 294 at ¶¶ 65, 67; Doc. 403-1 at ¶¶ 153, 155.) Payment of $22,000 in rents therefore represents approximately four months' rent. The Amended and Triple Net Lease was signed in early April 2021, three months after The Sourze's tenancy began and just over four months after the parties signed the initial lease agreement. In other words, the principal allegation *when* Westport Development told The Sourze that it would no longer agree to The Daiquiri Shop KC was after the Amended and Restated Triple Net Lease was signed. The Sourze's reference in its briefing to ongoing discussions between the initial lease and the Amended and Restated Triple Net Lease is unavailing and not supported by the allegations in the relevant pleadings and The Sourze's own theory of the case. Notwithstanding the addition in the proposed third amended complaint of a December 2020 e-mail from Westport Development to The Sourze stating that "the current lease needs several revisions in order to align the lease with your intended use," (Doc. 403-1 at ¶ 163), the operative allegations about when Westport Development is alleged to have reneged on its prior approval for The Daiquiri Shop KC occurred after the Amended and Triple Net Lease had been signed.

    As a result, The Sourze's suggestion of a claim that Westport Development breached the initial lease agreement as written and as "orally modified" is inapposite and not plausible. Even assuming that Missouri law does generally allow parties to "effect[] modifications by valid contractual formalities, even

23

Net Lease expressly limited The Sourze's permitted use of the property. Accordingly, The Sourze cannot assert an ordinary breach of contract claim under the Amended and Restated Triple Net Lease based on Westport Development not allowing it to proceed with its plan for The Daiquiri Shop KC.

Appearing to recognize this impasse for an ordinary breach of contract claim, The Sourze pivots in its briefing to focus on a contract claim for breach of the implied duty of good faith and fair dealing. "Missouri law implies a covenant of good faith and fair dealing in every contract." *City of Joseph v. Lake Contrary Sewer Dist.*, 251 S.W.3d 362, 369 (Mo. Ct. App. 2008) (quoting *Farmers' Elec. Coop. v. Mo. Dep't of Corr.*, 977 S.W.2d 266, 271 (Mo. banc 1998)). However, "[t]here can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract." *City of Joseph*, 251 S.W.3d at 371 (internal quotation marks omitted); *see also CitiMortgage, Inc. v. Chi. Bancorp, Inc.*, 808 F.3d 747, 751 (8th Cir. 2015); *Bishop v. Shelter Mut. Ins. Co.*, 129 S.W.3d 500, 506 (Mo. Ct. App. 2004) ("[T]he implied covenant cannot be used to contradict or override the *express* employment terms contained in a contract.").

Moreover, "a breach of the implied covenant occurs when a party utilizes contract language that allowed unilateral action to improperly deny the other party from the expected benefits flowing from the contract." *Family Dollar Stores of Mo., LLC v. Tsai's Inv., Inc.*, No. 4:21-CV-572-SRW, 2022 WL 16833957, at *5 (E.D. Mo. Nov. 9, 2022) (internal quotation marks omitted; quotation modified). "The covenant of good faith and fair dealing cannot be relied upon to overcome the parol evidence rule and add terms to a contract that do not exist," and is not "an ever[]flowing cornucopia of wished-for legal duties," in that it "cannot give rise to new obligations not otherwise contained in a contract's express terms." *DePeralta v. Dlorah, Inc.*, No. 11-1102-CV-SJ-ODS, 2012 WL 4092191, at *4 (W.D. Mo. Sept. 17, 2012) (internal quotation marks omitted).

---

though there is no writing," *Doss v. Epic Healthcare Mgmt. Co.*, 901 S.W.2d 216, 221 (Mo. Ct. App. 1995), neither the Second Amended Complaint nor the proposed third amended complaint allege facts to support such modification, particularly as to the initial lease agreement. The only "ongoing negotiations" alleged were discussions that occurred after the initial lease agreement, and which ultimately were followed by the Amended and Restated Triple Net Lease that The Sourze signed.

24

As indicated above, the Amended and Restated Triple Net Lease expressly excluded The Sourze's use of the premises other than as an art gallery/event space. The Sourze appears to argue that Westport Development breached its duty of good faith and fair dealing by expressly limiting The Sourze's use of the premises in the Amended and Restated Triple Net Lease—which The Sourze signed—despite having approved the concept earlier. The Sourze provides no specific legal authority in support of this theory.

As to the proposed third amended complaint, The Sourze clarifies its theory for that Westport Development "breached the covenant of Good faith [and fair dealing]" by "badger[ing]" The Sourze "with repeated unsubstantiated termination threats and amendments to the lease" when The Sourze "had not violated any terms of the lease." (Doc. 419 at 12.) The Sourze similarly asserts that Westport Development breached the covenant of good faith and fair dealing by "imposing limitations on permitted use after The Sourze would not enter the [Good Neighbor Agreement] where there was not originally a limitation." (*Id.*) Neither of these arguments is supported by the allegations in the proposed third amended complaint, however. As to the alleged termination notices (claiming defects), the proposed third amended complaint itself indicated that The Sourze cured "all defects" identified in the termination notices. (Doc. 403-1 at ¶ 167.) In other words, The Sourze does *not* allege that the defects identified in the lease notices were "unsubstantiated" or not grounded in fact but instead affirmatively suggests that it cured the defects that had been identified.

Moreover, while the parties entered the Amended and Restated Triple Net Lease after The Sourze had declined to sign the Good Neighbor Agreement, The Sourze still provides no cognizable legal theory how presenting an amended lease agreement itself which it then signed can constitute a breach of the duty of good faith and fair dealing. Somewhat prophylactically, The Sourze now alleges in the proposed third amended complaint that it signed the amended lease agreement only under "duress . . . because of the previous threats to terminate the lease." As a matter of law, it is not entirely clear how duress applies to support The Sourze's claim for breach of contract.

Under Missouri law, duress is a defense to a breach of contract claim. *See Kohlbeck v. Wyndham Vacation Resorts, Inc.*, 7 F.4th 729, 737-38 (8th Cir. 2021). "Duress exists when, considering all surrounding circumstances, one party to the transaction was prevented from exercising his free will by threats or wrongful conduct of another." *Id.* (internal quotation marks

25

omitted).  "Even so, the party asserting duress must act promptly to repudiate the contract because silence and acquiescence for a considerable period after an agreement is allegedly executed under duress, action in accord with it, and acceptance of the benefits under it amount to a ratification of the agreement."  *Id.* (internal quotation marks omitted).

Even assuming that the concept of duress is applicable in this context, again, The Sourze alleges no facts of any improper threat or wrongful conduct by Westport Development vis-à-vis the two alleged notices of termination.  The initial lease agreement itself contemplated Westport Development's right to terminate and The Sourze's right to cure.  (*See* Doc. 377-1 at 18 (Article 21 – Default by Tenant), 30 (Article 54 – Tenant's Failure).)  And The Sourze's tenancy extended almost two years after it signed the Amended and Restated Triple Net Lease through at least February 8, 2023, when Westport Development petitioned a Missouri state court for rents and possession under the amended lease.  (Doc. 403-1 at ¶ 194.)

In the end, The Sourze does not provide any support or plausible legal basis for the theory that Westport Development is liable for breach of contract by "imposing limitations on the permitted use [in the Amended and Restated Triple Net Lease] . . . where there was not originally a limitation."  (Doc. 419 at 12.)  To the extent The Sourze would point to the duty of good faith and fair dealing, as explained above, this duty must be grounded in a contractual provision. Without something more, The Sourze does not plausibly allege an ordinary claim for breach of contract or a claim for breach of the duty of good faith and fair dealing against Westport Development.

Westport Development's motion to dismiss Count 1 of the Second Amended Complaint is **GRANTED**, and Plaintiffs' third motion to amend is **DENIED in relevant part** because Count 1 of the proposed third amended complaint asserting a breach of contract claim against Westport Development is futile.

### 2. Murfin, Inc. and Hurt and Vos

Nor does The Sourze assert a plausible claim for breach of contract (under any theory) against Murfin, Inc. or Hurt and Vos, whether in the Second Amended Complaint (as to Murfin, Inc.) or proposed third amended complaint (as to all three defendants).  Murfin, Inc. is an entirely separate legal entity from Westport Development.  The Sourze alleges no contractual relationship or contractual privity to state a breach of contract claim against Murfin, Inc.  *See Bell v. Shelter Gen'l Ins. Co.*, 701 S.W.3d 614, 618 (Mo. banc 2024) (among the elements of a breach of contract

26

claim under Missouri law includes "the existence and terms of a contract" between the plaintiff and the defendant).

In its briefing in support of the third motion to amend, The Sourze suggests that "[u]nder Missouri agency principles, Murfin can be held liable for contracts negotiated or interfered with by its directors [i.e., Hurt and Vos] acting within the scope of their authority." (Doc. 421 at 2.) As to Count 1, however, The Sourze does not allege that Hurt and Vos undertook any action as agents of Murfin, Inc., but instead only as agents of Westport Development. (*See, e.g.*, Doc. 403-1 at ¶¶ 361, 362; Doc. 249 at ¶¶ 71, 72, 222, 231.) Moreover, The Sourze does not refer to the breach of contract claim at all in its reply to Murfin, Inc.'s opposition to the proposed third amended complaint.

As to Hurt and Vos, they cannot be individually liable (under a conspiracy theory or otherwise) for *Westport Developments'* alleged breach of contract. *See Harmon v. W. Heritage Ins. Co.*, No. 1:11-CV-63 SNLJ, 2011 WL 2882032, at *2 (E.D. Mo. July 19, 2011) ("[U]nder Missouri agency law generally, a principal cannot conspire with its own agents." (quoting *Wiles v. Capitol Indem. Corp.*, 280 F.3d 868, 871 (8th Cir. 2002))) (holding that individual insurance agents were fraudulently joined in an action asserting breach of an insurance policy).

Ultimately, the sole case The Sourze cites for the principal-agent-liability proposition as to a civil conspiracy claim, *thyssenkrupp Elevator Corp. v. Creed*, No. 4:18 CV 762 RWS, 2019 WL 13211009 (E.D. Mo. Jan. 30, 2019), involved a claim for civil conspiracy to misappropriate and disclose confidential information and trade secrets against a corporation and its employees, not a breach of contract claim. Finally, because The Sourze fails to state a plausible claim for breach of contract, any conspiracy theory of liability necessarily fails as well. *See Envirotech, Inc. v. Thomas*, 259 S.W.3d 577, 587 (Mo. Ct. App. 2008).

Murfin, Inc.'s unopposed motion to dismiss Count 1 of the Second Amended Complaint is **GRANTED**, and Plaintiffs' third motion to amend is **DENIED in relevant part** because Count 1 of the proposed third amended complaint asserting a breach of contract claim against Murfin, Inc. and Hurt and Vos is futile.

**C.** **Count 4 – Unlawful Race Discrimination in Violation of 42 U.S.C. § 1982 (property rights) and Count 6 Unlawful Race Discrimination in Violation of 42 U.S.C. § 1981 (contract rights)**

**[As to AC Westport (Denver Biscuit), DB Icehouse, Bartold, Niebur, Westport Development, and Murfin, Inc.]**

In Count 4 of the Second Amended Complaint, Plaintiffs assert a civil rights claim for unlawful race discrimination under 42 U.S.C. § 1982. Plaintiffs reassert the same claim in the proposed third amended complaint. Title 42 U.S.C. § 1982 provides that "[a]ll citizens of the United States shall have the same right . . . as is enjoyed by white citizens . . . to inherit, purchase, lease, sell, hold and convey real and personal property." The law "forbids both official and private racially discriminatory interference with property rights." *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 616 (1987); *see Gomez-Perez v. Potter*, 553 U.S. 474, 479 (2008) (recognizing that although § 1982 "does not use the phrase 'discrimination based on race,' that is its plain meaning"). To state a claim for unlawful race discrimination under § 1982 as to property rights, a plaintiff must allege facts plausibly showing "(1) membership in a protected class; (2) discriminatory intent on the part of the defendant and (3) interference with the rights or benefits connected with the ownership of property." *Daniels v. Dillard's, Inc.*, 373 F.3d 885, 887 (8th Cir. 2004).

Similarly, in Count 6 of the Second Amended Complaint, Plaintiffs assert a civil rights claim for unlawful race discrimination under 42 U.S.C. § 1981. Plaintiffs reassert the same claim in the proposed third amended complaint. Title 42 U.S.C. § 1981 similarly provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . ." A claim for race discrimination under § 1981 is necessarily premised on either race discrimination that impairs an existing contractual relationship or that "blocks the creation of a contractual relationship." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006). The elements of a § 1981 race-discrimination claim are: "(1) that the plaintiff is a member of a protected class; (2) that the defendant intended to discriminate on the basis of race; and (3) that the discrimination on the basis of race interfered with a protected activity as defined in § 1981." *Elmore v. Harbor Freight Tools USA, Inc.*, 844 F.3d 764, 766 (8th Cir. 2016) (internal quotation marks omitted; quotation modified).

### 1. AC Westport (Denver Biscuit)

The basis for the claims against AC Westport (Denver Biscuit) for illegal race discrimination under §§ 1981/1982 are not entirely clear from the face of the Second Amended

28

Complaint. Unikc somewhat clarifies the race-discrimination theory against AC Westport (Denver Biscuit) in the motion-to-dismiss briefing. In its briefing, Unikc highlights the circumstances arising after the Denver Biscuit Company meeting during which Shader raised concerns about the "hip hop and R&B" music Unikc would play and questioned the type of crowd it would attract, in particular (1) that the following day, AC Westport (Denver Biscuit) sent DB Icehouse a cease-and-desist letter concerning Unikc's lease, and (2) that sometime later, Shader contacted DB Icehouse to "discuss his displeasure with his new neighbor."[30] (Doc. 249 at ¶ 117.) Unikc alleges that it was locked out of the property and DB Icehouse terminated the lease with Unikc in a $100,000 settlement. (*Id.* at ¶¶ 121, 122, 126.)[31] Unikc largely reasserts the same allegations in the proposed third amended complaint, with the clarification that the cease-and-desist letter following the

---

[30] The proposed third amended complaint is less clear who from AC Westport (Denver Biscuit) allegedly contacted DB Icehouse, alleging only that "[u]pon information and belief, after the [Denver Biscuit Company] meeting, the owners of the Denver Biscuit [i.e., Shader, McGovern, and Carter] contacted representatives of DB Icehouse, LLC [i.e., Bartold or Niebur] to discuss their displeasure with their new neighbor." (Doc. 403-1 at ¶ 239.)

[31] Plaintiffs' pleadings are somewhat unclear and relatively challenging to parse. As an example, while Plaintiffs emphasize in the motion-to-dismiss briefing that "AC Westport [(Denver Biscuit)] threatened DB Icehouse with a cease-and-desist letter demanding the termination of [Unikc]'s lease," (Doc. 293 at 6), nowhere in the Second Amended Complaint as relevant to Counts 4 and 6 does Unikc allege as a factual proposition that *AC Westport (Denver Biscuit)* itself sent DB Icehouse the referenced cease-and-desist letter. Paragraph 120 of the Second Amended Complaint only alleges that the day after the Denver Biscuit Company meeting, Niebur told Unikc that he had received a cease-and-desist letter regarding the lease. This factual assertion noticeably does not allege *from whom* the cease-and-desist letter had been sent (let alone the contents or basis for the cease-and-desist letter). Later in the complaint, however (as emphasized by Plaintiffs in their motion-to-dismiss briefing), at paragraph 373, the Second Amended Complaint alleges that AC Westport (Denver Biscuit) sent the cease-and-desist letter to DB Icehouse. But paragraph 373, asserted in Count 12 of the Second Amended Complaint, is not applicable to Counts 4 and 6, both of which only incorporate by reference all of the *preceding* allegations in the complaint, respectively. Even if the practice of incorporating all prior paragraphs is not per se improper (albeit somewhat unhelpful to the Court and the defendants), it is improper to rely on factual assertions that are only made later in the complaint and therefore cannot have been incorporated into a particular claim.

Nonetheless, as discussed above, Plaintiffs clarify in the proposed third amended complaint that the referenced cease-and-desist letter was actually sent to Niebur from Bartold and therefore was *not* sent by AC Westport (Denver Biscuit). (Doc. 403-1 at ¶ 227.) Somewhat confusingly, Plaintiffs still allege later in the proposed third amended complaint (similar to paragraph 373 of the Second Amended Complaint) that AC Westport (Denver Biscuit), "acting through its Defendant individual owners [Shader, among others] contacted the landlord of 4140 Pennsylvania Avenue [DB Icehouse] and issued a cease-and-desist letter accompanied by threats." (*Id.* at ¶ 525.) This allegation in the proposed third amended complaint appears to likely be a drafting oversight. If not, it is wholly conclusory and unsupported by well-pleaded facts. The pleadings only appear to reference one cease-and-desist letter. None of the pleadings in this case have included any facts suggesting that DB Icehouse received more than one cease-and-desist letter.

29

Denver Biscuit Company meeting was not sent from Shader/AC Westport (Denver Biscuit) to DB Icehouse but was sent to Niebur from Bartold (i.e., within DB Icehouse itself). (*See* Doc. 403-1 at ¶¶ 211-39.)

Other than the cease-and-desist letter, the Second Amended Complaint and proposed third amended complaint both allege that Shader or the co-owners of AC Westport (Denver Biscuit), collectively, contacted DB Icehouse (Bartold or Niebur) to express concerns about Unikc's tenancy. (Doc. 249 at ¶ 117; Doc. 403-1 at ¶ 239.) Unikc alleges that in "subsequent conversations," Niebur and Bartold told Unikc that "several neighboring business owners, including the owner of the Denver Biscuit, did not want their 'type of crowd' to come to the Westport Community." (Doc. 403-1 at ¶ 251; Doc. 249 at ¶ 125.) All of this followed the Denver Biscuit Company meeting in which Shader and/or McGovern and Carter met with Unikc and raised concerns about the "type of crowd" and R&B and Hip Hop music the club would play. Unikc ultimately alleges that it was wrongly locked out of the premises and that DB Icehouse later terminated the lease in a $100,000 settlement with Unikc. While it is somewhat a close call, the Court finds that Unikc states a plausible claim that AC Westport (Denver Biscuit) interfered with its property rights and rights-to-contract vis-à-vis its lease agreement with DB Icehouse in violation of 42 U.S.C. §§ 1981/1982.

AC Westport (Denver Biscuit)'s motion to dismiss Counts 4 and 6 for failure to state a claim is **DENIED**.

### 2. DB Icehouse, Bartold, and Niebur

As to DB Icehouse, Bartold, and Niebur, Unikc asserts a similar claim for unlawful race discrimination in violation of 42 U.S.C. §§ 1981 and 1982. Unikc largely relies on the same allegations as its claim for unlawful race discrimination against AC Westport (Denver Biscuit). Specifically:

(1) that at some point after the Denver Biscuit Company meeting, the owner (or owners) of AC Westport (Denver Biscuit) contacted Bartold or Niebur to "discuss his displeasure with his new neighbor [i.e., Unikc]," (*id.* at ¶ 117), and

(2) that Bartold or Niebur told Gray (Unikc's managing member) in "subsequent conversations" that "several neighboring business owners, including the owner of the Denver Biscuit, did not want [Unikc]'s 'type of crowd' to come to the Westport Community and cause problems," (*id.* at ¶ 125).

30

Unikc asserts in its briefing that the "lockout followed almost immediately after [Shader]'s racially coded comments regarding an 'R&B or hip-hop' clientele." (Doc. 424 at 11.) Both the Second Amended Complaint and the proposed third amended complaint, however, indicate that AC Westport (Denver Biscuit)'s alleged comments to DB Icehouse occurred *after* the initial lockout, which was tied to the cease-and-desist letter Bartold sent to Niebur (not sent by AC Westport (Denver Biscuit), as originally alleged in the Second Amended Complaint). (*See* Doc. 249 at ¶¶ 120-22, 125; Doc. 403-1 at ¶¶ 224-27, 39.)

Unikc also asserts, however, that "[w]here a Black applicant satisfies objective requirements, and the transaction fails because of race, discriminatory intent is inferable." (Doc. 424 at 13.) The circular reasoning is somewhat imprecise. The critical question is whether Unikc has plausibly alleged that in locking Unikc out of the premises and terminating the lease (in a $100,000 settlement), DB Icehouse (and Bartold and Niebur) were motivated by an unlawful racial animus. Fundamentally, it appears that Unikc seeks to impute AC Westport (Denver Biscuit)'s alleged racial animus to DB Icehouse (and Bartold and Niebur). Like Unikc's claims against AC Westport (Denver Biscuit), it is somewhat a close call as to whether Counts 4 and 6 assert plausible claims of race discrimination under 42 U.S.C. §§ 1981/1982 against DB Icehouse, Bartold, and Niebur. The Court concludes that Unikc asserts a plausible claim that DB Icehouse, Bartold, and Niebur interfered with its property rights and rights-to-contract motivated by an unlawful racial animus, particularly to the extent subsequent conversations between Unikc and DB Icehouse relayed similar concerns and language attributed to AC Westport (Denver Biscuit) regarding the "type of crowd" Unikc would attract by playing "R&B and hip-hop" music.

DB Icehouse and Bartold and Niebur's motion to dismiss Counts 4 and 6 for failure to state a claim is **DENIED**.

### 3. Westport Development

As to The Sourze's claim against Westport Development for illegal race discrimination in violation of 42 U.S.C. §§ 1981 and 1982, the Court similarly finds that, although a close call, The Sourze asserts a plausible claim for race discrimination under § 1981. The Sourze alleges that Westport Development initially approved its plans for The Daiquiri Shop KC but then reneged or changed course, stating that "they did not want any more bar and restaurant concepts in the Westport [community] because bars, and especially those patronized by the hip-hop crowds, equated to violence." (Doc. 249 at ¶¶ 72, 228; Doc. 403-1 at ¶¶ 174, 362.) Section 1981 prohibits

31

race discrimination not only in the making and termination of a contract but also in the "modification" of contracts and ensures "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." As to The Sourze's claim under § 1982, however, the Court finds that The Sourze fails to state a plausible claim as to Westport Development because it does not show that it had any property right as tenant under the Amended and Restated Triple Net Lease (or the initial lease agreement) to "use and expand their leased premises" by opening The Daiquiri Shop KC. The Amended and Restated Triple Net Lease in fact prohibited use of the premises other than as an art gallery/event space.

Westport Development's motion to dismiss Count 4 for failure to state a claim is **GRANTED**, Westport Development's motion to dismiss Count 6 for failure to state a claim is **DENIED**, and Plaintiffs' third motion to amend is **DENIED in relevant part** because Count 4 of the proposed third amended complaint asserting a claim under 42 U.S.C. § 1982 against Westport Development is futile.[32]

---

[32] At this juncture, the Court notes that a number of citations in Plaintiffs' briefs are incorrect and somewhat inaccurate or misleading in substance as presented to the Court. Several defendants raised this issue in their reply briefs. (*See, e.g.*, Doc. 269 at 2 n.2; 296 at 4 n.3; Doc. 312 at 5-6, 8, 10-11.) The Court provides a few representative examples from Plaintiffs' deficient briefing in this regard, below.

Plaintiffs cite "*Stroud v. Farr Rentals, LLC*, No. 4:19-CV-03050-AGF, 2020 WL 1322855, at *3 (E.D. Mo. Mar. 20, 2020)," for the proposition that "Plaintiffs also allege interference with their ability to use and expand their leased premises . . . which is actionable under § 1982." (Doc. 377 at 6.) The citation is inaccurate. As best as the Court can discern, Plaintiffs intended to cite to *Stroud v. Farr Rentals, LLC*, No. 2:19-cv-95-CDP, 2020 WL 1433644 (E.D. Mo. Mar. 24, 2020). Plaintiffs similarly provided incorrect citations for two other cases, citing "*Affordable Communities of Missouri v. EF and A Capital Corp.*, No. 4:11-CV-00505-AGF, 2012 WL 1374126, at *4 (E.D. Mo. Apr. 19, 2012)"—while the correct citation appears to be *Affordable Communities of Missouri v. EF and A Capital Corp.*, No. 4:11-CV-555 CAS, 2012 WL 43520, at *10 (E.D. Mo. Jan. 9, 2012)—and "*Family Dollar Stores of Missouri, LLC v. Tsai's Investment, Inc.*, No. 4:21-CV-01325-SEP, 2022 WL 16571059, at *6 (E.D. Mo. Oct. 31, 2022)"—while the correct citation appears to be *Family Dollar Stores of Missouri, LLC v. Tsai's Investment, Inc.*, No. 4:21-CV-572-SRW, 2022 WL 16833957, at *5-6 (Nov. 9, 2022). In each of these three instances, Plaintiffs included inaccurate case numbers, Westlaw citations, and dates; these cases were only identifiable by the Court at all through the case name.

In addition to an incorrect citation to *Stroud*, Plaintiff's reliance on *Stroud* for the proposition indicated above is somewhat inaccurate and misleading. In that case, the district court found that a plaintiff failed to state a claim under § 1982 because (1) she "does not allege that the City or Phillips [the defendants] were her landlords or that they interfered with her right to lease the property," and (2) although she "alleges that Farr Rentals and the Farrs engaged in misconduct related to her tenancy . . . she alleges no facts permitting the inference that she was actually treated differently because of her race." *Id.* at *4. *Stroud's* claim against her landlords concerned their failure to repair reported electrical and air quality issues at the property, causing her to suffer "'Upper Respiratory Illnesses' from breathing sewer gas." *Id.* at *2. The pin-cite in Plaintiffs' brief to *3 of *Stroud* concerns the district court's consideration of Stroud's separate

claim under the Fair Housing Act, which the district court similarly dismissed for failure to state a claim. It is difficult to see how *Stroud* provides direct legal authority for the proposition that "a tenant's ability to use and expand their leased premises is actionable under § 1982." The district court simply did not discuss this issue but dismissed the complaint because it failed to state a plausible claim in other respects.

As a second example of an inaccurate substantive discussion of a case, Plaintiffs cite to a case, *Cook v. MFA Livestock Association*, 700 S.W.2d 526 (Mo. Ct. App. 1985), for the proposition that "Missouri courts have found a single phone call sufficient to state a claim for tortious interference where it causes a third party to cancel an agreement." (Doc. 293 at 22.) Nothing in the *Cook* decision appears to reference or involve a "single phone call" or any analogous material fact. Moreover, as the Missouri Court of Appeals explicitly recognized in that case, as relevant to a tortious interference claim, "the only issue for determination . . . is whether or not the arrangement with Raines was a sufficient contract, business relationship, or expectancy upon which to base a claim of tortious interference with contract." *Id.* at 528. *Cook* simply does not support the proposition for which it is cited by Plaintiffs. The same is true for Plaintiffs' citation to *Institutional Food v. Golden State Strawberries*, 587 F. Supp. 1105, 1111 (E.D. Mo. 1983), as cited for the proposition that "Missouri law does not permit interference based on discriminatory motives." Nothing in that case supports that broad proposition and in fact, the district court dismissed the case for lack of personal jurisdiction, finding that the plaintiff did not make a prima facie showing that the out-of-state defendant tortiously interfered with the contract, discussing only the absence-of-justification element of a tortious interference claim under Missouri law.

Similarly, Plaintiffs cite an Eighth Circuit en banc case, *Gregory v. Dillard's, Inc.*, 565 F.3d 464 (8th Cir. 2009), for the proposition that "[t]he Eighth Circuit recognizes racially coded language as direct evidence of discrimination" for a claim under 42 U.S.C. § 1982. (Doc. 377 at 6.) As the Eighth Circuit made clear, however, in that case, Dillard's "does not urge dismissal of the claims on the ground that the plaintiffs failed to allege or present a disputed issue of fact concerning discriminatory intent." *Gregory*, 565 F.3d at 469. Moreover, the conduct the Eighth Circuit referenced as supporting Dillard's discriminatory intent in that case had nothing to do with "racially coded language" but instead concerned security officers and store clerks surveilling Black/African-American customers "for no reason" and not similarly surveilling white customers. *Id.* at 469 n.5.

As another example, Plaintiff cite *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 342 (6th Cir. 2002), as supporting the proposition that "decisions based on stereotypes violate[s] civil rights protections." That case, however, considered a "regarded as" disability discrimination claim under the ADA which is in part defined as the denial of services "because of myths, fears, or stereotypes associated with disabilities," and ultimately held that "where the discrimination results from unfounded fears and stereotypes that merely because Plaintiff's potential clients are recovering drug addicts, they would necessarily attract increased drug activity and violent crime to the city, such discrimination violates the ADA and Rehabilitation Act." *MX Group, Inc.*, 293 F.3d at 342. Thus, the broad assertion Plaintiffs make, citing to *MX Group* as support, is largely unhelpful and somewhat misleading as presented in the context of this case.

As two final examples: Plaintiffs cite to *Bradford v. DANA Corp.*, 249 F.3d 807, 809 (8th Cir. 2001), as supporting the proposition that "[t]he Eighth Circuit has repeatedly held that amendments based on newly discovered evidence satisfy Rule 16(b)." Nothing in *Bradford* supports this broad proposition. In fact, the Eighth Circuit affirmed the district court's denial of leave under Rule 16(b), finding that the plaintiff had "made only minimal efforts to satisfy" the scheduling order deadline. And Plaintiffs also refer to the following quotation from *Arbors at Sugar Creek Homeowners Association v. Jefferson Bank & Trust*, 464 S.W.3d 177, 185 (Mo. banc 2015), stating that "[a] party breaches this covenant [of good faith and fair dealing] when it '*acts in a manner that evades the spirit of the transaction or denies the other party the expected benefit of the contract*.'" The quoted language Plaintiffs included in their briefing (italicized here) does not appear in the cited case, however.

33

### 4. Murfin, Inc.

None of the Plaintiffs allege any facts about Murfin, Inc.'s involvement with any of the three properties. At most, The Sourze alleges that "[i]n a meeting between agents of Defendant Westport Development, LLC, either Defendant Hurt or Vos"—who are also the principals of Murfin, Inc.—"stated to Plaintiff The Sourze LLC, that they did not want any more bar and restaurant concepts in the Westport [*sic*] because bars, and especially those patronized by the hip-hop crowds, equated to violence." (Doc. 249 at ¶ 228.) As set out above, Murfin, Inc. is a separate legal entity and was not a party or was not separately involved in Westport Development's lease agreement with The Sourze for the property at 427 Westport Road. Nor does The Sourze allege that Hurt or Vos made these statements in their capacity as directors or agents of Murfin, Inc., nor that they undertook any other action related to 427 Westport Road and The Sourze as directors or agents of Murfin. (*Cf.* Doc. 403-1 at ¶ 174 (alleging that this statement was made "[i]n a meeting between agents of Defendant Westport Development, LLC" and The Sourze).)

Additionally, Murfin, Inc. cannot conspire with Westport Development or Westport CID through Hurt and Vos. That Plaintiffs may have a claim against Westport Development, Westport CID, or Hurt and Vos does not necessarily mean that they have a claim against Murfin, Inc. Such tenuous connection is wholly insufficient to state a claim directly against Murfin, Inc. itself for illegal race discrimination in violation of 42 U.S.C. §§ 1981 or 1982.[33]

---

Beyond the fact of the inaccurate and improper citations in Plaintiffs' briefing, including the examples set out above, the Court does not presume that the erroneous citations and assertions in Plaintiffs' briefing were submitted or made in bad faith or with any ill intent by counsel. The Court is not aware of any facts that would suggest bad faith or ill intent, and the Court acknowledges that over the course of five months, Plaintiffs timely responded to the numerous motions to dismiss, each with a different briefing schedule. Nevertheless, and whatever the root cause for these inaccuracies and errors (including any use of legal or non-legal generative AI tools, for example), the professional duty and responsibility of counsel appearing before the Court as officers of the Court requires that careful and proper attention to detail is provided in both substance and the form of legal authority and propositions presented to the Court on a party's behalf. This is an important and foundational responsibility and duty of counsel that serves to uphold the integrity and perceived integrity of the judicial process. All counsel appearing in this case and before this Court must be mindful and attentive to this duty and responsibility as counsel.

[33] Plaintiffs' discussion of Counts 4 and 6 as asserted against Murfin, Inc. in the proposed third amended complaint highlights one of the apparent difficulties in this case due to the structure of Plaintiffs' pleadings, as identified at least in some regard by several defendants in their briefing of the current motions.

The proposed third amended complaint (like the Second Amended Complaint) groups various defendants, claims, and theories of liability together without clearly delineating when a particular plaintiff is asserting a claim directly and substantively against a particular defendant or when, instead, a claim is asserted against a defendant(s) under a conspiracy theory of liability. Plaintiffs' pleadings have several

hallmarks of what some federal courts have recognized as a "shotgun pleading." A shotgun pleading is characterized as a complaint that "indiscriminately incorporates assertions from one count to another, for example, by incorporating all facts . . . from all previous counts into each successive count" or one that "asserts multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Gibson v. City of Portland*, 165 F.4th 1265, 1288 (9th Cir. 2026) (internal quotation marks omitted). Not only does a shotgun pleading make a defendant's ability to respond much more difficult, it also "'waste[s] scarce judicial resources, inexorably broaden[s] the scope of discovery, wreak[s] havoc on appellate court dockets, and undermine[s] the public's respect for the courts.'" *Id.* (quoting *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018)).

For example, proposed Count 4 of the proposed third amended complaint ostensibly asserts a claim for unlawful race discrimination in violation of 42 U.S.C. § 1982 and both (1) "re-allege[s] and incorporate[s] by reference all preceding paragraphs . . . as though fully set forth herein," and (2) collectively and together asserts multiple claims against multiple defendants, alleging that:

409. All Defendants—including [Westport Regional Business League], [Chelsey Brown International], [Regulated Industries Division], all CID board members, Allred Inc., Allred Holdings, Westport Development, Murfin Inc., AC Westport [(Denver Biscuit)], DB Icehouse, 4128 Broadway, all Westport property owner defendants, all business entity defendants, and all individual owner operators—acted . . . to interfere with Plaintiffs' ability to lease, hold, and use commercial property in Westport.

410. Defendants engaged in a coordinated pattern of racially discriminatory conduct designed to prevent Black owned businesses from obtaining or retaining leases, liquor licenses, and operational rights in Westport, including:

a. withholding or threatening to withhold liquor license consents unless Plaintiffs signed unlawful "Good Neighbor Agreements";

b. pressuring landlords to terminate or refuse leases to Plaintiffs;

c. imposing racially coded objections to Plaintiffs' anticipated clientele ("hip hop crowd," "young R&B crowd," "Black crowd," "dicey crowd");

d. falsely representing that properties zoned for restaurant/bar use were suitable only for clothing stores;

e. arbitrarily reducing occupancy limits for Black owned establishments;

f. threatening regulatory retaliation through [the Regulated Industries Division] and [Kansas City Police Department] if Plaintiffs attempted to operate without CID mandated restrictions.

(Doc. 403-1 at 63-64.) Proposed Count 4 continues to similarly lump together various allegations demonstrating that "Defendants' conduct was motivated by racial animus" as well as how "Defendants' coordinated actions directly interfered with Plaintiffs' rights to lease and use property," leaving it to the individual defendants (and to some extent the Court) to attempt to piece Plaintiffs' claims/theories together and try to figure out *what exactly* Plaintiffs assert against *whom*. (*Id.* at ¶¶ 411, 412.)

To be clear, the Court is not making any finding that the proposed third amended complaint (or the Second Amended Complaint for that matter) is necessarily an improper shotgun pleading. It appears that Plaintiffs do attempt to provide some additional clarification in the proposed third amended complaint by more specifically identifying the particular defendants who are included in each count (although the allegations within the counts still largely rely on a group format and use collective and imprecise language).

35

Murfin, Inc.'s unopposed motion to dismiss Counts 4 and 6 for failure to state a claim is **GRANTED**, and Plaintiffs' third motion to amend is **DENIED in relevant part** because Counts 4 and 6 of the proposed third amended complaint asserting claims under 42 U.S.C. §§ 1981/1982 against Murfin, Inc. are futile.

### D. Count 5 – Civil Conspiracy (Race Discrimination) in violation of 42 U.S.C. § 1985
### [As to AC Westport (Denver Biscuit), DB Icehouse, Bartold, Niebur, Westport Development]

In Count 5 of the Second Amended Complaint, Plaintiffs assert a claim for civil conspiracy of unlawful race discrimination under 42 U.S.C. § 1985. Plaintiffs reassert the same claim in the proposed third amended complaint.

Title 42 U.S.C. § 1985(3) makes it unlawful for "two or more persons . . . [to] conspire . . . for the purpose of depriving, either directly or indirectly, any person . . . of the equal protection of the laws, or of equal privileges and immunities under the laws . . . ." To state a claim for civil conspiracy under § 1985(3), Plaintiffs "must allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement." *Johnson v. Perdue*, 862 F.3d 712, 717-18 (8th Cir. 2017) (internal quotation marks omitted). Conclusory allegations that "defendants conspired 'through mutual decisions and correspondence' and 'acted in concert and with a mutual understanding'" are insufficient to state a plausible claim for civil conspiracy. *Id.* at 718. Plaintiffs must, instead, "point[] to at least some facts which would suggest that [defendants] reached an understanding to violate [their] rights." *City of Omaha Emps. Betterment Ass'n v. City of Omaha*, 883 F.2d 650, 652 (8th Cir. 1989) (internal quotation marks omitted). Put another way, "[a] conspiracy claim . . . requires allegations of specific facts tending to show a meeting of the minds among the alleged conspirators." *Murray v. Lene*, 595 F.3d 868, 870 (8th Cir. 2010) (internal quotation marks omitted).

---

While the Court would be justified in considering *sua sponte* the potential shotgun-pleading issue, *see Gibson*, 165 F.4th at 1289 (recognizing that district courts have "inherent authority to control [the court's] docket and ensure the prompt resolution of lawsuits, which in some circumstances includes the power to dismiss a complaint for failure to comply with Rule 8(a)(2) and Rule 10(b)," both of which are implicated by a shotgun pleading (internal quotation marks omitted)), the Court prefers at this juncture to address the merits as best as the Court can, as briefed and argued by all relevant parties here. In short, the Court makes no finding in this regard at this juncture.

36

Generally, Plaintiffs allege that "all Defendants acting in conspiracy with Defendant [Westport] CID developed an illegal plan and agreement by and through the 'Good Neighbor' agreement . . . to prevent Black/African American entrepreneurs from opening and maintaining businesses in Westport." (Doc. 249 at ¶ 280; *see* Doc. 403-1 at ¶ 419 (alleging that "Defendants engaged in a coordinated, racially motivated conspiracy to prevent Black-owned businesses from obtaining, maintaining, or benefiting from leases, liquor licenses, and business operations in Westport").) Plaintiffs allege that "all Defendants" conspired to deprive Plaintiffs of their rights under the civil rights statutes 42 U.S.C. §§ 1981, 1982. Plaintiffs allege that "all Defendants . . . meet regularly and discuss plans for new businesses opening in Westport" and that they "agreed to a plan by and through the 'Good Neighbor' agreement and other means that served to limit the existence of Black/African American business owners in the Westport community." (*Id.* at ¶ 283.)

### 1. AC Westport (Denver Biscuit), DB Icehouse, Bartold, and Niebur

As to AC Westport (Denver Biscuit) and DB Icehouse, none of their principals (including Bartold and Niebur for DB Icehouse) are CID board members. (*See* Doc. 249 at ¶ 39.) Plaintiffs do not allege with specificity any material facts plausibly showing these non-CID-board-member defendants' involvement with the Good Neighbor Agreement or how they took any "affirmative action[] by and through the 'Good Neighbor' agreement" regarding Unikc's lease of the property at 4140 Pennsylvania Avenue. Nor are there any allegations concerning Unikc's potential (or not) to obtain a liquor license at this location.[34]

"A common goal, never discussed explicitly or implicitly among the Defendants, does not constitute an agreement" for purposes of a civil conspiracy under § 1985(3). *Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 62 (D.D.C. 2019). And moreover, a claim for civil conspiracy under § 1985(3) requires more than alleging the conspiracy "had the effect of curtailing" Plaintiffs' rights under §§ 1981/1982, but "[i]nstead, the conspiracy must have been consciously aimed at impairing those rights." *Id.* In short, as to AC Westport (Denver Biscuit), DB Icehouse, Bartold, and Niebur, the Court finds that the Second Amended Complaint alleges no more than mere conclusory allegations of their agreement with any other person or entity to discriminate against Unikc (or any other Plaintiff) on the basis of race in violation of 42 U.S.C. §§ 1981/1982.

---

[34] The crux of Unikc's claim against these defendants, of course, is that they refused to allow Unikc to open The Daiquiri Shop KC and that it was wrongfully locked out of the property, followed by a $100,000 settlement to unwind the lease agreement.

37

AC Westport (Denver Biscuit), DB Icehouse, Bartold, and Niebur's motions to dismiss Count 5 for failure to state a claim is **GRANTED**, and Plaintiffs' third motion to amend is **DENIED in relevant part** because Count 5 of the proposed third amended complaint asserting a claim under 42 U.S.C. § 1985 against AC Westport (Denver Biscuit), DB Icehouse, Bartold, and Niebur is futile.

### 2. Westport Development

Unlike AC Westport (Denver Biscuit) and DB Icehouse, the alleged principals of Westport Development and Murfin, Inc.—Hurt and Vos—are also members of the CID board of directors.[35] The Sourze alleges that "agents of Defendant Westport Development, LLC, either Defendant Hurt or Vos" stated that "the Daiquiri Shop [KC] would 'cannibalize' the other Westport bars" and indicated "that they did not want any more bar and restaurant concepts in the Westport because bars, and especially those patronized by the hip-hop crowds, equated to violence." (*Id.* at ¶¶ 71, 72.) Plaintiffs allege that the CID Board Members have conspired, acting outside the scope of their official roles as board members, to engage in racial discrimination and to exclude or limit Black/African American-owned or operated businesses from Westport that serve Black/African American patrons through the Good Neighbor Agreement and liquor license consents. They allege that CID Board Members did so "for their own economic gain with their own personal business development goals in mind." (*Id.* at ¶ 42.) Under these circumstances, the Court finds that the Second Amended Complaint states a plausible claim against Westport Development for civil rights conspiracy under 42 U.S.C. § 1985(3).

Westport Development's motion to dismiss Count 5 for failure to state a claim is **DENIED**.

---

[35] The Court notes that the CID Board Members and Westport CID itself, including Hurt and Vos, do not argue that Count 5 fails to state a claim but instead only seek dismissal as to Count 12, the civil RICO claim. (*See* Doc. 260.) They otherwise filed an answer to the remaining claims, including Count 5. (*See* Doc. 262.)

As a matter of black letter law, a principal (such as a corporate or business entity form) may be held liable "for acts of their agents or employees in the scope of their authority or employment." *Meyer v. Holley*, 537 U.S. 824, 829 (2003). Although Hurt and Vos, along with Westport CID and CID Board Members, deny the allegation in the Second Amended Complaint that they are "the owners, agents, operators, stockholders, landlords and/or managers of Westport Development, LLC," (Doc. 262 at ¶ 55; Doc. 277 at ¶ 55), the Court must accept this pleaded fact as true. (*See* Doc. 403-1 at ¶ 143 (including the same allegation in the proposed third amended complaint).)

**E.** **Count 7 – Failure to Prevent Race Discrimination under 42 U.S.C. § 1986**

**[As to AC Westport (Denver Biscuit), DB Icehouse, Bartold, Niebur, Westport Development]**

Next, in Count 7 of the Second Amended Complaint, Plaintiffs assert a claim under 42 U.S.C. § 1986 for failing to prevent racial discrimination conspiracy. Plaintiffs reassert the same claim in the proposed third amended complaint.

Section 1986 "creates a cause of action for neglect to prevent a conspiracy to interfere with a person's civil rights." *Pitts v. City of Cuba*, 913 F. Supp. 2d 688, 703-04 (E.D. Mo. Dec. 19, 2012). Plaintiffs acknowledge at least implicitly that a claim under § 1986 is in large part (even if not wholly) dependent on a valid civil-rights conspiracy claim. (*See* Doc. 377 at 7.) Indeed, "liability [under § 1986] is dependent on proof of actual knowledge by a defendant of the wrongful conduct." *Owen v. City of Independence*, 445 U.S. 622, 674 n.15 (1980) (Powell, J., dissenting) (internal quotation marks omitted); *see Brandon v. Lotter*, 157 F.3d 537, 540 (8th Cir. 1998) (citing *Owen*). While "firsthand knowledge is not required under § 1986," some "direct . . . knowledge of a conspiracy to commit a civil rights violation" is required. *Clark v. Clabaugh*, 20 F.3d 1290, 1296 (3d Cir. 1994) (holding that a question of fact existed for a jury to determine whether so-called "rumors" about motorcycle gangs coming into the town and of a race riot "was sufficiently reliable to constitute 'actual knowledge' of a § 1985 conspiracy"); *see Thompson v. Trump*, 590 F. Supp. 3d 46, 107-08 (D.D.C. 2022) (dismissing § 1986 claim for which plaintiff failed to plead facts that the defendants "knew of a tacit plan to prevent members of Congress from discharging their duties").

As best as the Court can discern, Plaintiffs rely on the alleged "participat[ion] in the [Westport] CID's network" by each defendant as raising a plausible inference of actual knowledge of a civil rights conspiracy centered around the "'Good Neighbor Agreement' scheme." (Doc. 293 at 19; *see* Doc. 403-1 at ¶¶ 439-41.) Plaintiffs' vague and conclusory allegations of participation or knowledge by merely existing within the Westport community and even having agreed to the Good Neighbor Agreement themselves is insufficient to state a plausible claim for relief under 42 U.S.C. § 1986. That AC Westport (Denver Biscuit), for example, "devised its own discriminatory strategy to exclude [Unikc]" and used "coded language for excluding African American patrons" (by referring to "hip hop and R&B" and the "type of crowd" Unikc would

39

draw), does not alone give rise to a plausible inference that AC Westport (Denver Biscuit) had actual knowledge of the broader conspiracy Plaintiffs allege as to the so-called Good Neighbor Agreement scheme. While the Court finds that Unikc alleges a plausible independent claim for race discrimination to survive a motion to dismiss, a separate claim under § 1986 requires more. The same is true of a § 1986 claim against non-CID board members DB Icehouse, Bartold, and Niebur, as well.

As to Westport Development, the Court again notes that Plaintiffs allege its principals— Hurt and Vos—are also CID board members. Under these circumstances, for the same reasons discussed above as to Count 5, the Court finds that the Second Amended Complaint alleges a plausible claim against Westport Development under 42 U.S.C. § 1986.

Accordingly, while Plaintiffs fail to state a claim for civil rights conspiracy under 42 U.S.C. § 1986 as to AC Westport (Denver Biscuit), DB Icehouse, Bartold, and Niebur, the Court finds that Plaintiffs do state a plausible claim for civil rights conspiracy against Westport Development (to the extent its alleged principals—Hurt and Vos are CID board members) to survive a motion to dismiss. AC Westport (Denver Biscuit), DB Icehouse, Bartold, and Niebur's motions to dismiss Count 7 for failure to state a claim are **GRANTED**, and Plaintiffs' third motion to amend is **DENIED in relevant part** because Count 7 of the proposed third amended complaint asserting a claim under 42 U.S.C. § 1986 against AC Westport (Denver Biscuit), DB Icehouse, Bartold, and Niebur is futile. Westport Development's motion to dismiss Count 7 for failure to state a claim is **DENIED**.

**F.     Count 8 – Tortious Interference with Contract, Count 9 – Tortious Interference with Business Expectancy, and Count 10 – Civil Conspiracy**

**[As to AC Westport (Denver Biscuit), DB Icehouse, Bartold, Niebur, Westport Development]**

In Count 8 of the Second Amended Complaint, Plaintiffs assert a claim for tortious interference with contract under Missouri state law. Plaintiffs reassert the same claim in the proposed third amended complaint. To state a claim for tortious interference with contract, a plaintiff must plausibly allege facts showing "(1) a contract; (2) defendant's knowledge of the contract; (3) intentional interference by the defendant inducing or causing a breach of the contract; (4) absence of justification; and (5) damages resulting from defendant's conduct." *Creative Compounds, LLC v. ThermoLife Int'l, LLC*, 669 S.W.3d 330, 340 (Mo. Ct. App. 2023) (internal quotation marks omitted).

Similarly, in Count 9 of both the Second Amended Complaint and proposed third amended complaint, Plaintiffs assert a claim for tortious interference with business expectancy under Missouri law. To state a claim for tortious interference with business expectancy, a plaintiff must plausibly allege facts showing (1) a valid business expectancy, (2) defendant's knowledge of the business expectancy, (3) intentional interference by the defendant, (4) absence of justification, and (5) damages. *CGB Diversified Servs., Inc. v. Baumgart*, 504 F. Supp. 3d 1006, 1022 (E.D. Mo. 2020).

Finally, in Count 10 of both pleadings, Plaintiffs assert a claim for civil conspiracy under Missouri law, premised on the tortious interference claims. As the Missouri Supreme Court has recognized, "[a]lthough civil conspiracy has its own elements that must be proven, it is not a separate and distinct action." *W. Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 22 (Mo. banc 2012). Instead, it is a theory of liability that "acts to hold the conspirators jointly and severally liable for the underlying act." *Id.* "To demonstrate a civil conspiracy existed, [Plaintiffs] must show: (1) two or more persons; (2) with an unlawful objective; (3) after a meeting of the minds; (4) committed at least one act in furtherance of the conspiracy; and (5) [Plaintiffs were] thereby damaged." *Id.*

### 1. AC Westport (Denver Biscuit)

As to the Second Amended Complaint, Unikc alleges that following the Denver Biscuit Company meeting where AC Westport (Denver Biscuit) raised concerns about Unikc's "type of crowd" and the music it would play (R&B and Hip Hop), AC Westport (Denver Biscuit) sent a cease-and-desist letter to DB Icehouse and expressed concerns with Unikc's tenancy with one of the owners of DB Icehouse (Bartold or Niebur). (Doc. 294 at ¶¶ 117, 120.) Thereafter, Unikc was locked out of the property and the lease ultimately terminated in a $100,000 settlement. Prior to the lease settlement, Bartold or Niebur told Unikc that "several neighboring business owners, including the owner of the Denver Biscuit, did not want [Unikc]'s 'type of crowd' to come to the Westport community and cause problems," (*id.* at ¶ 125). In the proposed third amended complaint, as set out above, Unikc clarifies that shortly after Unikc was initially locked out, Unikc learned that Bartold (co-owner of DB Icehouse) sent Niebur (co-owner of DB Icehouse) a cease-and-desist letter (not that AC Westport (Denver Biscuit) sent Niebur the letter). Nevertheless, consistent with the analysis above, the Court finds that although it is somewhat close, Unikc asserts

a plausible claim for tortious interference against AC Westport (Denver Biscuit) as to Unikc's lease of the property at 4140 Pennsylvania Avenue.

AC Westport (Denver Biscuit)'s motion to dismiss Counts 8 and 9 is **DENIED**.

### 2.    DB Icehouse, Bartold, and Niebur

The Court has little difficulty finding that Unikc fails to state plausible claims for tortious interference against DB Icehouse, Bartold, and Niebur, however. As a matter of Missouri law, "an action for tortious interference with a business expectancy [or contract] will lie against a third party only." *Farrow v. Saint Francis Med. Ctr.*, 407 S.W.3d 579, 602 (Mo. banc 2013) (internal quotation marks omitted; quotation modified). The primary case on which Unikc relies in opposition, *Lick Creek Sewer Systems, Inc. v. Bank of Bourbon*, 747 S.W.2d 317 (Mo. Ct. App. 1988), as supporting its assertion that "officers or agents of a business may be liable where they . . . act with improper means, including unlawful discrimination," (Doc. 354 at 13), was overruled in the relevant aspect by the Missouri Supreme Court in *Farrow*. *See Halderman v. City of Sturgeon*, 670 S.W.3d 193, 208 (Mo. Ct. App. 2023). DB Icehouse, Bartold, and Niebur, cannot be held liable for tortious interference with contract or business expectancy arising out of DB Icehouse's lease agreement with Unikc for the property located at 4140 Pennsylvania Avenue.

DB Icehouse, Bartold, and Niebur's motion to dismiss Counts 8 and 9 is **GRANTED**, and Plaintiffs' third motion to amend is **DENIED in relevant part** because Counts 8 and 9 of the proposed third amended complaint asserting claims for tortious interference against DB Icehouse, Bartold, and Niebur are futile.

### 3.    Westport Development

For the same reason, The Sourze fails to state tortious interference claims against Westport Development arising out of the lease agreement for 427 Westport Road. The Sourze's theory of tortious interference against Westport Development is premised on its "reversing its approval [for The Daiquiri Shop KC] based on racially coded stereotypes." (Doc. 377 at 8-9.) Westport Development cannot be held liable for tortious interference arising out of its lease agreement with The Sourze. Moreover, The Sourze also asserts in its motion-to-dismiss response brief that "[t]he [Second Amended Complaint] alleges that The Sourze had contracts with vendors, contractors, and service providers (SAC ¶¶ 73-80)," and that "Westport Development knew of these contracts because it approved the restaurant concept and reviewed architectural plans (SAC ¶¶ 59-63)." (*Id.* at 8.) While the allegations cited by The Sourze in its brief include that Westport Development

had "initially agreed to and approved of The Sourze's plans . . . to open a restaurant and bar as Daiquiri Shop," (Doc. 249 at ¶ 63), nothing in the cited paragraphs otherwise plausibly allege to any degree that The Sourze had any concrete or valid contract or actual business expectancy with any particular third party vendor, contractor, or service provider, let alone that Westport Development knew of any such contract or actual business expectancy.

Westport Development's motion to dismiss Counts 8 and 9 for failure to state a claim is **GRANTED**, and Plaintiffs' third motion to amend is **DENIED in relevant part** because Counts 8 and 9 of the proposed third amended complaint asserting claims for tortious interference against Westport Development are futile.

### 4. Civil Conspiracy

As to each of these defendants, Plaintiffs also assert liability for tortious interference based on a civil conspiracy theory primarily focused on the alleged broader "CID-centric" conspiracy to exclude or prevent Black/African American business owners from owning or operating businesses in the Westport community.

As discussed above, the principals of AC Westport (Denver Biscuit) and DB Icehouse are not CID board members. Plaintiffs' allegations of any meeting-of-the-minds as to these defendants are conclusory, speculative, and have no basis in the facts alleged in the Second Amended Complaint or the proposed third amended complaint. In addition, Plaintiffs cite no legal authority to support the proposition that—as to DB Icehouse, Bartold, and Niebur and Unikc—although a party to a contract cannot be held liable for tortious interference with that contract, they can nonetheless be held liable for conspiring to tortiously interfere with that contract. Plaintiffs point to no well-pleaded *facts* of any "coordinated lockout" or other "communication[], and joint pressure[]" to plausibly state a § 1985(3) civil rights conspiracy claim against DB Icehouse, Bartold, and Niebur to withstand a motion to dismiss under *Iqbal*/*Twombly*. AC Westport (Denver Biscuit), DB Icehouse, Bartold, and Niebur's motions to dismiss Count 10 for failure to state a claim are **GRANTED**, and Plaintiffs' third motion to amend is **DENIED in relevant part** because Count 10 of the proposed third amended complaint asserting a conspiracy theory of liability against AC Westport (Denver Biscuit), DB Icehouse, Bartold, and Niebur for tortious interference is futile.

As to Westport Development, however, its principals—Hurt and Vos—are also CID board members. Consistent with the Court's finding above, the Court concludes that Plaintiffs have stated plausible claims against Westport Development for tortious interference based on a

conspiracy theory of liability focused on the broader CID-centric conspiracy.  The same is true for Murfin, Inc.  Westport Development and Murfin, Inc.'s motions to dismiss Count 10 for failure to state a claim are **DENIED**.

> **G.**    **Count 11 – Antitrust Conspiracy**
>
> **[As to AC Westport (Denver Biscuit), DB Icehouse, Bartold, Niebur, Westport Development, and Murfin, Inc.]**

In Count 11 of the Second Amended Complaint, Plaintiffs assert an antitrust conspiracy claim under the Sherman Act and Missouri law.  Plaintiffs reassert the same claim in the proposed third amended complaint.

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce."  15 U.S.C. § 1.  To state a plausible antitrust claim under federal law, Plaintiffs must plausibly plead facts showing "(1) there was a contract, combination, or conspiracy; (2) the agreement unreasonably restrained trade under either a per se rule of illegality or a rule-of-reason analysis; and (3) the restraint affected interstate commerce."  *Sitzer v. Nat'l Ass'n of Realtors*, 420 F. Supp. 3d 903, 911 (W.D. Mo. 2019).  "[T]he crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express."  *Twombly*, 550 U.S. at 553 (internal quotation marks omitted; quotation modified).

A complaint alleging an antitrust conspiracy must include "enough factual material (taken as true) to suggest that an agreement was made," which requires more than mere "parallel conduct" because "[w]ithout more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."  *Id.* at 556, 557.  "However, an allegation of parallel conduct gets the complaint close to stating a claim"; "[w]ith further factual enhancement, plaintiffs can nudge their claims across the line from conceivable to plausible."  *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1069 (8th Cir. 2017) (internal quotation marks omitted; quotation modified).  Missouri's antitrust statute, § 416.031, RSMo, "closely parallels" the Sherman Act.  *Hanor & Bixler Farms, LLC v. Tyson Foods, Inc.*, No. 1:24-cv-00188-SEP, 2025 WL 2643787, at *6 (E.D. Mo. Sept. 15, 2015) (internal quotation marks omitted).

Plaintiffs' antitrust conspiracy theory here is largely premised on the same basis as its racial discrimination claims: the exclusion of Black/African American-owned businesses from Westport

44

as "implemented through the 'Good Neighbor Agreement' and coordinated threats regarding liquor licenses." (Doc. 293 at 28.)

First, Plaintiffs do not plausibly allege even parallel conduct to this alleged antitrust conspiracy as to AC Westport (Denver Biscuit) and DB Icehouse (including Bartold and Niebur). Unikc's lockout at 4140 Pennsylvania Avenue and the subsequent $100,000 settlement to unwind or terminate the lease is not plausibly connected with the enforcement of the Good Neighbor Agreement or any "coordinated threats" regarding a liquor license. Unikc does not allege that it ever sought or applied for a liquor license. Plaintiffs assert that "AC Westport [(Denver Biscuit)]'s overt act, contacting DB Icehouse and pressuring termination of [Unikc]'s lease demonstrates its participation in the conspiracy." (Doc. 293 at 28.) More is required to plausibly allege AC Westport (Denver Biscuit) and DB Icehouse's involvement with the antitrust conspiracy centered on the CID's Good Neighbor Agreement scheme, however. While the alleged "pressure" to terminate the lease had plausible racial overtones (to the extent AC Westport (Denver Biscuit) communicated similar concerns it had voiced to Unikc in the Denver Biscuit Company meeting regarding the "type of crowd" Unikc would bring and the R&B and Hip Hop music it would play to DB Icehouse), nothing (other than its timing) suggests that this episode was tied to or connected with the alleged anticompetitive CID-centric scheme to exclude Black/African American-owned businesses from Westport through the Good Neighbor Agreement and liquor-license consents.

Accordingly, the Court finds that Plaintiffs do not plausibly allege an antitrust conspiracy claim against these four defendants. *See Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 516-17 (8th Cir. 2018) (failure to plausibly plead parallel conduct or parallel activity to alleged anticompetitive conduct is fatal to an antitrust claim under the Sherman Act). AC Westport (Denver Biscuit), DB Icehouse, Bartold, and Niebur's motions to dismiss Count 11 for failure to state a claim are **GRANTED**, and Plaintiffs' third motion to amend is **DENIED in relevant part** as to Count 11 of the proposed third amended complaint asserting a claim for antitrust conspiracy against AC Westport (Denver Biscuit), DB Icehouse, Bartold, and Niebur.

As to Westport Development and Murfin, Inc., however, and again consistent with the Court's analysis above, because their alleged principals—Hurt and Vos—are CID board members, the Court concludes that at this juncture Plaintiffs plead a plausible antitrust conspiracy claim against Westport Development and Murfin, Inc. Westport Development and Murfin, Inc.'s motions to dismiss Count 11 for failure to state a claim are **DENIED**.

45

In addition, Westport CID and CID Board Members argue that proposed Count 11 in the proposed third amended complaint is futile and would not withstand a motion to dismiss. The Court notes, however, that the parties raise new issues in the briefing as to Plaintiffs' third motion to amend. Neither Westport CID nor CID Board Members' motions to dismiss address Count 11 as to the Second Amended Complaint (instead, they only argue that Count 12 should be dismissed for failure to state a claim). Plaintiffs assert a new primary theory of antitrust conspiracy in the proposed third amended complaint that the alleged coordination to "deny liquor-license consents," "impose unlawful Good Neighbor Agreements," "pressure landlords to terminate or refuse leases," and "eliminate Black-oriented establishments" constitutes "a per se unlawful group boycott," citing *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959). (Doc. 403-1 at ¶¶ 498, 499.) Westport CID and CID Board Members, among others, also assert a "group pleading" sufficiency-of-the-pleadings argument. These arguments all raise important issues that should be properly addressed with more complete briefing than what is currently before the Court as to Plaintiffs' third motion to amend. Accordingly, the Court declines to address the sufficiency of the proposed Count 11 as a pleadings matter. Defendants may, if they choose, raise any proper challenge to the sufficiency of Count 11 once the proposed third amended complaint is filed consistent with this Order.

### H.  Count 12 – Federal Civil RICO
**[As to Westport CID, CID Board Members, AC Westport (Denver Biscuit), DB Icehouse, Bartold, Niebur, Westport Development, and Murfin, Inc.]**

In Count 12 of the Second Amended Complaint, Plaintiffs assert a civil racketeering claim arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 *et seq.* Plaintiffs reassert the same claim in the proposed third amended complaint.

The federal RICO statute "provides a private right of action for any person injured in his business or property by reason of a violation of its substantive provisions." *UMB Bank, N.A. v. Guerin*, 89 F.4th 1047, 1052 (8th Cir. 2024) (internal quotation marks omitted). To state a federal civil RICO claim, Plaintiffs must allege plausible facts "to show (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Id.* at 1053 (internal quotation marks omitted). "RICO does not cover all instances of wrongdoing. Rather, it is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity." *Stonebridge Collection, Inc. v. Carmichael*, 791 F.3d 811, 822 (8th Cir. 2015) (internal quotation marks omitted).

46

As to the Second Amended Complaint, Plaintiffs largely failed to state a plausible RICO claim to the extent Plaintiffs failed to plausibly plead racketeering activity, let alone a pattern of racketeering activity as to each defendant.[36] The Second Amended Complaint alleges in a conclusory fashion that the predicate acts are coercion, extortion, and bribery under or concerning the Good Neighbor Agreement and liquor licenses for businesses in the Westport community, along with mail and wire fraud.

As to the predicate act of mail and wire fraud, the Court notes that nowhere in Count 12 of the Second Amended Complaint do Plaintiffs reference or include any alleged fraudulent communication by any Defendant to any Plaintiff. As best as the Court can discern, any reference to mail and wire fraud concerns The Sourze's allegation that "agents of Defendant Westport Development, LLC, [i.e., Hurt and Vos] falsely told the owner of The Sourze that the property was only fit to be a clothing store" while "the property was already zoned and deemed fit for a restaurant with a liquor license." (Doc. 249 at ¶¶ 69, 70.) However, these allegations do not satisfy the heightened pleading standard under Rule 9(b), which requires particularity and specificity as to "who, what, when, where, and how." *See Choi*, 2022 WL 526000, at *7-8 (applying Rule 9(b) to allegations of fraud-based predicate acts for a RICO claim). In their motion to dismiss briefing, Plaintiffs suggest that "Defendants used text messages, emails, and recorded communications to misrepresent material facts about property use and lease and licensing requirements." (Doc. 287 at 10.) But nowhere in the Second Amended Complaint do Plaintiffs allege how Westport Development allegedly transmitted its false statement to The Sourze. Because The Sourze does not allege, at a minimum, how these statements were communicated, it does not plausibly allege that these alleged false statements otherwise constitute mail or wire fraud as predicate acts for a civil RICO claim.

As to the alleged predicate acts of bribery, Plaintiffs similarly allege only in a conclusory and general fashion that "Defendants" (without any supporting facts as to any particular defendant)

---

[36] *See High Sch. Servicos Educacionais, LTDA. v. Choi*, No. 4:21-CV-00029-DGK, 2023 WL 10476025, at *7 (W.D. Mo. Jan. 13, 2023) ("The racketeering activity prong must be established by pleading two predicate acts committed by each Defendant." (collecting cases)); *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 358 (8th Cir. 2011) (finding that "Plaintiffs' RICO claim is fatally flawed because the complaint fails to adequately specify the predicate acts" and that "[w]e agree with the district court that while the complaint contains various and sundry boilerplate allegations, such allegations fail to meet the requirement of identifying two specific predicate acts for each Defendant" (internal quotation marks omitted; quotation modified)).

47

"are actively engaged in illegal racketeering through use of influence and bribery of Kansas City officials/agents and employees to control who receives and/or maintains a liquor license for prospective and/or established businesses in the Westport community." (Doc. 294 at ¶ 365.) As best as the Court can discern, Plaintiffs' assertion of "bribery" concerns liquor license consents as contemplated under the Kansas City Ordinances governing review of applications for liquor licenses.

Plaintiffs appear to rely on Missouri's bribery statutes, §§ 570.150 and 576.010, RSMo, which they assert "encompass the alleged conduct between Westport CID Defendants and private businesses through the Good Neighbor Agreement scheme," with the "Good Neighbor Agreement as the [bribery] mechanism . . . ." (Doc. 266 at 15.) Section 570.150 makes unlawful commercial bribery premised on a bribe or benefit to a fiduciary in exchange for that fiduciary "knowingly violating or agreeing to violate a duty of fidelity." § 570.150.1(1). Section 576.010 is Missouri's public-servant bribery statute, which makes it unlawful to bribe a public servant in return for some official action or favorable exercise of discretion by the public servant or to secure a violation of a known legal duty of the public servant. § 576.010.1.

As best as the Court can discern, the "Good Neighbor Agreement scheme" at least as between Westport CID/CID Board Members and private businesses in the Westport district is that, simply put, if a business owner signs the Good Neighbor Agreement, other Westport property owners and/or Westport CID itself will consent to (or will not oppose) that business owner's application for a liquor license with the Regulated Industries Division. It is not clear how Missouri's bribery laws would apply to that arrangement or interaction, and Plaintiffs do not provide any further legal authority or analysis. Moreover, Plaintiffs' allegation that defendants are engaged in "influence and bribery of Kansas City officials/agents and employees to control who receives and/or maintains a liquor license" is wholly conclusory and speculative with no supporting factual allegations. In short, Plaintiffs do not allege more than mere conclusions or labels how the "Good Neighbor Agreement scheme" constitutes bribery under Missouri state law as a predicate act supporting the federal civil RICO claim.

Finally, the Court considers what fundamentally is the primary predicate act underlying Plaintiffs' federal civil RICO claim—Hobbs Act extortion. Plaintiffs' theory of extortion, although somewhat unclear in the Second Amended Complaint, also appears to rely on the Good Neighbor Agreement plan implemented by Westport CID in 2013. Their theory appears to be that Westport

48

CID and CID Board Members "actually obtained or attempted to obtain the commercial lease and liquor license for themselves . . . [by] condition[ing] lease approvals and liquor license consents on execution of one-sided 'Good Neighbor Agreements.'" (Doc. 266 at 9.)  Plaintiffs then pivot in another motion-to-dismiss brief, suggesting that "the Defendants obtained and extorted money from individuals by threatening the liquor licenses of those who did not comply with the CID's 'one-sided' demands [i.e., the Good Neighbor Agreement]." (Doc. 287 at 8.)  Put another way, "Defendants . . . plac[ed] Westport property and business owners in fear of economic loss by threatening the loss of their liquor licenses." (*Id.* at 10.)

Under the Hobbs Act, extortion is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).  Plaintiffs are correct that extortion may include use or threat of "[f]ear of economic loss." *United States v. Rabbitt*, 583 F.2d 1014, 1027 (8th Cir. 1978). Plaintiffs' suggestion that "[e]xtortion by wrongful use of economic fear constitutes racketeering activity under federal law," (Doc.293 at 31), is imprecise, however.  Hobbs Act extortion requires more than a mere threat or inducing fear of economic harm toward another but also that some property (or something of value) is obtained by the extortioner.  *See Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 404-05 (2003) (interference with property right without acquisition of property or otherwise receiving "something of value" which "they could exercise, transfer, or sell" is not extortion under the Hobbs Act).  Put another way, when considering Hobbs Act extortion as a predicate RICO act, the extortionary mechanism (i.e. a threat of force, violence, or fear) is a separate element from what constitutes or concludes the ultimate extortionary act (i.e., "obtaining property from another").  Hobbs Act extortion "requires that the victim part with his property, and that the extortionist gain possession of it." *Sekhar v. United States*, 570 U.S. 729, 734 (2013) (internal quotation marks and citations omitted).

Plaintiffs' suggestion in their motion-to-dismiss briefs that Defendants obtained any money, commercial lease, or liquor license for themselves from Plaintiffs or anyone else in the Westport community through a threat of economic harm through the mechanism of the Good Neighbor Agreement (fundamentally by withholding consent for the anticipated liquor license application) is not supported by any well-pleaded factual allegation in the Second Amended Complaint.  Even accepting Plaintiffs' suggestion that a liquor license (like a commercial lease) is transferable property, Plaintiffs' corresponding theory of extortion (also primarily found in the

49

briefing rather than the Second Amended Complaint) that CID Board Members "pursued commercial leases and liquor license[s] for their own benefit" is not a plausible theory of extortion supported in any well-pleaded facts found in the Second Amended Complaint. Plaintiffs do not allege that any CID Board Member obtained a commercial lease or liquor license for their own benefit, whether related to one of the three properties at issue in this lawsuit or otherwise, to the detriment of Plaintiffs or any Black/African American business owner or other business owner through the economic fear of the Good Neighbor Agreement scheme.

In the proposed third amended complaint, Plaintiffs appear to somewhat clarify or shift their theory as to Hobbs Act extortion as the predicate act underlying the civil RICO claim.[37] Specifically, they include additional factual allegations concerning (1) Chapter 10 of the City Code, governing liquor licenses, and (2) the particular and specific "financial obligations, surveillance requirements, and operational restrictions" required or imposed under the Good Neighbor Agreement. (*See* Doc. 403-1 at ¶¶ 76-86, 101-04.) For example, Plaintiffs allege that the Good Neighbor Agreement requires:

> 78. . . . mandatory participation in the Westport Camera Program, installation of interior and exterior surveillance cameras with 14-day storage, providing video footage "immediately" to KCPD or Westport Public Safety, mandatory notification to Westport Public Safety before ejecting patrons, filing Tavern Disturbance Reports, enforcing "no loitering," "no weapons," and "no trespass" policies, and complying with CID-controlled nuisance standards . . . ;

> 79. . . . pay[ment] for off-duty Kansas City police officers, to allow CID-installed door alarms, and to restrict ingress and egress to a single entrance during CID-implemented screening periods.

(Doc. 403-1 at 16-17.) None of the defendants who opposed Plaintiffs' third motion to amend as to Count 12 meaningfully address these supplemental allegations.

As to the third motion to amend, Plaintiffs no longer present the theory that any defendant themselves obtained money, a lease, or a liquor license under the so-called Good Neighbor

---

[37] As to predicate acts of mail and wire fraud and bribery, Plaintiffs still fail to include sufficient factual allegations beyond mere labels, conclusions, and speculation. This includes Plaintiffs' additional allegations of Brody's alleged attempt to "bribe" Seals. Even if these allegations somehow fit within the bribery offenses under Missouri law as set out above (it is clear that they do not), rather than part of the Good Neighbor Agreement scheme involving liquor license applications, they are separate and not part of the alleged "pattern of racketeering activity" relevant to the federal civil RICO claim. (*See also* Doc. 403-1 at 90-92 (relying on these post-lawsuit allegations to assert a new claim for civil conspiracy against Brody, Allred, and 4128 Broadway, LLC).)

Agreement scheme. Instead, Plaintiffs' theory of extortion has shifted to focus on the Good Neighbor Agreement as the "extortionate tool" or "extortionate instrument" to the extent it requires certain operational and security restrictions, mandates, or requirements, and additional financial obligations of a business in exchange for consent to a liquor license application by the business. The financial outlays, property access, and operational restrictions Plaintiffs allege that are required under the Good Neighbor Agreement may constitute sufficient property or intangible business interests for purposes of Hobbs Act extortion. Again, no defendant substantively addresses this newly stated theory of Hobbs Act extortion focused on the Good Neighbor Agreement.

Another issue clarified in Plaintiffs' proposed third amended complaint that is relevant to the Hobbs Act extortion element of their civil RICO claim is whether Westport CID's use of the Good Neighbor Agreement is "wrongful." Plaintiffs appear to suggest that it is wrongful, *inter alia*, because it effectively imposes certain requirements on a business owner that are not otherwise required under the City Code to receive a liquor license, and because Westport CID uses the Good Neighbor Agreement as an unlawful quid pro quo for consents to liquor license applications.[38] (*See, e.g.*, Doc. 403-1 at ¶¶ 76, 86, 135.) No party has meaningfully addressed this question, either.

Accordingly, on this record and upon careful review of the proposed third amended complaint and the parties' briefing (including the motion-to-dismiss briefing), the Court finds that whether Count 12 as asserted in the proposed third amended complaint states a plausible federal civil RICO claim is better resolved after full briefing on a motion to dismiss or motion for summary judgment, considering the notable amendments and clarifications in the proposed third amended complaint in this regard.

Defendants' motions to dismiss Count 12 for failure to state a claim are **GRANTED in part** as to a civil RICO claim premised on predicate acts of mail/wire fraud and bribery, and Plaintiffs' third motion to amend Count 12 is accordingly **DENIED in relevant part** as to Count

---

[38] This argument of course presumes that Westport CID/neighboring business's consent is required to obtain a liquor license whether *de jure* or *de facto*. In this regard, Plaintiffs include additional allegations in the proposed third amended complaint, for example, that "Jim Ready and [the Regulated Industries Division] treated these private conditions as requirements for licensing approval or renewal," (Doc. 403-1 at ¶ 120), that the conditions were "incorporat[ed] . . . into licensing decisions or enforcement actions," (*id.* at ¶ 121), and that Ready "condition[ed] licensing approvals on compliance with" the Good Neighbor Agreement, (*id.* at ¶ 570). The Court makes no findings regarding the sufficiency of Plaintiffs' pleadings as to the new defendants who have not yet appeared in the case.

12 of the proposed third amended complaint asserting a civil RICO claim premised on predicate acts of mail/wire fraud and bribery.  Otherwise, Defendants' motions to dismiss Count 12 for failure to state a claim are **DENIED as moot in part** as to a civil RICO claim premised on the predicate act of Hobbs Act extortion.

I.  **Proposed Third Amended Complaint Count 14 – Fraudulent Misrepresentation**

   **[As to Westport Development and DB Icehouse]**

In Count 14 of the proposed third amended complaint, Plaintiffs assert a new claim for fraudulent misrepresentation against Westport Development and DB Icehouse (among other defendants[39]).  As relevant to these two defendants, Plaintiffs allege that they "knowingly made a series of false statements and omissions to Plaintiffs," including, *inter alia*, (1) "[r]epresenting that Westport Development and DB [Icehouse] would not interfere with Plaintiffs' business operations and would facilitate Plaintiffs' opening," (2) "[r]epresenting that Plaintiffs' use of the premises was permitted, authorized, and consistent with Westport's development plan," (3) "[c]oncealing that Defendants had already agreed internally to block, delay, or prevent Plaintiffs' opening because of racial animus, competitive motives, and pressure from other Westport tenants," and (4) "[c]oncealing that . . . DB [Icehouse] and Westport Development had no intention of honoring the lease as written and were simultaneously coordinating with [Westport] CID and [Westport Regional Business League] to impose arbitrary restrictions on Plaintiffs that were not imposed on similarly situated white-owned businesses."  (Doc. 403-1 at ¶ 556.)

Westport Development and DB Icehouse argue that Plaintiffs' new proposed claim for fraudulent misrepresentation fails to satisfy the heightened pleading requirement under Rule 9(b) of the Federal Rules of Civil Procedure.  Rule 9(b) requires a heightened pleading standard for fraud-based claims, including a Missouri state-law claim for fraudulent misrepresentation.  *See BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007).  Rule 9(b) requires a plaintiff to plead "such matters as the time, place and content of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby."  *Id.* (internal quotation marks omitted).  In other words, to satisfy Rule 9(b), a plaintiff

---

[39] Plaintiffs also appear to include in Count 14 claims for fraudulent misrepresentation against Brody and 4128 Broadway, LLC, neither of whom addressed Plaintiffs' third motion to amend. Accordingly, the Court does not consider the sufficiency of the pleadings as to Count 14 asserting a claim against Brody and 4128 Broadway, LLC.

must "identify the 'who, what, where, when, and how' of the alleged fraud." (*Id.*) Vague allegations presented in a group pleading format may fail to satisfy Rule 9(b)'s heightened pleading standard: "Casting . . . a broad net in pleading a claim grounded in fraud does not satisfy Rule 9(b)." *Streambend Props. II, LLC v. Ivy Tower Minneapolis, LLC*, 781 F.3d 1003, 1013 (8th Cir. 2015) ("Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." (internal quotation marks omitted)).

The Court agrees with Plaintiffs that Count 14 satisfies Rule 9(b) at least as to *some* claim(s) against *some* defendants (i.e., Westport Development). (*See* Doc. 419 at 3 (noting that Count 14 incorporates by reference the preceding paragraphs and explaining the "who, what, when, where, and how" as to The Sourze's claim for fraudulent misrepresentation against Westport Development).) As to DB Icehouse, however, Plaintiffs make no attempt to do the same. (*See* Doc. 424 at 13 (merely asserting—incorrectly—that the Court should not consider Rule 9(b)'s heightened pleading standard at the motion-to-amend stage[40]).) The only statement by Niebur or Bartold (and thus DB Icehouse) alleged in the proposed third amended complaint is that "several business owners, including the owner of the Denver Biscuit, did not want [The Sourze's] 'type of crowd' to come to the Westport Community and cause problems . . . ." (Doc. 403-1 at ¶ 251.) It is not clear how this statement could form the basis of any fraudulent misrepresentation claim against DB Icehouse.

Rather than an affirmative misrepresentation or statement, as best as the Court can discern, Plaintiffs really intend to assert a claim, particularly against DB Icehouse, for fraudulent omission, "a variation of fraudulent misrepresentation." *Cromeans v. Morgan Keegan & Co., Inc.*, No. 2:12-

---

[40] *See United States ex rel. Roop v. Hypoguard USA, Inc.*, 559 F.3d 818, 822-23 (8th Cir. 2009) (affirming district court order denying leave to amend for failure to satisfy Rule 9(b)).

Plaintiffs' citation to *Popp Telecom v. American Sharecom, Inc.*, 210 F.3d 928, 943-44 (8th Cir. 2000), as supporting the proposition that "[f]utility exists only where a proposed claim would clearly be subject to dismissal as a matter of law" is unavailing. (Doc. 424 at 13.) In *Popp Telecom*, the court of appeals found that the district court abused its discretion in denying leave to amend on futility grounds where the court of appeals disagreed that the doctrine of collateral estoppel applied to the proposed amended claims (which had been the basis for the district court's futility finding). To the extent a motion to amend under Rule 15(a)(2), even with a liberal amendment policy, considers futility of the proposed amendment— which is the same standard of review as a Rule 12(b)(6) motion to dismiss—consideration of whether a proposed amended complaint satisfies the heightened pleading standard under Rule 9(b) when it applies is proper.

cv-04269-NKL, 2014 WL 1901197, at *6 (W.D. Mo. May 13, 2014) (internal quotation marks omitted). Under this theory, "silence or nondisclosure of a material fact, when used as an inducement to another, can be an act of fraud, but only when an individual has a duty to speak." *Id.* (internal quotation marks omitted). The same Rule 9(b) factors apply to a claim premised on a fraudulent omission. *Ariel Preferred Retail Grp., LLC v. CWCapital Asset Mgmt.*, No. 4:10CV623SNLJ, 2011 WL 4501049, at *9 (E.D. Mo. Sept. 28, 2011) (under Rule 9(b) a plaintiff asserting a claim under the fraudulent omission theory "must allege what the omissions were, the person responsible for failing to disclose the information, the context of the omission and the manner in which it misled the plaintiff and what defendant obtained through the fraud").

At least as to DB Icehouse, if not the additional defendants as well against whom Plaintiffs seek to assert a fraudulent misrepresentation claim grounded in a fraudulent omission theory, the proposed third amended complaint does not satisfy the heightened pleading requirement under Rule 9(b) and is therefore futile. Neither the group-based pleadings in proposed Count 14 nor the portions of the proposed third amended complaint incorporated into proposed Count 14 provide the requisite specificity as to a fraudulent misrepresentation or fraudulent omission claim against DB Icehouse. Plaintiffs' third motion to amend is accordingly **DENIED in relevant part** as to Count 14 of the proposed third amended complaint asserting a fraudulent misrepresentation claim against DB Icehouse.[41]

## II.    Motion to Join

Next, Court considers Plaintiffs' second motion to join and assert claims against[42] several Westport CID-associated defendants—Westport Regional Business League, Chelsey Brown International, Tony Uredi, and Jason McGovern—as well as the Regulated Industries Division and

---

[41] The Court is also somewhat skeptical of Plaintiffs' fraudulent misrepresentation claim to the extent it appears to simply be a repackaging of the various breach of contract, tortious interference, and racial discrimination claims. *See Asbury Carbons, Inc. v. Sw. Bank, an M&I Bank*, No. 4:10-CV-878 (CEJ), 2011 WL 1086067, at *3 (E.D. Mo. Mar. 22, 2011) (finding that plaintiff failed to state a claim for fraudulent inducement under Missouri law premised on a theory that "defendant had already formed the intent to commit at least one of the above wrongs [i.e., arising from breach of contract, lack of good faith, and tortious interference] at the time it entered into the parties' agreement," where the plaintiff failed to allege that "defendant owed plaintiff any special duty of disclosure," a required element of a "claim for fraud by omission"). Neither Westport Development nor DB Icehouse substantively addressed this issue, however, at the motion-to-amend stage. Accordingly, the Court does not consider this issue further here.

[42] As reflected in the chart above on pages 20-21, Plaintiffs seek to assert existing claims against these new proposed defendants as well as add additional claims under 42 U.S.C. § 1983 against the Regulated Industries Division and Jim Ready.

54

its director, Jim Ready. Plaintiffs seek joinder under both Rule 19 (required joinder) and Rule 20 (permissive joinder) of the Federal Rules of Civil Procedure. (Doc. 402.)

As to required joinder under Rule 19,[43] Plaintiffs assert that each of these proposed new defendants are necessary parties to the extent "Plaintiffs seek injunctive and declaratory relief concerning the ongoing use of unlawful Good Neighbor Agreements, coordinated regulatory pressure, and discriminatory leasing and licensing practices." (Doc. 402 at 4.) First, it does not appear that Plaintiffs seek the broad "injunctive and declaratory relief" they assert, particularly involving the City defendants. The Good Neighbor Agreement is a private agreement put forth by Westport CID. As the Court previously recognized, "Rule 19 does not require joinder of each and every joint tortfeasor or co-conspirator." (Doc. 213 at 8 (quoting *Speaks Fam. Legacy Chapels, Inc. v. Nat'l Heritage Enters.*, No. 2:08-cv-04148-NKL, 2009 WL 2391769, at *8 (W.D. Mo. Aug. 3, 2009)).) Plaintiffs' perfunctory briefing does not establish that the Regulated Industries Division or Jim Ready, or any other proposed new defendant, are required parties under Rule 19(a).

The Court is persuaded, however, that these new defendants may be joined under Rule 20(a)(2)(1). The Court notes that no defendant filed an opposition to the second motion to join itself. Plaintiffs' claims against these new defendants appear to involve the same alleged conspiracies and underlying conduct, making permissive joinder appropriate.[44]

### III. Motion to Reconsider

Finally, the Court considers Plaintiffs' motion to reconsider the prior Order granting Shader's unopposed motion to dismiss as to the First Amended Complaint. (Doc. 430.)

As noted above in the "Procedural Posture" section of this Order, Plaintiffs Euphoric and Unikc filed—through prior counsel—a First Amended Complaint on February 7, 2025, asserting claims against Westport CID and its individual members, in addition to Drew Shader.[45] (Doc. 16.) As to Shader (as co-owner of AC Westport (Denver Biscuit)), the First Amended Complaint

---

[43] Rule 19(a)(1)(A) requires that a party is necessary to a lawsuit and must be joined if "in that person's absence the court cannot afford complete relief among existing parties."

[44] Although Plaintiffs' second motion to join does not reference the third co-owner of AC Westport (Denver Biscuit), Ashleigh Carter, she is named in the proposed third amended complaint alongside Shader and McGovern. The Court therefore construes the second motion to join as including Carter as well.

[45] The First Amended Complaint named Shader as a defendant "in his individual capacity and as a member of the Westport Community Improvement District." (Doc. 16 at 3.) To the extent this was intended to include Shader as a member of the CID Board of Directors, the Court notes that neither of the subsequent amended pleadings include Shader as a CID board member.

referenced the same Denver Biscuit Company meeting Shader had with Unikc, including that after the meeting,

(1) Shader "contacted representatives of DB Icehouse to discuss his displeasure with his new neighbor,"

(2) that "[i]n subsequent conversations with N[ie]bur and Bartold, [Unikc] was told that several neighboring business owners, including the owner of the Denver Biscuit [i.e., Shader], did not want [Unikc]'s 'type of crowd' to come to the Westport Community and cause problems," and

(3) that Shader ultimately "joined the civil conspiracy by contacting DB Icehouse to encourage them to terminate the lease entered into by Unikc for illegal reasons and without just cause," and that he did so "on behalf of and for the benefit of The Denver Biscuit." (*Id.* at ¶¶ 64, 66-68, 74, 157, 158.)

The First Amended Complaint accordingly asserted claims against Shader for civil conspiracy to engage in racial discrimination in violation of 42 US.C. § 1985, violation of 42 U.S.C. §§ 1981 and 1982, failure to prevent racial discrimination conspiracy in violation of 42 U.S.C. § 1986, tortious interference with contracts and business expectancy, and antitrust conspiracy, among others.

On May 16, 2025, Shader filed a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. 57.) Plaintiffs Euphoric and Unikc did not file a response to Shader's motion to dismiss within the deadline to do so. Instead, on June 13, 2025, two weeks after the response deadline expired, Plaintiffs Euphoric and Unikc filed a conclusory motion for leave to file a response out of time. (Doc. 64.) The motion did not cite any legal authority in support of the request, did not provide any reason or explanation for the failure to respond, and did not attach a proposed response brief.[46] The Court denied the motion without prejudice four days later on June 17, 2025, specifically noting that the motion for leave "cite[d] no legal authority" and "did not provide a reason why timely response was not made," and ultimately did "not provide[] any information for the Court to determine whether there was excusable neglect." (Doc.

---

[46] Although the motion states that a proposed reply brief was attached to the filing, Plaintiffs instead only attached a proposed order granting the motion for leave to file out of time (which was removed from the docket by the Clerk's Office pursuant to the Court's administrative policies and procedures).

67.) New counsel appeared in the case on behalf of Euphoric approximately one week later on June 25, 2025. (Doc. 71.)[47]

Neither Euphoric (then represented by new counsel) nor Unikc (then represented by prior counsel) filed anything further related to Shader's motion to dismiss. Accordingly, nearly one month later, on July 22, 2025, the Court granted Shader's motion to dismiss, finding that the motion was unopposed and Plaintiffs Euphoric and Unikc waived their claims against him by failing to respond to the motion to dismiss. (Doc. 99.) The Court noted, additionally, that "[e]ven if the Court overlooked Plaintiffs' waiver, dismissal is still warranted for the reasons explained in Defendant Shader's suggestions in support of his motion to dismiss." (Doc. 99 at 2 n.1.) No Plaintiff sought any further relief related to Shader's dismissal.

Instead, three months later, Plaintiffs filed the Second Amended Complaint, with leave of the Court.[48] (Doc. 249.) As detailed above, the Second Amended Complaint asserted claims against AC Westport (Denver Biscuit), rather than as to Shader directly or individually. Now, almost nine months later and after significant litigation in this case—including a third motion to amend the complaint that continues to be substantially similar in relevant respects to the Second Amended Complaint vis-à-vis Plaintiffs' claims against AC Westport (Denver Biscuit)—Plaintiffs seek reconsideration of the Court's July 22, 2025 Order granting Shader's unopposed motion to dismiss as to the First Amended Complaint.[49]

The Federal Rules of Civil Procedure do not expressly provide for reconsideration. As Plaintiffs recognize, the dismissal Order at issue is a non-final interlocutory order. Rule 54(b) of the Federal Rules of Civil Procedure contemplates that such a non-final interlocutory order "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."[50] Rule 54(b) recognizes the district court's "inherent power to reconsider

---

[47] Prior counsel remained as counsel-of-record for Unikc through early August 2025 when additional new counsel appeared on Unikc's behalf. (Docs. 72, 126; *see* Doc. 213.)

[48] The Sourze once again joined the lawsuit in the Second Amended Complaint alongside Plaintiffs Euphoric and Unikc.

[49] Although the motion to reconsider was filed on behalf of all three Plaintiffs, the Court notes that at the time of the dismissal Order, The Sourze had been removed from the case as a party-plaintiff when it was omitted from the First Amended Complaint.

[50] Alternatively, as Rule 54(b) also explains, a district court "may direct entry of a final judgment as to one or more, but fewer than all, claims or parties . . . [if] there is no just reason for delay." No party requested certification of the July 22, 2025 Order granting Shader's unopposed motion to dismiss as a final

and modify an interlocutory order any time prior to the entry of judgment." *K.C. 1986 Ltd. P'ship v. Reade Mfg.*, 472 F.3d 1009, 1017 (8th Cir. 2007). While "[t]he Court has substantial discretion in ruling on motions for reconsideration," relief should not ordinarily be granted unless reconsideration is necessary "to correct manifest errors of law or fact or to present newly discovered evidence." *Winkelmeyer v. DePuy Orthopaedic, Inc.*, No. 2:13-cv-04058-NKL, 2023 WL 2974480, at *1 (W.D. Mo. Apr. 17, 2023) (internal quotation marks omitted; quotation modified); *see Discount Tobacco Warehouse, Inc. v. Briggs Tobacco & Specialty Co., Inc.*, No. 3:09-CV-05078-DGK, 2010 WL 3522476, at *2 (W.D. Mo. Sept. 2, 2010).

In the Eighth Circuit, a motion for reconsideration as to a non-final or interlocutory order is governed under the standard established by Rule 60(b) of the Federal Rules of Civil Procedure. *Williams v. York*, 891 F.3d 701, 706 (8th Cir. 2018) ("[M]otions for reconsideration of non-final orders [are construed] as motions under Rule 60(b) of the Federal Rules of Civil Procedure." (citing *Broadway v. Norris*, 193 F.3d 987, 989 (8th Cir. 1999)); *Elder-Keep v. Aksamit*, 460 F.3d 979, 984 (8th Cir. 2006)). Thus, in the Eighth Circuit, a district court may grant relief from an interlocutory or non-final order for one of six enumerated reasons including, as relevant here, (1) for excusable neglect or (2) for "any other reason that justifies relief." In any case, relief under Rule 60(b) "may only be granted upon an adequate showing of exceptional circumstances." *Id.*

As the Eighth Circuit has recognized, the concept of excusable neglect is fundamentally "an equitable" consideration that "tak[es] into account . . . all relevant circumstances surrounding the party's omission," and considers "the danger of prejudice to the non-moving party, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Feeney v. AT&E, Inc.*, 472 F.3d 560, 563 (8th Cir. 2006) (internal quotation marks omitted). In the context of Rule 60(b)(1), in particular, "[t]he term 'excusable neglect' . . . is generally understood to encompass situations in which the failure to comply with a filing deadline is attributable to negligence." *Noah v. Bond Cold Storage*, 408 F.3d 1043, 1045 (8th Cir. 2005). However, excusable neglect "generally . . . does not include ignorance or carelessness on the part of an attorney." *Id.* In the context of failure to respond to a particular motion, "[w]hether the movant had a good reason for delay is a key factor in the analysis." *Feeney*, 472 F.3d at 563. Even

---

order under Rule 54(b). Nor would the Court be inclined to do so *sua sponte*.

without a good reason or explanation, though, reconsideration may be warranted "where other equitable considerations weigh strongly in favor" of the moving party. *Id.*

As to the "catchall" provision for relief under Rule 60(b)(6) (i.e., "any other reason that justifies relief"), the Supreme Court has made clear that relief "is available only in narrow [and extraordinary] circumstances." *BLOM Bank SAL v. Honickman*, 605 U.S. 204, 211 (2025) (internal quotation marks omitted). The Eighth Circuit has recognized, similarly to the relief available under Rule 60(b)(1) for excusable neglect, that negligence or even gross negligence by counsel (short of leaving the parties as if they were unrepresented) are not grounds for relief under Rule 60(b)(6). *Heim v. C.I.R.*, 872 F.2d 245, 247-48 (8th Cir. 1989); *see id.* at 247 ("We have generally held that neither ignorance nor carelessness on the part of an attorney will provide grounds for Rule 60(b) relief." (internal quotation marks omitted)); *Giles v. St. Luke's Northland-Smithville*, 908 F.3d 365, 370 (8th Cir. 2018) ("Rule 60(b)(6) has never been a vehicle for relief because of an attorney's incompetence or carelessness." (internal quotation marks omitted)).

Here, Plaintiffs argue that the dismissal of Shader must be reconsidered in light of what they assert is inadequate and deficient representation by their prior counsel. The Court acknowledges that prior counsel's representation, primarily in meeting certain case-management deadlines set out in the Court's Scheduling Order, does appear to have been lacking.[51] The Court disagrees with Plaintiffs' suggestion, however, that prior counsel's deficiencies go beyond mere professional negligence or even gross negligence and that prior counsel left Plaintiffs as if they were unrepresented to a degree or effect that would support reconsideration of the Court's July 22, 2025 Order granting Shader's unopposed motion to dismiss as to the First Amended Complaint.

Prior counsel quickly recognized his failure to respond and attempted to resolve the deficiency by filing a motion for leave (albeit without citing the proper legal standard, giving any reason for the failure to respond, or attaching a proposed response). Neither prior counsel nor new

---

[51] Plaintiffs Euphoric and Unikc's prior counsel also missed the expert disclosure deadline established under the initial Scheduling Order. (*See* Doc. 102 (denying in part Plaintiffs' motion to amend the Scheduling Order to the extent they requested an extension to the expert disclosure deadline that had already expired); Doc. 268 (denying Unikc's motion to amend the Scheduling Order to extend the expired expert designation deadline, finding that prior or current counsel's inadvertence or mistake did not constitute "good cause" under Rule 16(b) to amend the Scheduling Order as to the then-expired expert disclosure deadline); Doc. 376 (denying Euphoric and Unikc's motion to reconsider extending the expired expert designation deadline but granting The Sourze's request to extend the expert designation deadline since it was not a party at the time the deadline originally expired).)

59

Case 4:25-cv-00023-RK    Document 476    Filed 06/03/26    Page 59 of 65

counsel who had by then appeared in the case on behalf of Euphoric otherwise addressed Shader's unopposed motion to dismiss within the month after the Court denied <u>without prejudice</u> the initial motion for leave to file a response out of time. The record demonstrates, at best, negligence and potentially even gross negligence in prior counsel's representation of Plaintiffs in this regard but not full abandonment. *See also Heim*, 872 F.2d at 248-49 (distinguishing the alleged attorney negligence or gross negligence in that case from other out-of-circuit cases where counsel failed to make necessary filings in each respective case (1) where the counsel had "a total of fifty-three clients . . . and that in each case the attorney had failed to make the necessary filings," and (2) where the counsel failed to file a brief opposing summary judgment "due to a mental disorder of the counsel" (citing *Boughner v. Sec'y of Health, Educ. & Welfare*, 572 F.2d 976, 977 (3d Cir. 1978) and *United States v. Cirami*, 563 F.2d 26, 33-34 (2d Cir. 1977))).[52]

Plaintiffs (and more precisely their principals) are entrepreneurs. They are established businessmen. While they may regret their decision to hire prior counsel to represent them in this matter, they "cannot now avoid the consequences of the acts or omissions of [their] freely selected agent." *Link v. Wabash R. Co.*, 370 U.S. 626, 633-34 (1962). Although prior counsel appears to have provided lackluster representation of Plaintiffs in some respects in this case—again, mainly

---

[52] This case is fundamentally different from *Klapprott v. United States*, 335 U.S. 601, 613-15 (1949), on which Plaintiffs also rely. (Doc. 431 at 7.) In that case, the district court entered default judgment in an action to cancel Klapprott's naturalization after he failed to appear in that case. *Id.* at 603. (Klapprott was a German by birth who had been granted U.S. citizenship pursuant to a certificate of naturalization upon taking an oath renouncing his allegiance to Germany.) One month after he had been served in the civil denaturalization case but before expiration of the 60-days to appear, Klapprott had been arrested on other federal criminal charges and confined in a New York jail. *Id.* at 603. After finding the default judgment of denaturalization to be void under federal law, *id.* at 608-13, the Supreme Court also held relief under Rule 60(b) was warranted because the facts "reveal far more than a failure to defend the denaturalization charges due to inadvertence, indifference, or careless disregard of consequences." *Id.* at 613. To the contrary, the Supreme Court found that the record showed that Klapprott had not merely

> neglected to act in his own defense, but that in jail as he was, weakened from illness, without a lawyer in the denaturalization proceedings or funds to hire one, disturbed and more fully occupied in efforts to protect himself against the gravest criminal charges, he was no more able to defend himself in the New Jersey court than he would have been had he never received notice of the charges.

*Id.* at 614.

Plaintiffs' prior counsel, even if negligent or grossly negligent in some aspects of his representation of Plaintiffs otherwise acted for Plaintiffs as counsel in this action in various substantive ways. Plaintiffs, represented by retained counsel, are in a fundamentally different position than Klapprott who was unable to obtain counsel and otherwise prevented from appearing pro se in the denaturalization matter.

60

as to meeting certain deadlines—he otherwise meaningfully and substantively litigated Plaintiffs case including by obtaining leave to file the First Amended Complaint (which was largely the foundation on which Plaintiffs' subsequent amended pleadings filed by new counsel was based which primarily supplemented and expanded on the First Amended Complaint) and participated in initial discovery and motions practice. Prior counsel's failure to respond to Shader's motion to dismiss or to properly seek leave to do so out of time despite being given ample opportunity by the Court, even if negligent or grossly negligent, does not support the extraordinary remedy Plaintiffs seek here.

In addition, the late timing of Plaintiffs' motion to reconsider by new counsel itself weighs against the extraordinary relief they pursue here. First, the motion to reconsider was filed after the Scheduling Order deadline expired to amend the pleadings and to add parties.[53] Second, following Shader's dismissal under the First Amended Complaint, and over the course of the next eight

---

[53] The Court acknowledges that the deadline to join parties and amend pleadings expired one day before the motion for reconsideration was filed. Plaintiffs were well aware of this deadline, however. In fact, they emphasized in the briefing as to the second motion to join and third motion to amend that those two motions were filed one month before the Scheduling Order deadline to join parties and amend pleadings. In their reply brief to the motion to reconsider, Plaintiffs argue only that the Rule 16 Scheduling Order deadline to join parties and amend pleadings does not apply to the motion to reconsider. The Court is not persuaded. Shader was dismissed as a defendant under the First Amended Complaint. Had Plaintiffs not amended the complaint following that dismissal Order, that argument might hold slightly more water. Following this Order, this case will proceed under a third amended complaint. "It is well-established that an amended complaint supercedes [*sic*] an original complaint and renders the original complaint without legal effect." *In re Atlas Van Lines, Inc.*, 209 F.3d 1064, 1067 (8th Cir. 2000). To return Shader as a defendant in this case would require a fourth amended complaint. Plaintiffs cannot use the procedural mechanism of reconsideration to do what they would not otherwise be entitled to do at this juncture absent further explanation or reasons they have not provided.

Nevertheless, the Court does not apply the Scheduling Order deadline as dispositive but, as explained above, the Court addresses the motion to reconsider otherwise in full. The Court disagrees with Plaintiffs' suggestion that the Scheduling Order deadline is wholly irrelevant. At a minimum, the current procedural posture in which Plaintiffs' motion for reconsideration was filed is necessarily a part of the Court's equitable reconsideration analysis. It not only goes to the timeliness and diligence factors as to the relief sought, but also the consideration of prejudice to the non-moving parties.

As this case has time and again reflected, the Court's Rule 16 Scheduling Order deadlines are meaningful and will be enforced. This is not to say that a district court's scheduling order deadlines are concrete and immovable. Indeed, the Federal Rules of Civil Procedure provide great discretion to the district court to extend deadlines, particularly when requested by a party before that deadline had expired. But once a deadline has expired, the Court's analysis when asked to do late what was required to be accomplished earlier is somewhat more limited and stringent and takes into account the other animating principles of litigation practice in our federal court system including fairness, judicial economy, finality, and docket or case management considerations. A motion to reconsider, while an exercise of the Court's discretion, necessarily takes into account similar considerations under Rule 60(b).

months, Plaintiffs (represented by new counsel) obtained leave to file a Second Amended Complaint and fully briefed a motion for leave to file a third amended complaint. In both amended pleadings, Plaintiffs added additional claims and parties but also reasserted and maintained the same principal factual allegations as the First Amended Complaint. Notably, as indicated above, the subsequent amended pleadings reasserted the same facts as to Shader but functionally replaced Shader with Defendant AC Westport (Denver Biscuit). In other words, for the last eight months, Plaintiff's strategy was to rely on Shader's alleged conduct or acts to hold AC Westport (Denver Biscuit)—which Shader co-owns—liable under agency principles. Thus, until this late stage, Plaintiffs did not otherwise seek to reassert or continue to pursue a claim against Shader individually following the Court's Order dismissing Shader under the First Amended Complaint.

Plaintiffs' motion for reconsideration as to the dismissal of Shader individually (at the motion-to-dismiss stage under the First Amended Complaint) was anything but prompt. *Cf. Union Pac. R.R. Co. v. Progress Rail Servs. Corp.*, 256 F.3d 781, 783 (8th Cir. 2001) (reversing district court's denial of relief under Rule 60(b)(1) for a party's failure to file an answer because of a "recording error by [the defendant's] legal department," noting that "nor did Progress Rail act negligently over a long period of time despite receiving warnings about its omission" but instead that Progress Rail took action "as soon as [it] had notice of the default judgment," including immediately engaging in negotiations with Union Pacific to have the default judgment set aside and then by seeking relief in the district court "only three weeks after it had notice of the default and less than six months after Union Pacific filed its complaint"). In the intervening months and as this case continued to develop, Plaintiffs simply chose a different course of action and different litigation strategy that did not involve reasserting claims against Shader individually. Having chosen and maintained a litigation strategy and posture seeking relief only against AC Westport (Denver Biscuit) and not Shader individually, Plaintiffs will not be permitted at this late stage to change course.

Whether under Rule 60(b)(1) for excusable neglect or Rule 60(b)(6) for other extraordinary circumstances, the Court finds that reconsideration of the prior Order granting Shader's unopposed motion to dismiss is not warranted for the reasons explained above. Plaintiffs' motion for reconsideration is **DENIED**.

**Conclusion**

Accordingly, after careful consideration and review, the Court **ORDERS** that:

First, as to the interrelated claims of Defendants' motions to dismiss and Plaintiffs' third motion to amend:  Defendants' motions to dismiss are **GRANTED in part** as to the Second Amended Complaint, and Plaintiffs' third motion to amend is **DENIED in relevant part** to file the proposed third amended complaint, as set out specifically in the following chart.  Additionally, Plaintiffs' third motion to amend is **DENIED in part** as to proposed Count 14 asserting a claim for fraudulent misrepresentation against DB Icehouse, LLC.  Subject to the foregoing, Plaintiffs' third motion to amend is otherwise **GRANTED**, and Defendants' motions to dismiss are **DENIED as moot in relevant part**.

*Claims for which Defendants' motions to dismiss are granted in part and Plaintiffs' third motion to amend is denied in relevant part*:

| Count | Claim | Defendants Dismissed from the Claim |
|---|---|---|
| 1 | Breach of Contract | Westport Development, LLC; Murfin, Inc.; Hurt; Vos |
| 4 | 42 U.S.C. § 1982 | Westport Development, LLC; Murfin, Inc. |
| 5 | 42 U.S.C. § 1985 | AC Westport (Denver Biscuit); DB Icehouse, LLC; Bartold; Niebur |
| 6 | 42 U.S.C. § 1981 | Murfin, Inc. |
| 7 | 42 U.S.C. § 1986 | AC Westport (Denver Biscuit); DB Icehouse, LLC; Bartold; Niebur |
| 8 | Tortious Interference (Contract) | Westport Development, LLC; DB Icehouse, LLC; Bartold; Niebur |
| 9 | Tortious Interference (Business Expectancy) | Westport Development, LLC; DB Icehouse, LLC; Bartold; Niebur |
| 10 | Civil Conspiracy | AC Westport (Denver Biscuit); DB Icehouse, LLC; Bartold; Niebur |
| 11 | Antitrust Conspiracy | AC Westport (Denver Biscuit); DB Icehouse, LLC; Bartold; Niebur |
| 12 | RICO (premised on predicate acts of mail/wire fraud and bribery) | All Defendants |

63

Second, as to the remaining motions, (1) Plaintiffs' second motion to join is **GRANTED** pursuant to Rule 20 of the Federal Rules of Civil Procedure, and (2) Plaintiffs' motion to reconsider the dismissal of Defendant Shader is **DENIED**.

Subject to the Court's Order as set out above, Plaintiffs shall file the Third Amended Complaint **on or before June 8, 2026**.  Upon doing so, consistent with the Court's rulings herein, the following claims remain:

| Count | Claim | Plaintiff(s) | Defendant(s) |
|---|---|---|---|
| 2 | Declaratory Relief (4128 Broadway Lease Agreement) | Euphoric | 4128 Broadway, LLC, Brody |
| 3 | Breach of Contract | Euphoric | 4128 Broadway, LLC, Brody |
| 4 | Race Discrimination (42 U.S.C. § 1982) | All Plaintiffs | All Defendants *except* Westport Development, LLC; Murfin, Inc. |
| 5 | Conspiracy, Race Discrimination (42 U.S.C. § 1985) | All Plaintiffs | All Defendants, *except* AC Westport (Denver Biscuit); DB Icehouse, LLC; Bartold; Niebur |
| 6 | Race Discrimination (42 U.S.C. § 1981) | All Plaintiffs | All Defendants, *except* Murfin, Inc. |
| 7 | Failure to Prevent Race Discrimination (42 U.S.C. § 1986) | All Plaintiffs | All Defendants, *except* AC Westport (Denver Biscuit); DB Icehouse, LLC;  Bartold; Niebur |
| 8 | Tortious Interference with Contract | All Plaintiffs | All Defendants, *except* Westport Development, LLC; DB Icehouse, LLC; Bartold; Niebur |
| 9 | Tortious Interference with Business Expectancy | All Plaintiffs | All Defendants, *except* Westport Development, LLC; DB Icehouse, LLC; Bartold; Niebur |
| 10 | Civil Conspiracy | All Plaintiffs | All Defendants, *except* AC Westport (Denver Biscuit); DB Icehouse, LLC; Bartold; Niebur |

| | | | |
|---|---|---|---|
| 11 | Antitrust Conspiracy | All Plaintiffs | All Defendants, *except* AC Westport (Denver Biscuit); DB Icehouse, LLC; Bartold; Niebur; Ready; and Uredi |
| 12 | Violation of RICO (18 U.S.C. § 1962 *et seq.*) *predicate acts of Hobbs Act extortion only | All Plaintiffs | All Defendants |
| 13 | Civil Conspiracy | Euphoric | Brody; Allred; 4128 Broadway, LLC |
| 14 | Fraudulent Misrepresentation | All Plaintiffs | Brody; 4128 Broadway, LLC; Westport Development, LLC |
| 15 | 42 U.S.C. § 1983 – *Monell* Liability | All Plaintiffs | Regulated Industries Division; Ready (official capacity) |
| 16 | 42 U.S.C. § 1983 – Equal Protection | All Plaintiffs | Ready (individual capacity) |
| 17 | 42 U.S.C. § 1983 – *Monell* Liability, Failure to Train/Supervise | All Plaintiffs | Regulated Industries Division |

**IT IS SO ORDERED**.

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED: June 3, 2026

65